Case number:

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

In re Application of Eli Sabag for an Order
Pursuant to 28 U.S.C. § 1782 to Conduct
Discovery for Use in a Foreign Proceeding

## DECLARATION IN SUPPORT OF APPLICATION
## FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE
## TO OBTAIN DISCOVERY FOR USE IN A FOREIGN PROCEEDING

I, Peter Bibby, under the penalty of perjury, hereby swear pursuant to 28 U.S.C §1746 that the
following is true and correct.

## INTRODUCTION

1.  I submit this declaration in support of the application submitted by Mr Eli Sabag ("**Mr
    Sabag**") for an order under 28 U.S.C. § 1782 (the "Application") permitting Mr Sabag to
    take discovery in the form of documents and deposition testimony from Marion County
    Community Corrections ("**MCCC**") and certain specified employees of MCCC including
    its former Director, John Deiter (**"Mr Deiter"**), and deposition testimony from certain
    employees of Marion County in the Southern District of Indiana.

2.  I am an attorney in the London, England office of Brown Rudnick LLP ("**BR**"), an
    American-based law firm, and a Partner in BR's White Collar Defense and Government
    Investigations Group. I specialize in contentious financial regulation and enforcement.  I
    advise clients in relation to the powers of the UK financial regulators and in particular the
    Financial Conduct Authority ("**FCA**"). The FCA has regulatory; civil; and criminal
    powers to deal with financial impropriety.

3.  I was admitted to practice as a solicitor of England and Wales in 1989.  I received my
    Bachelor of Laws degree from the University of Manchester in 1986, and completed the
    Legal Practice Course at Chester College of Law in 1987.  I was employed by the
    Financial Services Authority ("**FSA**") (the predecessor of the FCA) as a Head of
    Department in the Enforcement Division between 1998 and 2001.  Since leaving FSA, I
    have on occasion been appointed as a "skilled person" under s166 of the Financial
    Services and Markets Act ("**FSMA**") to make reports to the FSA.

4.  As discussed further below, I have been asked to advise Mr Sabag in connection with the criminal complaint that he intends to bring in the United Kingdom.

5.  The requested discovery is for evidence for use in Mr Sabag's intended criminal complaint in the UK against Mr Lars Windhorst (**"Mr Windhorst"**).  Based on knowledge and belief Mr Windhorst was based in London and operated out of London at the time of the relevant events.[1]

6.  In summary Mr Sabag alleges that Mr Windhorst committed offences under:

(i)     s89 of the Financial Services Act 2012[2], by making false or misleading statements and dishonestly concealing material facts from Mr Sabag with the intention of inducing Mr Sabag to enter into an agreement to sell the whole of his share capital in GPS Global Tracking & Surveillance System Ltd (**"GPS Global"**) to Track Group Inc. (**"Track Group"**), (the **"Misleading Statements Offence"**);

(ii)    s1 of the Fraud Act 2006[3], by dishonestly making false representations to Mr Sabag with the intention of making a gain for Track Group and exposing Mr Sabag to a loss (the **"Fraud by False Representations Offence"**);

(iii)   s6 of the Bribery Act 2010[4], if Mr Windhorst or those acting on his behalf offered a financial or other advantage to a foreign public official, namely Mr Deiter as the former Director of MCCC, with the intention to influence the official in his duties in relation to MCCC's May 2016 agreement with Track Group so as to gain a business advantage (the **"Bribery Offence"**);

---

[1]   In March 2014 Mr Windhorst's address was 21 Chesham Place, SW1X 8HG London United Kingdom.  LWO Limited (Company number 09767851), a company of which Mr Windhorst is a director filed a Notice of Change of Particulars for Mr Windhorst on 15 September 2016 asserting that he had become usually resident in Monaco on 23 March 2016.  However, Mr Windhorst's business address remained 6th Floor, 23 Saville Row, London W1S 2ET.

[2]   s89 of the Financial Services Act 2012 provides that it is a criminal offence for a person to  make a statement which he knows is false or misleading in a material respect, or makes a statement which is false or misleading in a material respect being reckless as to whether it is; or dishonestly conceals any material facts whether in connection with a statement made by the person or otherwise with the intention of inducing or being reckless as to whether it may induce another person to enter into an agreement to sell shares.

[3]   s1 of the Fraud Act 2006 makes it an offence for a person to act in breach of s2 of the Fraud Act.  It is a breach of s2 for a person dishonestly to make a false representation, intending by making that representation to make a gain for himself or another or to cause loss to another or expose another to a risk of loss.  A representation is false if it is untrue or misleading and the person making it knows that it is or might be untrue or misleading.

[4]   s6 of the Bribery Act 2010 provides that it is a criminal offence for a person to offer, promise, or give a financial or other advantage to a foreign public official if their intention is to influence the official in his official capacity in order for the offender to gain or retain an advantage in the conduct of business.

(iv)     s1(1) of the Criminal Law Act 1977 by conspiring with others (discussed below) to commit the Misleading Statements Offence, the Fraud by False Representations Offence and the Bribery Offence (the **"Conspiracy Offence"**);[5]

(v)      Conspiracy to defraud contrary to common law by conspiring with others (discussed below) to dishonestly prejudice or to take the risk of prejudicing Mr Sabag's economic rights (the **"Conspiracy to Defraud Offence"**).[6]

7.   A person found guilty of the Misleading Statements Offence is liable to a maximum term of imprisonment of 7 years.[7]  A person found guilty of the Fraud by False Representations Offence is liable to a maximum term of imprisonment of 10 years.[8]  A person found guilty of the Bribery Offence is liable to a maximum term of imprisonment of 10 years.[9]  Where a person is found guilty of the Conspiracy Offence, the same penalties apply as to the underlying substantive offences.[10]  A Person found guilty of the Conspiracy to Defraud Offence is liable to a maximum term of imprisonment of 10 years. There is no limitation period within which a prosecution must be brought for those offences.

8.   I understand that Mr Sabag's Application seeks discovery from MCCC and various employees of Marion County and MCCC relating to, amongst other things: (1) A commercial agreement between MCCC and Track Group dated May 5, 2016, and any subsequent amendments or extensions, between MCCC and Track Group under which Track Group agreed to provide electronic Monitoring services and/or tracking units to MCCC for an 18 month period (the **"MCCC Agreement"**); (2) communications between employees of MCCC and Marion County relating to the MCCC Agreement, and the original request for proposal or equivalent request from MCCC that gave rise to the submission from Track Group that led to the MCCC Agreement; (3) communications

---

[5]   Section 1(1) of the Criminal Law Act 1977 states: "if a person agrees with any other person or persons that a course of conduct shall be pursued which, if the agreement is carried out in accordance with their intentions, either will necessarily amount to or involve the commission of any offence or offences by one or more of the parties to the agreement, or would do so but for the existence of facts which render the commission of the offence or offences impossible he is guilty of conspiracy to commit the offence or offences in question."

[6]   Conspiracy to defraud is an offence in the UK at common law. It is specifically preserved as an offence by s.5(2) of the Criminal Law Act 1977. The offence occurs when two or more persons conspire together to dishonestly prejudice another's right knowing that they have no right to do so (Welham v DPP [1961] A.A 103 HL). The offence is not confined to a risk of possible injury resulting in economic loss though most cases do involve this.  Where, however, an allegation of conspiracy to defraud is based on economic loss, it is necessary for the prosecution to prove that the victim had a right or interest which was capable of being prejudiced either by actual loss or by being put at risk.  (Adams v. R. [1995] 2 Cr.App.R. 295, PC)

[7]   Financial Services Act s92(1)(b).

[8]   Fraud Act 2006 s1(3)(b).

[9]   Bribery Act s11(1)(b).

[10]  s3 of the Criminal Law Act 1977 states: "Where …. the relevant offence or any of the relevant offences is punishable with imprisonment, the person convicted shall be liable to imprisonment for a term not exceeding the maximum term provided for that offence."

between employees of MCCC and employees or agents acting on behalf of Track Group relating to the MCCC Agreement, and (4) the original request for proposal or equivalent request from MCCC that gave rise to the submission from Track Group that led to the MCCC Agreement.

9.  The discovery sought by Mr Sabag is to establish the extent to which the term of the MCCC Agreement was manipulated so that it would not count towards the earn-out targets to which Mr Sabag agreed when he sold GPS Global to Track Group. I have been asked, among other things, to comment on the extent to which the discovery sought by Mr Sabag in his Application may be used by Mr Sabag for the purpose of his intended criminal complaint.

10. The facts set out in this Declaration are based on documents that I have reviewed and information with which I have been provided. The documents to which I refer are at Attachment 1 to this Declaration.  I also rely on the facts as set out in the memorandum in support of the Application that has been submitted on behalf of Mr Sabag by Mr Offer Korin and Ms Courtney Caprio ("**the U.S. Memorandum**") to which I make reference in this Declaration. This Declaration is structured as follows:

| | |
|---|---|
| **I.** | **Facts** |
| **II.** | **Mr Sabag's allegations** |
| **III.** | **The relevant criminal offences** |
| **IV.** | **Analysis of the "mandatory" and "discretionary" tests under 28 U.S.C. § 1782** |

## I.   Facts

11. Mr Sabag is a citizen of Israel who was, until March 2014, the owner and sole shareholder of GPS Global, an Israeli Company which he founded and expanded.  GPS Global manufactured a lightweight GPS prison tracking device called "Shadow." Track Group (then known as SecureAlert) was a Utah Corporation with a primary business office in Indianapolis, Indiana.  Track Group was, and is, a publicly traded company whose shares are traded over the counter on OTCQX. Track Group specialized in both prison monitoring services and the sale of GPS prison tracking devices.  GPS Global was attractive to Track Group because Track Group was looking for a smaller "flagship" GPS prison tracking device for its prison monitoring business.

12. Mr Windhorst was the owner of Sapinda Asia Limited ("**Sapinda**").  Sapinda was the largest shareholder in Track Group and, in March 2014, owned approximately 45% of the shares in Track Group. Mr Windhorst was neither a director nor an employee of Track

Group.  Mr Windhorst, who was based in London[11], initiated negotiations for the acquisition of GPS Global by Track Group (the "**Acquisition**") in 2013 through a series of meetings, first in Israel and then in London.

13. At a first meeting in Israel, Mr Windhorst met with Mr Sabag without any representative from Track Group. At the second meeting in London between October 6 and 8, 2013, Mr Windhorst again met initially with Mr Sabag without representatives of Track Group.  The meetings in London lasted over a number of days and, during those meetings, Mr Windhorst introduced Mr Sabag to Mr Guy Dubois who was the Chief Executive of Track Group at the time ("**Mr Dubois**").  Mr Dubois had been appointed to the Board of Directors of Track Group by Mr Windhorst in December 2012.[12] Mr Windhorst and Mr Dubois thereafter co-negotiated the terms of the Acquisition.  Mr Windhorst also introduced Mr Sabag to a representative of Sapinda, Tatiana Cohen ("**Ms Cohen**") who operated out of London[13] and acted on Mr Windhorst's instructions and negotiated with Mr Sabag.

14. The negotiations for the Acquisition were difficult because Mr Sabag was not prepared to enter into an agreement to sell his shares in GPS Global for consideration solely in Track Group shares, many of which would have sale restrictions under U.S Securities laws.  Mr Sabag was aware that the market for Track Group shares was mostly illiquid and that there was a risk that the price of the Track Group shares could fall significantly before the restrictions on the shares that he received had lapsed.  Throughout the negotiations Mr Sabag made clear that he would be prepared to sell his shares in GPS Global for a consideration in excess of $7.5 million in cash.  Mr Windhorst and Mr Dubois, in turn, made it clear that Track Group was not prepared to purchase GPS Global for a cash consideration of $7.5 million, but would instead offer shares in Track Group for the bulk of the consideration.

---

[11]  Mr Windhorst first made Mr Sabag a written offer of a put option from Sapinda guaranteed by him on 13 October 2013. The offer was in relation to 500,000 shares in Track Group with a strike price of $20 exercisable 2 years after the sale of GPS Global.  The offer was addressed to Mr Sabag and was e-mailed by Ms Cohen to Mr Sabag copying Mr Windhorst on the e-mail. The offer confirmed that Mr Windhorst's address was, at that time, Apartment D.03.1 One Hyde Park, The Residence at Mandarin Oriental, 100 Knightsbridge, London, SW1X 7LJ, United Kingdom. The offer was signed by Mr Windhorst and the signature page gives London as the location where it was signed [Pages1 -4 of Attachment 1]. The executed Put Option Agreement in favour of Mr Sabag over Track Group shares dated 16 March 2014, states that Mr Windhorst's address was, at that time, 21 Chesham Place, SW1X 8HG London United Kingdom [Page 60 of Attachment 1].

[12]  Mr Dubois' appointment to the Board of Directors of Track Group was a requirement of a financing arrangement as part of the term of a loan agreement from Sapinda to Track Group as referred to in Track Group's public SEC filings.

[13]  I am informed that although Ms Cohen used a "Sapinda Germany" e mail address at times, she had a dedicated office within Sapinda's Saville Row, London office suite.  As further evidence of Ms Cohen's connection to the United Kingdom, she also listed a UK Area mobile phone on her email stamp.

15. In order to enable the Acquisition to progress, Mr Windhorst offered to enter into separate agreements with Mr Sabag alongside the sale and purchase agreement for the Acquisition (the "**SPA**").  Mr Dubois was fully knowledgeable of these separate agreements and Mr Windhorst was fully aware of the terms of the SPA.  The purpose of these separate agreements was to ensure that Mr Sabag could sell the shares in Track Group, which he was due to receive under the SPA (for the sale of his company), to Sapinda in return for a substantial amount of cash.  These separate agreements are described more fully at paragraph 21 below and comprised a loan agreement (the "**Loan Agreement**") and a put option agreement (the "**Put Option Agreement**") (together the "**Sapinda Agreements**").  Mr Windhorst personally guaranteed Sapinda's obligations under the Put Option Agreement.

### *The Terms of the Acquisition*

16. The SPA [Pages 9-53 of Attachment 1] was between Track Group and Mr Sabag, and was signed by Mr Dubois, on behalf of Track Group, and Mr Sabag in his individual capacity as owner of GPS Global.  It was dated 12 March 2014 with a closing date of March 31 2014 and was supplemented by a document called the "Closing Protocol" dated 31 March 2014 [Pages 5-8 of Attachment 1] which was also signed by Mr Dubois and Mr Sabag and which provided for closing to be 1 April 2014 (the "**Closing**"). The SPA provided that Mr Sabag would receive total consideration with a value of $7,811,404 for the sale of his 100% holding of shares in GPS Global, made up of cash consideration of $311,404 with the remainder in Track Group stock as follows[14]:

(i)      $1,600,000 worth of "initial buyer shares" in Track Group (the number of shares to be calculated on the basis of the volume weighted average closing price in the 60 day period ending on the third day prior to closing) which would be transferred to Mr Sabag immediately on Closing (the "**Initial Buyer Shares**").

(ii)     $2,900,000 worth of "Restricted Shares" in Track Group (the number of shares to be calculated on the basis of the volume weighted average closing price in the 60 day period ending on the third day prior to Closing) which would be issued to Mr Sabag as "restricted" section 144A stock, meaning that Mr Sabag could not sell the stock until two years after the date of Closing (the "**Restricted Shares**").

(iii)    Stock in Track Group that was structured on an "earn-out" basis ("**Contingent Shares**") to be issued by Track Group to Mr Sabag dependent on the number of prison monitoring devices sold or leased by Track Group in the 36 months after Closing.  Only contracts for sale, or lease of prison monitoring devices with a minimum 24 month period, executed within the 36 months after Closing counted

---

[14]   Section 2.3 of the SPA as amended by the Closing Protocol.

towards the earn out ("**Revenue Generating Contracts**"). The targets were as follows (the "**Earn Out Targets**"):

- If Track Group sold or leased (at a 24 month minimum lease term) more than 1,500 GPS prison tracking devices within three years of Closing (the "**Earn Out Period**"), Mr Sabag would receive $1 million in Track Group stock (the "**First Earn Out Target**");

- If Track Group sold or leased (at a 24 month minimum lease term) an additional 2,500 GPS prison tracking devices during the Earn Out Period, Mr Sabag would receive a further $2 million in Track Group stock (the "**Second Earn Out Target**").

17.  Contingent Shares became due to Mr Sabag within 30 days of the achievement of an Earn Out Target, and the number of Contingent Shares to be issued was to be calculated on the basis of the volume weighted average closing price of the Track Group shares in the 60 day period ending on the third day prior to the date of issuance of the Contingent Shares.

18.  Accordingly, the mechanics of the earn out were that if Track Group met an Earn Out Target, (i) an obligation to transfer Contingent Shares arose and was to be satisfied within 30 days; and (ii) the price at which the Contingent Shares were to be issued, and therefore the number of Contingent Shares that would be issued, was calculated on the basis of the average price of the Track Group shares over the 60 days prior to the third day before issue. A drop in the price of Track Group shares increased the number of Contingent Shares which Track Group was required to issue to Mr Sabag, in the event an Earn Out Target was met.

19. In order to protect Mr Sabag's interests under the Earn Out, the SPA contained "Earn Out Protective Provisions" at clause 10A.2.  Clause 10A.2d provided that:

> *"The parties agree to act in good faith to allow the seller to reach his Contingent Stock milestones set forth in Section 2.10 as long as it does not prejudice the reasonable business interests of the Company as determined by the Board of directors of the Company"*

20. The SPA, however, only set out the terms as between Mr Sabag and Track Group.  As explained at paragraph 15 above, the actual terms of the Acquisition as agreed between Mr Windhorst, Mr Dubois and Mr Sabag comprised the SPA together with additional terms not found in the SPA (i.e., they included the Sapinda Agreements).

21. The separate Sapinda Agreements consisted of the following:

(i)     The Loan Agreement, effective March 16 2014 [Pages 54 to 59 of Attachment 1], under which Sapinda "lent" the sum of $1.6 million to Mr Sabag on or before 28 March 2014. The Loan Agreement gave Mr Sabag the option to repay the loan by transferring the Initial Buyer Shares to Sapinda within nine months of the date that the loan was made. The Loan Agreement was signed by Mr Sabag and Ms Cohen, under a power of attorney, for and on behalf of Sapinda.

(ii)     The Put Option Agreement, dated March 16, 2014 [Pages 60 to 68 of Attachment 1], which gave Mr Sabag the option to "put" all of his Restricted Shares issued pursuant to the SPA, and any Contingent Shares issued pursuant to the SPA, to Sapinda at $20 per share on or after the third anniversary of Closing (the "**Put Option**"). Mr Windhorst guaranteed Sapinda's obligations as a co-equal obligor to Sapinda. The Put Option Agreement was signed by Mr Sabag and by Ms Cohen acting under a power of attorney for both Sapinda and Mr Windhorst[15].

22. It was on the basis of the terms of the Sapinda Agreements, how such agreements operated in conjunction with the terms of the SPA and the obligations imposed by the SPA, that Mr Sabag was prepared to enter into the arrangement with Mr Windhorst to sell the shares in his company to Track Group.

23. The SPA required the parties to act in good faith to allow Mr Sabag to reach his Earn Out Targets and therefore to receive shares in Track Group with a total value of $7,500,000 for his company; and the Sapinda Agreements addressed Mr Sabag's concerns that, following the Acquisition, he might not be able to sell the shares he received in Track Group and could be left with illiquid shares which had little value in the market. The Loan Agreement enabled Mr Sabag to repay the loan by transferring the Initial Buyer Shares with a value of $1,600,000 to Sapinda within 9 months of Closing, and the Put Option Agreement enabled Mr Sabag to sell Track Group shares with an issue value of $5,900,000 to Sapinda 3 years after Closing at $20 per share (such obligation personally guaranteed by Mr Windhorst). As discussed further below, based on the formula found in the Put Option Agreement, Sapinda and Mr Windhorst might be required to buy the $5,900,000 in Track Group shares for significantly more money than their issue value or their market value.

24. In light of Mr Sabag's expressed concern that he would be left with illiquid shares in Track Group, Mr Windhorst and/or Sapinda procured a letter from Shard Capital partners LLP to Mr Sabag confirming that Shard Capital Partners held marketable assets and cash for

---

[15]   The power of attorney in favour of Ms Cohen from Mr Windhorst was dated 27 January 2014, was signed by Mr Windhorst and gave his address as Apartment D. 03. 1 Hyde Park, The Residence at Mandarin Oriental, 100 Knightsbridge, SW1X 7LJ, London, United Kingdom.

Sapinda group companies with a total value in excess of USD 150 million [Page 69 of Attachment 1]. This letter, dated 11 March 2014, was attached as Schedule 2 to the Put Option Agreement.

25. Mr Windhorst offered Mr Sabag the Put Option with the full knowledge that Mr Sabag was relying on its terms as the basis to enter into the SPA, and he made his offering with the intention that Mr Sabag would so rely on it. In fact, Section 4(g) of the Put Option Agreement refers to the "Reference Transaction" as the contemplated share purchase by Track Group of the whole of the share capital of GPS Global and provides:

> "*Sapinda Asia and the Guarantor agrees and acknowledges that the Seller has entered into the Reference Transaction in reliance on Sapinda Asia and the Guarantor's representations, warranties and undertakings set forth in this Agreement, and without such representations, warranties and undertakings, the Seller would not have entered into the Reference Transaction*"

26. Mr Sabag entered into the SPA in reliance on the representations (i) that Track Group would act in good faith to allow the Earn Out Targets under the SPA to be met; and (ii) that the Restricted Shares and the Contingent Shares that Mr Sabag would subsequently receive under the terms of the SPA could be sold by Mr Sabag (in accordance with the terms of the Put Option Agreement) to Sapinda for $20 per share, a company with more than $150 million in assets, backed by the personal guarantee of Mr Windhorst. Mr Windhorst and Mr Dubois were fully aware of the reliance being placed on these representations by Mr Sabag.

### The Impact of a fall in Track Group Share Price following the Acquisition

27. Under the Put Option Agreement, the $2,900,000 worth of Restricted Shares issued at the price of Track Group shares in the 60 days ending on the third day prior to Closing, would have to be bought by Sapinda for $20 per share three years after Closing irrespective of the Track Group share price at that time. If the price of Track Group shares fell significantly following the Acquisition, as it did, Sapinda (guaranteed by Mr Windhorst) would still have to pay $20 per share for each Restricted Share.

28. The Put Option Agreement also required Sapinda to pay $20 per share for the Contingent Shares no matter how many shares Track Group paid to Mr Sabag. Thus, for example, if (1) Mr Sabag was entitled to $3 million of Track Group shares because Track Group sold or leased (24 months) more than 4,000 GPS Tracking Devices during the Earn-Out Period, and (2) the price of the Track Group shares decreased to $1 per share when the Contingent Shares were due, Track Group would be required to pay 3 million shares to Mr Sabag. Sapinda would, in turn, be required to purchase those 3 million shares for $20 per share, or $60 million when the Put Option was exercised.

29. There was no upper limit under the SPA on the number of Contingent Shares that would be issued if the price of Track Group shares fell, or upper limit under the Put Option Agreement on the number of shares that could be put to Sapinda and Mr Windhorst by Mr Sabag. As a result, Sapinda and Mr Windhorst had a potential liability that Mr Windhorst knew could run into the tens or hundreds of millions of dollars if the price of Track Group shares fell significantly (which it did). For the reasons set out in this Declaration and in the U.S. Memorandum, Mr Sabag alleges that Mr Windhorst had no intention of permitting Track Group to act in good faith to allow the Earn Out Targets in the SPA to be met nor of honouring the terms of the Put Option Agreement if the price of Track Group shares fell significantly.

### The failure to disclose all the terms of the Acquisition in breach of SEC requirements

30. I have been informed by Mr Sabag's US Counsel that Track Group, as a publicly traded company, was required to disclose all material terms of the Acquisition in its SEC Form 8-K, and that, as an insider to Track Group, Mr Windhorst (and Sapinda) was required to file SEC Schedules 13D (item 6) to describe all of his outside dealings with Track Group stock. I am also informed that it is a potential criminal offence for a person to fail to make such disclosures. I am informed that Track Group disclosed the terms of the SPA to the SEC in its Form 8-K filing, but it did not disclose the terms of the Sapinda Agreements. Further, I am informed that neither Mr Windhorst nor Sapinda disclosed the terms of the Sapinda Agreements to the SEC. For further details of breaches of US securities laws see the U.S. Memorandum, which provides details of the particular obligations that applied. Mr Sabag alleges that the failure by Mr Windhorst to make the required SEC disclosure is further evidence that Mr Windhorst had no intention of permitting Track Group to act in good faith to allow the Earn Out Targets in the SPA to be met nor of honouring the terms of the Put Option Agreement if the price of Track Group shares fell significantly.

### Payments under the Loan Agreement

31. Mr Sabag duly received the loan of $1,600,000 under the terms of the Loan Agreement on 21 March 2014, in advance of the Closing. Following his receipt of the Loan, and in light of the terms of the SPA and the Put Option Agreement, Mr Sabag sold his company to Track Group. Mr Sabag subsequently transferred the Initial Buyer Shares that he received from Track Group to Sapinda in satisfaction of the loan in accordance with the terms of the Loan Agreement.

### The Restricted Shares

32. Mr Sabag received 152,391 Restricted Shares under clause 2.3(b)(i) of the SPA ($2,900,000 worth of Track Group stock based on the average price in the 60 days ending

on the third day prior to Closing which was approximately $19). The Restricted Shares could not be traded until 2 years after Closing, and therefore could not be sold before 1 April 2016.  Mr Sabag could then have sought to sell the Restricted Shares, but he chose not to do so because the share price of Track Group stock had fallen to approximately $6 per share.  Had Mr Sabag sold the stock on the open market (assuming a buyer could be found for the illiquid stock) he would have received only around $900,000 for the stock, rather than the $3,047,820 at which he could sell the shares by exercising the Put Option. Mr Sabag therefore decided to retain the stock until the Put Option became exercisable and he would receive $20 per share.

33. The Put Option did not become exercisable until three years after Closing, i.e. until April 2017.  On 29 March 2017 Mr Sabag served an exercise notice under the Put Option Agreement on both Sapinda and on Mr Windhorst, as the guarantor and co-obligator of Sapinda's obligations, requiring Sapinda to purchase the Restricted Shares at $20 per share. The Track Group share price had fallen to approximately $3.40 per share at that time.  As explained at paragraphs 44 to 51 below Mr Windhorst took steps to avoid meeting his and Sapinda's obligations under the Put Option Agreement to purchase the Restricted Shares following the service of the exercise notice. Mr Sabag alleges that the steps that Mr Windhorst took are further evidence that Mr Windhorst had no intention at the time of the negotiation of the terms of the Acquisition of permitting Track Group to act in good faith to allow the Earn Out Targets in the SPA to be met nor of honouring the terms of the Put Option Agreement if the price of Track Group shares fell significantly.

### *The potential financial impact under the Put Option Agreement if the Earn Out Targets were met at April 2016*

34. During April 2016, shortly before the MCCC Agreement was entered into, the price of Track Group shares was around $6 per share and falling. If the First Earn Out Target had been met at that time, Mr Sabag would have received around 166,000 shares in Track Group ($1,000,000 of shares). If the Second Earn Out Target had been met at that time Mr Sabag would have received around 500,000 shares in Track Group ($3,000,000 of shares). If the Track Group share price continued to fall before the Earn Out Targets were met then the number of shares issued would increase.

35. As explained above (see paragraph 21), the Put Option Agreement provided that the Put Option for the Contingent Shares was exercisable on the third anniversary of the Closing i.e. in April 2017.  Under the terms of the Put Option Agreement Sapinda and Mr Windhorst were obliged to pay $20 for each of the Contingent Shares irrespective of the Track Group share price at that time.

36. Sapinda's and Mr Windhorst's potential liability under the Put Option, if the Earn Out Targets had been met in April 2016, would have been as follows:

(i)    if the First Earn Out Target was met on the date that the MCCC Agreement was signed, Sapinda and Mr Windhorst would have been liable, in April 2017, to pay Mr Sabag around $3,320,000 for the Contingent Shares (166,000 at $20 per share); and

(ii)   if the Second Earn Out Target was met on the date that the MCCC Agreement was signed, Sapinda and Mr Windhorst would have been liable, in April 2017, to pay Mr Sabag around $10,000,000 for the Contingent Shares (500,000 at $20 per share).

37. This potential liability was in addition to the $3,047,820 which Sapinda and Mr Windhorst already knew they would have to pay to Mr Sabag for the Restricted Shares (see Paragraph 32 above).

38. All told, in April 2016 Sapinda and Mr Windhorst were facing a potential liability in April 2017 of around $13,000,000 to Mr Sabag if both Earn Out Targets were met and Mr Sabag exercised the Put Option.  In April 2016 the market value of those Track Group shares was approximately $3,900,000 and the market value continued to fall before the Put Option was exercised.

***Track Group's statements concerning the achievement of the Earn Out Targets***

39. In August 2015, Track Group reported in its SEC form 10K for the quarter ending June 30, 2015 that it expected Mr Sabag to meet both of his Earn Out Targets [Pages 70 to 72 of Attachment 1].  Track Group thus recorded a stock payable liability on its books of $3,000,000.

40. However, on March 30 2017, the General Counsel of Track Group wrote to Mr Sabag's US Counsel explaining that neither of the Earn Out Targets had been met, and therefore Track Group would not be issuing any Contingent Shares to Mr Sabag [Pages 73 to 74 of Attachment 1].  The General Counsel's letter stated:

> *"Other than the Virginia contract, all contracts entered into for leasing GPS devices during the period from 1 April 2014 to the present have been for an initial term of less than 24 months.  The term of these contracts is set by the customer. Although the number of GPS devices in the field has grown over the last 36 months, none of that growth is attributable to "revenue generating contracts" as defined in the SPA."*

41. Mr Sabag alleges that Mr Windhorst and or those acting on his behalf and at his direction had taken steps in breach of the terms of the SPA to ensure that the Earn Out Target would not be met and that Mr Windhorst had never intended to allow Track Group to act in good

faith to allow the Earn Out Targets to be met if the price of Track Group shares fall significantly.

### *The circumstances surrounding the MCCC Agreement*

42. I refer to the facts and allegations set out at sections 2 and 3 of the U.S. Memorandum which describes the events and the circumstances surrounding the execution of the MCCC Agreement which I have been advised represents a fair and accurate reflection of the evidence.

43. Mr Sabag alleges that Mr Windhorst took steps to manipulate or cause the manipulation of the term of the MCCC Agreement so that it would not satisfy the definition of a "Revenue Generating Contract" for the purpose of the Earn Out Targets in the SPA. Mr Sabag alleges that Mr Windhorst did this because he never intended to allow Track Group to act in good faith to allow the Earn Out Targets in the SPA to be met if the price of Track Group shares fell significantly.

### *Subsequent steps taken by Mr Windhorst and Sapinda to seek to avoid liabilities under the Put Option Agreement*

44. Mr Sabag alleges that Mr Windhorst's intention not to honour the terms of the Put Option Agreement or to allow Track Group to act in good faith to enable the Earn Out Targets in the SPA to be met if the price of Track Group shares fell significantly is also evidenced by his conduct following Mr Sabag's exercise of the Put Option. The Put Option did not become exercisable until April 2017. As discussed above, on 29 March 2017, Mr Sabag served an exercise notice under the Put Option Agreement on both Sapinda and on Mr Windhorst as the guarantor and co-obligor of Sapinda's obligations, requiring the purchase of Mr Sabag's 152,391 Restricted Shares at $20 per share (Mr Windhorst's obligations under the Put Option Agreement are stated to be primary obligations) [Pages 75 to 78 of Attachment 1].

45. The Track Group share price was around $3.20 in March 2017, having fallen from around $19 at the time of the Acquisition. Sapinda and Mr Windhorst were, therefore, obliged under the terms of the Put Option Agreement to pay $3,047,820 ($20 each for 152,391 shares) for the Restricted Shares which then had a value of around $500,000 ($3.20 for each of 152,391 shares).

46. Mr Windhorst's "notice" representative acknowledged receipt of Mr Sabag's notice but, despite follow up e-mails from Mr Sabag and his US Counsel over a period of several months, including letters to Sapinda and Mr Windhorst during April and May 2017 [Pages

79 to 89 of Attachment 1], neither Sapinda nor Mr Windhorst responded so as to enable the sale to take place.

47. On 21 July 2017, Sapinda transferred its holding of 4,734,607 Track Group shares (which represented 45.2% of Track Group shares) to ADS Securities LLC ("**ADS**") a company based in the UAE. ADS's filing with the SEC pursuant to Rule 13D [Pages 91 to 100 of Attachment 1] records that the shares were transferred to ADS following the service by ADS of a notice of default on Sapinda and Mr Windhorst, for failure to meet certain obligations under a pledge agreement. The SEC filing records that the shares had been pledged to ADS under the terms of a pledge agreement dated 4 May 2017 entered into by ADS with Sapinda and Mr Windhorst.

48. The pledge agreement was therefore entered into days after Sapinda received a letter from Mr Sabag's US Counsel formally notifying Sapinda that it was in breach of the Put Option Agreement. Neither Mr Sabag nor his US Counsel were given any notice by Sapinda or Mr Windhorst of the intention to enter into the pledge agreement or its potential effect on the assets of Sapinda, and therefore on the ability of Sapinda to meet Mr Sabag's rights under the Put Option Agreement. Mr Sabag only became aware of the transfer of the shares because he was monitoring all SEC filings with regard to Track Group.

49. In December 2017, Mr Sabag initiated insolvency proceedings in the BVI to place Sapinda into involuntary liquidation for failing to meet the debt that it owed to him under the Put Option Agreement. KPMG had applied to be appointed as liquidator.

50. I am informed by Mr Sabag's US Counsel that around one week before the first liquidation hearing, Mr Windhorst called Mr Sabag to ask him to discontinue the liquidation proceedings in order that they could clear up the "misunderstanding". Mr Sabag refused to discontinue the proceedings, and on the day before the first liquidation hearing Mr Windhorst agreed to pay the amount owed by Sapinda under the Put Option Agreement for the Restricted Shares, together with Mr Sabag's legal fees.

51. Track Group shares were, by the date of Mr Windhorst's agreement to pay Mr Sabag for the Restricted Shares, trading at around $1 per share. Despite the Restricted Shares having a value of around $150,000 at the time, and the terms of the Put Option Agreement which provided for the shares to be transferred to Sapinda in the event that the Put Option was exercised, I am informed that Mr Windhorst did not wish to receive the shares in Track Group (which I am informed would have triggered an SEC reporting event).

## II.    Allegations

52. In light of the facts set out above, Mr Sabag makes the following allegations:

(i)     Mr Windhorst entered into an understanding with Mr Dubois in or around October 2013, the aim of which was to structure the terms of a transaction involving Track Group, Sapinda and Mr Windhorst to induce Mr Sabag to sell his shares in GPS Global to Track Group in return for shares in Track Group;

(ii)    Mr Windhorst, who has held himself out to the public as a sophisticated businessman, knew that he was entering into a transaction in which (a) Mr Sabag could receive an almost unlimited number of shares in Track Group if the price of Track Group shares fell significantly and the Earn Out Targets in the SPA were met; and (b) that he and Sapinda would be required to purchase each of those shares together with each of the Restricted Shares for $20 per share under the terms of the Put Option Agreement irrespective of the market price of Track Group shares. Mr Windhorst did not intend to honour the terms of the transaction if the price of Track Group shares fell significantly;

(iii)   Mr Windhorst failed to disclose to Mr Sabag that he never intended to allow Track Group to act in good faith to meet the Earn Out Targets in the SPA if the price of Track Group shares fell significantly;

(iv)    Mr Windhorst's representations to Mr Sabag that he and Sapinda would meet their obligations under the Put Option Agreement were false or misleading, as evidenced by the steps Mr Windhorst took to avoid obligations under the Put Option Agreement in relation to the Restricted Shares following notice from Mr Sabag of his exercise of the Put Option in March 2017;

(v)     Mr Windhorst acted dishonestly in representing to Mr Sabag that he and Sapinda would meet their obligations under the Put Option Agreement and in failing to disclose that he never intended to allow Track Group to act in good faith to meet the Earn Out Targets in the SPA if the price of Track Group shares fell significantly;

(vi)    Mr Windhorst had no intention, at the time he made the representation, of making payments for any shares to Mr Sabag under the Put Option Agreement if the price of Track Group shares fell significantly;

(vii)   In April 2016, Mr Windhorst and/or those acting on his behalf or at his direction took steps to manipulate the term of the MCCC Agreement to ensure that the Earn Out Targets would not be met;

(viii)  The term of 18 months for the MCCC Agreement was sought by Mr Cassell at the direction of Mr Windhorst or others acting on his behalf or at his direction because it (a) would not meet the definition of a "revenue generating contract" for the purpose of the Earn Out Targets; and (b) would not end within the Earn Out Period, and be at

risk of an extension within the Earn Out Period so as to potentially meet the definition of a "revenue generating contract" for the purpose of the Earn Out Targets;

(ix)    Mr Deiter was influenced by Mr Windhorst or others acting on his behalf or at his direction to recommend that MCCC enter the 18 month MCCC Agreement, and as a result Mr Deiter caused MCCC to act in breach of Indiana and Marion County procurement protocols (and to act outside the direction and mandates of the MCCC Advisory Board) to award a contract with a term of 18 months and a then estimated value of over $4,000,000 (without an RFP) to Track Group;

(x)    Mr Deiter may have been offered some promise of a financial or other advantage, from or at the direction of Mr Windhorst (and/or those whom he directed), in return for agreeing to recommend that MCCC enter into the 18 month MCCC Agreement (outside the direction or mandates of the MCCC Advisory Board) in breach of Indiana and Marion County procurement protocols;

(xi)    That by his actions, Mr Windhorst has caused Mr Sabag financial loss and has avoided his own liabilities.

## III.    The Relevant Criminal Offences

53. The statutory provisions setting out the criminal offences which Mr Sabag alleges Mr Windhorst committed are set out in Attachment 2. Set out below is a summary of how in my opinion, by reference to the statutory requirements for each offence, the evidence sought under this Application may help to prove they have been committed.

### s89 of the Financial Services Act 2012

(i)    By entering into the Sapinda Agreements to persuade Mr Sabag to sell his shares in GPS Global to Track Group, Mr Windhorst led Mr Sabag to understand that he would act in good faith in accordance with the terms of the SPA to allow the Earn out Targets to be met (See paragraphs 22-26);

(ii)    Mr Windhorst did not disclose to Mr Sabag that he would not act and did not intend to act in good faith to allow the Earn out Targets under the SPA to be met in the event that the price of Track Group shares fell significantly. Evidence that Mr Windhorst took steps to manipulate the terms of the MCCC Agreement so that it did not meet the definition of a Revenue Generating Contract would corroborate a claim that he failed to act in good faith to allow the Earn Out Targets to be met and, together with the other evidence referred to in this Declaration and in the U.S. Memorandum, would evidence a course of conduct that would strongly support the

claim that Mr Windhorst dishonestly concealed his intention in relation to the Earn Out Targets under the SPA (s89(1)(c))[16][17];

(iii) Mr Windhorst made a statement to Mr Sabag that he and Sapinda would honour the Put Option Agreement (see paragraph 21(ii)). The statement was false or misleading in a material respect because Mr Windhorst did not honour (see paragraphs 44-51) and did not intend to honour the terms of the Put Option Agreement in relation to the Restricted Shares (s89(1)(a))[18];

(iv) Evidence that Mr Windhorst took steps to manipulate the terms of the MCCC Agreement so that it did not meet the definition of a Revenue Generating Contract together with the other evidence referred to in this Declaration and in the U.S. Memorandum would evidence a course of conduct that would strongly support the claim that Mr Windhorst had no intention at the time of making that statement, of honouring the terms of the Put Option Agreement if the price of Track Group shares fell significantly, and that Mr Windhorst knew that his statement in relation to the Put Option Agreement was false or misleading at the time he made it. (s89(1)(a))[19];

(v) Alternatively, Mr Windhorst recognised the risk that the price of Track Group shares might fall significantly leading to a potentially massive liability for him and Sapinda (see paragraphs 27-29), but he still made the statement to Mr Sabag that he would honour the Put Option Agreement. This statement was false or misleading because Mr Windhorst did not intend to honour the Put Option Agreement in the event that the share price of Track Group fell significantly. Mr Windhorst therefore recognised the risk that his statement to Mr Sabag might be untrue (because of the risk of a fall in the price of Track Group shares) and, in the circumstances known to him at the

---

16  s89(1)(c) Financial Services Act 2012, provides that the offence may be committed where a person dishonestly conceals any material facts.

17  The test for dishonesty is set out in the Supreme Court judgement in Ivey v Genting Casinos [2017] UKSC 67. *"When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."*

18  s89(1)(a) Financial Services Act 2012 provides that the offence may be committed where a person makes a statement which is false or misleading.

19  s89(1)(a) Financial Services Act 2012, requires the maker of the statement to know that the statement is false or misleading at the time that he makes the statement.

time, it was not reasonable for him to take that risk.[20]  Evidence that Mr Windhorst took steps to manipulate the terms of the MCCC Agreement following the fall in the price of Track Group shares so that it did not meet the definition of a Revenue Generating Contract, together with the other evidence referred to in this Declaration and in the U.S. Memorandum would evidence a course of conduct that would strongly support the claim that Mr Windhorst was at least reckless as to whether his statement in relation to the Put Option Agreement was false or misleading in a material respect when he made the statement (s89(1)(b))[21][22];

(vi)    Mr Windhorst's statements in relation to the Put Option Agreement and the concealment of his intentions in relation to the Earn Out Targets were intended to, and did, induce Mr Sabag to enter into the SPA which is a 'relevant agreement' (s89(2)(a))[23];

(vii)   The SPA is a 'relevant agreement' because it is an agreement under which Mr Sabag acquired shares in Track Group, and Track Group bought shares in GPS Global (s93(3)(a)), (s93(5))[24];

(viii)  The statements were made, and the facts concealed by Mr Windhorst at meetings with Mr Sabag that took place in London, England, whilst Mr Windhorst was ordinarily resident in England and in documents that were executed by or on behalf of Mr Windhorst, whilst Mr Windhorst was ordinarily resident in London. Negotiations took place between Mr Windhorst and Mr Sabag and Mr Dubois (acting

---

[20]  In R. v. G [2003] UKHL 50 it was held that a person acts recklessly with respect to (a) a circumstance when he is aware of a risk that it exists or will exist, and (b) a result when he is aware of a risk that it will occur, and it is in the circumstances known to him, unreasonable to take the risk.

[21]  s89(1)(b) Financial Services Act 2012, provides that the offence may be committed where a person makes a statement which is false or misleading in a material respect being "reckless" whether the statement is false or misleading.

[22]  A person acts recklessly when he is aware of a risk that a particular result will occur and it is unreasonable in the circumstances for him to take the risk.

[23]  s89(2)(a) Financial Services Act 2012, provides that the offence is committed if the statement is made or the facts are concealed with the intention of inducing a person to enter into a relevant agreement.

[24]  s93(3)(a) Financial Services Act 2012, defines a 'relevant agreement' as an agreement "the entering into or performance of which by either party constitutes an activity of a kind specified in an order made by Treasury". s93(5) defines a 'relevant investment' as "an investment of a kind specified in an order made by Treasury". The order made by Treasury is the Financial Services Act 2012 (Misleading Statements and Impressions) Order 2013.  Article 2 of that order specifies 'controlled activities' as 'relevant activities' for the purpose of s93. Article 4 specifies 'controlled investments' as 'relevant investments' for the purpose of s93.  'Controlled activities' and 'controlled investments' are defined in Part I and Part II of Schedule 1 to the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 ("the Financial Promotions Order").  Article 3 of Part I of Schedule 1 of the Financial Promotions Order provides that "Buying, selling, subscribing for or underwriting securities or contractually based investments as principal or agent is a controlled activity".  Article 14 of Part II of Schedule 1 of the Financial Promotions Order provides that "shares or stock in the share capital of - (a) any body corporate (wherever incorporated)"are controlled investments.

on behalf of Track Group), and Ms Cohen (acting on behalf of Mr Windhorst and Sapinda), while operating out of England (see paragraphs 13-15) (s89(4))[25].

### s1 of the Fraud Act 2006 (by virtue of a breach of s2 of the Fraud Act 2006)

(i)    s1 of the Fraud Act provides that a person will have committed fraud if they act in breach of s2 of the Fraud Act[26];

(ii)    By entering into the Sapinda Agreements to persuade Mr Sabag to sell his shares in GPS Global to Track Group, Mr Windhorst represented to Mr Sabag that he would act in good faith so as allow the Earn Out Targets under the SPA to be met irrespective of the price of Track Group shares (see paragraphs 22-26)[27];

(iii)    Evidence that Mr Windhorst took steps to manipulate the terms of the MCCC Agreement so that it did not meet the definition of a Revenue Generating Contract would (a) establish that the representation was untrue; and (b) indicate a course of conduct together with the other evidence referred to in this Declaration and in the U.S. Memorandum which would strongly support a claim that Mr Windhorst knew that his representation was untrue, or might be untrue, at the time he made the representation[28] and was therefore a false representation (s2(2))(s2(3))[29] [30];

---

25  The misleading statements offence will be committed where the statement is made in or from, or the facts are concealed in or from, the United Kingdom or arrangements are made in or from the United Kingdom for the statement to be made or the facts to be concealed (s89(4)) Financial Services Act 2012. Mr Windhorst was based in the United Kingdom throughout the period of the negotiations and met with Mr Sabag in the United Kingdom, both alone and with Mr Dubois (see notes 11 and 15 above). Mr Windhorst remained ordinarily resident in the UK until at least March 2016 and maintained his main place of business in the UK beyond March 2016 (see note 45 below). Mr Windhorst was Chairman of the Sapinda Group. In April 2017 Ms Tsang of Sapinda Asia forwarded correspondence from Mr Sabag to Mr Gardener who was Head of the Group Chairman's Office at 6th Floor 23 Saville Row, London, W1S 2ET. In an e-mail of 3 April 2017 Ms Tsang advised that Mr Gardener was "in charge of the subject case". In an e-mail dated 27 April 2017 to Mr Sabag's Israeli and US Counsel Ms Tsang stated, "This is to confirm that Mr Lars Windhorst, Mr Austen Gardener and Mr Eoin Speight are in charge of your subject case, kindly refer all your questions to them". Mr Sabag's Israeli counsel did as requested and the response came from Mr Gardener from Group Chairman's [Mr Windhorst] office in London (see pages 102-107 of Attachment 1 for the email chain without attachments). In June 2018, Mr Sabag successfully served judicial process on Mr Windhorst (in legal proceedings against Mr Windhorst, Track Group and Sapinda) in accordance with the Hague Convention at Mr Windhorst's business address in London.

26  s2 of the Fraud Act 2006 makes it an offence for a person dishonestly to make a false representation knowing that the representation was or might be untrue or misleading with intent to make a gain for himself or another, to cause loss to another or to expose another to risk of loss. A representation may be express or implied.

27  s2(4) of the Fraud Act 2006 provides that 'A representation may be express or implied'.

28  s2(3) of the Fraud Act 2006 provides that a representation "means any representation as to fact or law, including a representation as to the state of mind of - (a) the person making the representation"

29  s2(2) of the Fraud Act 2006 provides that a representation is false if (a) it is untrue or misleading; and (b) the person making it knows that it is, or might be, untrue or misleading.

(iv)     Mr Windhorst made a representation that he and Sapinda would honour the Put Option Agreement (see paragraph 21(ii)). The representation was untrue or misleading because Mr Windhorst did not honour and did not intend to honour the terms of the Put Option Agreement in relation to the Restricted Shares if the price of Track Group shares fell significantly;

(v)      Evidence that Mr Windhorst took steps in 2016 to manipulate the terms of the MCCC Agreement so that it did not meet the definition of a Revenue Generating Contract together with the other evidence referred to in this Declaration and in the U.S. Memorandum including Mr Windhorst's conduct in relation to the Restricted shares in 2017 (see paragraphs 44-51) would evidence a course of conduct which would strongly support the claim that Mr Windhorst knew that his representation that he would honour the Put Option Agreement was untrue, or might be untrue, at the time he made the representation and was therefore a false representation (s2(2))(s2(3))[31][32];

(vi)     The representations, if shown to be false, could be shown to have been made dishonestly because Mr Windhorst, by inducing Mr Sabag through false representations to sell his company to Track Group, would have acted in a way that would be viewed as dishonest in the minds of ordinary, decent people (although this would be a question for the jury) (s2(1)(a))[33];

(vii)    The representations, if false, could be shown to have been made by Mr Windhorst with the intent of making a gain for himself and Track Group through the acquisition of GPS Global for less than the cash value agreed with Mr Sabag (s2(1)(b)(i))[34];

(viii)   The representations, if false, could be shown to have been made to expose Mr Sabag to the risk of loss by inducing him to enter into a transaction whereby he sold GPS

---

[30]  s2(3) of the Fraud Act 2006 provides that a "representation" means any representation as to fact or law, including a representation as to the state of mind of (a) the person making the representation, or (b) any other person.

[31]  See note 29 above

[32]  See note 30 above.

[33]  s2(1) of the Fraud Act 2006 provides that for a person to commit the offence the false representation must be made dishonestly. The test for dishonesty is set out in the Supreme Court judgement in *Ivey v Genting Casinos [2017] UKSC 67* (see note 17 above).

[34]  s2(1)(b) of the Fraud Act 2006 requires the false representation to have been made with the intent of making a gain for the maker of the statement or for another person or with the intent of causing loss to a person or exposing another to a loss. There is no requirement for an actual gain to be made or a loss to be caused. The offence focusses on the intent of the accused.

Global for less than the cash value at which he was prepared to sell his company (s2(1)(b)(ii))[35];

(ix)    The representations were made by Mr Windhorst at meetings with Mr Sabag that took place in London, England, whilst Mr Windhorst was ordinarily resident in England and in documents that were executed by or on behalf of Mr Windhorst whilst Mr Windhorst was ordinarily resident in London.   Negotiations took place between Mr Windhorst and Mr Sabag and Mr Dubois (acting on behalf of Track Group), and Ms Cohen (acting on behalf of Mr Windhorst and Sapinda), while operating out of England (see paragraphs 13-15)[36].

### s6 of the Bribery Act 2010

54. Mr Sabag also alleges that Mr Windhorst will have committed an offence under the Bribery Act 2010 if he offered, promised or gave any financial or other advantage to the Director of MCCC in relation to the MCCC Agreement:

(i)    s6(1) of the Bribery Act 2010 makes it an offence for a person to bribe[37] a foreign public official[38] with the intention of influencing the foreign public official[39] in his capacity as a foreign public official to gain a business or other advantage[40];

(ii)    The facts and circumstances, including the size of potential liability that Sapinda and Mr Windhorst would face if the MCCC Agreement satisfied the definition of a Revenue Generating Contract for the purpose of the SPA (see paragraphs 34-38), and the failures to make disclosure in accordance with US securities laws which would likely come to light (see the U.S. Memorandum) provide reasonable grounds to suspect that Mr Windhorst, directly or through a third party, offered, promised or

---

[35]  See footnote 34 above.

[36]  The Fraud by False Representations Offence can be prosecuted in England if any act or omission or other event proof of which is required for conviction of the offence occurred in England (see Criminal Justice Act 1993 section 2).  In this case it is alleged that the false representations made by Mr Windhorst were made in or from England during the course of the negotiations for the Acquisition.

[37]  s6(3) of the Bribery Act 2010 provides that a person bribes a foreign public official if they, directly or through a third party offer, promise or give any financial or other advantage to the foreign public official or to another person at the official's request or with the official's assent or acquiescence.

[38]  s6(5) of the Bribery Act 2010 provides that a foreign public official includes someone who holds a "legislative, administrative or judicial position of any kind" in a country outside the United Kingdom; and someone who exercises a public function on behalf of any country, territory or subdivision of a country or territory outside the United Kingdom.

[39]  s6(4) of the Bribery Act 2010 provides that influencing a foreign public official in their capacity as such means influencing them in the performance of their functions as an official which includes influencing them to omit any exercise of the functions, and any use of their position as an official even if outside their authority.

[40]  s6(2) of the Bribery Act 2010 provides that to commit the offence the person making the bribe must intend to gain a business advantage or other advantage in the conduct of business.

gave a financial or other advantage to Mr Deiter or to another at his request or with his assent in order to influence Mr Deiter to procure the MCCC Agreement with an 18 month term (see sections 2 and 3 of the U.S. Memorandum) (s6(3))[41] and if the evidence sought establishes that, then the evidence sought would be prima facie evidence the offence has been committed;

(iii)     Mr Deiter was a foreign public official for the purpose of the Bribery Act as he exercised a public function in his role as the Director of MCCC (s6(5))[42];

(iv)     Any bribe could be shown to have been made with the intention of obtaining an advantage in the conduct of business namely: (a) in securing the MCCC Agreement which would provide over $4,000,000 in revenue to Track Group; and (b) avoiding an agreement which would count as a Revenue Generating Contract which would enable the Earn Out Targets to be met and result in the issue of Contingent Shares to Mr Sabag which he could then put to Sapinda and Mr Windhorst under the Put Option Agreement (s6(2))[43];

(v)     There is reasonable evidence to suggest that Mr Windhorst had sufficient connection with the UK in April 2016 to commit the offence[44] since he was ordinarily resident in the UK up until at least 23 March 2016 when he purported to move to Monaco[45]and, I am informed, it is not clear whether he did so at that date.  Even after that date, Mr Windhorst maintained an office in London from which he operated and continued to operate his business affairs from the UK[46].

***Conspiracy to commit offences contrary to section 1(1) of the Criminal Law Act 1977***

*Mr Windhorst and Mr Dubois*

---

[41]   See note 37 above.

[42]   See note 38 above.

[43]   See note 40 above.

[44]   s12(2) of the Bribery Act 2010 provides that the UK authorities will have jurisdiction where any part of the offence takes place in the UK or where a person's acts or omissions outside the UK would, if done within the UK, be an offence within the UK and the person has a close connection with the UK.  Person's having a close connection with the UK include persons ordinarily resident in the UK.

[45]   LWO Limited (Company number 09767851), a company of which Mr Windhorst is a director filed a Notice of Change of Particulars for Mr Windhorst on 15 September 2016 asserting that he had become usually resident in Monaco on 23 March 2016.  However, Mr Windhorst's business address remained 6th Floor, 23 Saville Row, London W1S 2ET.

[46]   See note 25 above which explains that Mr Windhorst's Group Chairman's office was maintained at 23 Saville Row, London, until at least April 2017 and that Sapinda Asia directed Mr Sabag and his counsel to raise issues concerning the Restricted Shares with Mr Gardener who was Head of Mr Windhorst's office and was housed at 23 Saville Row. In June 2018, Mr Sabag successfully served Mr Windhorst with legal proceedings against Mr Windhorst, Track Group and Sapinda at Mr Windhorst's business address in London.

55. Mr Sabag also alleges that Mr Windhorst and Mr Dubois conspired to commit the offences shown above in that Mr Windhorst and Mr Dubois had an ongoing agreement to pursue a course of conduct to induce Mr Sabag to sell his shares in GPS Global in return for shares in Track Group, in circumstances where they made promises to Mr Sabag regarding his future entitlements under the Sapinda Agreements and the future value of these, which, given their state of mind and their intentions as alleged would involve the commission of the Misleading Statements Offence; and/or the Fraud by False Representation Offence; and the Bribery Offence, if it is shown that any financial or other advantage was offered or given to Mr Deiter[47].

### *Conspiracy to defraud contrary to common law*

56. As above, Mr. Sabag also alleges that Mr. Windhorst and Mr. Dubois conspired to defraud him by their ongoing agreement to pursue a course of conduct to induce Mr. Sabag to sell his shares in GPS Global in return for shares in Track Group in circumstances where they had made promises to Mr. Sabag regarding his future entitlements under the Sapinda Agreements and the future value of these, which, given their state of mind and their intentions as alleged amount to a conspiracy to defraud Mr. Sabag of his economic interest in GPS Global and his future economic interests as set out in the Sapinda Agreements.

## IV.   Application of the test under 28 U.S.C. § 1782.

57. US legal counsel have advised that there is a four prong "mandatory" statutory requirement under s 1782 that must be satisfied before a US Court will grant discovery.  I have been asked to comment on how the four prongs may be analysed in the context of this Application.

### *The four prong mandatory statutory requirement*

58. I set out below an analysis of the four prong test by reference to the facts of this case:

> *(1)     the request must be made "by a foreign or international tribunal," or by "any interested person"; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing"; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance.*

---

47  Section 1(1) of the Criminal Law Act 1977 states: "if a person agrees with any other person or persons that a course of conduct shall be pursued which, if the agreement is carried out in accordance with their intentions, either will necessarily amount to or involve the commission of any offence or offences by one or more of the parties to the agreement, or would do so but for the existence of facts which render the commission of the offence or offences impossible he is guilty of conspiracy to commit the offence or offences in question."

*(i)   The request must be made by an "interested person."*

59. Mr. Sabag, despite being a nonresident of the United Kingdom, would be an "interested person" in an investigation into the alleged crimes and in any subsequent prosecution in the United Kingdom.  The alleged criminal activity of Mr Windhorst was directed specifically at Mr Sabag, commencing with the representations made by Mr Windhorst in the course of the negotiations to purchase GPS Global which took place in the UK and culminating in Mr Windhorst's attempts to avoid honouring the Put Option Agreement by his transfer of assets from Sapinda which required court action by Mr Sabag in the BVI.  The purpose of Mr Windhorst's criminal conduct was:

(i)    to induce Mr Sabag to enter into the SPA to sell GPS Global to Track Group for a consideration made up almost completely in shares in Track Group;

(ii)   to deny Mr Sabag the Contingent Shares which Mr Sabag could then have put to Sapinda and Mr Windhorst under the terms of the Put Option Agreement;

(iii)  to avoid paying Mr Sabag the cash that was properly due under the Put Option Agreement in return for the Restricted Shares in Track Group that Mr Sabag did receive and the Contingent Shares that he should have received under the SPA.

60. Mr. Sabag may make a criminal complaint to the authorities in the UK that have the power to investigate the alleged criminal offences committed by Mr Windhorst. Those authorities will consider whether to launch a formal investigation using statutory powers of investigation and where appropriate they will liaise with overseas authorities which may have an interest in the matter.  Those authorities are:

(i)    the FCA or the Serious Fraud Office ("**SFO**") in relation to the Misleading Statements Offence;

(ii)   the police or the SFO in relation to the Fraud by way of False Representation Offence;

(iii)  the NCA (directing the police) or the SFO in relation to the Bribery Offence;

(iv)   The police or the SFO in relation to the Conspiracy to Defraud Offence.

61. Following an investigation, a decision will be taken by a relevant prosecutor whether to commence criminal proceedings.  The relevant prosecutors for the offences identified in this Declaration are:

(i)    the FCA or the SFO or the Crown Prosecution Service ("**CPS**") in relation to the Misleading Statements Offence;

(ii)   the SFO or the CPS in relation to the Fraud by way of False Representation Offence;

    (iii)    the SFO or the CPS in relation to the Bribery Offence.

62. Mr Sabag may also, should he so choose, launch his own private prosecution in relation to the Fraud by False Representation Offence, Conspiracy to commit Fraud by False Representation and Conspiracy to Defraud Offence and he would not require the consent or approval of any agency or authority to do so. The right of a person to bring a private prosecution in the UK is specifically preserved by section 6 of the Prosecution of Offences Act 1985. This right is becoming increasingly and frequently exercised, particularly in the field of economic crime[48]. In relation to the other offences for which the consent of the DPP is required for a prosecution to be commenced, Mr Sabag could conduct his own investigation into these offences and then apply to the DPP for consent to bring a private prosecution in respect of these offences. In these circumstances, if the DPP considers that the evidence passes the Full Code Test contained in the Code for Crown Prosecutors (see paragraph 90 below for further detail on the Code for Crown Prosecutors), then the CPS will take over the prosecution and prosecute the offence itself [49].

### The Misleading Statements Offence

63. Mr Sabag is an interested person in relation to a criminal complaint concerning the Misleading Statements Offence since he may report the alleged criminal conduct to the FCA, and the FCA will consider whether it should appoint investigators as a result of the evidence that he provides[50]. The FCA encourages reports from those who have been the victims of investment and financial scams or who have witnessed financial misconduct. For example, the section of the FCA website dealing with 'Whistleblowing' provides "if you think a firm or individual is involved in

---

[48]   In D Limited v A and Others [2017] EWCA Crim 1172,  the Court of Appeal, Criminal Division reiterated at para 40 of the judgement:
*"40. Nevertheless, a general right to bring a private prosecution is conferred by statute. It is not readily to be undermined. In fact in recent years there seems to have been something of a growth in private prosecutions (reflected in the fact that there are now counsel and solicitors' firms who specialise in such cases). One particular area of growth, indeed, may lie in complex fraud cases: where, in reality, the public authorities sometimes may lack the resources and/or inclination to commence a public prosecution: the present being, as the applicant would say, precisely such a case."*  In addition, the Private Prosecutors Association has recently published a Code of Conduct for Private Prosecutors to provide a benchmark for best practice in the conduct of private prosecutions.

[49]   Code for Crown Prosecutors 2018 provides that a prosecution should not be commenced by the CPS unless it passes both the Evidential Sufficiency and Public Interest tests.  See also the CPS's Legal Guidance on Private Prosecutions (Updated October 2019).

[50]   s168(2) FSMA provides that FCA may appoint investigators to conduct an investigation on its behalf "if it appears to an investigating authority that there are circumstances suggesting that:
(2)(a) … an offence under Part 7 of the Financial Services Act 2012 may have been committed". The Misleading Statements Offence is an offence under Part 7 of that Act.

wrongdoing within an area we regulate, and you want to report it confidentially contact our whistleblowing team" It goes on to state:

> *"The more detail you can give us, the easier it will be for us to consider what our response should be.*
>
> *The following things are all useful:*
>
> - *the names of any individuals involved in the misconduct*
> - *any key dates you know about*
> - *the 'how', 'what' and 'where' of any supporting documents or evidence*
> - *the type of wrongdoing and who else knows about it"*[51]

64. Reports of potential criminal activity can also be made to the FCA's Enforcement Division. There is no specific process to be followed. However, in practice, Mr Sabag would send the report together with a description of the supporting evidence to the Director of Enforcement at the FCA. The matter would then be delegated to appropriate members of the Enforcement Division who would consider the information and obtain further details from Mr Sabag before assessing whether investigators should be appointed to carry out a formal investigation under s168 FSMA[52], no action taken, or whether it would be more appropriate for the matter to be passed to another investigating authority.

65. s168(2) of FSMA provides that both the FCA and the Secretary of State have the power to appoint investigators to conduct an investigation in relation to the Misleading Statements Offence. That power arises where "…. there are circumstances suggesting that (a)… [the Misleading Statements Offence] may have been committed". The statutory test for appointing investigators is a relatively low threshold and, in my opinion, evidence of manipulation of the term of the MCCC Agreement by Mr Windhorst, or at his instruction or direction would, when taken with the other facts and matters set out in this Declaration and in the U.S. Memorandum satisfy the statutory test giving rise to the power to appoint investigators. FCA would still need to take a decision whether to exercise that power and appoint investigators. s401(1)(c) of FSMA provides that the Misleading Statements Offence is one that may be prosecuted by either the FCA or by the Secretary of State.

---

[51] https://www.fca.org.uk/firms/whistleblowing

[52] Investigators appointed under s168(2) have powers set out in s173. Under s173 an investigator may require any person whom he considers is or may be able to give information relevant to the investigation to attend before him and answer questions or provide information or documents. Answers provided in response to a requirement imposed under s173 may not be used against a person in criminal proceedings other than in relation to an offence alleging that the person provided false information in response to a statutory requirement.

66. The FCA has agreed guidelines that establish a framework for liaison and cooperation in cases where certain other UK authorities have an interest in investigating or prosecuting[53] any aspect of a matter that the FCA is considering for investigation, is investigating or is considering prosecuting. The guidelines are intended to assist the agencies when considering cases concerning financial crime and/or regulatory misconduct that are, or may be, of mutual interest to the FCA and one or more of the other agencies including the SFO and the Police. The guidelines set out broad principles which the agencies agree should be applied by them in order to assist them to decide which of them should investigate such cases; co-operate with each other particularly in cases where more than one agency is investigating; and prevent undue duplication of effort by reason of the involvement of more than one agency. The guidelines apply where the FCA and another agency may have investigation powers and where the FCA and another agency may have the power to prosecute an offence.

67. The SFO investigates and prosecutes the top tier of crimes in the UK involving serious or complex fraud, including bribery and corruption. The section of its website entitled "victims and witnesses - our commitment to you" confirms that in doing so, "*it is fully committed to putting victims and witnesses at the heart of every case. For these purposes, you are a victim of crime if you have suffered harm or economic loss which was directly caused by a criminal offence formally investigated by the SFO. Victims can be businesses as well as individuals.*" "*If you are a victim who has suffered loss as a direct result of the criminal conduct, we will try to obtain financial compensation for you where the law allows. If you think you have suffered loss, please let us know straight away.*"[54] Mr Sabag would clearly satisfy the definition of a victim of crime for the purpose of the SFO.

68. The SFO takes on a small number of large economic crime cases. The SFO may investigate any suspected offence which appears to the Director of the SFO (currently Lisa Osofsky) on reasonable grounds to involve serious or complex fraud. In considering whether to authorise an investigation the Director will take into account the actual or intended harm that may be caused to:

- the public, or

- the reputation and integrity of the UK as an international financial center, or

- the economy and prosperity of the UK

---

[53] Chapter 3.10 of the FCA Enforcement Guide which provides guidance on how FCA uses its Enforcement powers (https://www.handbook.fca.org.uk/handbook/EG/3?view=chapter) and the Guidelines themselves are set out at Annex 2 to the Enforcement Guide.

[54] https://www.sfo.gov.uk/publications/information-victims-witnesses-whistleblowers.

and whether the complexity and nature of the suspected offence warrants the application of the SFO's specialist skills, powers and capabilities to investigate and prosecute.[55]

69. The SFO also pursues criminals for the financial benefit they have made from their crimes and assists overseas jurisdictions with their investigations into serious and complex fraud, bribery and corruption cases. The SFO is unusual in the UK in that it both investigates and prosecutes cases. The SFO was set up in this manner "because these kinds of cases are complicated and lawyers and investigators need to work together from the beginning".[56]

70. The SFO website explains that the first stage of an investigation is intelligence gathering and that it relies on the provision of information and evidence from victims of crime (such as Mr Sabag) to initiate this stage:

"*The SFO receives information on possible criminal activity from a variety of sources, including whistleblowers, victims other law enforcement agencies,... This information is analysed and the potential for the alleged activity to become the subject of a criminal investigation is assessed by our Intelligence Unit, a team of intelligence operatives, lawyers, accredited financial intelligence officers, analysts and investigators*".

71. When deciding whether to accept a case for criminal investigation the Director of SFO will consider whether it meets SFO criteria and if there are reasonable grounds to suspect "serious or complex fraud". The formal acceptance of a fraud matter for investigation enables the SFO to use its "s2 Criminal Justice Act 1987" powers to pursue the investigation.[57]

72. In this case, the fact that the s89 offence is one under which FCA is a statutory prosecutor by reason of s401(1)(c) of FSMA tends to favor the FCA investigating the potential offence. However, the fact that serious or complex fraud is the predominant issue in the conduct in question may make it more appropriate for the SFO to investigate. It would be for the agencies to decide among themselves which one would take the matter forward following the provision by Mr Sabag of the evidence to them including, in particular, the discovery obtained pursuant to this Application. As set out in section III above, evidence that Mr Windhorst took steps to manipulate the term of the MCCC Agreement together with the other evidence referred to in this Declaration and in the U.S. Memorandum would strongly support the claim that Mr Windhorst knew that

---

[55] https://www.sfo.gov.uk.aboutus.

[56] https://www/sfo/gov.uk/aboutus

[57] Criminal Justice Act 1987 powers enable the SFO to require subjects to attend and answer questions, albeit the answers may not be used against a person in a criminal prosecution other than a prosecution for providing false information.

his representations and statements were untrue and misleading at the time that he made them.

### *The Fraud by False Representation Offence/ Conspiracy to Defraud Offence*

73. Mr Sabag is an interested person in relation to a criminal complaint concerning the Fraud by False Representation Offence since he may report the criminal conduct to the Police or the SFO, and the Police or the SFO will consider whether to appoint investigators as a result of the evidence that he provides. The role and the approach of the SFO is described above.

74. Fraud can be reported to any police force or to "Action Fraud" which is the "UK's national reporting center for fraud and cybercrime where you should report fraud if you have been scammed, defrauded or experienced cyber crime in England, Wales and Northern Ireland."[58]

75. The Action Fraud website provides that "you can report fraud or cybercrime to Action Fraud any time of the day or night using our online reporting tool. Reporting online is quick and easy. The tool will guide you through simple questions to identify what has happened and our advisors are available twenty four hours to give you help and advice if you need it."[59]

76. Action Fraud will ensure that the crime is assigned to the correct police force. Once the correct police force has been established then an officer will conduct an initial investigation and will then carry out an investigative assessment where the police force reviews all of the information gathered and decides whether to investigate the matter further. The decision will be based on four factors:

- *vulnerability of the victim*
- *severity of the offence*
- *likelihood it can be solved*
- *the most effective use of resources*

77. There are two possible outcomes to an investigative assessment. The first is that the investigation is closed as there are "no further leads we can proportionately follow at that time". The second is that further work will be done and an investigating officer will be assigned to the case to pursue the matter. This may then ultimately lead to a decision being taken to present a file to a Crown Prosecutor for a decision on whether to

---

[58] https://www.actionfraud.police.uk/what-is-action-fraud
[59] https://www.actionfraud.police.uk/reporting-fraud-and-cyber-crime

prosecute the offence.  The more evidence that Mr Sabag is able to provide the more likely that any investigation would commence and would then progress to a prosecution.

### *The Bribery offence*

78. Mr Sabag is an interested person in relation to the alleged Bribery Offence since the purpose of the alleged Bribe was to cause him loss. The National Crime Agency ("**NCA**") "leads the UK's fight to cut serious and organised crime, protecting the public by targeting and pursuing those criminals who pose the greatest risk to the UK"[60]. It is the specialist agency to which reports of bribery and corruption should be made. The NCA works with and has the power to direct police resources to deal with serious and organised crime.

79. The NCA website provides[61]:

> *"Bribery, corruption and the evasion of financial sanctions pose a serious risk to the UK's national security, economic prosperity and International reputation. As part of our response to illicit finance we work with partners in the UK and around the world to investigate offenders, identify the proceeds of bribery and corruption and return funds to victims"*

80. The NCA website invites reports of suspected bribery and corruption[62]:

> *"Allegations of bribery and corruption involving UK companies, or foreign companies and/or individuals with a connection to the UK, should be reported to our International Corruption Unit*
>
> *The Bribery Act applies to:*
>
> - *UK Nationals*
> - *Foreign Nationals resident in the UK*
> - *UK Companies*
> - *Foreign Companies doing business in the UK*
>
> *Allegations of bribery and corruption involving UK companies, or foreign companies and/or individuals with a connection to the UK should be reported to our International Corruption Unit.*

---

[60] https://www.nationalcrimeagency.gov.uk

[61] https://www.nationalcrimeagency.gov.uk/what-we-do/crime-threats/bribery-corruption-and-sanctions-evasion

[62] https://nationalcrimeagency.gov.uk/what-we-do/crime-threats/bribery-corruption-and-sanctions-evasion/how-to-report-international-bribery-and-corruption

> *The allegation may relate to bribery and/or corruption taking place within a company, organisation, group of individuals or by your competitors anywhere in the world."*
>
> *"Please include as much information as possible about the alleged offence. This will enable us to investigate the allegation more quickly and thoroughly".*

81. The NCA website outlines the types of information that should be provided to assist the NCA. This includes:

   - *what has occurred*
   - *what is the crime you suspect*
   - *what evidence do you hold*
   - *what connection is there to the United Kingdom*

82. Once the NCA has assessed the information provided, it may initiate a criminal investigation if it meets NCA criteria. NCA may contact the information provider to seek information as a witness.

83. The more information and evidence that Mr Sabag is able to provide to the Agencies, then the more likely it is that the Agencies will choose to use their powers to investigate Mr Windhorst's alleged criminal conduct, and subsequently the greater the likelihood that a decision would be taken to prosecute Mr Windhorst and/or others. Evidence that Mr Windhorst directly or through a third party, offered, promised or gave a financial advantage to Mr Deiter or to another at his request, or with his assent in order to influence Mr Deiter to procure the MCCC Agreement with an 18 month term would be prima facie evidence the offence has been committed (see paragraph 54 above).

### *Right to challenge a decision not to investigate and/or a decision not to prosecute*

84. If the Agencies choose not to launch an investigation into Mr Windhorst's alleged criminal conduct then Mr Sabag may challenge the relevant agency and ultimately seek a review of that decision by the Court.[63] Mr Sabag may also seek a review of any subsequent decision not to prosecute.[64] In such a review, which is not an appeal but

---

[63] R (on the application of Soma Oil and Gas) and the Director of the SFO [2016] EWHC2471 (Admin) is precedent for the proposition that a decision by the Serious Fraud Office in relation to an investigation is susceptible to judicial review. Decisions by other investigating authorities are subject to the same judicial oversight.

[64] The Crown Prosecution Service own guidance provides that a decision to prosecute or not to prosecute may be judicially reviewed. If an application for judicial review is successful, the court will direct the CPS to reconsider its position. A victim may also have a right to seek an internal review within the CPS of a decision not to charge. This is the Victims Right to Review Scheme which applies to "any" person who has suffered harm, including physical, mental or emotional harm or economic loss which was directly caused by criminal conduct.

rather is a challenge of whether the Agency acted reasonably, the Court will consider the reasonableness of the approach of the Agency taking into account its public duties and its stated policies. In determining whether the Agency has acted unreasonably, the Court will take account of the evidence available to the Agency when declining whether to investigate further or prosecute[65].

### *Private Investigation and Prosecution - Fraud by False Representation Offence / Conspiracy to commit Fraud by False Representation / Conspiracy to Defraud Offence*

85. As an alternative to pursuing the Fraud by False Representation Offence with an Agency, Mr Sabag may choose to carry out his own personal investigation without referring the matter to an Agency. Following his investigations, Mr Sabag may initiate his own private prosecution under the Fraud Act in relation to the Fraud by way of False Representation Offence, Conspiracy to commit Fraud by False Representation or Conspiracy to Defraud without recourse to any of the Agencies or to a public prosecutor[66] [67]. Mr Sabag would not be able to launch a private prosecution in relation to the Misleading Statements Offence, nor would he be able to do so in relation to the Bribery Offence, since each of these offences requires consent from the DPP/Attorney General[68].

### *Right to an award of compensation*

86. In the event of a successful prosecution, Mr Sabag could also be eligible for the benefit of a compensation order at the end of any criminal proceedings. The Powers of Criminal Courts (Sentencing) Act 2000 provides that a court may make a compensation order requiring the offender to pay compensation for any loss resulting from the offence. The Proceeds of Crime Act 2002 provides that where a person is found to have benefitted from criminal conduct, the Court has the power to make a confiscation order which may include a direction that part or all of the amount be ordered to be paid by way of

---

[65] It is well established that the High Court will only very rarely intervene in relation to the prosecutorial decision making process. However, the High Court will intervene if it were satisfied:
- the prosecution failed to take account of matters that ought to have been considered;
- the prosecution took account of matters that ought not to have been considered;
- the decision was so unreasonable that no reasonable authority could have taken it "Associated Picture Houses Limited v Wednesbury Corporation 1947 IAII ER 498".

[66] In R (Gujra) v Crown Prosecution Service [2012] UKSC52; [2013]1 AC 484 Lord Neuberger stated: "*There is no doubt that the right to bring private prosecutions is still firmly part of English law, and that the right can fairly be seen as a valuable protection against an oversight or worse on the part of the public prosecution authorities.*"

[67] s6(1) of the Prosecution of Offenders Act 1985 provides that "nothing in this Part shall preclude any person from instituting any criminal proceedings or conducting any criminal proceedings to which the Director's duty to take over the conduct of proceedings does not apply."

[68] However, see paragraph 62 above.

compensation to the victim. This includes in cases where the criminal prosecution was a private prosecution.[69]

### (ii) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing".

87. The Application seeks documents and communications from MCCC, and depositions and documents from Mr Deiter and deposition evidence from certain employees of Marion County.

### (iii) the evidence must be "for use in a proceeding in a foreign or international tribunal"

88. The evidence sought in this Application would form part of Mr Sabag's report to the Agencies described above. Mr Sabag would present the evidence which he already has including in relation to the negotiations with Mr Windhorst, Mr Dubios and Ms Cohen about the Acquisition of GPS by Track Group; the attempts by Mr Windhorst to avoid the terms of the Put Option Agreement; the evidence of non-compliance with US securities law; together with the evidence obtained pursuant to this Application concerning the 18 month MCCC Agreement. The Agencies would then decide whether to appoint investigators who, if appointed, would then be able to exercise formal powers to seek further evidence.[70] The evidence sought through this Application would be central to the assessment by the Agencies of whether to launch an investigation since the evidence will help to establish the extent to which the term of the MCCC Agreement was manipulated causing the MCCC Agreement to fall outside the terms of a Revenue Generating Contract for the purpose of the SPA. Evidence of manipulation of the term of the MCCC Agreement by Mr Windhorst would strongly support the claim that Mr Windhorst knew that his representations and statements were untrue and misleading at the time he made them, and if there is evidence of a Bribe, that he bribed a foreign public official contrary to the Bribery Act 2010.

89. The investigation by an Agency will be guided by a Public Prosecutor who will work with the Agency to ensure any investigation is focused most effectively. Following investigation, a decision would be taken by the Public Prosecutor whether to prosecute for

---

[69] See s. 13 of the Proceeds of Crime Act 2002 and section 120 of the Powers of the Criminal Courts (Sentencing) Act 2000. In the case of R v Ketan Somaia [2016] EWCA Crim 2267, proceedings under the Criminal Justice Act 1988 (which was the predecessor legislation to the Proceeds of Crime Act 2002) were brought for a confiscation order and an order was made that Mr Somaia pay £20,434,691 of which £18,220,723 was to be paid to the victim Mr Murli Mirchandani who had brought the private prosecution. See also R (Virgin Media Ltd) v Zinga [2014] EWCA Crim 52.

[70] For instance, under s168 of the Financial Services and Markets Act, the FCA may appoint investigators to carry out an investigation into the misleading statements offence. The power to appoint investigators arises where it appears to FCA "that there are circumstances suggesting" that such an offence has been committed.

an offence. Should Mr Sabag pursue a private prosecution then he will be the "prosecutor" but will appoint his own legal team to conduct the prosecution on his behalf.

### The Decision to Prosecute by an Agency

90. The code for Crown Prosecutors (**"the Code"**) is a document published by the Director of Public Prosecutions under s10 of the Prosecution of Offenders Act 1985. The Code sets out, amongst other things, the test to be applied by Crown Prosecutors when deciding whether to prosecute an offence. This is a two stage test: first whether there is enough evidence to provide "a realistic prospect of conviction"; second whether it is in the public interest to bring a prosecution. Paragraph 2.5 of the Code provides:

> *"It is the duty of prosecutors to make sure that the right person is prosecuted for the right offence and to bring offenders to justice wherever possible".*

91. As explained above the discovery obtained under the Application would be material to the assessment by a Public Prosecutor of whether there is enough evidence to provide "a reasonable prospect of conviction" of Mr Windhorst.  Albeit, that it will be supplemented by evidence subsequently gathered through further investigation.

### Private Prosecution by Mr Sabag

92. As noted above the discovery will also form a part of the evidence gathered by Mr Sabag with a view to initiating a private prosecution.  In the UK, individuals like Mr Sabag may undertake investigations into suspected criminal conduct, notwithstanding the fact that they do not have the formal statutory powers of investigators appointed under a statute. Individuals like Mr Sabag may also initiate private prosecutions without recourse to a Public Prosecutor or authority unless specific consent to prosecute the offence is required under statute.[71]

### The Procedure for commencing a prosecution

93. A prosecution is commenced by the police charging the offender with the offence or by the person bringing the prosecution (either a public or private prosecutor) laying a charge sheet known as an 'information' before a Magistrates' Court. The Magistrates' Court will then decide whether to issue a summons requiring the defendant to attend Court or a warrant seeking his arrest. The procedure which must be followed when starting a

---

[71] Consent is not required for a prosecution of the Fraud by False Representation Offence or for the offences of Conspiracy to commit Fraud by False Representation or Conspiracy to Defraud.

prosecution is set out in Rule 7 of the 'Criminal Procedure Rules and Criminal Practice Directions'[72]. Rule 7.2 requires the application to:

(i)   include a statement of the alleged offence described in ordinary language together with any legislation that creates the offence and particulars of the conduct constituting the commission of the offence to make clear what is being alleged;

(ii)  demonstrate that the application has been made in time[73];

(iii) demonstrate that the applicant has the necessary consent, if legislation requires it[74];

(iv)  demonstrate that the offence can be tried in the Crown Court[75];

(v)   demonstrate that the offence can be punished with imprisonment[76].

94. Where the prosecution is a private prosecution, then Rule 7.2(6) also applies and the application must:

(a) concisely outline the grounds for asserting that the defendant has committed the alleged offence or offences;

(b) disclose any previous application by the same applicant and any current or previous proceedings brought by another prosecutor in respect of any allegation now made[77];

(c) include a statement that, to the best of the applicant's knowledge information and belief:
   i.   the allegations contained in the application are substantially true;
   ii.  the evidence on which the applicant relies will be available at trial;
   iii. the details given about previous applications are true; and
   iv.  the application discloses all information that is material to what the court must decide.

---

[72] The Criminal Procedure Rules and Criminal Practice Directions are the Rules and Directions that must be followed in criminal prosecutions. They are issued by the Lord Chief Justice. The current version came into force on 1 April 2019.

[73] There is no limitation period that applies to a prosecution for the offences described in this Declaration.

[74] No consent is required for a prosecution under the Fraud Act. Any prosecution brought under the Financial Services Act or the Bribery Act would be brought by a public prosecutor who would obtain the necessary consent.

[75] The offences described in this Declaration may all be tried in the Crown Court.

[76] A term of imprisonment may be imposed for each of the offences described in this Declaration. See paragraph 7 above: 7 years for the Misleading Statements Offence; 10 years for the Fraud by False Representation Offence; and 10 years for the Bribery Offence. The same penalties as for the substantive offence apply in relation to conspiracy.

[77] No previous application has been brought and nor are there any current or previous proceedings brought by any prosecutor in respect of any allegation described in this Declaration.

95. Mr Sabag's Application is part of his investigation prior to formal accusation. It is for evidence which will go to establish the extent to which and the manner in which the term of the MCCC Agreement was improperly manipulated so as to fall outside the definition of a Revenue Generating Contract for the purpose of the SPA and therefore whether the agreement formed in London under which GPS Global was sold to Track Group was based on false and misleading representations by Mr. Windhorst, and whether an offence of bribery has been committed in respect of the MCCC Agreement.  The evidence will be key to an assessment by the Agencies of whether there are grounds to launch an investigation into suspected criminal offences, and will be material to whether a prosecution should be brought thereafter, albeit that it will be supplemented by evidence gathered through further investigation. The evidence will form part of the material that could be used for the purpose of launching any prosecution, whether a public prosecution or a private prosecution.

***(iv) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance.***

96. I understand that all of the persons from whom the discovery is sought reside in the Southern District of Indiana for the State of Indiana.

***The four prong "discretionary" test***

97. I have also been asked by U.S. counsel to comment on the first three prongs of the four prong "discretionary" test that a US court would apply before granting discovery under s1782.

> *(1) whether the person from whom discovery is sought is a participant in the foreign proceedings; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.*

***(i) whether the person from whom discovery is sought is a participant in the foreign proceedings.***

98. At this stage, neither Marion County or MCCC, or any of their employees including Mr Deiter would be an expected "party" in any UK proceedings. Neither Marion County, MCCC nor Mr Deiter were involved in making any statements or representations to Mr Sabag at the time of the purchase of GPS Global by Track Group and so there is no basis on which they could be concerned with the Misleading Statement or Fraud by False Representation offences. If the evidence were to show that a bribe was paid to Mr Deiter, receipt of a bribe by a foreign public official is not a criminal offence which can be

prosecuted in the UK. At this time, there is no suggestion of any wrongdoing by other employees or ex-employees of Marion County or MCCC.

**(ii) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance.**

99. The process for reporting offences to the Agencies is outlined at paragraphs 59-83 above. The process by which the Agencies or Mr Sabag may initiate a prosecution is outlined at paragraphs 88-95 above.

**Receipt by UK authorities of US assistance**

100. The UK authorities regularly receive the assistance of US discovery to aid in the criminal investigation and subsequent prosecution of an individual who commits an offence which may be prosecuted in the UK.  For example, the FCA has expressly stated in its Approach to Enforcement document:

> *"We also work closely with other international regulators, sharing information, intelligence and know-how as well as detecting and taking action to tackle cross-border misconduct."*[78]

101. The SFO website explains that its cases "usually; involve activity in many countries; involve alleged criminals who go to great lengths to hide their activity and the money they make from it". The website has a specific section 'International Assistance' explaining how it goes about obtaining evidence from abroad and how it assists other agencies abroad by providing evidence:

> *"Mutual Legal Assistance ('MLA') is the formal way in which countries request and provide help to each other, to obtain evidence located in one country for use in criminal investigations and prosecutions in another country. The SFO is a designated prosecuting authority in the United Kingdom for the purpose of MLA requests. Crime is increasingly global in nature and MLA is a vital tool for ensuring fair and effective criminal proceedings. The UK is committed to helping other countries combat international crime. By giving them the evidence to prosecute cases, we are deterring international criminals from*:
>
> - *Using the UK as a base for their activities*
> - *Seeking out UK victims*
> - *Damaging the UK's reputation*

---

[78] "FCA Mission: Approach to Enforcement" April 2019

> *It also helps us enhance the cooperation the SFO receives from overseas partners. Most SFO cases have an international dimension and so we frequently make MLA requests ourselves".*[79]

102. The CPS[80] often requires evidence from abroad for the purpose of investigations and subsequent prosecutions.  CPS guidance provides:

> *"Prosecutors can obtain evidence from overseas using mutual legal assistance (MLA). This takes the form of a formal International Letter of Request (ILOR) issued by a designated prosecuting authority or a Court.*

> *A prosecutor is not always required to obtain evidence from overseas; often it can be obtained by investigators through police cooperation channels. This is often referred to as police to police informal cooperation or mutual administrative assistance (MAA).*

> *The appropriate mechanism to be used to obtain evidence from overseas generally depends on the type of assistance being sought and the domestic legislation of the country from which the assistance is sought.*

> *Investigators and prosecutors should be alert to the need to obtain evidence from overseas as early as possible and keep this under review as the case progresses."*[81]

103. The website of the NCA explains that its role is an international one[82]:

> *"Bribery, corruption and the evasion of financial sanctions pose a serious risk to the UK's national security, economic prosperity and international reputation. As part of our response to illicit finance we work with partners in the UK and around the world to investigate offenders, identify the proceeds of bribery and corruption, and return funds to victims."*[83]

104. Evidence obtained from a person abroad will be used by the Agencies to establish whether a formal investigation should be opened and used in the course of an investigation

---

[79]  https://www.sfo.gov.uk/about-us

[80]  The CPS website states:" The Crown Prosecution Service (CPS) prosecutes criminal cases that have been investigated by the police and other investigative organisations in England and Wales. The CPS is independent, and we make our decisions independently of the police and government."

[81]  CPS Guidance "International Enquiries".

[82]  The NCA website provides that its role is to: "lead the UK's fight to cut serious and organised crime. NCA officers work at the forefront of law enforcement, building the best possible intelligence picture of serious and organised crime threats, relentlessly pursuing the most serious and dangerous offenders and developing and delivering specialist capabilities on behalf of law enforcement and other partners."

[83]  NCA website, "Bribery Corruption and Sanctions Evasion."

to help establish whether offences have been committed[84].  The question of whether the evidence would be admissible in subsequent criminal proceedings is a separate question of UK law that is beyond the scope of this Declaration.

105. Evidence obtained from abroad may form the basis for the evidence given by a witness at a subsequent criminal trial.  Witnesses give evidence in person at trial.  However, hearsay evidence in the form of written statements is admissible in certain circumstances.  One of the grounds on which the prosecution may seek to introduce hearsay evidence is that "the person is outside the United Kingdom and it is not reasonably practicable to secure their attendance."[85]

106. There is no basis on which the Agencies would refuse to consider the material evidence obtained under this Application as part of their assessment of whether to launch an investigation.  As explained above, discovery obtained under this Application would thereafter be material when drafting the particulars of any offence for the purpose of laying an information before the Magistrates' Court[86] (albeit this will have been supplemented by evidence subsequently gathered through further investigation).  I would expect the Agencies to be receptive to any useful evidence that could be obtained and presented with the assistance of a U.S. federal court.

***(iii) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.***

107. As noted above, this request does not attempt to circumvent foreign proof gathering restrictions. The evidence gathered under this Application would form part of an overall package that will be provided by Mr Sabag to the Agencies to be used to determine whether to launch an investigation and a subsequent prosecution. It would also form part of the basis for the information laid before the Magistrates' Court in the event of a prosecution, including in respect of a private prosecution by Mr Sabag.

108. As explained in this Declaration, the Agencies have powers to gather evidence and information in the UK. They also work closely with overseas regulators to gather information and evidence and regularly use Mutual Legal Assistance channels to obtain evidence in the US. However, those steps will be taken only where a decision has been made to take the case on, and that step has not yet been taken. Mr Sabag does not have a current route through which he may use the UK Court's to gather the evidence from

---

[84]  Further, for example, the FCA "Our Approach to Enforcement" document dated 1 April 2019 provides "we work closely and collaboratively with other regulators and law enforcement agencies both in the UK and overseas… We also work closely with other international regulators, sharing information, intelligence and know-how as well as detecting and taking action to tackle cross border misconduct".

[85]  Criminal Justice Act 2003 Section 116(2)(c).

[86]  See paragraphs 94 and 95 above.

Marion County or MCCC and, in any event, I am informed by US Counsel that there is legally no requirement on a s1782 applicant to exhaust all discovery options in the country where the proceedings are taking place before applying for relief under s1782.

I declare, certify, verify or state under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

30/12/19

Date

Peter Bibby