| | |
|---|---|
| **From:** | Guy Dubois <guy.dubois@securealert.com> |
| **Sent:** | Tuesday, December 17, 2013 9:35 PM |
| **To:** | Eli Sabag |
| **Cc:** | Tatiana Cohen; Joe Zimmerman |
| **Subject:** | executed LOI |
| **Attachments:** | GPS p1.pdf; ATT00001.htm; GPS p2.pdf; ATT00002.htm; GPS p3.pdf; ATT00003.htm; GPS p4.pdf; ATT00004.htm |

Dear Eli: please find attached the executed LOI from our side. A major milestone for our companies! I am eagerly looking forward to work with your team to make this a true win-win opportunity for both of us.
Should you and your wife be in London over the weekend, do take some time to relax and enjoy the festive season!
Speak soon,
Best,
Guy



EXHIBIT F

December 10, 2013

VIA: Eli@GPSGlobal.co.il

Mr. Eli Sabag
Chairman
GPS Global
Tel Aviv
Israel

    RE:    Non-Binding Letter of Intent

Dear Eli:

    This non-binding Letter of Intent (the "LOI"), which sets forth our mutual understanding and intent regarding the principal terms and conditions of the proposed acquisition (the "Acquisition") by SecureAlert, Inc., a Utah corporation (the "Buyer"), of 100% of the equity interests and voting rights (the "Stock") of GPS Global, a company incorporated in Israel (the "Company"). For purposes of this LOI, the Seller's shareholders are collectively referred to as the "Sellers."

    While we anticipate that all of the terms and conditions will be fully set forth in a later definitive purchase agreement, we confirm that the proposed terms of the Acquisition are as follows:

1.    <u>Basic Transaction</u>.    The Sellers would sell all of the issued and outstanding Stock to the Buyer at the price (the "Purchase Price") set forth below in Paragraph 2, free and clear of all liens, security interests and other encumbrances. This assumes that there are no other issued and outstanding equity interests of the Company, and there are no outstanding or contingent rights to acquire equity interests of the Company. It is further understood that following the closing there will be no remaining shareholder loans due. The Acquisition shall be structured such that the shareholder loans shall be repaid from the consideration received.

2.    <u>Purchase Price</u>. The total consideration for the Acquisition shall be $8 million and will be settled as follows:

    (a) $5.0 million on the closing date, as follows:
        1. $0.5 million in cash;
        2. $1.6 million in freely tradeable SecureAlert equity;
        3. $2.9 million in SecureAlert equity, carrying a 2 year trading restriction which will be held in escrow for a period of 6 months following closing to allow for confirmation of the product performance of the Company's unit;

    (b) $1.0 million in SecureAlert equity following the signing of the Thailand contract for a minimum of 2,000 units;

    (c) $2.0 million in SecureAlert equity following the successful installation of 2,000 recurrent revenue generating units, excluding the units referenced under (b).

Mr Eli Sabag
Chairman
GPS Global
December 10, 2013
Page 2 of 4

All SecureAlert equity issued shall be registered for trade immediately after its issuance. The price per SecureAlert share is currently valued at $20. The shares issued under this agreement shall be identical to such publicly traded shares.

3. <u>Exclusivity</u>. During the period from the date that this LOI is executed by the Company and Sellers (the "Signing Date") and through and including the date that is 45 days after the date that this LOI is executed by the Company and Sellers (the "Target Date"):

   (a) neither the Company nor the Sellers will, directly or indirectly, through any representative or otherwise solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept, or consider any proposal of any other person relating to the acquisition of the Stock or the Company, the assets or business, in whole or in part, whether directly or indirectly, through purchase, merger, consolidation, or otherwise;
   (b) the Company and the Sellers will immediately notify the Buyer regarding any contact between the Sellers, the Company or its respective representatives any other person regarding any such offer or proposal or any related inquiry; and
   (c) the Company and the Sellers will inform any such interested party that the Company and the Sellers are unable to entertain any offer during such period.

4. <u>Confidentiality; Public Announcements</u>. Each of the Company, Sellers and Buyer shall maintain the confidentiality of and shall not disclose any of the terms of this LOI (including its existence or the fact that the parties are in negotiations) and any other information related to the other party or its representatives or affiliates except to the extent required by law (provided that any party so required shall provide the other party with the contents of such disclosure as soon as reasonably practicable prior to making such disclosure). It is understood that all press releases or other public communications of any sort relating to this LOI or the transactions contemplated herein, including the method of release for publication thereof, shall be subject to the approval of each of the parties hereto; provided, however, that the parties shall be entitled to make such disclosures as may be required pursuant to applicable law or the lawful requirements of any governmental agency or by order of a court of competent jurisdiction.

5. <u>Conditions to Closing</u>. The closing of the Acquisition would be subject to the satisfaction of various conditions, including:

   (a) the parties shall have negotiated and executed the Definitive Agreement (as hereinafter defined) and any other documents described in this LOI;
   (b) the completion by the Buyer and the Buyer's representatives of its due diligence review and investigation of the Company and its assets and liabilities;
   (c) the absence of any material adverse change in the business, condition or prospects of the Company (financial or otherwise), or its relationship with customers, vendors and independent consultants/contractors prior to the closing;
   (d) the receipt of all contractual, and governmental consents and approvals necessary (if any) in connection with the Acquisition;
   (e) each of the parties shall have received all required corporate approvals of the Acquisition.

6. <u>Other Agreements to be Executed at Closing</u>. In addition to the Definitive Agreement (as hereinafter defined), the following agreements would be entered into at the closing (in each case in form and substance satisfactory to the parties thereto):

Mr Eli Sabag
Chairman
GPS Global
December 10, 2013
Page 3 of 4

    (a) Each seller would execute a non-compete agreement in favor of Buyer; and
    (b) The senior management and selected contractors of Company would enter into regular employment agreements with the Company; and
    (c) Eli Sabag shall be nominated as a Director of the Buyer and shall remain as the CEO of the Company for a period of no less than 24 months. His total annual base remuneration will be $0.2 million with an additional variable bonus potential of 50%.
    (d) The Buyer shall provide a funding agreement of up to $3.0 million to the Company to ensure sufficient working and operating capital is available to allow the company to deliver on its objectives

7.    Access.    During the period from the Signing Date through and including the earlier of (a) the Target Date, or (b) the date on which the Buyer provides the Company and Sellers with written notice that negotiations toward a Definitive Agreement are terminated (the "Termination Date"), the Company and the Sellers will afford the buyer, and its employees, agents, representatives, accountants, actuaries, consultants, and counsel access to their property, books, records, documents, premises, employees, customers, suppliers and independent accountants for the purpose of a due diligence investigation. Such access shall be at reasonable times during normal business hours, with reasonable prior notice to the Sellers and the Company. Buyer will work cooperatively with the Sellers and the Company to conduct such investigation in as efficient manner as is reasonably possible to permit the Company to continue to operate in the ordinary course with limited interruptions. Buyer shall not contact any employee, customer or other business relation of the Company without the prior written consent of the Company. A copy of the Buyer's Due Diligence – Request for Materials enclosed herewith and it is anticipated that the Buyer will conclude its due diligence investigation on or before the 45th day after the date hereof. Buyer intends to use third parties to assist with its due diligence investigation and will so advise the Company and the Sellers of the identities of such advisors upon engagement of the advisors. The Buyer and its advisors shall execute an NDA in a form agreed by the Company prior to any disclosure.

8.    Conduct of the Business.    During the period from the Signing Date through and including the Termination Date, the Sellers shall cause the Company to operate the business in the ordinary course, consistent with past practice, and to refrain from any extraordinary transactions.

9.    Cooperation and Closing.    During the period from the Signing Date through and including the Target Date (or if earlier, the Termination Date), the Buyer, the Company and the Sellers will cooperate with each other and proceed in good faith toward the completion of the proposed transaction(s) described herein. The parties are interested that the Closing of the transaction shall occur no later than 45 days from the date of acceptance of this LOI by the Sellers.

10.    Costs. The Buyer and the Sellers will be responsible for and bear all of their own respective costs and expenses (including any broker's, bankers' or finder's fees and the expenses of its attorneys and other representatives) incurred at any time in connection with pursuing or consummating the Acquisition. Each party shall indemnify and hold harmless the other from expenses related to brokerage, banker or finder's fees or agent's commissions and any similar charges in connection with the transaction for which such party is responsible. All transaction related expenses incurred by the Company shall be the responsibility of the Sellers.

11.    Definitive Agreement. Upon execution of this LOI, the Buyer, the Sellers and the Company mutually agree to proceed in good faith toward negotiation and execution of a definitive agreement (the

Mr Eli Sabag
Chairman
GPS Global
December 10, 2013
Page 4 of 4

"Definitive Agreement"), which will provide for the Acquisition, and contain representations, warranties, and indemnifications customary for transactions of this nature. This LOI is intended to be a guide in drafting the Definitive Agreement and should not be construed to preclude other provisions that are consistent with the terms specified in this LOI.

12. [Reserved]

13. Non-Binding. It is expressly understood and agreed that this is a letter of intent only and that no liability or obligation of any nature whatsoever is intended to be created between the parties hereto; provided that the parties do intend to be legally bound by the provisions of paragraphs 3,4, 7, 8, 9, 10,11, and 12 (the "Binding Provisions").

If you are in agreement with the foregoing, please sign and return one copy of this LOI to the undersigned, which thereupon will constitute our agreement with respect to its subject matter. If you do not return a signed copy to the undersigned on or before December 17, 2013, this LOI shall terminate and be without further force or effect.

This LOI may be executed in one or more counterparts, each of which will be deemed to be an original copy of this LOI and all of which, when taken together, will be deemed to constitute one and the same agreement. This LOI may be executed by facsimile or other electronic signatures.

Sincerely yours,

SECUREALERT, INC.

_____
Guy Dubois
Chairman of the Board

Acknowledged, accepted and agreed to this 17 day of December, 2013, by:

GPS Global

By: _____
    Eli Sabag, Chairman