# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re:<br>The Application of:<br><br><br>ELI SABAG, for an Order Pursuant to 28<br>U.S.C. § 1782 to Conduct Discovery for Use in<br>Foreign Proceedings. | Case No.: 1:19-mc-00084-JPH-TAB |

**LARS WINDHORST'S OPPOSITION TO APPLICANT ELI SABAG'S**
**SUPPLEMENTARY REQUEST FOR DISCOVERY IN ACCORDANCE WITH 28 U.S.C.**
**§ 1782**

Lars Windhorst ("Mr. Windhorst"), through counsel, hereby submits this Opposition to Applicant Eli Sabag's ("Mr. Sabag") Supplementary Request for Discovery in Accordance with 28 U.S.C. § 1782 (Doc. 98 ("Supplementary Request").

**I.      PRELIMINARY STATEMENT**

Mr. Sabag's Supplementary Request looks to do what no § 1782 applicant has done before – compel a foreign individual to sit for a deposition to be used in a foreign criminal proceeding against that foreign individual simply because the foreign individual intervened in a U.S. court proceeding to oppose § 1782 discovery against a domestic discovery target.  This extraordinary request for discovery is problematic on its own, but given the circumstances here where the parties have released and covenanted not to pursue claims against one another, it is evident Mr. Sabag's purpose in seeking to depose Mr. Windhorst is merely to exact revenge for Mr. Windhorst's delay in wiring Mr. Sabag a multi-million dollar settlement payment.

On its face, Mr. Sabag's Supplementary Request under § 1782 fails to satisfy three statutory prerequisites: (1) it compels Mr. Windhorst to testify in violation of privilege; (2) it seeks discovery from Mr. Windhorst even though he is not "found" in this District; and (3) it seeks

1

discovery that is not "for use" in a foreign proceeding.  This dooms the Supplementary Request because failure to satisfy even just one of the statutory requirements means discovery under § 1782 is impermissible as a matter of law.

Moreover, even if Mr. Sabag could satisfy § 1782's statutory requirements (he cannot), his Supplementary Request should be denied because the four discretionary factors articulated by the Supreme Court in *Intel v. Advanced Micro Devices Inc.,* 542 U.S. 241 (2004) clearly weigh against discovery.  Indeed, each individual *Intel* factor clearly weighs against discovery: (i) Mr. Windhorst is within the jurisdictional reach of the relevant U.K. criminal courts and authorities; (ii) the criminal nature of Mr. Sabag's contemplated foreign proceedings renders it less suitable to discovery by a private individual; (iii) deposing Mr. Windhorst circumvents U.K. proof-gathering restrictions and the well-established U.S. policy of enforcing contractual agreements, especially where Mr. Sabag has waited more than 30-months to file his Supplementary Request; and (iv) the deposition is unduly burdensome and intrusive.

For at least these reasons and as further explained below, the Court should deny Mr. Sabag's Supplementary Request.

## II.    FACTUAL AND PROCEDURAL HISTORY

### 1.    Mr. Sabag files the Original 1782 Application

On December 31, 2019, Mr. Sabag initiated this proceeding ("1782 Action") by filing under seal an *ex parte* application with the Court for an order pursuant to 28 U.S.C. § 1782, seeking "targeted discovery from Marion County Community Corrections (MCCC) and various employees of MCCC and Marion County for use in an anticipated criminal investigation conducted before formal accusation in a foreign court."  Doc. 1 at 1.  Mr. Sabag's application, however, was mostly describing an acquisition transaction, related agreements, and subsequent disputes among or

between Mr. Sabag, Mr. Windhorst, Track Group, Inc. ("Track Group") and Sapinda Asia Limited ("Sapinda").  *See* Doc. 9 at 8-36.

> **2.      This Court grants the Original 1782 Application and Mr. Sabag initiates arbitration**

On January 31, 2020, the Court granted Mr. Sabag's *ex parte* application, (Doc. 13 ("*Ex Parte* Order")), and unsealed it in February 2020.  Doc. 15.  Shortly after obtaining the *Ex Parte* Order from the Magistrate Judge, on March 11, 2020, Mr. Sabag filed a notice of arbitration in the International Center for Dispute Resolution (ICDR) in New York.  Doc. 33-3 ("Mr. Sabag's Statement of Claim").  The facts section in Mr. Sabag's *ex parte* Application is almost the same as the facts section in Mr. Sabag's Statement of Claim, and this time Mr. Sabag sought damages under claims including breach of the share purchase agreement and put option agreement. *Compare* Doc. 33-3 *with* Doc. 9; *see also* Doc. 65 at 12 (noting the 1782 Application and the Statement of Claim "are inextricably linked and involve an identical nucleus of facts all stemming from the potential joint venture between Mr. Sabag, Mr. Windhorst, and Track Group").

> **3.      Mr. Windhorst and Track Group move to intervene and move to vacate the *Ex Parte* Order and quash the subpoenas**

On March 18, 2020, Mr. Windhorst moved to intervene in the above-captioned proceeding ("1782 Action") under Fed. R. Civ. P. 24 (Docs. 20, 21), and moved to vacate the *Ex Parte* Order and to quash the subpoenas under Fed. R. Civ. P. 45 and 60 (Docs. 24, 25).  Mr. Windhorst's intervention was limited—as the party against whom the information "could potentially be used in litigation," he intervened to protect his interests in ensuring the discovery sought by Mr. Sabag was actually authorized under § 1782.  Doc. 21 at 6; *see also id.* at 1 (filing motion to intervene "so that he may request that this Court vacate its Order . . . granting the *ex parte* application of Mr.

Sabag requesting discovery under 28 U.S.C. § 1782 . . . and quash the subpoenas issued to [MCCC], John Deiter, and David Condon"); Doc. 51 at 3 (noting the motion to intervene is for the Court to "have the benefit of a more complete record and appliable controlling legal authority on § 1782 discovery"). Mr. Sabag did not object to intervention "for the limited purpose of challenging the Court's Section 1782 Order." Doc. 40 at 9. On May 22, 2020, the Magistrate Judge granted Mr. Windhorst's motion to intervene as a permissive intervenor under Fed. R. Civ. P. 24(b)(1)(B), finding Mr. Windhorst's intervention was "reasonable" and not "highly prejudicial" to Mr. Sabag. Doc. 54 at 6, 7.[1] The Magistrate Judge found, in particular, that Mr. Windhorst "does not seek to file a claim or defense in the underlying action; rather, he just seeks to ensure that his interests are adequately represented and protected [in this 1782 Action]." *Id.* at 6.

**4.     The Magistrate Judge vacated the *ex parte* order and quashed the subpoenas, but the District Court Judge sustained Mr. Sabag's objections**

On August 18, 2020, the Magistrate Judge vacated the *Ex Parte* Order and denied Mr. Sabag's *ex parte* application, concluding that Mr. Sabag's application "did not set forth a sufficient factual basis objectively indicating that a foreign proceeding was within reasonable contemplation at the time he filed his application," and therefore failed to show the application was "for use" in a foreign proceeding, as § 1782 required. Doc. 69, at 1.

---

[1] The Magistrate Judge also considered whether Mr. Windhorst qualified as an intervenor as of right under Fed. R. Civ. P. 24(a)(2). The Magistrate Judge found that Mr. Windhorst had met the requirements of having "an interest relating to the subject matter of the action" and "potential impairment, as a practical matter, of that interest by the deposition of the action", because Mr. Windhorst noted that no foreign criminal matter was pending and pled that Mr. Sabag might be using the discovery to use in a pending arbitration in New York. The Magistrate Judge did not address the argument further, however, finding that he would in his discretion allow Mr. Windhorst to intervene permissibly regardless. Doc. 54 at 4, 5.

Mr. Sabag objected to the Magistrate Judge's order to vacate.  Doc. 70.  On April 26, 2021, this Court sustained Mr. Sabag's objection.  Doc. 80.  This Court concluded that Mr. Sabag's own sworn statements and his U.K. counsel's affidavit are the "objective indicium that the action is being contemplated," and thereby satisfied the "for use" requirement of § 1782 for granting an application.  *Id.* at 8.[2]

### 5. Mr. Windhorst moves for, and the Magistrate Judge enters, a protective order

On July 7, 2021, Mr. Windhorst moved to request that this Court deny Mr. Sabag's § 1782 Application and, should the Court grant the § 1782 Application, issue a protective order prohibiting the use of any discovery outside of the contemplated foreign proceedings.  Doc. 86; Doc. 87 at 8.

On July 28, 2021, the Magistrate Judge denied Mr. Windhorst's motion to vacate and allowed Mr. Sabag's § 1782 application to proceed, and granted Mr. Windhorst's motion for a protective order.  Doc. 89 at 1.  The Magistrate Judge concluded that "the person from whom the discovery is sought", i.e., MCCC personnel, resided in the district.  *Id.* at 4.  The Magistrate Judge also found that the discretionary factors weigh in favor of granting the § 1782 application, mainly because Mr. Windhorst was not the target of the discovery requests.  *See id.* at  6-8 (finding that

---

[2]    The Court should have denied Mr. Sabag's § 1782 application because as a matter of law this Court lacked jurisdiction to authorize discovery under § 1782 from government agents and government entities. *Al Fayed v. C.I.A.*, 229 F.3d 272, 274, 276 (D.C. Cir. 2000) (affirming quashing of subpoenas on the ground that "'person' excludes the sovereign" under Section 1782 and that "[t]he district court must have jurisdiction under § 1782 before the discovery rules become operative"); *In re Gushlak*, No. 11-MC-218 NGG, 2011 WL 3651268, at *7 (E.D.N.Y. Aug. 17, 2011) (denying § 1782 application seeking discovery from an official of the United States Bureau of Prisons on the basis that the application was "effectively an application directed at the United States government."). Since this Court had no jurisdiction under § 1782 from the outset, any subsequent orders should be unenforceable. *See, e.g. Wolf-Tec, Inc. v. Miller's Sausage Co.*, 899 F.2d 727, 728 (8th Cir. 1990) ("The district court had no jurisdiction over [defendant], and thus the [order of default] judgment of the district court is unenforceable."); *Am. Train Dispatchers Ass'n v. Norfolk & W. Ry. Co.*, 627 F. Supp. 941, 950 (N.D. Ind. 1985) (denying motion to amend complaint as moot where court has no jurisdiction over this dispute).

no one from whom the discovery is sought (MCCC and MCCC-related individuals) "would be an expected party in any proceedings in the United Kingdom" and the discovery requests are not "so unduly intrusive or burdensome" to these third-parties).

The Magistrate Judge also granted the protective order prohibiting the use of any discovery outside of the contemplated foreign proceedings and requiring Mr. Sabag to provide Mr. Windhorst with copies of the discovery he received from the Section 1782 Application, "given the substantial concerns . . . about the possibility of misuse [of the § 1782 Application]. *Id.* at 9, 11.

**6.    The District Court Judge overrules Mr. Sabag's objections to the protective order and closes the case**

On August 11, 2021, Mr. Sabag filed an objection to the Magistrate Judge's protective order.  Doc. 90.  On July 14, 2022, this Court overruled Mr. Sabag's objection, finding that the Magistrate Judge did not err in granting the protective order limiting the use of § 1782 discovery to the contemplated foreign proceeding and granting Mr. Windhorst the right to receive copies of Mr. Sabag's discovery.  Doc. 97 at 1, 6, 9.

This Court then ordered "[t]he clerk shall close this case on the docket." *Id.* at 10.

**7.    Mr. Sabag and Mr. Windhorst settle their disputes**

After almost two years of launching proceedings in different forums against Mr. Windhorst on the acquisition transaction, Mr. Sabag, Mr. Windhorst, Sapinda, and Track Group entered into a Confidential Settlement Agreement and Mutual Release ("Settlement Agreement"), effective on June 10, 2022.  Decl. of Lars Windhorst ("Windhorst Decl."), Ex. 1 [Settlement Agreement].[3]

---

[3]     The published terms of the agreement can be found on https://trackgrp.com/wp-content/uploads/2022/06/TRCK-8K.pdf, as part of Track Group's SEC Form 8-k filing.  Track Group's SEC Form 8-K explicitly provides that the Effective Date of the Settlement Agreement is June 10, 2022.

The Settlement Agreement requires Mr. Sabag to voluntarily dismiss all his existing claims and proceedings relating to Mr. Windhorst, expressly including this 1782 Action, with prejudice after receiving the settlement payment.  The Settlement Agreement "is intended to settle and resolve permanently and forever any and all claims" that were asserted by Mr. Sabag against Mr. Windhorst in, *inter alia*, the 1782 Action.  Windhorst Decl. Ex. 1 ¶ 3.  Paragraph 5 of the Settlement Agreement requires Mr. Sabag's counsel to "**file a Joint Stipulation of Dismissal of the 1782 Action" "within five (5) business days [of receiving the settlement payment].**"  *Id.* ¶ 5.  The Settlement Agreement defines "1782 Action" as this case.  *See id.* ¶ 3 ("[Mr.] Sabag filed an action in the United States District Court of the Southern District of Indiana under case number 1:19-mc-00084-JPH-TAB, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings ('1782 Action').").

Under Paragraph 6.a of the Settlement Agreement, Mr. Sabag is also obligated to "RELEASE AND FOREVER DISCHARGE[]" Mr. Windhorst "from any and all past, present or future claims … of any nature whatsoever, whether or not now known, suspected, or claimed, that exist in whole or in part as of the Effective Date of this Agreement," immediately upon the disbursement of the settlement payment.  *Id.* ¶ 6.a.

Paragraph 8.d of the Settlement Agreement further sets forth that:

The Parties shall not initiate, prosecute, participate in, or enforce any legal or equitable action that is contrary to the terms and conditions or intent of this Agreement or otherwise required by law. The Parties acknowledge that the claims being released include all existing claims up to the Effective Date of this Agreement and they have voluntarily given up the right to pursue those claims in any forum or proceeding. The Parties expressly WAIVE any right to assert in the future any claims of any kind or nature whatsoever that may have existed up to and including the Effective Date of this Agreement, even it if they are not now known and regardless of the amount or extent of any damages.

*Id.* ¶ 8.d.

7

Because Mr. Windhorst had administrative issues with his bank and his bank account was frozen (which subsequently caused him liquidity issues), (Windhorst Decl. ¶ 5), he and Mr. Sabag entered into an Amendment to the Settlement Agreement that extended the time by which Mr. Windhorst needed to make the settlement payment and increased the amount of the settlement payment.  Windhorst Decl. Ex. 3 [Amendment to the Settlement Agreement].  Despite this extension, Mr. Windhorst's administrative issues with the bank were not resolved so he was not able to wire a payment by August 1, 2022.  Windhorst Decl. ¶ 8.

### 8.  Mr. Sabag moves to enforce the Settlement Agreement

On August 2, 2022—the day after Mr. Windhorst was supposed to tender payment under the Settlement Agreement, as amended—Mr. Sabag filed a motion to enforce the Settlement Agreement in the ICDR arbitration proceeding.  Windhorst Decl. Ex. 6 [Sabag Motion to Enforce].  Mr. Sabag never sought to rescind the Settlement Agreement and revive his underlying claims against Mr. Windhorst.  *See id.*  Rather, Mr. Sabag sought to enforce the terms of the Settlement Agreement via arbitration and obtained arbitral awards against Mr. Windhorst and Sapinda, which included interest and attorneys' fees ("Enforcement Awards").  Windhorst Decl. Ex. 11 [Settlement Enforcement Award]; Windhorst Decl. Ex. 12 [Final Award].

Mr. Sabag's affirmation of the Settlement Agreement is not only evident from his motion to enforce it, but also from Mr. Sabag (via counsel) chasing Mr. Windhorst for payments of funds, both before and after the issuance of the arbitral award on the breach by Mr. Windhorst of the Settlement Agreement in August 2022.  Windhorst Decl. ¶¶ 9, 11.

### 9.  Mr. Sabag files the Supplementary Request to depose Mr. Windhorst

On October 11, 2022, Mr. Sabag filed a supplementary request for discovery purportedly under 28 U.S.C. § 1782 to conduct a videotaped deposition of Mr. Windhorst in Indiana at a

"mutually acceptable time" ("Supplementary Request").   Doc. 98 at 1, 14.   Mr. Sabag again claimed that the evidence will be "for use" in a contemplated criminal investigation of Mr. Windhorst in the U.K.   *Id.* at 6. Mr. Sabag also asserted that Mr. Windhorst "is found" in this district, because Mr. Windhorst moved to intervene in the above-captioned proceeding. *Id.* at 6-8. On the discretionary factors, Mr. Sabag alleged that Mr. Windhorst is not a participant, but a target in the contemplated foreign criminal investigations; that his § 1782 request does not conceal an attempt to circumvent foreign proof-gathering restrictions because the related ICDR arbitration has been adjudicated; that his § 1782 request is not unduly intrusive or overly burdensome because Mr. Windhorst chose to intervene in this proceeding.   *Id.* at 9-12.

### 10.     The Magistrate Judge grants the Supplementary Request

On December 15, 2022, the Magistrate Judge granted Mr. Sabag's Supplementary Request. Doc. 105.   The order states that "the deposition shall occur at a mutually acceptable time."   *Id.* at 6.   Mr. Windhorst did not respond to the deposition notice that Mr. Sabag sent on December 29, 2022 (*see* Doc. 106 at 1), as Mr. Windhorst was committed to gathering settlement funds to satisfy his obligations under the Settlement Agreement, and expected Mr. Sabag to also follow the Settlement Agreement.   Windhorst Decl. ¶ 16.

### 11.     Mr. Windhorst pays the summary award but Mr. Sabag refuses to dismiss this proceeding and release his claims

On February 1, 2023, while Mr. Windhorst was working towards a resolution to get Mr. Sabag paid, Mr. Sabag filed a Motion for Order to Show Cause on Civil Contempt ("Motion for OSC").   Doc. 107.   Since the parties' foreign counsel were discussing arrangements for payment, Mr. Windhorst did not expect that Mr. Sabag would file his Motion for OSC, particularly since no

"mutually acceptable time" had been set, and when Mr. Sabag had already taken steps to enforce the Settlement Agreement.  Windhorst Decl. ¶ 17.

On February 8, 2023, Mr. Windhorst was able to successfully wire the settlement funds and paid Mr. Sabag the full amount as set forth in the Amendment to the Settlement Agreement and the Enforcement Awards.  Windhorst Decl. ¶ 18; Windhorst Decl. Ex. 16 [Bank Receipt of the Settlement Payment].  Mr. Sabag's counsel confirmed receipt of the payment the following day.  Windhorst Decl. ¶ 18; Windhorst Decl. Ex. 15 at 3.

Following Mr. Windhorst's payment to Mr. Sabag, Mr. Sabag was required under the Settlement Agreement to dismiss the 1782 Action by no later than February 15, 2023.  *See* Windhorst Decl. Ex. 1 ¶5.  Despite Mr. Windhorst's U.S. counsel informing Mr. Sabag's counsel of Mr. Sabag's obligation, Mr. Sabag, through Indiana counsel, has stated that he is "committed to depose Mr. Windhorst."  Bento Decl. Ex. B [Email Correspondence Between L. Bento and O. Korin on Feb. 27, 2022].  Indeed, Mr. Sabag has even refused Mr. Windhorst's offer (in an effort to avoid further litigation) to compensate Mr. Sabag for his reasonable legal fees incurred in connection with preparing for the deposition and filing the OSC Motion.  Bento Decl. ¶ 8.

Mr. Windhorst's U.S. counsel sent Mr. Sabag's Indiana counsel a letter on March 2, 2023 requesting Mr. Sabag abide by the Settlement Agreement and work with Mr. Windhorst to jointly dismiss this proceeding.  Bento Decl. Ex. C [Letter from L. Bento to O. Korin].  Mr. Sabag's counsel never responded.  Bento Decl. ¶ 11.  Following Mr. Sabag's failure to respond, Mr. Windhorst has filed a motion to enforce the Settlement Agreement in the ICDR Arbitration ("Mr. Windhorst's Motion to Enforce"), arguing *inter alia* that, under New York law (which applies to the Settlement Agreement), Mr. Sabag continues to be bound by the Settlement Agreement he

executed and subsequently affirmed by, *inter alia*, his motion to enforce its terms in the arbitration. Bento Decl. Ex. D [Windhorst Motion to Enforce]; Bento Decl. ¶ 12.

## III.    LEGAL STANDARDS

Section 1782 "authorizes the federal district court 'of the district in which a person resides or is found to order him to produce a document or other thing for use in a proceeding in a foreign tribunal. The order may be made upon the application of any interested person." *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 593 (7th Cir. 2011) (cleaned up) (quoting 28 U.S.C. § 1782). In addition to the aforementioned statutory requirements, § 1782 "also imposes other requirements, including that the discovery not be 'in violation of any legally applicable privilege.'" *In re Guo*, 965 F.3d 96, 102 n.3 (2d Cir. 2020); 28 U.S.C. § 1782 (a) ("A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."). Failure to satisfy even one of these statutory requirements mandates denial of discovery under § 1782. *See, e.g.*, *Servotronics, Inc. v. Rolls-Royce PLC*, 975 F.3d 689, 691 (7th Cir. 2020) (affirming district court's grant of motion to quash § 1782 subpoenas where applicant sought discovery for use in private foreign commercial arbitration, which is not a "tribunal" under § 1782).

Even if a district court finds § 1782's statutory requirements are met, the court may still deny a § 1782 application by exercising its discretion. *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 242 (2d Cir. 2018) ("Section 1782 states that a court 'may order' such discovery; so even if a court has jurisdiction under the statute to grant a petition, the decision to grant it is discretionary."). In *Intel*, the Supreme Court set forth four factors for district courts to consider in exercising their discretion under § 1782: "(1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' in which event 'the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a

nonparticipant in the matter arising abroad'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'" *Id.* at 244 (quoting *Intel*, 542 U.S. at 264-65).

## IV.   ARGUMENT

### 1.   The Supplementary Request Does Not Satisfy the Statutory Requirements of Section 1782

Mr. Sabag cannot satisfy at least three statutory requirements for § 1782 discovery: (1) Mr. Sabag seeks to depose Mr. Windhorst in violation of legally applicable privileges against self-incrimination, (2) Mr. Windhorst, as an intervenor in a § 1782 proceeding, is not "found" in this District, and (3) Mr. Sabag seeks evidence that is no longer "for use" in a foreign proceeding in light of the Settlement Agreement's release and covenant not to pursue claims provisions.  This warrants denial of the Supplementary Request.

### a.   U.S. and English Privileges Preclude Mr. Sabag's Requested Deposition

At the outset, this matter implicates a fundamental statutory requirement of § 1782: discovery must not be granted "in violation of any legally applicable privilege."  28 U.S.C. § 1782(a); *see, e.g.*, *In re Guo*, 965 F.3d at 102 n.3 ("While our case law has often focused on the[ ] three elements" typically stated in the § 1782 inquiry, "the statute also imposes other requirements, including that the discovery not be 'in violation of any legally applicable privilege.'"); *United States v. Zubaydah*, 142 S. Ct. 959, 972 (2022) (ordering dismissal of § 1782 application in light of state secrets privilege).  The Supplementary Request runs afoul of this statutory requirement as Mr.

Sabag seeks to compel Mr. Windhorst to testify in a manner that implicates both his U.S. Fifth Amendment and English common law privileges against self-incrimination.

Appellate courts around the United States have recognized the "legislative history [of § 1782] makes clear that ... [the 'legally applicable privilege' language] 'provides for the recognition of all privileges to which the person may be entitled, including privileges recognized by foreign law.'" *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 98 (2d Cir. 2020) (alterations in original) (quoting *In re Erato*, 2 F.3d 11, 14 (2d Cir. 1993); *In re Commissioner's Subpoenas*, 325 F.3d 1287, 1305 (11th Cir. 2003) (§ 1782's "legislative history makes clear that this language 'embraces privileges recognized by foreign law.'") (quoting S. Rep. 1580, 88th Cong., 2d Sess. (1964), reprinted in U.S.C.C.A.N. 3782, 3790).   This includes foreign privileges against self-incrimination.   *In re Grand Jury Proc., Doe No. 700*, 817 F.2d 1108, 1112 (4th Cir. 1987) (observing § 1782 "forbids the taking of testimony in violation of any privilege, including the Philippine privilege against self-incrimination."); *see also* Hans Smit, *International Litigation Under the United States Code*, 65 COLUM. L. REV. 1015, 1029-1032 (1965) (noting 28 U.S.C. § 1785, which became the last sentence of § 1782 on "legally applicable privilege", explicitly provided that witnesses are protected from incriminating themselves "under the laws of . . . the United States *or any foreign state*") (emphasis added).

(i)      The Fifth Amendment privilege against self-incrimination

Mr. Sabag is not entitled to depose Mr. Windhorst under § 1782 because Mr. Windhorst would be compelled to testify in violation of his Fifth Amendment privilege against self-incrimination.

Mr. Sabag's Supplementary Request seeks to depose Mr. Windhorst about "the reasonably contemplated (and/or actual) investigations ("Contemplated Proceedings") taking place in the

United Kingdom that formed the basis for this Court's Order approving Mr. Sabag's Section 1782 Application," asserting that "[Mr.] Windhorst obviously has highly relevant information regarding the crimes that he is alleged to have committed in the United Kingdom."[4]  Doc. 98 at 4.  The "basis for this Court's Order approving Mr. Sabag's Section 1782 Application," however, encompasses alleged conduct related not only to purported crimes allegedly committed in the United Kingdom but also to purported U.S. crimes.  Indeed, Mr. Sabag's initial 1782 Application repeatedly claims Mr. Windhorst has allegedly criminally violated U.S. securities law and has also engaged in bribery.  *See, e.g.*, Doc. 9 at 13 ("Mr. Windhorst's . . . failure to report the Loan Agreement to the SEC represented a potential criminal act.  (citing 15 U.S.C. § 78ff)); *id.* at 48 ("Mr. Windhorst . . . knew that [he] would be exposing [himself] to potential criminal liabilities under the U.S. securities laws if MCCC accepted a 24-month deal"); Doc. 6-1 ¶ 54 (Mr. Sabag's U.K. counsel stating "Mr. Sabag alleges that Mr. Windhorst . . . offered, promised, or gave any financial or other advantage to the Director of MCCC" and alleging violations of ); *id.*, ¶6(iii) (alleging Mr. Windhorst "offered" a "financial or other advantage" to a U.S. "public official").

Accordingly, it is of no import that Mr. Sabag seeks to depose Mr. Windhorst for contemplated foreign criminal proceedings rather than a U.S. criminal proceeding because, as Mr. Sabag readily acknowledges, Mr. Windhorst's alleged conduct could reasonably subject him to criminal prosecution here in the United States.  *See, e.g.*, Doc. 9 at 6 (alleging Mr. Windhorst "criminally conceal[ed] all of his 'insider' financial dealings with Mr. Sabag relating to the Acquisition from the U.S. Securities and Exchange Commission"); *id.* at 40 (alleging Mr. Windhorst has "conceal[ed] criminal violations of U.S. securities law.").  It is axiomatic that the Fifth Amendment privilege against self-incrimination may be invoked in the course of any

---

[4]  Mr. Sabag has not set forth any deposition topics in his subpoena.  Doc. 106-1.

proceeding, criminal or civil, *Kastigar v. United States*, 406 U.S. 441, 444 (1972), and is broadly construed "to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action." *Maness v. Meyers*, 419 U.S. 449, 461 (1975). "A witness may invoke this privilege even 'where practically there is only a slight possibility of prosecution' without regard to the 'practical possibility that prosecution would result from incriminatory answers.'" *Sec. & Exch. Comm'n v. Pence*, 323 F.R.D. 179, 187 (S.D.N.Y. 2017) (quoting *United States v. Miranti*, 253 F.2d 135, 139 (2d Cir. 1958)).  Indeed, "[a] witness may invoke the Fifth Amendment to avoid answering deposition questions if he has 'reasonable cause to apprehend that answering the question will provide the government with evidence to fuel a criminal prosecution.'"  *In re Forensic News LLC*, No. 22-MC-0229, 2023 WL 2136424, at *1 (S.D.N.Y. Feb. 21, 2023) (quoting *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 262 F. Supp. 2d 302, 306 (S.D.N.Y. 2003)).

Here, Mr. Windhorst's Fifth Amendment privilege against self-incrimination applies as there is a reasonable basis to conclude that answering questions related to Mr. Sabag's allegations will provide evidence to "fuel a criminal prosecution" in the United States.  The Court need look no further than Mr. Sabag's initial memorandum of law in support of his 1782 Application, where he expressly and repeatedly asserted Mr. Windhorst has allegedly criminally violated U.S. law. *See, e.g.*, Doc. 9 at 13, 48.

The protective order in this case, contrary to Mr. Sabag's suggestion (Doc. 98 at 4 (asserting the "Court has fully protected Mr. Windhorst's 'foreign' criminal rights far beyond any right Windhorst may enjoy under the U.K. criminal laws")), does not alleviate Mr. Windhorst's privilege concerns.  Although the protective order prohibits Mr. Sabag from using § 1782 evidence outside of his Contemplated Proceedings, (Doc. 86-1 ¶ 3; Doc. 89), nothing prohibits the U.K. law

enforcement authorities from sharing information with their U.S. counterparts, so any evidence obtained by Mr. Sabag here could be used to "fuel" a U.S. criminal prosecution. Decl. of Julianne Hughes-Jennett ("Jennett Decl.") ¶ 24;[5] *see also* Doc. 6-1 ¶¶ 60, 100, 108 (Mr. Sabag's U.K. counsel acknowledging U.K. criminal authorities "will liaise with overseas authorities which may have an interest in the matter," "work closely with other international regulators, sharing information, intelligence and know-how," and "regularly use Mutual Legal Assistance channel to obtain evidence in the US"). Similarly, if Mr. Sabag is permitted to depose Mr. Windhorst, nothing prohibits U.S. authorities from subpoenaing Mr. Sabag to compel him to produce the deposition transcript. *See United States v. Davis*, 702 F.2d 418, 421-22 (2d Cir. 1983) (compelling production of a deposition transcript used in a bankruptcy proceedings in response to grand jury subpoenas where subpoenaed parties opposed on the basis that access to the testimony was restricted by a protective order).[6]

For at least these reasons, Mr. Sabag's Supplementary Request should be denied for compelling testimony in violation of the Fifth Amendment privilege against self-incrimination.

(ii)     English law privilege against self-incrimination

Independently, Mr. Sabag is not entitled to depose Mr. Windhorst under § 1782 because Mr. Windhorst would be compelled to testify in violation of his English law privilege against self-incrimination.

---

[5]     The Declaration of Julianne Hughes Jennett in Support of Mr. Windhorst's Proposed Opposition to Mr. Sabag's Supplementary Request is attached as Exhibit 2 to the Declaration of Gavin S. Frisch ("Frisch Decl.").

[6]     Moreover, given Mr. Sabag's failure to abide by the parties' Settlement Agreement to dismiss this action and halt pursuit of his contemplated foreign proceedings, Mr. Windhorst can only speculate as to whether Mr. Sabag can be trusted to abide by the protective order.

The English privilege of a suspect and/or defendant to maintain their silence has been a feature of the English common law for over 500 years,  (Jennett Decl. ¶16),  and possesses many similarities to the Fifth Amendment's privilege against self-incrimination.   Specifically, the English privilege affords any suspect in a criminal investigation the right not to answer any questions put to him during an investigation and the right to elect to remain silent during trial and not give evidence in his own defense should he decide to do so.  *Id.*  In the context of a criminal investigation, the scope and impact of this privilege vary depending on the type of interview at issue.  *See id.* ¶¶ 17-22.  In the context of Mr. Sabag's Contemplated Proceedings, Mr. Windhorst would be entitled to invoke his English common law privilege against self-incrimination in any interview *except* for interviews conducted pursuant to the compulsory powers of the Serious Fraud Office ("SFO") and the Financial Conduct Authority ("FCA") (and any answers provided in these compulsory interviews could not be introduced as evidence in a hypothetical trial of Mr. Windhorst).  *Id.* ¶ 22.

Here, Mr. Sabag seeks to depose Mr. Windhorst in a manner outside the scope of the compulsory powers of the SFO and FCA with the hope to provide evidence in a criminal prosecution against Mr. Windhorst.  Doc. 98 at 4.  As such, Mr. Windhorst is entitled to remain silent throughout the deposition.  Jennett Decl. ¶ 22.

Moreover, compelling Mr. Windhorst's deposition undermines the comity considerations that are the backbone of § 1782.  *See ZF Auto. US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2088 (2022) (observing "the animating purpose of § 1782 is comity: Permitting federal courts to assist foreign and international governmental bodies promotes respect for foreign governments and encourages reciprocal assistance.").  Mr. Sabag seeks to circumvent privileges and statutory protections afforded to purported suspects and targets of U.K. criminal investigations, and his

request to depose Mr. Windhorst therefore undermines a foundational pillar of the English criminal justice system (i.e., the right to silence).  *See* Jennett Decl. ¶ 25.

Because compelling Mr. Windhorst to testify here interferes with Mr. Windhorst's English law privilege, the Supplementary Request must be denied.

> b.  <u>The Supplementary Request is not "for use" in any foreign proceeding</u>

Mr. Sabag independently cannot obtain discovery from Mr. Windhorst under § 1782 as a matter of law because he cannot establish that his requested evidence is "for use" in a foreign proceeding.  In order to satisfy § 1782's "for use" requirement, an applicant must have "the practical ability … to place [the documents sought]—or the information [they] contain[]—before a foreign tribunal."  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).  Here, Mr. Sabag cannot satisfy these requirements because his Contemplated Proceedings have been released pursuant to the Settlement Agreement, (Windhorst Decl. Ex. 1 ¶ 6.a), and he has also covenanted not to pursue *any* claims against Mr. Windhorst under the Settlement Agreement.  *See* Windhorst Decl. Ex. 1 ¶ 8(d).

Specifically, Mr. Sabag "on behalf of himself and on behalf of each and every person or entity that could possibly claim by, through, or on behalf of Sabag" released Mr. Windhorst from "any and all past, present or future claims, causes of action, suits, . . . and liabilities of any nature whatsoever, whether known or not now know, suspected, or claimed, that exist in whole or in part as of the Effective Date of this Agreement, including but not limited to the Settled Claims as described above in this Agreement."  *Id.* ¶ 6.a.  Moreover, Mr. Sabag has agreed not to "initiate, prosecute, participate in, or enforce any legal or equitable action that is contrary to the terms and conditions or intent of this Agreement or otherwise required by law."  *Id.* ¶ 8(d).

Having released and covenanted not to pursue the claims in his Contemplated Proceedings, Mr. Sabag has no way to "use" the evidence in any proceedings—domestic or foreign.  In other words, assuming Mr. Sabag were to depose Mr. Windhorst (which he cannot do given, *inter alia*, his obligation to dismiss this proceeding), Mr. Sabag cannot do anything with the deposition as he no longer has the practical ability to use it to advance any claims, allegations, or proceedings against Mr. Windhorst in light of the Settlement Agreement's release and covenant not to pursue provisions.  *See Dessaint v. Lignel*, 584 F. App'x 30, 30-31 (2d Cir. 2014) (affirming district court's dismissal of § 1782 application as moot when filed because there was no injury to be redressed by a favorable decision); *In re China Petrochemical Dev. Corp.*, No. 3:17-cv-02138 (SRU), 2018 WL 1320665, at *3 (D. Conn. Mar. 14, 2018) (holding deposition testimony was not "for use" in a foreign proceeding because, even if it was "'useful' information," the applicant did not have the practical ability to place the evidence before the foreign tribunal).  Indeed, because of the Settlement Agreement, Mr. Sabag is not even permitted to pass on information to the U.K. authorities with the hope the U.K. authorities will initiate proceedings against Mr. Windhorst.  *See, e.g., Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.,* 798 F.3d 113, 121 (2d Cir. 2015) (holding that § 1782's "for use" requirement is not satisfied where the applicant intends to provide information to a third party "in the hope that it might be used" by the third party to initiate foreign proceedings).  Yet even if Mr. Sabag were permitted under the Settlement Agreement to voluntarily share the deposition with U.K. authorities (he is not), the result is the same:  Mr. Sabag at most has shown he intends to share the evidence with the U.K. authorities and "hope that [the deposition] might be used" by the U.K. authorities in a future legal proceeding against Mr. Windhorst.  *Id.*  Such a showing, however, is not enough to meet the "for use" requirement of § 1782.  *See, e.g., id.*(explaining "a witness approaching a prosecutor's office claiming to have

knowledge of a crime . . . might be relevant or interesting to the recipient, but it is not 'for use' in any proceeding in which the recipient is a party unless the recipient takes some further, independent action to introduce it."); *IJK Palm LLC v. Anholt Servs. USA, Inc.*, 33 F.4th 669, 678 (2d Cir. 2022) (holding that the requested discovery "is not 'for use' in a foreign proceeding [because] it must first be used to persuade a third party to initiate that proceeding").

Tellingly, Mr. Sabag initially filed his § 1782 action more than 3 years ago, *see* Doc. 1, and yet not one of his Contemplated Proceedings has actually commenced nor is there any evidence that the relevant U.K. authorities are even remotely interested in Mr. Sabag's allegations. Yet for a contemplated foreign proceeding to be within "reasonable contemplation" (thereby satisfying the "for use" requirement), the contemplated proceeding must "be instituted within a reasonable time." *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1270 (11th Cir. 2014). Moreover, Mr. Sabag has presented no evidence whatsoever that the relevant U.K. authorities have initiated any investigation—while Mr. Sabag cites "communications" with the SFO, (Doc. 98 at 2), anyone can send the SFO an email. *See* https://www.sfo.gov.uk/contact-us/.

Because Mr. Sabag can no longer "use" the deposition as potential evidence in a foreign proceeding, his Supplementary Request must be denied.

     c.   <u>Mr. Windhorst is not found in this District</u>

Mr. Sabag independently cannot obtain discovery from Mr. Windhorst under § 1782 as a matter of law because Mr. Windhorst is not found in the Southern District of Indiana.[7]

The Seventh Circuit has not yet explicitly addressed the meaning of "resides or is found" in 28 U.S.C. § 1782(a). Mr. Sabag points to the Second Circuit's standard articulated in *In re del*

---

[7] Mr. Sabag does not argue (nor could he) that Mr. Windhorst "resides" in this District.

*Valle Ruiz*, which looks to whether the discovery target (in that case, a corporation) is subject to personal jurisdiction within the District.  Doc. 98 at 6 (citing 939 F.3d 520, 528 (2d Cir. 2019)). Then, citing the Sixth Circuit's decision in *County Sec. Agency v. Ohio Dept. of Commerce*, Mr. Sabag argues that "[w]hen Windhorst moved to intervene in this § 1782 proceeding as a party to assert his claims and defenses, he waived his right to object to personal jurisdiction or whether he 'is found' in the Southern District of Indiana." *Id.* (citing 296 F.3d 477, 483 (6th Cir. 2002)).  That, however, is simply incorrect.

Whether intervention in a proceeding necessarily results in the court having personal jurisdiction over the intervenor is a question unresolved by the Seventh Circuit.  It is clear, however, that the Sixth Circuit's answer on this question is incorrect and inapplicable in the Section 1782 context.  Indeed, there is no analysis in *County Sec. Agency v. Ohio Dept. of Commerce* supporting the Sixth Circuit's conclusion.  *See* 296 F.3d at 483.  The same is true for other cases cited by Mr. Sabag – they simply regurgitate the Sixth Circuit's conclusion without any analysis of whether the decision is correct.  *See* Doc. 98 at 6-7 (citing cases).

The lack of analysis in these cases is telling – a meaningful analysis of this question makes clear that a court does not automatically possess full-scope personal jurisdiction over an intervenor. Indeed, the Ninth Circuit has thoughtfully analyzed the relationship between intervention and personal jurisdiction, rejecting the Sixth Circuit's simplistic conclusion:

> In general, we have held that a party has consented to personal jurisdiction when the party took some kind of affirmative act—accepting a forum selection clause, submitting a claim, filing an action—that fairly invited the court to resolve the dispute between the parties. By contrast, where a party has filed a timely and unambiguous objection to the court's jurisdiction, we have concluded that the party has not consented to jurisdiction. This is true even if the party has preserved its own options by simultaneously asserting whatever claims or defenses it has against the plaintiff

> **We do not see why an intervenor should be considered to have automatically consented to the jurisdiction of the court.** The intervenor has consented to something, but it is not personal jurisdiction. Rather, the quid pro quo for his intervention is that he consents to have the district court determine all issues in the case, including issues of jurisdiction, venue and service of process. *See Ins. Corp. of Ireland*, 456 U.S. at 706 ("By submitting to the jurisdiction of the court for the limited purpose of challenging jurisdiction, the defendant agrees to abide by that court's determination on the issue of jurisdiction."). **Intervention of right simply puts the intervenor into the position he would have been in had the plaintiff (or another party) properly named him to begin with.**

*S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007) (emphasis added); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 139 (2d Cir. 2011) (citing *Ross* for the proposition that "defendant-intervenor does not, through Rule 24(a) intervention, consent to personal jurisdiction").

Mr. Windhorst submits that the Ninth Circuit has articulated the correct standard for assessing personal jurisdiction over an intervenor.  Applying the Ninth Circuit's reasoning here, Mr. Windhorst consented to have this Court "determine all issues in the case, including issues of jurisdiction, venue and service of process." *Ross*, 504 F.3d at 1149.  Whether Mr. Windhorst is "found" in this District, however, was not an "issue in the case" when Mr. Sabag filed his original 1782 Application; rather, the issue was whether this Court had jurisdiction under § 1782 to authorize discovery from MCCC and the other respondents.  *See, e.g.*, Doc. 9 at 56 (arguing MCCC is "found" in this District); Doc. 25 at 13 et seq (arguing Mr. Sabag did not satisfy Section 1782 statutory requirements and *Intel* discretionary factors).  Rather, to the extent Mr. Windhorst intervened in this proceeding, he only did so to "request that this Court vacate its Order dated January 31, 2020 ("Order") (Doc. 13) granting the *ex parte* application of Mr. Eli Sabag requesting discovery under 28 U.S.C. § 1782 (the "Application") and quash the subpoenas issued to Marion County Community Corrections ("MCCC"), John Deiter, and David Condon."  Doc. 21 at 1.

Accordingly, Mr. Windhorst did not consent to this Court's jurisdiction over him for issues other than those at issue in his motion to vacate.[8]

As the Ninth Circuit explains "[i]ntervention of right simply puts the intervenor into the position he would have been in had the plaintiff (or another party) properly named him to begin with." *Ross*, 504 F.3d at 1149. Essentially, this requires the Court to assume Mr. Sabag named Mr. Windhorst as a respondent in his original 1782 Application. If Mr. Sabag so named Mr. Windhorst as a respondent at the time he filed his original 1782 Application, there would be no question that Mr. Windhorst would not be "found" in this District. Mr. Windhorst is a German citizen (Doc. 27 at ¶2) who works and conducts his business activities in the United Kingdom. *See*, *e.g.*, Doc. 9 at 8.[9]

As a matter of common sense, Mr. Windhorst's position must prevail. At the outset, the this proceeding was closed at the time Mr. Sabag filed the Supplementary Request, Docs. 97-98, and should be dismissed as improperly asserted in a closed action that was initially commenced against a different party. *See, e.g., Hanahan v. Luther*, 760 F.2d 148, 150 (7th Cir. 1985) (holding district court did not have jurisdiction to adjudicate plaintiff's motion where case had been closed and plaintiff's motion "used the same . . . case number assigned to the original petition."); *Griffin*

---

[8] Mr. Windhorst's motion for a protective order was ancillary to his motion to vacate and quash as it sought to limit the use of the discovery against the respondents. *See* Doc. 87 at 1-4 (arguing Mr. Sabag's § 1782 application should be denied but that a protective order should issue "if the Court grants Mr. Sabag's § 1782 Application"); *see also* Doc. 89.

[9] *See also id.* at 7 n. 2 (Mr. Windhorst "work[s] primarily from his business office in the United Kingdom); 11 n.4 (recognizing Mr. Windhorst has offices in London), 22 (acknowledging Mr. Windhorst has an apartment in the United Kingdom), 55 (United Kingdom is "where Mr. Windhorst's personal conduct occurred"); Doc. 106-1 at 2 (Mr. Korin certifying that the deposition notice was sent by email and by UPS Worldwide Express to Mr. Windhorst under addresses in London); Doc. 106-3 (UPS Delivery Receipt showing the deposition notice package was delivered to London); Doc 107 at 6 (Mr. Korin certifying the OSC Motion was sent via email and UPS Worldwide Express to Mr. Windhorst in London).

*v. DeTella*, No. 97 C 4768, 1998 WL 89320, at *1 (N.D. Ill. Feb. 19, 1998) ("[A] closed case is a closed case, permitting no later motions except in the unusual circumstances covered by [Rule] 60(b)."); *Walter Brockman Studios v. Poinsett*, No. CIV-04-1307-F, 2006 WL 931954, at *1 (W.D. Okla. Apr. 11, 2006) ("Defendants have incorrectly docketed the motion as a 'Notice.' It is not necessary to correct the docket entry, however, because this case is closed and the motion is moot."). Yet even if Mr. Sabag followed correct procedure, if Mr. Sabag is correct that intervening to oppose a § 1782 application automatically renders the intervenor "found" in the District of the proceeding, foreign parties would be discouraged from intervening to present to U.S. courts evidence and arguments that will help the court reach the right decision. If foreign parties are deterred from challenging § 1782 applications due to the fear of subjecting themselves to the jurisdiction (and discovery) of U.S. courts, courts may be left with one-sided *ex parte* applications where the respondents may not have an incentive to oppose. Mr. Sabag's position, if accepted, would thus do a disservice to justice and preclude the US court from obtaining a fuller picture of the facts and law. *See, e.g.*, S*ec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995) (affirming grant of intervention because "[i]ntervention enabled the court to address important issues in th[e] case once, with fairness and finality" by "allow[ing] a more worthy opponent to get into and onto the court."); *In re Ex parte SPS I Fundo de Investimento de Acoes - Investimento No Exterior*, No. 22-mc-00118 (LAK), 2022 WL 17553067, at *2-4 (S.D.N.Y. Dec. 9, 2022), *appeal filed*, No. 22-3200 (2d Cir. 2022) (granting in part intervenors' motion to vacate and quash § 1782 subpoenas where "neither Respondent [] appeared before th[e] Court or [took] a position on [the Intervenor's motion to oppose the § 1782 application].").

Finally, Mr. Windhorst simply does not have sufficient contacts with the Southern District of Indiana to be subject to personal jurisdiction, and Mr. Sabag's argument (Doc. 98 at 8) that Mr.

Windhorst "cannot argue that he cannot be found in Indiana when an Indiana state court has ruled that he was a partner of an Indiana joint venture with co-Intervenor Track Group" is simply incorrect as, due to this case being closed, there is no jurisdictional basis for Mr. Sabag's Supplementary Request. *See Hanahan*, 760 F.2d at 150 (holding district court did not have jurisdiction to adjudicate plaintiff's motion where the case had been closed and plaintiff's motion "used the same . . . case number assigned to the original petition."). Moreover, the state court case was referred to the ICDR Arbitration, which the parties have since settled.

Because Mr. Windhorst is not "found" in this District, the Court must deny Mr. Sabag's Supplementary Request.

### 2.    The *Intel* Factors Weigh Against Discovery

"[A] district court is not required to grant a § 1782 application simply because it has the authority to do so." *Venequip, S.A. v. Caterpillar, Inc.*, No. 21-cv-6297, 2022 WL 823856, at *1 (N.D. Ill. Mar. 18, 2022) (quoting *Intel*, 542 U.S. at 264). Even if the statutory requisites were met (they are not), each of discretionary *Intel* factors weighs against compelling Mr. Windhorst's deposition. *Id.* at *2-3 (denying § 1782 application where statutory requirements were satisfied).

### a.    *Intel* Factor 1: Mr. Windhorst is within the jurisdictional reach of the U.K. tribunals

Under the first *Intel* factor, courts consider "whether the requested discovery is within the foreign tribunal's jurisdictional reach and thus accessible without § 1782 aid." *In re Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016) (citation omitted). Indeed, the Seventh Circuit has warned "district courts must be alert for potential abuses that would warrant a denial of an application to be allowed to take such discovery. One abuse would be for a party to seek discovery in a federal district court that it could obtain in the foreign jurisdiction, thus gratuitously forcing

his opponent to proceed in two separate court systems; the inference would be that the party seeking U.S. discovery was trying to harass his opponent." *Heraeus Kulzer*, 633 F.3d at 594.  But Mr. Sabag sidesteps this standard to assert that the first *Intel* factor weighs in its favor because Mr. Windhorst is not a participant in Mr. Sabag's contemplated foreign criminal proceedings.  Doc. 98 at 9-10.  This argument is without merit.

Here, the first *Intel* factor weighs against discovery because the discovery sought by Sabag – i.e. the testimony of Mr. Windhorst – is within the jurisdictional reach of U.K. authorities and U.K. courts.  *See, e.g., In re Postalis*, No. 18-mc-497 (JGK), 2018 WL 6725406, at *5 (S.D.N.Y. Dec. 20, 2018) ("the first *Intel* factor weighs against granting the discovery application because the evidence sought is within the foreign tribunal's jurisdictional reach").  As explained in the declaration of Julianne Hughes-Jennett, U.K. law enforcement authorities possess statutory powers to compel a suspect in an investigation to attend an interview, and would be able to compel Mr. Windhorst to do so.  Jennett Decl. ¶¶ 6-15.  Likewise, if Mr. Sabag ever initiates his contemplated private prosecution, that prosecution will additionally place Windhorst within the jurisdiction of the U.K. criminal courts.  *Id.* ¶ 14.  Ultimately, Mr. Windhorst clearly falls within the jurisdiction of the U.K.'s criminal justice system given that, as Mr. Sabag readily admits (Doc. 9 at 55), Mr. Windhorst's alleged conduct occurred in the United Kingdom.  Jennett Decl. ¶13.  And even if Mr. Windhorst's alleged conduct occurred outside of the United Kingdom, U.K. authorities would still have the ability to arrest, detain, or compel Mr. Windhorst by virtue of his physical presence in the U.K.  *Id.*

Mr. Sabag's argument that Mr. Windhorst is technically not a participant in the putative criminal investigations is incorrect at worst and a red herring at best.  It is wrong because a suspect or target of a criminal investigation in the U.K. is a participant in the investigation.  *Id.* ¶ 6.  Mr.

Sabag does not dispute (nor could he) that Mr. Windhorst is the putative defendant in Mr. Sabag's still-to-be-commenced criminal investigations. *See* Doc. 9 at 8. ("Mr. Sabag intends to file a criminal complaint *against Messrs. Windhorst* . . . with various British government offices"). Likewise, Mr. Sabag's position overlooks the fact that his Contemplated Proceedings include a private prosecution pursuant to which Mr. Sabag would stand in the shoes of the prosecutor while Mr. Windhorst would be the defendant – on its face, Mr. Windhorst is a participant.

Yet even if Mr. Sabag is correct (he is not) that Mr. Windhorst is not technically a participant in Mr. Sabag's contemplated foreign proceedings, Mr. Sabag cannot dispute Mr. Windhorst, as the prime "suspect," will very likely be involved in those proceedings (assuming Mr. Sabag actually commences them). Indeed, Mr. Sabag's own U.K. counsel explains that Mr. Windhorst will have a "right to see the evidence . . . following a decision to prosecute, and [a] right to challenge any evidence which is to he relied on . . . during the trial process including any pretrial hearings." Doc. 40-1.[10] Where, as here "the real party from whom [discovery] are sought . . . is involved in foreign proceedings, the first *Intel* factor counsels against granting a Section 1782 petition." *Kiobel*, 895 F.3d at 245.

Unsurprisingly, district courts adjudicating § 1782 applications purporting to seek discovery for contemplated foreign criminal proceedings weigh the first *Intel* factor against discovery where the potential defendant is within the jurisdictional reach of the foreign tribunal. For example, in *Lazaridis v. Int'l Ctr. for Missing & Exploited Child., Inc.*, the court denied a § 1782 application seeking discovery from potential defendants who were within the jurisdictional reach of the foreign tribunal. 760 F. Supp. 2d 109, 114 (D.D.C. 2011), *aff'd sub nom. In re*

---

[10] Mr. Bibby's assertion (Doc. 40-1) that Mr. Windhorst will not have a right to participate in an interview conducted by U.K. investigating authorities is nonsensical. How would the U.K. authorities interview Mr. Windhorst if he is not allowed to participate in the interview?

*Application for an Ord. Pursuant to 28 U.S.C. § 1782*, 473 F. App'x 2 (D.C. Cir. 2012).  The Court explained that, like here, "there is technically no defendant [in the foreign criminal investigation], since no formal criminal proceedings are opened, but merely 'suspects' who may later become defendants if a prosecution is commenced."  *Id.*; *see also Matter of Application of O2CNI Co.,* No. C 13–80125 CRB (LB), 2013 WL 5826730, at *13 (N.D. Cal. Oct. 29, 2013) (weighing first *Intel* factor against testimonial discovery for use in a foreign proceeding in light of "the important procedural protections that a criminal suspect has here and in [the foreign country]."); Jennett Decl. ¶ 15 (explaining that the U.K. law enforcement agencies' evidence-collection powers and that those are the "appropriate mechanism[s] for the disposal of criminal allegations in the U.K. and there are hundreds of years of the common law and multiple Acts of Parliament that ensure the process is conducted fairly and is subject to proportionate safeguards throughout.").

Because Mr. Windhorst's relevant alleged conduct and his overall business activities took place in the United Kingdom, he "can be compelled to submit to examination and other forms of discovery by [the United Kingdom authorities]," which thus warrants weighing the first *Intel* factor against discovery.  *Mattel, Inc. v. MGA Ent., Inc.*, No. CV 04-9049-DOC(RNBx), 2010 WL 3705782, at *8 (C.D. Cal. Aug. 3, 2010).

b.  <u>*Intel* Factor 2: The nature and character of Mr. Sabag's U.K. proceedings are not suited for § 1782 aid</u>

The second *Intel* factor, which considers "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance," also weighs against permitting Mr. Sabag to depose Mr. Windhorst.  *Intel*, 542 U.S. at 264.  It is undisputed that Mr. Sabag's Contemplated Proceedings against Mr. Windhorst are criminal in nature.  *See, e.g.*, Doc. 9 at 8.  Courts that have

addressed § 1782 applications seeking evidence for use in foreign criminal proceedings have regularly weighed this *Intel* factor against § 1782 discovery due to the criminal nature and character of those proceedings. *See, e.g.*, *Lazaridis*, 760 F. Supp. 2d at 114 (weighing *Intel* factor 2 against discovery because the foreign proceeding was a "penal" criminal investigation, and the requested discovery was "directly relevant to establishing the criminal liability of the Defendants"); *O2CNI*, 2013 WL 5826730, at *13 (weighing *Intel* factor 2 against discovery in light of "the context of a criminal investigation"). Given the criminal nature of Mr. Sabag's contemplated foreign proceedings, the second *Intel* factor weighs against compelling Mr. Windhorst to sit for a deposition.

Independently, Mr. Sabag's delay in bringing this Supplementary Request weighs against discovery. Courts routinely reject § 1782 application where, as here, the applicant waits too long to pursue § 1782 discovery. *See, e.g.*, *Certain Funds*, 798 F.3d at 116, 124 (five-year delay between events and filing of petitioner's § 1782 application suggested that "the anticipated proceedings were not within reasonable contemplation"); *In re TJAC Waterloo, LLC*, No. 3:16-mc-9-CAN, 2016 WL 1700001, at *3 (N.D. Ind. Apr. 27, 2016) (denying § 1782 application where applicant waited 16 months before requesting discovery); *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331, 352 (S.D.N.Y. 2019) (holding applicant's delay "disfavor[ed] a grant of their section 1782 application."); *Aventis Pharma v. Wyeth*, No. M-19-70, 2009 WL 3754191, at *1 (S.D.N.Y. Nov. 9, 2009) (denying § 1782 application where application sought "discovery it could have requested in this same Court starting over five years ago."). Here, Mr. Sabag waited until October 11, 2022—after this case was closed and settled—to initiate the Supplementary Request against Mr. Windhorst. *See* Doc. 98. Under Mr. Sabag's position (Doc. 98 at 6-8) that Mr. Windhorst allegedly rendered himself "found" in this District by intervening in this proceeding, Mr. Sabag

29

could have sought this discovery from Mr. Windhorst as early as May 20, 2020, the date of the Court's order granting Mr. Windhorst's motion to intervene.  This 30-month delay screams of gamesmanship and strongly suggests Mr. Sabag's intent to harass Mr. Windhorst.  *See, e.g.*, *In re TJAC Waterloo*, 2016 WL 1700001, at *3 (applicant's 16-month delay "may even suggest an improper purpose" for the § 1782 application); *In re WinNet R CJSC*, No. 16-mc-484-DLC, 2017 WL 1373918, at *8 (S.D.N.Y. Apr. 13, 2017) (finding "[petitioner's] delay lends credence to the idea that [its] application is an attempt to circumvent the [foreign proceeding] and/or to harass [the foreign target]").  Indeed, it is telling that Mr. Sabag filed his Supplementary Request only a few short weeks after the settlement payment did not come through, despite Mr. Windhorst's efforts to clear it.

> c.   *Intel* Factor 3: Mr. Sabag seeks to circumvent the U.K. authorities' ability to compel Mr. Windhorst's testimony, the English and U.S. privileges against self-incrimination, and U.S. policy favoring the enforcement of contracts

The third *Intel* factor, which considers "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," weighs against permitting Mr. Sabag to depose Mr. Windhorst for at least three reasons.  *Intel*, 542 U.S. at 265.

First, Mr. Sabag's request to depose Mr. Windhorst circumvents the U.K. authorities' ability to compel Windhorst's testimony.  There is no doubt that the U.K. authorities identified by Mr. Sabag could, if they wished, compel Mr. Windhorst's testimony, (Jennett Decl. ¶¶ 6-15), and should Mr. Windhorst testify in any manner other than pursuant to the compulsory powers available to the SFO and FCA, he would be entitled to remain silent throughout irrespective of his

guilt or innocence.  *Id.* ¶¶ 16, 22.  Because Mr. Sabag here seeks to usurp the U.K. authorities' authority to compel Mr. Windhorst's testimony, (*see id.* ¶ 15),  this weighs against discovery.  *See, e.g.*, *In re Caratube Int'l Oil Co.*, LLP, 730 F. Supp. 2d 101, 107 (D.D.C. 2010) (third *Intel* factor weighed against granting petition where evidence suggested that petitioner was "using section 1782 in an attempt to circumvent the [foreign tribunal's] control over" its procedures).

*In re Fagan* is also instructive.  No. 19-mc-91210-ADB, 2019 WL 2267063 (D. Mass. May 28, 2019).   In *Fagan*, like here, the applicant sought discovery for use in a foreign criminal investigation.  *Id.* at *1. The court denied the application based on failure to satisfy the statutory factors, but also explained the court would have exercised discretion to deny the application because it was "most likely an attempt to circumvent ordinary proof-gathering practices for a criminal matter, which would should occur through law enforcement channels rather than through an individual like [the applicant]."  *Id.* at *3 (citing *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 594 (7th Cir. 2011).  The same is true here – the U.K. authorities are able to directly compel Mr. Windhorst to sit for an interview.  Jennett Decl. ¶¶ 6-15; Doc. 40-1.

Second, the Supplementary Request seeks to circumvent the English and U.S. Fifth Amendment privileges against self-incrimination by compelling Mr. Windhorst to testify about potentially incriminating subject matter.  As explained above, both privileges apply here.  *See supra*, § IV.1.a.  The circumvention of these privileges provides the Court with another reason to weigh this *Intel* factor against discovery.  *See In re Application of Shervin Pishevar for an Ord. to take Discovery for use in Foreign Proc. Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 304–05 (S.D.N.Y. 2020), *adhered to on reconsideration sub nom. In re Pishevar*, 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020) (holding the "third *Intel* factor weigh[ed] against granting [a] 1782 Application based upon the U.S. public policy that undergirds the reporter's privilege.").

Third, the Supplementary Request attempts to circumvent well-established U.S. policy favoring the enforcement of contracts, including settlement agreements.  Under the terms of the parties' Settlement Agreement, Mr. Sabag was obligated to dismiss this action, and release and halt pursuit his claims against Mr. Windhorst by no later than February 15, 2023.  Windhorst Decl. Ex. 1 ¶¶ 5-6, 8(d).  By continuing to pursue a deposition of Mr. Windhorst, Mr. Sabag is circumventing the Settlement Agreement in contravention of U.S. policy favoring the enforcement of contracts, particularly settlement agreements.  *See, e.g.*, *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prod. Co.*, 969 F.2d 585, 590 (7th Cir. 1992) (recognizing U.S. federal "policy favoring enforcement of contracts"); *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383 (N.Y. 1993) (recognizing New York's "[s]trong policy considerations favor the enforcement of settlement agreements").  This blatant attempt to circumvent U.S. policy and the Settlement Agreement warrants denial of the Supplementary Request.  *See, e.g.*, *In re Grynberg*, 223 F. Supp. 3d 197, 202 (S.D.N.Y. 2017) (denying § 1782 application that attempted to circumvent the United States "well-established policy in favor of the finality of judgments").

For at least these reasons, the third *Intel* factor heavily weighs against the Supplementary Request.

        d.    <u>*Intel* Factor 4: The deposition subpoena is unduly intrusive and burdensome</u>

The final *Intel* factor weighs in Mr. Windhorst's favor because Mr. Sabag's requested deposition is unduly intrusive and burdensome.  As explained above, the deposition infringes on Mr. Windhorst's U.S. and U.K. privileges, so sitting for a deposition is inherently unduly intrusive.  *See In re Microsoft Corp.*, 428 F. Supp. 2d 188, 196 (S.D.N.Y. 2006), *abrogated on other grounds by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019) (weighing *Intel* factor 4 against discovery where applicant sought discovery that, to the extent it existed, was protected by the work product

doctrine).  Likewise, the U.K. authorities are able to compel Mr. Windhorst to sit for an interview, rendering Mr. Windhorst potentially subject to further and likely duplicative compulsion of his testimony.  *See Heredia v. Tate*, No. 19-cv-338-JDP, 2021 WL 5446872, at *8 (W.D. Wis. Nov. 22, 2021) (acknowledging the "policy against permitting a second deposition of an already-deposed deponent").

Moreover, Mr. Sabag's purpose in seeking the deposition, in light of the U.K. authorities' ability to compel Mr. Windhorst to sit for an interview, the privileges at issue, and the fact that Mr. Sabag has been made whole in accordance with the parties' Settlement Agreement, is purely to harass Mr. Windhorst.  While, in an effort to avoid further litigation and arbitration, Mr. Windhorst has offered to compensate Mr. Sabag for his expenses incurred in connection with preparing for the deposition and filing his motion for an order to show cause, Mr. Sabag continues to refuse to dismiss this proceeding.  Bento Decl. ¶ 8.  In any event, Mr. Sabag has released (and has similarly covenanted not to pursue) his claims against Mr. Windhorst, so Mr. Sabag is effectively requesting Mr. Windhorst to sit for a deposition to support claims Mr. Sabag has released and cannot pursue under the Settlement Agreement (in addition to his obligation to dismiss this 1782 Action as well).  Windhorst Decl. Ex. 1 ¶¶ 6.a, 8(d).  Mr. Sabag's lack of a proper purpose to depose Windhorst weighs against discovery.  *See, e.g.*, *In re Fagan*, 2019 WL 2267063, at *3 (denying § 1782 application where "discovery [was] unduly intrusive and burdensome given the lack of a proper purpose"); *In re Komanokai*, No. 4:20-mc-80149-KAW, 2020 WL 6684565, at *3 (N.D. Cal. Nov. 12, 2020) (denying § 1782 application where applicant sought evidence "for the improper purpose to harass or intimidate").

## V.   CONCLUSION

For the foregoing reasons, Mr. Sabag's Supplementary Request should be denied.

DATED:  March 9, 2023                   */s/ Ann O'Connor McCready*
                                        Ann O'Connor McCready, Atty. No. 32836-53
                                        Taft Stettinius & Hollister LLP
                                        One Indiana Square, Ste. 3500
                                        Indianapolis, IN 46204
                                        (317) 713-3500
                                        ammcready@taftlaw.com

                                        */s/ Lucas Bento*
                                        Lucas V.M. Bento (New York Bar No. 4907986)
                                        lucasbento@quinnemanuel.com
                                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                        51 Madison Ave. 22d Floor
                                        New York, NY 10010
                                        Telephone: (212) 849-7000
                                        Fax: (212) 849-7100

                                        Gavin S. Frisch (Mass. Bar No. 704216)
                                        gavinfrsich@quinnemanuel.com
                                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                        111 Huntington Ave, Ste. 520
                                        Boston, MA 02199
                                        Telephone: (617) 712-7100
                                        Fax: (617) 712-7200
                                        *Pro hac application pending*

                                        *Attorneys for Lars Windhorst*