# EXHIBIT 2

Case number: 19-mc-00084

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF INDIANA

In re Application of Eli Sabag for an Order

Pursuant to 28 U.S.C. § 1782 to Conduct

Discovery for Use in a Foreign Proceeding

**DECLARATION OF JULIANNE HUGHES-JENNETT IN SUPPORT OF LARS WINDHORST'S PROPOSED OPPOSITION TO APPLICANT ELI SABAG'S SUPPLEMENTARY REQUEST FOR DISCOVERY IN ACCORDANCE WITH 28 U.S.C. § 1782**

I, Julianne Hughes-Jennett, under the penalty of perjury, hereby swear pursuant to 28 U.S.C. §1746 that the following is true and correct.

1. I submit this declaration in support of Lars Windhorst's ("**Mr. Windhorst**") Proposed Opposition to Applicant Eli Sabag's Supplementary Request for Discovery in Accordance with 28 U.S.C. § 1782.

2. I am an Partner in the London, England office of Quinn Emanuel Urquhart & Sullivan LLP ("**Quinn Emanuel**"), an American-head-quartered law firm. I advise clients in a broad range of matters, including white collar crime and investigations.

1

3. I was admitted to practice as a solicitor of England and Wales in 2002. I received my Bachelor of Arts in Jurisprudence degree from the University of Oxford, Lady Margaret Hall in 1998, and received an LL.M from Queens University in 2014.

4. I have been asked to advise Mr. Windhorst in connection with Mr. Eli Sabag's ("**Mr. Sabag**") Supplementary Request for Discovery In Accordance With 28 U.S.C. § 1782 ("**Supplementary Request**"), with a particular emphasis on the criminal complaint that Mr. Sabag purportedly intends to bring in the United Kingdom against Mr. Windhorst.

5. As discussed further below, Mr. Sabag's proposed criminal complaint in the United Kingdom ("**U.K.**") gives rise to at least two issues. First, the SFO (and every other relevant law enforcement authority in the U.K.) has the authority to compel a target of its investigations to sit for an interview. Second, compelling Mr. Windhorst to sit for Mr. Sabag's requested video deposition in the Section 1782 action (which Mr. Sabag alleges is for use solely in contemplated English criminal proceedings) runs afoul of the English privilege against self-incrimination. I discuss both of these issues in further detail below.

**I.  U.K. Law Enforcement Authority to Compel the Requested Deposition**

6. All law enforcement agencies in the U.K. have at their disposal statutory powers to compel a suspect in an investigation to attend an interview. There can be no doubt that, if so minded, any law enforcement agency in the U.K. would be in a position to compel a suspect to attend an interview, either following arrest or by virtue of specific statutory powers that require attendance at interviews, and provide for sperate criminal sanction for a failure to do so without reasonable excuse. There can also be no doubt that a suspect or target of an investigation is by necessity a participant of an investigation. The target or suspect is the putative defendant of the criminal enquiry and eventual trial, if charges are brought.

7. I understand from the declaration provided by Mr Peter Bibby that the allegations Mr Sabag makes are said to amount to offences concerning misleading statements under the Financial Services Act 2012, fraud pursuant to the Fraud Act 2006, bribery of a foreign official under the Bribery Act 2010, and a conspiracy to commit those preceding offences, which may be prosecuted pursuant to the Criminal Law Act 1977 or contrary to English common law. These are all extremely serious offences that fall squarely within the jurisdiction of the English criminal justice system and the law enforcement agencies and prosecutorial bodies operating within that jurisdiction.

8. The various police services that operate in districts across the U.K. are empowered to arrest,[1] detain,[2] and question in interview[3] suspects of a crime by virtue of the Police and Criminal Evidence Act 1984 ("**PACE**"). Police officers are also empowered to enter premises to conduct searches in certain circumstances, apply for search warrants if required, and seize any materials they believe may be evidence of criminality during such searches.[4] Police interviews are typically conducted, "under caution", which means that the interviewee is formally informed at the beginning of an interview that he has the right to silence and that anything he does say may be later used against him.[5]

---

[1] Part III, PACE

[2] Part IV, PACE

[3] Part V, PACE, and Codes C, E, and F of the PACE Code of Practice (created pursuant to s.66 PACE)

[4] Part II, PACE

[5] The full wording of a caution is, "*You do not have to say anything. But it may harm your defence if you do not mention when questioned something which you later rely on in court. Anything you do say may be given in evidence.*" (see PACE Code C)

9. Once the police have conducted their investigation, including interviewing suspects and witnesses, the Crown Prosecution Service are responsible for prosecuting most criminal trials in the criminal courts across the U.K.

10. Certain offences are investigated and prosecuted by dedicated agencies that specialize in those types of criminal proceedings. The Serious Fraud Office ("**SFO**") is one such agency who are responsible for prosecuting the most complex cases of fraud, corruption and bribery. The SFO conducts both the investigation and the prosecution stages of a criminal investigation and trial. In connection with such investigations, the SFO is empowered by the Criminal Justice Act 1987 ("**CJA**") to compel the attendance at an interview of the person under investigation, and any other person who the SFO has reason to believe may have information relevant to an investigation.[6] Such interviews are commonly referred to as a "Section 2 Interview". The SFO is also empowered to directly compel any person (i.e. not just the person under investigation) to produce any documents that relate to a matter under investigation.[7] A failure to comply with a request to attend a Section 2 Interview without a reasonable excuse is a criminal offence in its own right, as is a failure, without reasonable excuse, to comply with a request to produce documents.[8]

11. The Financial Conduct Authority ("**FCA**") is another specialist regulatory, investigative and prosecutorial body that is responsible for investigating financial misconduct and associated criminality. The FCA is primarily a market regulator, but also has broad investigative and prosecutorial powers under the Financial Services and Markets Act 2000 ("**FSMA**"). Those powers include requiring compulsory attendance at an interview by any person suspected of having

---

[6] S.2 (2), CJA
[7] S.2 (3), CJA
[8] S.2 (13), CJA

committed a crime, or being "connected" with such a person, or indeed any person who may have information relevant to an investigation.[9] A failure to attend a compulsory interview under the FSMA is not itself a stand alone criminal offence, as is it is under the CJA, but such conduct can be referred to Court, where a judge may, if satisfied there was no reasonable excuse for not complying with a requirement imposed by the FCA, treat the person as though they are in contempt of court.[10] Penalties for contempt of court can include imprisonment, fines or both.

12.     It should also be noted that the SFO and FCA may also request voluntary attendance at interviews (i.e. not compel such attendance by relying upon their statutory powers). Such interviews may or may not be conducted under caution.

13.     As described at paragraphs 59 and 60 of the Declaration of Mr Peter Bibby (Dkt. No. 6-1), the alleged offences that Mr Sabag's purported criminal complaint cites primarily relate to conduct that occurred within the U.K. There can therefore be little doubt that it would fall to U.K. law enforcement agencies to investigate and prosecute any alleged offences. Not only would Mr Windhorst clearly fall within the jurisdiction of the U.K.'s criminal justice system by virtue of the location of the alleged conduct, as an individual who works and conducts extensive business activities in the U.K., even if the conduct had taken place outside the jurisdiction, the U.K.'s law enforcement agencies would be entitled to use their powers to arrest, detain and/or compel Mr Windhorst by virtue of his physical presence in the jurisdiction.

14.     Reference has also been made [by Mr Sabag and Mr Bibby] to the prospect of a private prosecution in which Mr Sabag would stand in place of the state law enforcement and prosecutorial agencies. An individual or corporation who brings a private prosecution is referred

---

[9]     Sections 171-173, FSMA
[10]    Section 177, FSM

5

to as the "Private Prosecutor". In a private prosecution, the defendant is subject to the full jurisdiction of the UK criminal courts, where he can be ordered to provide evidence (subject to his right to silence and other privileges, as applicable).

15.     It is also of note that, despite [Mr Sabag's and Mr Bibby's] reference to a series of extremely serious criminal offences alleged to have been committed by Mr Windhorst, it must be the case that at this stage those allegations are mere speculation and the possibility of a criminal investigation, let alone a criminal prosecution, is entirely hypothetical. If there were any evidence at all that Mr Windhorst was involved in the sort of serious offending that is alleged, the U.K.'s law enforcement agencies would be entirely open to receiving a complaint with no further evidence other than the bare assertions made in these proceedings, and would undoubtably be investigating this matter already.  Mr Sabag and Mr Bibby, however, provide no evidence whatsoever that an investigation is afoot or that those agencies are even interested in these allegations.[11]  There is no obligation on a complainant in criminal proceedings in the U.K. to gather evidence on behalf of law enforcement, and it is precisely for that reason that the U.K.'s parliament has empowered the various law enforcement agencies with broad and robust investigative powers to ensure alleged criminality is capable of thorough investigation and successful prosecution. If Mr Sabag were minded to report these alleged crimes to U.K. law enforcement, he is perfectly entitled to do so, and those agencies would use the powers available to them to investigate, including by interviewing Mr Windhorst if that were required. That is the appropriate mechanism for the disposal of criminal allegations in the U.K. and there are hundreds of years of the common law and multiple Acts of Parliament that ensure the process is conducted fairly and is subject to

---

[11]     Mr. Sabag's reference to his attorney's purported "communications with SFO" (see Sabag Affidavit, Dkt. 98-2) does nothing to remedy this.  Indeed, anyone can enter into "communications" with the SFO via their website: https://www.sfo.gov.uk/contact-us/.

proportionate safeguards throughout, including limiting the powers to compel testimony to certain U.K. government law enforcement agencies.[12] Any departure from that process would almost certainly cause prejudice to a defendant in criminal proceedings, evidence would be at risk of being inadmissible, and the safety of any conviction would be wholly undermined. Moreover, such a departure would represent an undermining of U.K. law enforcement's authority to properly investigate and prosecute matters which are, for the reasons set out above, clearly within their jurisdiction.

**II.     Privilege Against Self-Incrimination**

16.     I note at the outset that the right of a suspect and/or defendant to maintain their silence has been a feature of the English common law for over 500 years. Whilst that right has been subject to academic debate and development through English jurisprudence, it remains the case today that any suspect in a criminal investigation is not bound to answer any questions put to him during that investigation, irrespective of his guilt or innocence. Equally, a defendant in a criminal trial may elect to remain silent throughout and not give evidence in his own defence should he decide to do so.

17.     As outlined above, there are broadly speaking four types of interview that are typically conducted in criminal proceedings in the U.K.: (i) a voluntary interview, (ii) a voluntary interview conducted under caution, (iii) interviews conducted under arrest and under caution, and (iv) interviews compelled under U.K. statutory powers.

18.     In respect of (i)-(iii) above, the subject of such interviews has an absolute right to remain silent. In respect of (i) and (ii) the interviewee is also free to leave the interview at any

---

[12]     For example, in addition to the SFO and FCA, the U.K.'s Health and Safety executive (the body responsible for workplace health and safety regulation) also have analogous powers to compel answers to questions put in interview, together with similar safeguards concerning their use in criminal proceedings, as described in relation to the SFO and FCA.

7

stage. It is only in respect of interviews conducted pursuant to (iv) that a subject is compelled to answer questions or risk becoming subject to separate criminal penalty.

19. Any answers given in response to a voluntary interview are, in the absence of a caution, highly likely to be rendered inadmissible during a criminal trial. Answers provided during an interview under caution are almost certainly admissible evidence in a criminal trial.

20. Answers provided during a compelled interview are not admissible during subsequent criminal proceedings,[13] unless those proceedings relate solely to the conduct during that interview (for example, a prosecution for giving false or misleading answers).[14]

21. The right to silence in all but compelled interviews is tempered by the statutory right of a court and or jury to draw such inferences from that silence, "*as appear proper*".[15] This means that a tribunal of fact in criminal proceedings are permitted to draw an adverse inference from the defendant's choice to remain silent about a matter in which he was given an opportunity to comment under caution by U.K. authorities.

22. Should Mr Windhorst be interviewed in any manner other than pursuant to the compulsory powers available to the SFO and FCA, he would be entitled to remain silent throughout. Whilst he would be required to provide answers in a compulsory interview by U.K. authorities, such as the SFO or the FCA, those answers would not be capable of forming part of the evidence in a criminal trial, and at such a trial, irrespective of the manner in which he was interviewed (if at all), Mr Windhorst would also be entitled to assert his right to remain silent throughout and elect to test the prosecution evidence through cross examination and submission/oral argument alone.

---

[13] S.2(8) CJA, and s.174(2) FSMA
[14] S.2(8) CJA and s.174(3) FSMA
[15] S.34(2) Criminal Justice and Public Order Act 1994

23. Finally I note that there are mechanisms for information sharing between criminal law enforcement agencies in the U.K and U.S, In the U.K. the Criminal Justice (International Co-Operation) Act 1990 establishes a framework of Mutual Legal Assistance under which law enforcement agencies are able to request information and assistance from each other in connection with, amongst other things, criminal investigations. There is also a bilateral Treaty[16] between the U.S. and U.K., pursuant to which law enforcement agencies are able to request assistance in investigating criminal matters, including the provision of documents, records and evidence. This legislative framework provides the basis for dialogue between U.S. and U.K. law enforcement agencies, which will often result in the ceding of jurisdiction to investigate and prosecute certain matters that involve cross border conduct. For example, the SFO were investigating the sale of a British company, Autonomy, to Hewlett Packard in 2011. The decision was ultimately taken that, despite the conduct taking place in part within the U.K. jurisdiction and the key Defendants being U.K. nationals, jurisdiction to prosecute those crimes would be ceded to the U.S. authorities.[17]

24. In light of these information sharing mechanisms, it is entirely possible that, if Mr Windhorst were deposed in connection with U.K. based criminal proceedings, if there were grounds to do so that evidence could and almost certainly would be shared with the U.S. criminal authorities.

25. In summary, the Section 1782 request for the deposition of Mr Windhorst represents an attempt to undermine the authority of the U.K. law enforcement agencies who are best placed and appropriately empowered to investigate matters of U.K. criminal law, is clearly

---

[16] Treaty Between The Government of The United States of America and the Government of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, signed January 6, 1994

[17] See SFO press release confirming ceding of jurisdiction (https://www.sfo.gov.uk/2015/01/19/hp-autonomy/)

designed to violate Mr Windhorst's right to silence in any such investigation, and may prejudice his associated rights in other jurisdictions.

I declare, certify, verify or state under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/*Julianne Hughes-Jennett*

**Date:** March 9, 2023                          Julianne Hughes-Jennett