# EXHIBIT I

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**CASE NO. 01-20-0003-6931**

LARS WINDHORST

Claimant,

v.

ELI SABAG,

Respondent.

**NOTICE OF ARBITRATION AND STATEMENT OF CLAIM**

Claimant Lars Windhorst ("Claimant" or "Mr. Windhorst"), files this Notice of Arbitration and Statement of Claim to demand arbitration in accordance with the Rules of the International Centre for Dispute Resolution ("ICDR") against Respondent Eli Sabag ("Mr. Sabag"), an Israeli citizen.

I.    **PRELIMINARY STATEMENT**

1.    This case stems from Mr. Sabag's breach of a settlement agreement (defined below as the "Settlement Agreement") that resolved the parties' dispute in, inter alia, ICDR arbitration Case Number 01-20-0003-6931.  Mr. Sabag's complete disregard for his obligations under that Settlement Agreement is all the more puzzling given the fact that Mr. Sabag himself moved to enforce the agreement only a few months ago.[1]

_____

[1]    The parties' Settlement Agreement provides that any dispute relating to the Settlement Agreement shall be filed under ICDR arbitration case number 01-20-0003-6931.   C-001 [Confidential Settlement Agreement and Mutual Release, dated June 10, 2022 ("Settlement Agreement")] ¶ 13.  Mr. Windhorst defers to the Case Manager and the ICDR whether to re-open that arbitration (which was administratively closed on November 7, 2022) or to commence a new

2.      Mr. Windhorst hereby invokes the arbitration clause in the Settlement Agreement entered into by Mr. Sabag, Mr. Windhorst and two third-parties, Sapinda Asia Limited ("Sapinda") and Track Group, Inc. ("Track Group"), which specifically requires Mr. Sabag to dismiss all actions (including a discovery proceeding pending before the U.S. District Court for the Southern District of Indiana (defined below as the "1782 Action")) against Mr. Windhorst within 5 business days of receipt of the settlement payment.

3.      Although it took Mr. Windhorst longer than he anticipated, Mr. Windhorst has since made Mr. Sabag whole and satisfied his debt to Mr. Sabag.  Indeed, on February 8, 2023, Mr. Windhorst made payment of the amounts due under the Settlement Agreement and prior ICDR arbitral awards enforcing that agreement (totaling $3,099,985, including interest and attorneys' fees).

4.      Having unquestionably reaped the benefits of the Settlement Agreement, Mr. Sabag now must uphold his end of the bargain by, in accordance with the parties' Settlement Agreement, dismissing and otherwise ceasing to pursue the actions, including the 1782 Action he continues to maintain against Mr. Windhorst.

5.      Mr. Sabag's refusal to dismiss the 1782 Action is a textbook case of the proverbial phrase "hav[ing] one's cake and eating it too."[2]  On the one hand (and with the cake in his mouth), Mr. Sabag has repeatedly affirmed the Settlement Agreement, including moving to enforce the Settlement Agreement following Mr. Windhorst's payment delays and accepting payment from Mr. Windhorst.  Yet on the other hand (and with the cake on his plate), Mr. Sabag now refuses to

---

proceeding with the same or a different Case Number.  *See* C-002 [Correspondence between Mr. Carmona and Mr. Bento, dated March 10, 2023].  Mr. Windhorst's expectation is that the same tribunal will hear this present dispute in order to promote judicial economy and efficiency.

[2] Merriam-Webster Dictionary, "Have One Cake and Eat It Too", https://www.merriam-webster.com/dictionary/have%20one%27s%20cake%20and%20eat%20it%20too.

abide by the very Settlement Agreement he has previously sought to enforce against Mr. Windhorst.

6.      Fortunately, the law precludes Mr. Sabag from having his cake and eating it too, and now that Mr. Sabag has reaped significant benefits from the Settlement Agreement, including netting a multi-million dollar settlement payment and resolving arbitration and legal proceedings (including those related to the SPA, Put Option Agreement, and the 1782 Action), he cannot disavow his obligations under the Settlement Agreement and must dismiss his 1782 Action.  His failure to do so is a clear breach of contract.  Accordingly, Mr. Windhorst respectfully requests that the Tribunal order Mr. Sabag to comply with and perform his obligations under the terms of the Settlement Agreement and compensate Mr. Windhorst for damages incurred as a direct and proximate result of Mr. Sabag's breaches.

II.      **THE PARTIES AND THEIR LEGAL REPRESENTATIVES**

7.      Claimant Lars Windhorst is a German citizen and Swiss resident who primarily conducts business from his offices in the United Kingdom.  Mr. Windhorst's contact details are:

> Lars Windhorst
> 6th Floor, 23 Savile Row
> London W1S 2ET
> United Kindom
> **Tel**: +44 (0) 207 087 7590
> **Fax:** +44 (0) 207 629 2016
> **Email Address:** Lars.Windhorst@tennor.com

8.      Mr. Windhorst's legal representatives in the current proceeding are Quinn Emanuel Urquhart & Sullivan LLP.  All notifications and communications intended for the Claimant in this Application should be sent to his legal representatives using the contact details set out below:

**Quinn Emanuel Urquhart & Sullivan LLP**

51 Madison Ave., 22nd Floor

New York, New York 10010

**Attn**: Lucas V.M. Bento / Gavin S. Frisch / Jingfei Lu

**Tel**: +1 (212) 849 7000

**Fax:** +1 (212) 849 7100

**Email Address:**

lucasbento@quinnemanuel.com          /          gavinfrisch@quinnemanuel.com          /

jingfeilu@quinnemanuel.com

9.      Respondent Mr. Sabag is an Israeli citizen and, upon information and belief,  a U.S.

permanent resident. Upon information and belief, Mr. Sabag's contact details are:

 Eli Sabag

204 NW 4th Ave

Hallandale Beach, Florida, 33009

**Tel**: +1-954-554-8671

**Email**: eli@elisabag.net

Alternatively:

Eli Sabag

Hamaapilim 14

Kfar Saba, Israel

**Tel:** +972 50 576 4288

**Email:** eli@arazim.org

10.      Respondent is represented by Reed Smith LLP and AXS Law PLLC.  Their contact

details are as follows:

**Reed Smith LLP**

200 S. Biscayne Blvd.

Ste. 2600

4

Miami, Florida, 33131

**Attn:** Edward Mullins / Cristina Cardenas / Matthew McKinnon

**Tel**: +1 (786) 747 0200

**Fax:** +1 (786) 747 0299

**Email Address:**

emullins@reedsmith.com          /          ccardenas@reedsmith.com          /

mmckinnon@reedsmith.com

**AXS Law PLLC**

2121 NW 2nd Avenue, Suite 201

Miami, FL 33128

**Attn:** Courtney Capiro

**Tel**: +1 (305) 297 1878

**Fax:** +1 (786) 747 0299

**Email Address:** courtney@axslawgroup.com

III.     **THE CURRENT DISPUTE**[3]

     A.     **Mr. Sabag Attempts to Litigate His Claims Related to the Acquisition, But Then Initiates the Predecessor Arbitration**

    11.     In March 2014, Track Group entered into a Share Purchase Agreement ("SPA") with Mr. Sabag to acquire Mr. Sabag's Israeli company (the "Acquisition") for approximately $7.5 million in shares of Track Group and $311,404 in cash.[4]   Under the SPA, Track Group was obligated to provide Mr. Sabag additional shares of Track Group, conditioned on the number of

---

[3]  For the Tribunal and the parties' convenience, this Notice of Arbitration will also briefly recount the procedural history leading up to the disputes that the Settlement Agreement resolved, although the substance of those disputes became virtually irrelevant after the signing of the Settlement Agreement.

[4]  The SPA is attached as Exhibit C-003.  Track Group was known as SecureAlert, Inc. when it entered into the SPA.  *See* C-004 [Sabag's Notice of Arbitration, dated March 11, 2020] at 1 (filing arbitration against Track Group, "a Delaware corporation formerly known as SecureAlert, Inc.").

GPS prisoner tracking devices Track Group sold or leased after the Acquisition ("Earn-out Shares").[5]

12.     At the time of signing the SPA, Mr. Windhorst indirectly owned approximately 45.2% of the shares of Track Group through Sapinda, his wholly-owned British Virgin Islands corporation.[6]  Mr. Windhorst negotiated the SPA and, in connection with the Acquisition and the SPA, Mr. Windhorst and Mr. Sabag signed a Put Option Agreement[7] under which Mr. Sabag can put any Earn-out Shares to Sapinda at a price that would increase if the price of Track Group's shares decreased.[8]  The SPA contained an arbitration clause providing that all disputes, claims or controversies that arise out of or in relation to the SPA were to be settled by the ICDR arbitration.[9]

13.     Despite the requirement to submit any disputes arising out of or in relation to the SPA to the ICDR arbitration, on May 4, 2018, Mr. Sabag filed a complaint against Track Group, Sapinda, and Windhorst in the Marion Superior Court ("Superior Court") in Indianapolis, Indiana, alleging that 1) Sapinda and Mr. Windhorst breached their promises under the Put Option Agreement to purchase the Earn-out Shares for $20 per share; and 2) Track Group, Sapinda, and Windhorst collaboratively engaged in "bad faith" activities to deliberately prevent Mr. Sabag from meeting his earn-out milestones.[10]

---

[5]   C-004 [Sabag's Notice of Arbitration] ¶ 1.

[6]   *Id.*

[7]   The Put Option Agreement is attached as Exhibit C-005.

[8]   C-004 [Sabag's Notice of Arbitration] ¶ 3.  Mr. Sabag alleged that the SPA and related transaction documents provided that the more Track Group's share price dropped,  the more shares Track Group would issue to Mr. Sabag.  Mr. Sabag also alleged that under the Put Option Agreement, Sapinda was obligated to accept all shares Mr. Sabag put at $20.  *See id.* ¶¶ 40, 51.

[9]   C-003 [SPA] ¶ 11.5.

[10]   C-004 [Sabag's Notice of Arbitration] ¶ 14.  The copy of the complaint to the Superior Court is attached as Exhibit C-006.

14.     Specifically, Mr. Sabag believed that Track Group, Sapinda, and Mr. Windhorst maneuvered Track Group's transactions with "Marion County Community Corrections" (prison system) in Marion County, Indiana ("MCCC")" to avoid the provision of GPS prisoner tracking devices under these transactions being counted towards Mr. Sabag's earn-out milestone.[11]

15.     On April 1, 2019, the Superior Court granted the Track Group's motion to compel arbitration in accordance with Section 11.5 of the SPA.[12] The Superior Court also granted Mr. Windhorst and Sapinda's motion to compel arbitration.[13]

16.     Rather than immediately commencing arbitration against Mr. Windhorst, Sapinda, and Track Group following the Superior Court's order compelling arbitration of disputes in relation to the SPA, Mr. Sabag's next move was, on December 31, 2019, to initiate a discovery proceeding in the United States District Court for the Southern District of Indiana requesting discovery under 28 U.S.C. § 1782[14] from MCCC and various employees of MCCC and Marion County ("1782 Action").[15] While Mr. Sabag claimed that the discovery would be "for use" in a U.K. criminal proceeding that Mr. Sabag contemplated to bring against Mr. Windhorst in the

---

[11]   *See* C-004 [Sabag's Notice of Arbitration] ¶¶ 158-159.

[12]   *Id.* ¶ 16.

[13]   *Id.* ¶ 17.  The Superior Court's order is attached as Exhibit C-007.

[14]   28 U.S.C. § 1782 provides in relevant part: "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. . . . A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege".

[15]   *See In re Eli Sabag*, No. 1:19-mc-0008-JPH-TAB (S.D. Ind.) (the "1782 Action") at Dkts. 1, 6 & 9.  Docket entries Nos. 1, 6, and 9 to the 1782 Action are attached as Exhibits C-008, C-009, and C-010.

future,[16] the allegations in that proceeding related to the SPA and the Put Option Agreement: Mr. Sabag spent almost 20 pages describing in detail the negotiation and the terms of the SPA and Put Option Agreement[17], and Mr. Sabag's purported criminal action focused on Mr. Windhorst's "activities to defraud Mr. Sabag of the mutually agreed consideration for the Acquisition."[18]

17.     Over two months after he filed the 1782 Action, on March 11, 2020, Mr. Sabag filed a notice of arbitration in the ICDR in New York ("Predecessor Arbitration") in accordance with Section 11.5 of the SPA.[19] The case number for the arbitration is 01-20-0003-6931,[20] and Mr. Brian Casey was appointed as the arbitrator.[21]

B.     **The Parties Settle the Predecessor Arbitration & the Settlement Agreement**

18.     Before the arbitrator in the Predecessor Arbitration issued a substantive award, Mr. Sabag entered into a "Confidential Settlement Agreement and Mutual Release" with Track Group, Sapinda, and Mr. Windhorst on June 10, 2022 ("Settlement Agreement").[22]   The Settlement Agreement "is intended to settle and resolve permanently and forever any and all claims" that were

---

[16]   Tellingly, to this date, Mr. Sabag has not initiated any criminal proceeding against Mr. Windhorst.

[17]   C-010 [1782 Action Dkt. 9, Sabag 1782 Application Memorandum of Law], at 9-27.

[18]   *Id.  See also id.* at 8 ("summary of criminal claims alleged by Mr. Sabag" against Mr. Windhorst's "misconduct to defraud Mr. Sabag").

[19]   C-004 [Sabag's Notice of Arbitration] at 1.

[20]   *See*, *e.g.*, C-011 [Procedural Order 1 of ICDR Arbitration No. 01-20-0003-6931, dated December 14, 2020] at 1.

[21]   *Id.* ¶ 18.

[22]   C-001 [Settlement Agreement]; the Settlement Agreement was amended on July 11, 2022.  C-012 [Amendment to Settlement Agreement, dated July 11, 2022].

asserted by Mr. Sabag against Mr. Windhorst, including the Predecessor Arbitration and the 1782 Action.[23]

19.     Specifically, paragraph 3 of the Settlement Agreement describes the "Background and Description of the Settled Claims" encompassed by the Settlement Agreement.[24] The "Settled Claims" are defined to include, *inter alia*, the "1782 Action," the "State Lawsuit," and the "Arbitration."[25]

20.     "1782 Action" is defined in paragraph 3 of the Settlement Agreement as the "action [filed by Mr. Sabag] in the United States District Court of the Southern District of Indiana under case number 1:19-mc-00084-JPH-TAB, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings."[26]

21.     "State Court Lawsuit" is defined in paragraph 3 of the Settlement Agreement as the "lawsuit [filed by Mr. Sabag] in the Marion County Superior Court, located in Marion County, Indianapolis, Indiana, under cause number 49D14-1805-PL-017647."[27] That lawsuit was dismissed, and the Parties were ordered by the Court to arbitrate the issues.[28]

22.     The "Arbitration" is defined in paragraph 3 of the Settlement Agreement as the "action [filed by Sabag] with the American Arbitration Association International Centre for Dispute Resolution under case number 01-20-0003-6931."[29]

---

[23]   C-001 [Settlement Agreement] ¶ 3.

[24]   *Id.*

[25]   *Id.*

[26]   *Id.*

[27]   *Id.*

[28]   *Id.*; C-007 [Superior Court's Order] at 4-5.

[29]   C-001 [Settlement Agreement] ¶ 3.

23.     Under the terms of the Settlement Agreement, Mr. Windhorst agreed to pay Mr. Sabag $2,800,000 to resolve all claims, both known and unknown, and to dismiss all actions against Mr. Windhorst.[30]  Paragraph 5 of the Settlement Agreement requires Mr. Sabag's counsel "**within five (5) business days [of receiving the settlement payment]**" to "**file a Joint Stipulation of Dismissal of the 1782 Action**."[31]

24.     The Settlement Agreement contains releases which provide that Mr. Sabag is obligated "to RELEASE AND FOREVER DISCHARGE[]" Mr. Windhorst "from any and all past, present or future claims, causes of action, suits, … judgments, obligations, damages and liabilities  of any nature whatsoever, whether or not now known, suspected, or claimed, that exist in whole or in part as of the Effective Date of this Agreement," immediately upon the disbursement of the settlement payment.[32]

25.     Further, under the "Covenant not to Pursue Legal or Equitable Claims" of the Settlement Agreement, Mr. Sabag agreed "not [to] initiate, prosecute, participate in, or enforce any legal or equitable action that is contrary to the terms and conditions or intent of this Agreement or otherwise required by law."[33] He further acknowledged that he has "voluntarily given up the right to pursue [all existing claims up to the Settlement Agreement] in any forum or proceeding," and he "expressly WAIVE[D] any right to assert in the future any claims of any kind or nature

---

[30]   *Id.* ¶¶ 4, 6.a; *id.* at Ex. A.  The Effective Date of the Settlement Agreement is defined as "the date on which last signature is added to this Agreement, at which time it shall be fully enforceable." *Id.* ¶ 2.

[31]   *Id.* ¶ 5.

[32]   *Id.* ¶ 6.a.

[33]   *Id.* ¶ 8.d.

whatsoever that may have existed up to and including the Effective Date" of the Settlement Agreement.[34]

26.     Paragraph 10 of the Settlement Agreement provides that the prevailing party in any "dispute relating to the" Settlement Agreement "shall be entitled to recover from the non-prevailing party its costs, fees, expenses, and reasonable attorneys' fees incurred in this dispute."[35]

C.     **Post-Settlement Activity of the Parties**

27.     As noted above, the Predecessor Arbitration concerned Mr. Sabag's claims related to alleged breaches of the SPA and Put Option Agreement.[36]

28.     On June 10, 2022, the parties settled all of their disputes, including the 1782 Action, by entering into the Settlement Agreement.[37] The Settlement Agreement provided, *inter alia*, that Mr. Windhorst would pay Mr. Sabag within 14 days.[38]

29.     On July 6, 2022, counsel for Mr. Windhorst informed Mr. Sabag's counsel that Mr. Windhorst was unable to timely pay his portion of the settlement fund due to administrative issues with his bank and that his account was frozen.[39] As such, the parties subsequently executed an Amendment to the Settlement Agreement on July 11, 2022, pursuant to which the amount of the payment was increased to $2,850,000 and the due date for the payment was extended until August

---

[34]   *Id.*

[35]   *Id.* ¶ 10.

[36]   *Supra* ¶¶ 16-17.

[37]   C-001 [Settlement Agreement] ¶15.

[38]   *Id.* ¶ 4.b.

[39]   C-013 [Sabag's Motion to Enforce] at 3; *see also* C-014 [Correspondence between Mr. Mullins and Mr. Calamari, dated June 28, 2022] (Mr. Calamari informing Mr. Mullins that Mr. Windhorst has planned to make the payment by the end of the week).

1, 2022.[40] The Amendment specifically states that all other terms and conditions of the Settlement Agreement "remain in full force and effect."[41]

30.     After executing the Amendment to the Settlement Agreement, Mr. Sabag, through his attorneys, continued to regularly inquire as to when Mr. Windhorst would be able to make the settlement payment.[42]

31.     On August 2, 2022 – the day after Mr. Windhorst's failure to timely remit payment under the Amendment to the Settlement Agreement – Mr. Sabag filed a Motion to **__Enforce the Settlement Agreement__** ("Mr. Sabag's Motion to Enforce") in the Predecessor Arbitration.[43]  Mr. Sabag's Motion to Enforce requested that the Tribunal "enforce the terms of the parties' signed Settlement Agreement" and "summarily enter an award against [Mr.] Windhorst … for the amounts set forth in the Settlement Agreement and Amendment ($2,850,000)."[44]  Mr. Sabag has never sought to rescind the Settlement Agreement following Mr. Windhorst's failure to timely remit payment.[45]

32.     After Mr. Sabag filed Mr. Sabag's Motion to Enforce, his attorneys repeatedly reached out to Mr. Peter Calamari (general counsel of one of Mr. Windhorst's companies) for payment.[46]

---

[40]  C-012 [Amendment to Settlement Agreement] ¶ 2.

[41]  *Id.* ¶ 4.

[42]  C-015 [Correspondence from Mr. Mullins to Mr. Calamari, dated July 26, 2022]; C-016 [Correspondence Between Mr. Mullins and Mr. Calamari, dated July 30, 2022].

[43]  C-013 [Sabag's Motion to Enforce] at 7.

[44]  *Id.* at 6.

[45]  *See id.*

[46]  C-017 [Correspondence between Mr. Mullins and Mr. Calamari, dated August 5, 2022]; C-018 [Correspondence between Mr. Mullins and Mr. Calamari, dated August 9, 2022]; C-019 [Correspondence between Mr. Mullins and Mr. Calamari, dated August 10, 2022].

33.     Mr. Sabag's attorney explicitly instructed that the settlement payment can also be made to Mr. Sabag's personal account, though payment to the Reed Smith account is "prefer[red]."[47]

34.     On August 10, 2022, counsel for Mr. Windhorst advised that "Mr. Windhorst intend[ed] to pay the settlement amount owed to Claimant Eli Sabag as soon as possible and we understand that payment of the settlement amount is being arranged."[48]   Indeed, Mr. Windhorst signed a transfer request form to Euram Bank for an amount of $ 2,850,000 to Reed Smith LLP dated August 8, 2022.[49] However, the wire transfer was not successful due to administrative issues.

35.     On August 17, 2022, the arbitrator in the Predecessor Arbitration issued a summary award (the "Settlement Enforcement Award") finding Mr. Windhorst in breach of the Settlement Agreement.[50]   The Settlement Enforcement Award required Mr. Windhorst to pay Mr. Sabag the $2,850,000 due under the Settlement Agreement, plus interest.[51]   The Settlement Enforcement Award also gave Mr. Sabag the opportunity to submit supporting evidence to the arbitrator to add interest, fees, and costs.[52]

36.     After this, Mr. Sabag's attorneys continued to reach out to Mr. Calamari for payment.[53]

---

[47]   C-017 [Correspondence between Mr. Mullins and Mr. Calamari, dated August 5, 2022] at 2 (Mr. Mullins stating "[a]s alternative, although we would prefer payment to Reed Smith per the settlement, below is Eli's personal account in Israel.").

[48]   C-020 [Settlement Enforcement Award, dated August 17, 2022] ¶ 8.

[49]   C-021 [Correspondence from EuramBank, dated August 9, 2022] at 4.

[50]   C-020 [Settlement Enforcement Award] ¶15(a).

[51]   *Id.* ¶15(b).

[52]   *Id.* ¶¶15(c)-(d).

[53]   *See, e.g.*, C-022 [Correspondence between Mr. Mullins and Mr. Calamari, dated September 7, 2022].

37.    On October 11, 2022, Mr. Sabag filed in the 1782 Action a supplementary discovery request seeking a deposition of Mr. Windhorst allegedly for use in purportedly contemplated criminal proceedings in the United Kingdom (the "Supplementary Request").[54]

38.    On October 20, 2022, Mr. Windhorst's attorneys in the 1782 Action withdrew their appearances due to Mr. Windhorst's delay in paying his attorneys' fees.[55]  Mr. Windhorst was therefore not represented by counsel at the time and was not able to file an opposition to the Supplementary Request in the 1782 Action.

39.    While Mr. Windhorst was facing liquidity difficulties, Mr. Windhorst's absolute priority was to fund the settlement payment, which would have triggered the releases of all claims and the dismissals of the actions, including the 1782 Action.

40.    On November 7, 2022, the arbitrator in the Predecessor Arbitration issued a final summary award which added $13,742.94 in attorneys' fees and costs to the amounts owed under the Settlement Enforcement Award.[56]

41.    After the issuance of final summary award, Mr. Sabag's attorneys continued to reach out to Mr. Calamari for payment.[57]

42.    On December 15, 2022, the Court in the 1782 Action granted Mr. Sabag's Supplementary Request, ordering Mr. Windhorst to appear for a deposition at a mutually acceptable time within 45 days of the order.[58]

---

[54]   *See* 1782 Action at Dkt. 98 (attached as Exhibit C-023).

[55]   *See* 1782 Action at Dkts. 102 & 103 (attached as Exhibit C-024 and C-025).

[56]   C-026 [Final Award, dated November 7, 2022] ¶12(d).

[57]   *See*, *e.g.*, C-027 [Correspondence between Mr. Mullins and Mr. Calamari, dated November 23, 2022].

[58]   *See* 1782 Action at Dkt. 105 (attached as Exhibit C-028).

43.     After Mr. Sabag filed the Supplementary Request in the 1782 Action, Mr. Sabag's counsel continued to reach out to Mr. Windhorst's counsel for payment, and provided updated wire transfer instructions.[59]

44.     During January 2023, Mr. Windhorst again made attempts to wire the payment, and communicated his intent to complete the payment to Mr. Sabag.  For instance, on January 27, 2023, Mr. Windhorst called Mr. Sabag confirming his intent to make the payment in two tranches.[60]  Then, Mr. Windhorst instructed the payment of the first tranche (totaling 1 million Euro) on January 30, 2023,[61] and the second tranche (Euro equivalent of $2,100,000 U.S. dollars) on January 31, 2023.[62]  However, those payments bounced because Mr. Sabag's counsel did not have an account to receive payment made in Euro.[63]

45.     Despite Mr. Windhorst's repeated affirmation and attempts to make the payment (which failed because of administrative issues), on February 1, 2023, Mr. Sabag filed in the 1782 Action a motion requesting the Court to order Mr. Windhorst to show cause for his failure to appear for the deposition, despite never having agreed with Mr. Windhorst on a "mutually acceptable time" for the deposition.[64]

---

[59]   *See*, *e.g.*, C-029 [Correspondence between Mr. Rau and Conyers Dill & Pearman LLP, dated Jan. 2023 – Feb. 2023] at 32-33 (attaching wire transfer details).

[60]   *See id.* at 24 (Email from Mr. Windhorst's BVI counsel to Mr. Sabag's counsel confirming "Mr. Windhorst or his representative intend to make a transfer of EUR 1 million today or Monday"); *id.* at 21 (Mr. Sabag's counsel confirming "[w]e understand that your client reached out to Mr Sabag on Friday outlining a two-part payment plan over the next 7 days").

[61]   *Id.* at 17 (Email from Mr. Windhorst's BVI counsel to Mr. Sabag's counsel attaching the payment information of the first tranche).

[62]   *Id.* at 14.

[63]   *See id.* at 12 (Mr. Sabag's counsel noting "any funds sent in EUR would be returned by the intermediary bank Wells Fargo because they are not in USD").

[64]   *See* 1782 Action at Dkt. 107 (attached as Exhibit C-030).

15

46.     On February 2, 2023, Mr. Windhorst's counsel noted that the prior payments on January 30 and 31 were made in Euro and Mr. Windhorst "has therefore instructed a single payment in US dollars [so to avoid the payment being returned again]".[65]

47.     On February 8, 2023, Mr. Windhorst wired Mr. Sabag's counsel $3,099,985 (more than the amount of the award after adjustments) following the wire instructions provided by Mr. Sabag's counsel.[66]   On February 9, 2023, Mr. Sabag's counsel confirmed by email that they received Mr. Windhorst's wire transfer.[67]   On February 10, 2023, Mr. Sabag's counsel again confirmed receipt of the wire transfer by email, and stated that they would remit the amount of the overpayment ($55,353).[68]

48.     Following Mr. Windhorst's payment to Mr. Sabag, Mr. Sabag was required under the Settlement Agreement to dismiss the 1782 Action by no later than February 15, 2023.[69]   On the same day, U.S. counsel for Mr. Windhorst called Mr. Sabag's attorney in Indiana, informing him of the payment and requesting that the 1782 Action be dismissed per the Settlement Agreement.

49.     On this February 15, 2023 call, Mr. Windhorst's US counsel was informed by Mr. Sabag's Indiana counsel that he would need some time to confer with his client because, *inter alia*, Mr. Sabag's mother had recently passed.  In an effort to respect what must undoubtedly been a

---

[65]   *See* C-029 [Correspondence between Mr. Rau and Conyers Dill & Pearman LLP, dated Jan. 2023 – Feb. 2023] at 9.

[66]   C-031 [Wire Transfer Receipt, dated February 8, 2023]; *see also* C-029 [Correspondence between Mr. Rau and Conyers Dill & Pearman LLP, dated Jan. 2023 – Feb. 2023] at 20 (Mr. Sabag's counsel stating "I re-attach the wire instructions for ease").

[67]   C-029 [Correspondence between Mr. Rau and Conyers Dill & Pearman LLP, dated Jan. 2023 – Feb. 2023] at 3 (Email from Ms. Johns to Mr. Rau, dated February 9, 2023).

[68]   *Id.* at 1 (Email from Ms. Johns to Mr. Rau, dated February 10, 2023).

[69]   C-001 [Settlement Agreement] ¶ 5.

difficult time for Mr. Sabag (and in observance of the Jewish Shiva 7-day period), Mr. Windhorst's US counsel agreed to confer back the following week.

50.     On February 22, 2023, Mr. Sabag, through Indiana counsel, repeated his intention to depose Mr. Windhorst in the 1782 Action, thus refusing to dismiss the 1782 Action.[70]

51.     On February 23, 2023, Mr. Windhorst's U.S. counsel spoke to Mr. Sabag's Indiana counsel over the telephone to better understand Mr. Sabag's position in an effort to avoid further litigation or arbitration.

52.     On February 27, 2023, Mr. Sabag, through Indiana counsel, stated that he is "committed to depose Mr. Windhorst."[71]

53.     On March 1, 2023, the Court in the 1782 Action entered an Order directing Mr. Windhorst to appear at a hearing scheduled for April 11, 2023 to show cause as to why he should not be sanctioned for his refusal to sit for a deposition in a case Mr. Sabag is obligated to dismiss and has covenanted not to pursue.[72]

54.     On March 2, 2023, Mr. Windhorst's counsel sent a letter to Mr. Sabag's counsel demanding Mr. Sabag to dismiss the 1782 Action and reserving Mr. Windhorst's rights, including his rights to enforce the parties' Settlement Agreement ("March 2 Letter").[73]  In the letter, Mr. Windhorst's counsel requested to review a draft of the Joint Stipulation of Dismissal (i.e., a one-page document) of the 1782 Action by March 3, 2023.[74]

55.     Mr. Sabag has not responded to Mr. Windhorst's March 2 Letter.

---

[70]  C-032 [Correspondence between Mr. Korin and Mr. Bento, dated February 22, 2023] at 2.

[71]  C-033 [Correspondence between Mr. Korin and Mr. Bento, dated February 27, 2023] at 1.

[72]  1782 Action at Dkt. 108 (attached as Exhibit C-034).

[73]  C-035 [Letter from Mr. Bento to Mr. Korin, dated March 2, 2023].

[74]  *Id.*

56.     On March 9, 2023, Mr. Windhorst filed in the 1782 Action (1) a motion to vacate or stay the Court's December 15, 2022 order; (2) a motion to vacate or stay the Court's March 1, 2023 order; and (3) a motion for an interim administrative stay pending resolution of Mr. Windhorst's two motions to vacate or stay.[75]

57.     As of the date of this Notice of Arbitration, Mr. Sabag still has not dismissed the 1782 Action.

58.     Mr. Sabag has been made whole and has reaped the benefits of the Settlement Agreement, but refuses to comply with his obligations thereunder.

59.     As described herein, Mr. Windhorst asserts that Mr. Sabag has breached the Settlement Agreement by refusing to dismiss, release, and otherwise continuing to pursue the 1782 Action.  Accordingly, Mr. Windhorst's claims are subject to the arbitration clause in the parties' Settlement Agreement because they involve "issue[s] or dispute[s] relating to . . . breach[es] of th[e] [Settlement] Agreement."[76]

    D.     **Mr. Sabag's Breaches of the Settlement Agreement**

60.     The Settlement Agreement constitutes a valid and enforceable contract between Mr. Windhorst and Mr. Sabag.

61.     Mr. Windhorst effectuated payment of the settlement funds on February 8, 2023 by wiring to Mr. Sabag's counsel $3,099,985.[77]  Mr. Sabag's counsel acknowledged receipt of the

---

[75]   C-036 [1782 Action Dkt. 115, Motion to Vacate or Stay the Court's Deposition Order on December 15, 2022]; C-037 [1782 Action Dkt. 116, Motion to Vacate or Stay the OSC on March 1, 2023]; C-038 [1782 Action Dkt. 117, Motion to Stay]; C-040 [1782 Action Dkt. 118, Windhorst Declaration]; C-040 [1782 Action Dkt. 119, Bento Declaration].

[76]   *Id.* ¶ 13.

[77]   C-031 [Wire transfer receipt].

payment on February 9, 2023.[78]  The funds have not been returned to Mr. Windhorst at any point following the date of payment.

62.    Pursuant to paragraph 5 of the Settlement Agreement, Mr. Sabag's counsel "within five (5) business days [of receiving the settlement payment]" was required to "file a Joint Stipulation of Dismissal of the 1782 Action."[79] Mr. Sabag was required to file a Joint Stipulation of Dismissal of the 1782 Action by February 15, 2023.

63.    Mr. Sabag has breached (and continues to breach) the Settlement Agreement by failing to dismiss the 1782 Action as required by paragraph 5 of the Settlement Agreement.

64.    Pursuant to paragraph 6(a) of the Settlement Agreement, Mr. Sabag "RELEASE[D] AND FOREVER DISCHARGE[D]" Mr. Windhorst "from any and all past, present or future claims, causes of action, suits, … judgments, obligations, damages and liabilities of any nature whatsoever, whether or not now known, suspected, or claimed, that exist in whole or in part as of the Effective Date of this Agreement, including but not limited to" the 1782 Action.[80]  Pursuant to paragraph 6 of the Settlement Agreement, this release became "effective immediately upon the disbursement of the Settlement Funds."[81]

65.    Mr. Sabag has breached (and continues to breach) the Settlement Agreement by maintaining the 1782 Action despite having released the 1782 Action pursuant to paragraph 6 of the Settlement Agreement.

---

[78]   C-029 at 3 [Email from Ms. Johns to Mr. Rau, dated Feb. 9, 2023].

[79]   C-001 [Settlement Agreement] ¶ 5.  The Settlement Agreement defines the "1782 Action" as the "action [filed by Mr. Sabag] in the United States District Court of the Southern District of Indiana under case number 1:19-mc-00084-JPH-TAB, for an Order Pursuant to 28 U.S.C. ¶ 1782 to Conduct Discovery for Use in Foreign Proceedings."  *Id.* ¶ 3.

[80]   *Id.* ¶ 6.a; *id.* ¶ 3.

[81]   *Id.* ¶ 6.

66.     Pursuant to paragraph 8 of the Settlement Agreement, Mr. Sabag agreed "not [to] initiate, prosecute, participate in, or enforce any legal or equitable action that is contrary to the terms and conditions or intent of this Agreement or otherwise required by law," and he "voluntarily g[ave] up the right to pursue" the 1782 Action "in any forum or proceeding."[82] Mr. Sabag further "expressly WAIVE[D] any right to assert in the future any claims of any kind or nature whatsoever that may have existed up to and including the Effective Date" of the Settlement Agreement.[83]

67.     Mr. Sabag has breached (and continues to breach) the Settlement Agreement by maintaining the 1782 Action despite having covenanted not to pursue the 1782 Action pursuant to paragraph 8 of the Settlement Agreement.

68.     Paragraph 13 of the Settlement Agreement provides that "[t]his Agreement shall be construed and interpreted in accordance with the laws of the State of New York."[84]

69.     New York law applies the doctrine of election of remedies.[85] Although Mr. Windhorst's prior breach of the Settlement Agreement gave Mr. Sabag the right to elect to rescind the Settlement Agreement, Mr. Sabag elected not to do so. Instead, he elected to abide by the Settlement Agreement and reap its benefits.

70.     Mr. Sabag has unequivocally and repeatedly affirmed the validity of the Settlement Agreement by, *inter alia*, (i) amending the Settlement Agreement to provide Mr. Windhorst

---

[82]   *Id.* ¶ 8.d.

[83]   *Id.*

[84]   *Id.* ¶ 13.

[85]   *See, e.g.*, CLA-001: *331 East 14th St. LLC v. 331 East Corp.*, 740 N.Y.S.2d 327 (N.Y. App. Div. 2002) ("The election of remedies rule bars the pursuit of alternative relief after a party has chosen one of two or more co-existing inconsistent remedies, and in reliance upon that election, that party must also have gained an advantage, or the opposing party must have suffered some detriment.") (internal citation and quotation marks omitted).

additional time to remit payment;[86] (ii) filing Mr. Sabag's Motion to Enforce the terms of the Settlement Agreement;[87] (iii) filing Mr. Sabag's Motion to Enforce the Settlement Agreement under the dispute resolution clause of the Settlement Agreement as opposed to a new arbitration regarding the underlying SPA and Put Option Agreement;[88] (iv) chasing payment after filing his Motion to Enforce the Settlement Agreement and obtaining the summary award;[89] and (v) accepting Mr. Windhorst's payment in full.[90]

71.     If Mr. Sabag wished to maintain the 1782 Action, he could have instead elected to disavow the Settlement Agreement and proceed on his underlying claims and actions following Mr. Windhorst's failure to remit payment in the time provided by the Settlement Agreement.[91]

72.     Since Mr. Sabag elected to affirm the validity of the Settlement Agreement through, *inter alia*, seeking to enforce it, he cannot deny his obligations thereunder.[92]

73.     As a direct and proximate result of Mr. Sabag's breaches of the Settlement Agreement, Mr. Windhorst has been unable to recover the value upon which he relied when he entered into the Settlement Agreement with Mr. Sabag.

---

[86]   C-012 [Amendment to Settlement Agreement] ¶ 2.

[87]   C-013 [Sabag's Motion to Enforce].

[88]   *Id.*; C-001 [Settlement Agreement] ¶13; C-012 [Amendment to the Settlement Agreement] at ¶ 3.

[89]   C-013 [Sabag's Motion to Enforce] at 4; *supra* ¶¶ 32, 36, 41, 43 (citing C-017, C-018, C-019, C-022, C-027); C-029 [Correspondence between Mr. Rau and Conyers Dill & Pearman LLP, dated Jan. 2023 – Feb. 2023] at 8, 10, 22, 25-26.

[90]   C-029 [Correspondence between Mr. Rau and Conyers Dill & Pearman LLP, dated Jan. 2023 – Feb. 2023] at 1, 3; C-031 [Wire Transfer Receipt].

[91]   *See, e.g.*, CLA-002: *Cherniak v. Trans-High Corp.*, No. 18 CIV. 7734 (AT), 2020 WL 1047884, at *5 (S.D.N.Y. Mar. 4, 2020) ("by commencing [] litigation Plaintiffs elected to proceed on their underlying claims instead of seeking the money owed under the Agreement").

[92]   *See, e.g.*, CLA-003: *Sofi Classic S.A. de C.V.*, 444 F. Supp. 2d 231, 238 (S.D.N.Y. 2006).

74.     Mr. Windhorst's remedy at law for Mr. Sabag's breaches of the Settlement Agreement is inadequate because, due to Mr. Sabag's breaches, Mr. Windhorst faces in the 1782 Action court-ordered compulsion to provide testimony pursuant to a subpoena issued by Mr. Sabag for purported use in foreign criminal proceedings where Mr. Windhorst is the purported suspect in those proceedings.  If the deposition proceeds, there will be a permanent written record of Mr. Windhorst's testimony, which may include invocations of U.S. and U.K. privileges against self-incrimination.  Compensating Mr. Windhorst for his time appearing at such a deposition simply does not provide Mr. Windhorst with the value upon which he relied when he agreed to settle the 1782 Action.  An award of damages against Mr. Sabag would therefore not fully restore Mr. Windhorst to the position he would have occupied if Mr. Sabag had not breached the Settlement Agreement.

75.     Likewise, due to Mr. Sabag's failure to dismiss the 1782 Action, Mr. Windhorst faces the possibility of being sanctioned and/or held in contempt of Court in connection with the Court's March 1, 2023 order directing Mr. Windhorst to show cause at a hearing scheduled for April 11, 2023.  If the hearing proceeds and the Court imposes sanctions on Mr. Windhorst, there will be a permanent record of the fact that Mr. Windhorst has been sanctioned by a Court, which may permanently stain Mr. Windhorst's reputation.  Even if the Court only imposes monetary sanctions on Mr. Windhorst, compensating Mr. Windhorst in the amount of those sanctions simply does not provide Mr. Windhorst with the value upon which he relied when he agreed to settle the 1782 Action.  An award of damages against Mr. Sabag would therefore not fully restore Mr. Windhorst to the position he would have occupied if Mr. Sabag had not breached the Settlement Agreement.

76.     In addition to the potential irreparable harm Mr. Windhorst may suffer as a direct and proximate result of Mr. Sabag's breaches of the Settlement Agreement, Mr. Windhorst has suffered (and continues to suffer) damages as a direct and proximate result of Mr. Sabag's breaches of the Settlement Agreement.  Mr. Windhorst's damages include, but are not limited to, Mr. Windhorst's attorneys' fees, costs, and other expenses incurred in defending the 1782 Action after the date Mr. Sabag was obligated under the Settlement Agreement to dismiss the 1782 Action, including but not limited to attorneys' fees, costs, and expenses incurred in preparing the motions filed by Mr. Windhorst in the 1782 Action on March 9, 2023.[93]

77.     Paragraph 10 of the Settlement Agreement provides that the prevailing party in any "dispute relating to the" Settlement Agreement "shall be entitled to recover from the non-prevailing party its costs, fees, expenses, and reasonable attorneys' fees incurred in this dispute.[94]

78.     Due to Mr. Sabag's breaches of the Settlement Agreement, Mr. Windhorst has incurred, and will continue to incur, costs, fees, expenses, and reasonable attorneys' fees.

## IV.     **PROCEDURAL MATTERS**

### A.     **Agreement to Arbitrate & Controlling Law**

79.     The jurisdiction of the Tribunal derives from Paragraph 13 of the Settlement Agreement, which provides as follows:

> This Agreement shall be construed and interpreted in accordance with the laws of the State of New York. The agreement shall be interpreted in a neutral manner and not for or against any party. Any issue or dispute relating to the creation, execution, interpretation, performance, or breach of this Agreement shall be submitted to the American Arbitration Association International Centre for Dispute Resolution under case number 01-20-0003-693.

---

[93]   Mr. Windhorst reserves his rights and will separately file, if the Tribunal finds Mr. Sabag to have breached the parties' Settlement Agreement, documentation establishing the total amount of legal fees incurred by Mr. Windhorst after Mr. Sabag was obligated to dismiss the 1782 Action.

[94]   C-001 [Settlement Agreement] ¶10.

80.     Claimant and Respondent are both parties to the Settlement Agreement.

81.     The Settlement Agreement's arbitration clause is binding and valid.  Indeed, Mr. Sabag previously moved to enforce the Settlement Agreement in the Predecessor Arbitration by relying on paragraph 13 of the Settlement Agreement and acknowledging the parties' intent to refer any disputes relating to the Settlement Agreement to ICDR arbitration.[95] The arbitrator in the Predecessor Arbitration also issued arbitration awards on the enforcement of the Settlement Agreement, affirming the validity of the arbitration clause.[96]

### B.     Constitution of the Tribunal and Arbitral Award and Costs

82.     American Arbitration Association International Centre for Dispute Resolution case number 01-20-0003-6931 is the Predecessor Arbitration.

83.     As explained above,[97] the Predecessor Arbitration was initiated by Mr. Sabag after the Marion County Superior Court granted Mr. Windhorst and Sapinda's motion to compel arbitration based on Section 11.5(b) of the SPA.

84.     SPA Section 11.5(b) provides:[98]

Arbitration. Except as provided in Section 11.5( a) above, any dispute, claim or controversy which shall arise out of or in relation to this Agreement, or the breach thereof, shall be settled by binding arbitration. Any such arbitration shall be held in New York, New York U.S.A. in accordance with the Rules of the International Centre for Dispute Resolution in accordance with its international Arbitration Rules (the "Rules"), which Rules are deemed to be incorporated by reference. Any such arbitration shall be conducted by one ( 1) arbitrator appointed by the International Centre for Dispute Resolution. However, such arbitrator shall be an experienced business attorney with background in international stock purchases. The arbitration shall be conducted in the English language. Notwithstanding any contrary provisions in the Rules, each party shall bear its own costs and expenses of the

---

[95]   C-013 [Sabag's Motion to Enforce, dated August 2, 2022] at 4 (citing Settlement Agreement ¶ 13).

[96]   C-020 [Settlement Enforcement Award]; C-026 [Final Award].

[97]   *Supra* ¶¶ 16-17.

[98]   C-003 [SPA] § 11.5 (b).

arbitration and one-half ( I /2) of the fees and costs for the arbitrators unless the arbitrator determines the fees and costs should be borne by one of the parties. The arbitrator may not award or assess punitive damages against either party.

85.     SPA Section 11.5(c) provides:[99]

Jurisdiction: Services of Process. Any action or proceeding under Section l l.5(a) above and any action or proceeding seeking to enforce any decision of the arbitration under Section l l .5(b) above shall be brought against any of the parties exclusively in the state or federal courts located in the State of Utah, County of Salt Lake, U.S.A. and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

### C.     Nomination of Arbitrator and Other Procedural Matters

86.     In accordance with the Settlement Agreement's arbitration clause requiring such disputes to be "submitted to the American Arbitration Association International Centre for Dispute Resolution under case number 01-20-0003-693," Mr. Windhorst, on March 6, 2023, attempted to file a Motion to Enforce the Settlement Agreement in case number 01-20-0003-693.  The ICDR administratively rejected Mr. Windhorst's submission on March 10, 2023 on the grounds that case number 01-20-0003-693 was closed on November 7, 2022,[100] and informed Mr. Windhorst that he should refile the claim under the Settlement Agreement as a new arbitration proceeding.[101]  By filing this Notice of Arbitration and Statement of Claim, Mr. Windhorst is doing just that.

87.     Although this Notice of Arbitration and Statement of Claim may result in the ICDR assigning a different case number to the parties' dispute, the claims recited herein are nevertheless subject to the Settlement Agreement's arbitration clause.  The specific reference to case number

---

[99]  *Id.* § 11(c).

[100]  Neither the final award nor the ICDR's November 7, 2022 letter accompanying the final award state that the tribunal was closing case number 01-20-0003-693. *See* C-026 [Final Award]; C-041 [Letter from Mr. Carmona, dated November 7, 2022].

[101]  C-002 [Correspondence between Mr. Carmona and Mr. Bento].

01-20-0003-693 in the Settlement Agreement should only mean that the parties intended disputes about the Settlement Agreement to be heard by the same Tribunal, which would promote efficiency.  Ultimately, there is a clear intent to arbitrate any issue or dispute relating to a breach of the Settlement Agreement.

88.    To that end, in accordance with Article 2(3)(g) of the ICDR Rules, Mr. Windhorst proposes designating the arbitrator(s) and the place and language of this arbitration in the same manner the parties followed in case number 01-20-0003-693 and for purposes of efficiency to appoint the same arbitrator, Mr. J. Brian Casey, to resolve this dispute.  Mr. Windhorst is willing to mediate.

D.    **Payment of Filing Fee**

89.    Pursuant to Article 2(4) of the ICDR Rules and the ICDR International Arbitration Fee Schedule, Amended and Effective October 1, 2017, the Claimant has paid the initial filing fee of USD 8,625 with this Notice of Arbitration.[102]  The Claimant acknowledges that this payment is subject to the refund policy of the ICDR Standard Fee Schedule, and shall be credited to its portion of the advance on costs.

V.    **REMEDIES**

A.    **Amount in Dispute**

90.    Claimant has suffered significant monetary and non-monetary losses.  As described above, Claimant faces irreparable harm as a direct and proximate result of Mr. Sabag's breaches of the Settlement Agreement.[103]  In addition, Claimant has incurred and will continue to incur costs and expenses as a direct and proximate result of Mr. Sabag's breaches of the Settlement

---

[102]    *See* C-042 [Payment of ICDR Filing Fee (Mar. 15, 2022)].

[103]    *Supra* ¶¶ 73-75.

Agreement, including attorneys' fees and expenses related to litigating the 1782 Action after the date Mr. Sabag was obligated to dismiss the 1782 Action.[104]

91.     Claimant reserves his right to provide evidence showing the amount of the monetary damages directly and proximately caused by Mr. Sabag's breaches of the Settlement Agreement.

### B.     Relief Sought

92.     Claimant Mr. Windhorst respectfully requests the Tribunal (1) enter an award in his favor against Mr. Sabag, (2) compel Mr. Sabag to specifically perform his obligations under the Settlement Agreement by directing Mr. Sabag to dismiss, release, and otherwise not pursue his § 1782 Action, (3) award actual and compensatory damages, including but not limited to the attorneys' fees, costs, and expenses incurred (and continuing to be incurred) by Mr. Windhorst in defending the 1782 Action following the date Mr. Sabag was obligated to dismiss the 1782 Action, (4) reimburse Mr. Windhorst's reasonable attorneys' fees and costs pursuant to paragraph 10 of the Settlement Agreement,[105] (5) award pre-judgment and post-judgment interest, and (6) grant such other and further relief the Tribunal deems just and proper.

Dated: March 16, 2023                                    Respectfully submitted,


                                                        By:   /s/ Lucas Bento
                                                           Lucas Bento FCIArb FRSA
                                                           Jingfei Lu
                                                           lucasbento@quinnemanuel.com

---

[104]     *Supra* ¶¶ 76-78.

[105]     Mr. Windhorst reserves his rights and will separately file, if the Tribunal finds Mr. Windhorst is the prevailing party in this dispute, documentation establishing the total amount of costs, expenses, and attorneys' fees he is entitled to recover from Mr. Sabag pursuant to paragraph 10 of the Settlement Agreement.

jingfeilu@quinnemanuel.com
**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
51 Madison Ave., Floor 22
New York, New York 10010
Phone: 212.849.7000
Fax: 212.849.7100

Gavin. S. Frisch, Esq.
gavinfrisch@quinnemanuel.com
**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
111 Huntington Ave., Suite 520
Boston, Massachusetts 02199
Phone: 617.712.7100
Fax: 617.712.7200

***Counsel for Lars Windhorst***

## <u>CERTIFICATE OF SERVICE AND NOTICE</u>

Pursuant to Articles 2 and 11 of the ICDR Rules, I hereby certify that I have served the foregoing at the addresses listed above (1) on the Respondent by email, and (2) to the Administrator and via the Administrator's online filing service.  You are hereby notified that copies of our arbitration agreement and this Notice are being filed with the International Centre for Dispute Resolution at Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043 email: casefiling@adr.org, with a request that it commence administration of the arbitration. Under the rules, you may file a Statement of Defense within the time specified in the rules after notice from the Administrator.

/s/ Lucas Bento

Lucas Bento FCIArb FRSA