## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

In Re:                                          )
The Application of:                             )
                                                ) Case No.: 1:19-mc-00084-JPH-TAB
ELI SABAG, for an Order Pursuant to             )
28 U.S.C. § 1782 to Conduct Discovery           )
for Use in Foreign Proceedings.                 )

### APPLICANT ELI SABAG'S COMBINED RESPONSE IN OPPOSITION TO
### LARS WINDHORST'S MOTIONS UNDER DOCKET ENTRIES 115, 116, AND 117

Offer Korin, Atty No. 14014-49
Brooke Smith, Atty No. 32427-03
STOLL KEENON OGDEN, PLLC
334 North Senate Avenue
Indianapolis, Indiana 46204
T: (317) 464-1100
F: (317) 464-1111
offer.korin@skofirm.com
brooke.smith@skofirm.com

Courtney Caprio, PHV
Florida Bar No. 933961
AXS LAW GROUP, PLLC
2121 NW Second Avenue, Suite 201
Miami, Florida 33127
T: (305) 297-1878
F: (305) 397-2336
courtney@axslawgroup.com

1

**Table of Contents**

| Section | | Page No. |
|---|---|---|
| I. | Introduction | 6 |
| II. | Background and History | 7 |
| | A. The ICDR Recently Refused to Accept Mr. Windhorst's (First) "Motion to Enforce." | 7 |
| | B. The ICDR Arbitrator in the Initial Arbitration Explicitly Ruled That All of Mr. Windhorst's Rights Under the Original Settlement Agreement Were Forfeited When He Breached the Amended Settlement Agreement | 8 |
| | C. Brief History of this Section 1782 Proceeding | 10 |
| | D. The ICDR Arbitration and the Awards | 13 |
| | E. The BVI Enforcement Proceedings and Mr. Windhorst's Admissions that the Settlement Agreement Had Been Terminated.. | 17 |
| III. | Legal Arguments | 19 |
| | A. Mr. Windhorst Failed to Provide the Agreed Consideration to Mr. Sabag to Retain Rights under the Settlement Agreements | 20 |
| | B. The Amended Settlement Agreement Contains a Liquidated Damages Clause Which Explicitly Allowed Mr. Sabag to Terminate the Settlement Agreement and Seek Liquidated Damages | 21 |
| | C. New York Case Law Directly Refutes the Main Legal Arguments Asserted by Mr. Windhorst | 24 |
| | D. Mr. Windhorst's Legal Authorities Suggesting that Mr. Windhorst Is Seeking a Double Benefit Do Not Apply to the Facts in this Matter | 26 |
| | E. The "Election of Remedies" Defense Argued by Mr. Windhorst Is an Affirmative Defense that Must be Timely Asserted | 27 |
| | F. The Parties Explicitly Agreed that the Final Award in the ICDR Arbitration Would be "Final" | 28 |

| **Section** | | | **Page No.** |
|---|---|---|---|
| | G. | Mr. Windhorst's Motions to Vacate Fail to Meet the Applicable Standards under Fed. R. Civ. Pro. 55(c) or Fed. R. Civ. Pro. 60(b). | 29 |
| | | 1. Mr. Windhorst Has Not Established Any Excusable Neglect. ................................................................ | 31 |
| | | 2. Mr. Windhorst Has Not Established the Discovery of Any "New Evidence." ......................................................... | 35 |
| | | 3. Mr. Windhorst Has Not Established That Mr. Sabag Released His Rights To Pursue This Matter. ...................... | 36 |
| | | 4. Mr. Windhorst Has Not Established Any Other Good Cause for Relief. .......................................................... | 34 |
| | | 5. Mr. Windhorst's Motions to Stay Are Improper, As the Settlement Agreements Were Terminated ...................... | 37 |
| | | 6. Mr. Windhorst Has Waived His Rights to Arbitrate New Claims in the ICDR that Directly Interfere with this Section 1782 Proceeding. ................................................ | 40 |
| | | 7. Mr. Windhorst is Not Entitled to File a Rule 72(A) Objection to this Court's Order Granting Supplementary Discovery .......................................................... | 41 |
| | | 8. Mr. Windhorst Did Not File a Rule 72(A) Objection to this Court's Order to Show Cause, and He is Not Entitled to Any Relief Thereunder. ............................................ | 41 |
| | | 9. Mr. Windhorst Should Not Be Entitled to Respond in Opposition to Mr. Sabag's Supplementary Request for Discovery. ............................................................ | 42 |
| IV. | Conclusion | ....................................................... | 42 |

**<u>Table of Authorities</u>**

## Cases

*AM Cosmetics Inc. v. Solomon*, 67 F. Supp.2d 312 (S.D.N.Y. 1999) ............................................. 22

*Barbagallo v. Marcum LLP*, 925 F.Supp. 275 (E.D.N.Y. 2013) ...................................................... 22

*Bigda v. Fischbach Corp.*, 898 F.Supp. 1004 (S.D.N.Y. 1995) ....................................................... 22

*Braun v. Vill. of Palatine*, 56 F.4th 542 (7th Cir. 2022) ................................................................ 34

*Buck v. Davis*, 580 U.S. 100 (2017) .............................................................................................. 34

*Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995) .... 38

*Cary Oil Co., Inc. v. MG Refining Marketing, Inc.*, 90 F. Supp.2d 401 (S.D.N.Y. 2000) ............ 22

*Cato v. Thompson*, 118 Fed. Appx. 93 (7th Cir. 2004) .................................................................. 31

*CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, 2018 WL 2081860 (S.D.N.Y. 2018) ................. 22

*Chauffeurs v. Jefferson Trucking Co., Inc.*, 628 F.2d 1023 (7th Cir. 1980) .................................. 16

*Chi. Reg'l Council of Carpenters v. Unique Casework Installations, Inc.*, 2015 WL 5873380
  (N.D. Ill. Oct. 5, 2015) ................................................................................................................ 16

*Easley v. Kirmsee*, 382 F.3d 693 (7th Cir. 2004) .......................................................................... 31

*ESPN Inc. v. Office of the Commissioner of Baseball*, 76 F.Supp.2d 383 (S.D.N.Y. 1999) ......... 22

*Ganton Techs., Inc. v. UAW*, 358 F.3d 459 (7th Cir. 2004) ........................................................... 23

*George v. Bezy*, 2006 WL 517683 (S.D. Ind. Mar. 2, 2006) .......................................................... 33

*Greater Eastern Transport v. Waste Management*, 211 F.Supp.2d 499 (S.D.N.Y. 2002) ............. 22

*Heritage Travel & Tourism Ltd v. Windhorst*, 2021 WL 03811647 (England and Whales High
  Court, August 27, 2021) ............................................................................................................. 14

*Ind. State Police Pension Trust v. Chrysler LLC*, 556 U.S. 960 (2009) ........................................ 37

*Jones v. Lincoln Elec. Co.*, 188 F.3d 709 (7th Cir. 1999) ............................................................... 33

*Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prod., Inc.*, 660 F.3d 988 (7th Cir.
  2011) ........................................................................................................................................... 38

*Kramer v. Hammond*, 943 F.2d 176 (2d Cir. 1991) ...................................................................... 38

*Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939 (7th Cir.
  2013) ..................................................................................................................................... 23, 36

*Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939 (7th Cir. 2013)
  ..................................................................................................................................................... 23

*Lockheed Martin Transp. Sec. Sols. v. MTA Capital Constr. Co.*, 2014 WL 12560686 (S.D.N.Y.
  Sept. 16, 2014) ........................................................................................................................... 20

*Madbak v. Anthem Ins. Co. Inc.*, 2017 WL 5075262 (S.D. Ind. May 23, 2017) ........................... 37

*Magallanes Inv., Inc. v. Circuit Systems, Inc.*, 994 F.2d 1214 (7th Cir. 1993) ............................. 38

*Menorah Home v. Local 144, 573 F. Supp. 908 (E.D.N.Y. 1983)* ................................................. 8

*Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732 (7th Cir. 1990) ................. 27

*NAS Electronics v. Transtech Elec. PTE LTD,* 262 F. Supp. 2d 134 (S.D.N.Y. 2003) ................ 24

*Nat'l Wrecking Co. v. Teamsters Local 731*, 990 F.2d 957 (7th Cir. 1993) ............................. 23, 36

*Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380 (1993) ..................... 31

*Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495 (7th Cir. 2018) ....................................................... 38

*Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231 (S.D.N.Y. Aug. 7, 2006) ............ 26, 27

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994) ......................... 27

*United Food v. John Hofmeister & Son, Inc.*, 950 F.2d 1340 (7th Cir. 1991) .............................. 23

*United Leasing, Inc. v. Xcelerate Auto, LLC*, 2022 WL 18540544 (S.D. Ind. Nov. 18, 2022)36, 37

*United States v. One 1979 Rolls-Royce Corniche Convertible*, 770 F.2d 713 (7th Cir. 1985) ..... 31

*VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp.3d 372 (S.D.N.Y. 2014) .................................... 22

*Whitsons Food Serv. (Bronx) Corp. v. Unitherm Food Sys., Inc.*, 2018 WL 6336042 (E.D. N.Y. 2018).................................................................................................................................................. 22

*Yonofsky v. Wernick*, 362 F.Supp. 1005 (S.D. N.Y. 1973) ........................................................... 22

**Other Authorities**

Damages, Black's Law Dictionary (10th Ed. 2014) .................................................................... 21

**Rules**

Federal Rule of Civil Procedure 54(b)............................................................................................ 29

Federal Rule of Civil Procedure 55(a)............................................................................................ 28

Federal Rule of Civil Procedure 55(B)........................................................................................... 28

Federal Rule of Civil Procedure 60(b)......................................................................... 28, 29, 33, 39

Federal Rule of Civil Procedure 72(a)...................................................................................... 37, 38

Federal Rule of Civil Procedure 55(c) ...................................................................................... 28, 29

I.      <u>Introduction</u>

Eli Sabag ("Mr. Sabag"), the Section 1782 Applicant, through counsel, hereby files his combined response[1] in opposition to Intervenor Lars Windhorst's ("Mr. Windhorst") motions to vacate this Court's orders filed under Docket Entries 115 and 116 (collectively "Motions to Vacate") and Docket Entry 117, his Motion for Administrative Interim Stay ("Motion to Stay") this action.

Mr. Windhorst ignored this Court for months while awaiting the outcome of its decisions so he could then decide: (1) <u>if the decisions went in his favor</u>, to continue to enjoy benefits as an intervenor or (2) <u>if the decisions went against him</u>, to raise unsupported allegations that his eventual payment of an obligation to Mr. Sabag should terminate this Section 1782 Proceeding. The decisions of this Court went against Mr. Windhorst, and he now presents the most incredible story to suggest that his lengthy absence from this Section 1782 Proceeding as an intervenor was justified because he could not afford legal counsel and he "did not expect this Court to entertain" Mr. Sabag's motions to depose him.  As discussed further below, during this same period when Mr. Sabag was filing his motion to depose Mr. Windhorst, Mr. Windhorst was giving press interviews from his superyacht and taking legal advice from his personal in-house legal advisor, Peter Calamari ("Mr. Calamari"), a U.S. litigator and the former managing partner of Quinn Emanuel Urquhart & Sullivan's ("Quinn Emanuel") New York office.  Mr. Windhorst has failed to demonstrate any good cause, excusable neglect, or any other substantive support to justify rewards for his openly contemptuous conduct.  Mr. Windhorst's primary arguments regarding the continued validity of the Original Settlement Agreement (and his purported right to arbitrate) are

_____

[1] Mr. Sabag has elected to tender a combined response to Mr. Windhorst's Motions to Vacate and Motion to Stay because there is significant overlap and repetitive information in Mr. Windhorst's three filings, including nearly identical preliminary statements, factual and procedural histories, and requests for a stay.

belied by the final award of the arbitrator from the International Centre for Dispute Resolution ("ICDR") who dismissed all of Mr. Windhorst's rights under the Original Settlement Agreement. Mr. Windhorst's new initiation of "emergency" proceedings in the ICDR shows his true intent to prejudice Mr. Sabag by increasing his legal costs while interfering with this Court's administration of its orders.

Mr. Windhorst's Motions to Vacate and Motion to Stay should be denied, and he should be ordered to direct any further communications regarding this Section 1782 Proceeding to this Court rather than to the ICDR. Mr. Windhorst should also remain obligated to personally appear at the hearing currently scheduled for April 11, 2023 in order to show cause as to why sanctions are not appropriate for his failure to comply with this Court's Order.

II.   Background and History

A.   The ICDR Recently Refused to Accept Mr. Windhorst's (First) "Motion to Enforce."

On March 6, 2023, Mr. Windhorst attempted to file a (non-emergency) "Motion to Enforce Settlement Agreement" with the ICDR ("Motion to Enforce") under old Case Number 01-20-0003-6931. (Doc. 119, ¶ 12). On March 9, 2023, Mr. Windhorst's counsel affirmatively asserted to this Court that he had filed that ICDR motion, and he thereafter attempted to use that motion as a basis for this Court to vacate its orders. (Doc. 115, p. 9, 23; Doc. 116, p. 9, 20). On March 10, 2023, the ICDR informed Mr. Windhorst that his Motion to Enforce would <u>not</u> be accepted because the arbitration under Case Number 01-20-0003-6931 was closed in November 2022.[2] A true and accurate copy of the ICDR's notice of dismissal is attached hereto as **Exhibit A**. On March 17,

---

[2] As explained further below, the Settlement Agreement required that any enforcement action be filed under the <u>same</u> ICDR case number. (Doc 118-1, ¶ 13). The parties had obviously agreed in advance that the Original Settlement Agreement, as later amended, would not survive a final arbitration award.

2023, Mr. Windhorst responded to the ICDR's rejection of his first submission by filing a new "emergency" motion with the ICDR seeking to have an emergency arbitrator assigned to the case to stay this Section 1782 Proceeding (so Mr. Windhorst could refile another arbitration seeking to dismiss this Section 1782 Proceeding).  A true and accurate copy of that filing is attached hereto as **Exhibit B**[3].  Mr. Windhorst could no longer reconcile his earlier arguments to this Court that all disputes under the Original Settlement Agreement had to be filed in the ICDR under Case Number 01-20-0003-6931, so he artfully made his new filing using a caption that showed the old ICDR case number, but he changed the name of the parties in that caption, and he paid a new arbitration fee while seeking a new ICDR case number and a new arbitrator. [4]  *See* Ex. B.    On March 20, 2023, Mr. Sabag filed an emergency request with this Court requesting that it stay any further ICDR proceedings that interfere with the discretion of his Court to make its own determinations in this Section 1782 Proceeding. (Doc. 122).[5]

B.  <u>The ICDR Arbitrator in the Initial Arbitration Explicitly Ruled That All of Mr. Windhorst's Rights Under the Original Settlement Agreement Were Forfeited When He Breached the Amended Settlement Agreement</u>

Mr. Windhorst has intentionally glossed over the contents of the Amended Settlement Agreement and the awards of the arbitrator in Case Number 01-20-0003-6931 that show that Mr.

---

[3] Mr. Windhorst's counsel did not immediately inform this Court of his new actions to request the appointment of an emergency arbitrator until March 20, 2023, and only after Mr. Sabag filed his Emergency Motion to Order Lars Windhorst to Stay New Arbitration and Emergency Relief. (Doc. 122; Doc. 123).

[4] The Second Circuit has rejected AAA arbitration when a party ignored an agreement to make any new filings under the same AAA case number.  *See Menorah Home v. Local 144, 573 F. Supp. 908 (E.D.N.Y. 1983)*, aff'd 751 F.2d 370 (2d Cir. 1984) (staying arbitration when the parties agreed to temporarily suspend their arbitration during settlement negotiations, while reserving the right to return to the same arbitrator under the same AAA case number until a certain date if their negotiations failed; but, when the negotiations failed and the allowed date for continuing the AAA arbitration passed, no basis existed for a party to open new arbitration under a new case number).

[5] The new arbitrator noted in his procedural order that he would defer to this Court's order on whether to stay the arbitration matter.  A true and accurate copy of that procedural order is attached hereto as **Exhibit C.**

Windhorst forfeited any and all claims under both the Original and Amended Settlement

Agreements, including any right to have Mr. Sabag dismiss this Section 1782 Proceeding.

A brief summary of the facts is provided immediately below, followed by a more extensive

factual discussion and legal analysis:

(1) After Sapinda/Mr. Windhorst[6] breached the Original Settlement Agreement with Mr. Sabag (Doc. 118-1) which required Sapinda/Windhorst to pay $2.8 million, the parties entered into an Amended Settlement Agreement dated July 11, 2022 that increased the settlement amount to $2.85 million, while providing Sapinda/Windhorst until August 1, 2022 to make his payment. (Doc. 118-3). A "time is of the essence" condition was added to require prompt payment a "material" condition of the Settlement Agreements. *Id.*

(2) Section 3 of the Amended Settlement Agreement also provided Mr. Sabag with a new option which, in the event that Sapinda/Windhorst did not make the required payment, allowed Mr. Sabag to immediately terminate the Settlement Agreements and seek a liquidated damages award under the same ICDR arbitration case number for a pre-determined amount (enforceable under the NY Convention). *Id.*

(3) In Section 3 of the Amended Settlement Agreement, the parties also specifically agreed that Mr. Windhorst could not challenge Mr. Sabag's right to an immediate summary award in the event failed to timely pay. *Id.*

(4) Mr. Windhorst failed to meet the new payment deadline under the Amended Settlement Agreement.

(5) Mr. Sabag chose to terminate the Settlement Agreements by filing a motion for immediate entry of summary award with the arbitrator to enforce the liquidated damages provision of the Settlement Agreement. (Doc. 118-6).

(6) Sapinda/Windhorst responded to Mr. Sabag's motion to enforce the Settlement Agreements with only a three-line email response stating that Mr. Windhorst intended to pay Mr. Sabag in the future. No payment was made. A true and accurate copy of that correspondence is attached hereto as **Exhibit D**.

(7) The arbitrator explicitly ruled in his partial award dated August 17, 2022 (Doc. 118-11) and his final award ("Final Award") dated November 7, 2022 (Doc. 118-12) that Sapinda/Windhorst breached the "time is of the essence" obligation to pay $2.85 million under the Amended Settlement Agreement.[7]

---

[6] "Sapinda" or "Sapinda Asia" means Sapinda Asia Ltd., a British Virgin Islands company owned 100% by Mr. Windhorst. Sapinda Asia was the signatory to the Put Option Agreement with Mr. Sabag that gave rise to the original ICDR arbitration. Mr. Windhorst separately agreed to be a co-obligor with Sapinda Asia with respect to the Put Option agreement, and thus, he became jointly and severally liable after Sapinda Asia breached the Put Option Agreement.

[7] The first partial award and second final award, when referred to jointly, are hereinafter referred to as the "Awards" or the "ICDR Awards."

(8)   The arbitrator thereafter awarded Mr. Sabag liquidated damages in the amount of $2.85 million. (Doc. 118-12, ¶ 12).

(9)   In the Final Award, the arbitrator awarded interest, legal fees, and costs to Mr. Sabag while concluding that **"[a]ny and all other claims and counterclaims arising out of this arbitration [which included the Settlement Agreements] are dismissed."** (Doc. 118-12, ¶ 12(e)) (bracket and emphasis added).

(10)  Sapinda/Windhorst did not seek to vacate the arbitration awards, and the time has passed in which they could do so. Sapinda/Windhorst no longer possess any rights under the Settlement Agreements.

(11)  Mr. Sabag thereafter was forced by Mr. Windhorst to initiate new litigation in the British Virgin Islands ("BVI") to judicially place Sapinda into involuntary insolvency to enforce the ICDR awards. A true and accurate copy of the BVI filing is attached hereto as **Exhibit E**.

(12)  The contractual "consideration" that Sapinda/Windhorst promised to provide to Mr. Sabag under the Settlement Agreements was both (1) prompt payment and (2) the discharge of all claims. Mr. Windhorst not only breached the "time is of the essence" clause for payment, but he required Mr. Sabag to initiate new liquidation litigation in the BVI to enforce the ICDR awards.

(13)  Separate from the contractual language of the Settlement Agreements, the doctrine of *functus officio* also prevents Mr. Windhorst from reopening the closed ICDR arbitration.

(14)  The payment that Mr. Windhorst finally made to Mr. Sabag's BVI lawyers on February 8, 2023 (after Mr. Windhorst failed to sit for his deposition in Indiana on January 27, 2023) was used to satisfy the arbitration awards and to allow Mr. Windhorst to terminate the liquidation proceedings against Sapinda in the BVI (to save the entity).

(15)  This Court's protective order prohibits Mr. Sabag from using the Section 1782 discovery for any purpose other than U.K. criminal proceedings. Mr. Sabag continues to communicate with the U.K. Serious Fraud Office ("SFO") regarding Mr. Windhorst's actions.

C.   Brief History of this Section 1782 Proceeding

In light of the extensive number of filings in this case, Mr. Sabag will keep his historical description of these proceedings brief. In late 2019, Mr. Sabag filed a Section 1782 Application to seek discovery from Marion County Community Corrections (and employees) ("MCCC") in support of a criminal investigation against Mr. Windhorst in the United Kingdom. (Doc. 1; Doc. 9). The criminal allegations against Mr. Windhorst include the bribery of an Indiana official, securities fraud, and common law fraud. (Doc. 9, p. 8-9). The Section 1782 discovery from MCCC has already confirmed, at the very least, that the 18-year old son of the then-Director (and

Deputy Director spouse) of MCCC was provided a job with a company controlled by Mr. Windhorst ("Track Group') after Track Group was awarded a multi-million contract under suspicious circumstances (and then was awarded another longer contract). ([Doc. 9](), pp. 27-45; [Doc. 98](), pp. 2-3). On October 11, 2022, Mr. Sabag filed a Supplementary Request for Discovery to depose Mr. Windhorst ("Supplementary Request"). ([Doc. 98]()). In Mr. Sabag's Supplementary Request, he provided this Court with information regarding the breached and terminated Original Settlement Agreement from the ICDR arbitration, and he explained that Sapinda/Windhorst had breached their payment obligations.[8] ([Doc. 98-2](), ¶ 7).

After Mr. Sabag filed his Supplementary Request, Mr. Windhorst's litigation counsel withdrew from representing Mr. Windhorst while asking this Court to provide an additional 30 days for Mr. Windhorst to obtain new counsel to respond to Mr. Sabag's Supplementary Request. ([Doc. 99](); [Doc. 100](); [Doc. 101]()). The extension was unopposed by Mr. Sabag. ([Doc. 99](), ¶ 5). After this Court granted Mr. Windhorst an additional 30 days to retain new counsel and respond, Mr. Windhorst remained a *pro se* litigant, and he admits that he did not take any action to respond to the Supplementary Request. ([Doc. 118](), ¶ 13; [Doc. 104](); Docket). At no time after Mr. Sabag filed his Supplementary Request did Mr. Windhorst make any statements or filings regarding any rights that he now unilaterally believes he retained under the (terminated) Settlement Agreements.

At the same time that Mr. Windhorst was evading his obligations to respond to Mr. Sabag's Supplementary Motion, he sat for interviews for publications like *Boat International* onboard his

---

[8] Due to a confidentiality order from the arbitrator requested by Mr. Windhorst, Mr. Sabag acted cautiously (when filing his Supplementary Request) to provide this Court only with a copy of the Original Settlement Agreement (and not a copy of the Amended Settlement Agreement or ICDR Awards). Intervenor Track Group had published the Original Settlement Agreement in an SEC filing, so it was no longer confidential. Mr. Sabag is now sharing additional information from the arbitration in accordance with an exception to the ICDR confidentiality order which allows Mr. Sabag to disclose arbitration materials to "protect or pursue" a legal right (in this case, to correct a distortion of fact presented by Mr. Windhorst).

superyacht.[9]  Yet, Mr. Windhorst now avers in his affidavit that he could not afford legal counsel when Mr. Sabag filed his Supplemental Request.  (Doc. 118, ¶ 13).  Of course, during this entire period, Mr. Calamari was serving as Mr. Windhorst's personal legal counsel (hired by Tennor B.V., Mr. Windhorst's personal Dutch company).[10]  Further, John Quinn, the founder of Quinn Emmanuel, sits on the Board of Directors of Tennor B.V.[11]  Quinn Emmanuel is presently representing Mr. Windhorst in other litigation matters around the world.[12]  Two attorneys with Quinn Emmanuel and one attorney with Taft have now made an appearance in this matter to replace Sidley Austin, LLP and Hoover Hull Turner, LLP.  (Doc. 109; Doc. 114; Doc. 120).  That being said, Mr. Windhorst wishes this Court to believe that he could not afford any qualified lawyers to represent him in this matter.  (Doc. 118, ¶ 13).

On December 15, 2022, this Court issued a new Order, determining that Mr. Sabag satisfied the statutory and discretionary requirements under Section 1782 to depose Mr. Windhorst.  (Doc. 105).  The Court ordered Mr. Windhorst to cooperate with Mr. Sabag's counsel to sit for a deposition in Indiana within 45 days.  (Doc. 105).  After Mr. Sabag's counsel served Mr. Windhorst with notice of deposition and subpoena for a specific deposition date (January 27, 2023) while offering alternative dates, Mr. Windhorst remained silent and refused to cooperate.  (Doc. 106, ¶¶ 2, 6).  Mr. Sabag would later file a notice with this Court on January 20, 2023 to further describe Mr. Windhorst's failure to cooperate in scheduling the Court-ordered deposition.  (Doc. 106).  Mr. Windhorst did not appear for his deposition, and Mr. Sabag filed his Motion for Order

---

[9]https://www.boatinternational.com/luxury-yacht-life/owners-experiences/on-board-global-with-nobisrkug-owner-lars-windhorst (last visited March 18, 2023).

[10] https://tennor.com/people/ (last visited March 23, 2023).

[11] https://tennor.com/people/ (last visited March 23, 2023).

[12] *See e.g.*, https://caseboard.io/cases/99741978-c591-4291-b6c5-031a4da4c526 (last visited March 23, 2023); https://www.bailii.org/ew/cases/EWCA/Civ/2021/1802.html (last visited March 23, 2023).

to Show Cause on Civil Contempt, which this Court granted.  ([Doc. 107](); [Doc. 108]()).  Within two hours of this Court's circulation of Order to Show Cause on March 2, 2023, Mr. Windhorst's outside counsel sent Mr. Sabag's counsel a threatening letter with the intent to intimidate Mr. Sabag into dismissing this Section 1782 Proceeding within two days (March 4, 2023).  ([Doc. 119-3]()).[13]

D.     The ICDR Arbitration and the Awards

In March 2020, Mr. Sabag brought a New York ICDR arbitration against Respondents (1) Mr. Windhorst, (2) Sapinda Asia, and (3) Track Group Inc. for breach of contract and fraud issues arising out of the acquisition of Mr. Sabag's Israeli company.  ([Doc. 118-1]()).  In June 2022, before the arbitration went to trial, the parties decided to settle their differences.  ([Doc. 118-1]()).  In short, the parties agreed that: (1) Track Group was to pay Mr. Sabag $1.6 million and (2) Sapinda/Windhorst was to pay Mr. Sabag $2.8 million.  ([Doc. 118-1](), p. 12).  The settlement amounts had to be paid to the bank account of Mr. Sabag's arbitration counsel (Reed Smith) within 14 days, and Reed Smith would be required to return the money to all of the Respondents if Mr. Sabag did not dismiss this Section 1782 Proceeding within 5 days of receiving payment.  ([Doc. 118-1](), ¶¶ 4(b), 5).  Under the Original Settlement Agreement, the arbitration under Case Number 01-20-0003-6931 would not close until full payment and dismissal of this Section 1782 Proceeding had occurred.  ([Doc. 118-1](), ¶¶ 4, 5).  The parties agreed that the same ICDR arbitrator in the same pending ICDR case would resolve any disputes regarding the Original Settlement Agreement. ([Doc. 118-1](), ¶ 13).  All of the parties further agreed to "release and forever discharge" each other

---

[13] Mr. Windhorst has argued throughout this proceeding that Mr. Sabag's request for discovery in this matter was a sham because Mr. Sabag was seeking his Section 1782 discovery solely for use in the ICDR arbitration. Mr. Windhorst successfully obtained a protective order from this Court to limit Mr. Sabag's use of the Section 1782 discovery to communications with the U.K. criminal authorities.  ([Doc. 89]()).  The arbitration concluded in November 2022 with a Final Award.  ([Doc. 118-12]()).  Mr. Sabag is still engaged in communications with U.K. SFO regarding Mr. Windhorst's conduct. (98-2, ¶ 4).

from all outstanding claims relating to the arbitration.  (Doc. 118-1, ¶ 6).  Track Group made its payment into Reed Smith's bank account following the terms and conditions of the Settlement Agreement, but Sapinda/Windhorst did not.

Mr. Sabag and Sapinda/Windhorst thereafter entered into an Amended Settlement Agreement under which the settlement amount was increased from $2.8 million to $2.85 million, and Sapinda/Windhorst would be provided until August 1, 2022 to make the payment.  (Doc. 118-3, ¶ 2).  In the Amended Settlement Agreement, Mr. Sabag demanded two additional material provisions due to Mr. Sabag's knowledge of Mr. Windhorst's well-known history of dishonoring his promises.  First, the parties agreed that "time is of the essence" for payment by August 1, 2022. (Doc. 118-3, ¶ 2).  Second, the parties agreed to a new liquidated damages clause that permitted Mr. Sabag to terminate the Settlement Agreement and seek a pre-determined liquidated damages award under the same ICDR case number in the event that Mr. Windhorst failed to timely pay. (Doc. 118-3).  The parties also agreed that, in the event that Mr. Sabag sought relief under the liquidated damages clause, that Sapinda/Windhorst "could not contest whether the payment called for by the Settlement Agreement was due and owing."  (Doc. 118-3, ¶ 3).

As this Court is now amply aware, Mr. Windhorst is well-known around the world for evading debts and breaching payment terms of settlement agreements.[14]  Mr. Windhorst even failed to pay his own lawyers from Sidley Austin in this Section 1782 Proceeding, causing them to withdraw.  (Doc. 101-1).  Through the Amended Settlement Agreement, the parties were agreeing that either (1) each side would get the benefit of their bargain and end all litigation with Mr. Windhorst's timely payment; or (2) the Settlement Agreement would be terminated through a

---

[14] *See e.g., Heritage Travel & Tourism Ltd v. Windhorst*, 2021 WL 03811647 (England and Whales High Court, August 27, 2021) (determining that Mr. Windhorst's duress argument to avoid paying amounts under his settlement agreement was baseless).

liquidated damages award from the ICDR arbitrator, and Mr. Sabag would be required to pursue enforcement of the award through new litigation. [15]  Of course, Mr. Windhorst failed to make his required payment by August 1, 2022.  (Doc. 118-6, p. 5).  During this period, however, Mr. Windhorst's lawyer repeatedly claimed to Mr. Sabag's lawyers that Mr. Windhorst's payment was forthcoming, and Mr. Windhorst even sent two fake wiring confirmations from his Austrian bank (Euram Bank).  (Doc. 118-7, p. 2-6).  *See* Ex. D.  The *Financial Times* would later publish an article on November 8, 2022 explaining how Mr. Windhorst sent similar fake wires from Euram Bank in 2020 to other creditors while falsely claiming that he was satisfying his obligations.[16]

On August 2, 2022, Mr. Sabag filed his motion to enforce with the ICDR arbitrator to terminate the Settlement Agreements and obtain a liquidated damages award.  (Doc. 118-6).  Mr. Windhorst did not challenge the motion, and instead responded to the ICDR arbitrator with a three-line email to state that future payment was being arranged.  *See* Ex. D.  Mr. Windhorst did not mention any continuing rights to dismissal of this Section 1782 Proceeding to the ICDR arbitrator, as Mr. Sabag had elected to terminate the Settlement Agreements.  The ICDR arbitrator responded to the parties by email on August 15, 2022 to (informally) rule that he had read the submissions and he had jurisdiction under the Settlement Agreement to initially issue a partial award of the $2.85 million principal amount to Mr. Sabag, leaving issues of fees, costs, and interest to a subsequent final award after a briefing.  A true and accurate copy of that correspondence is attached hereto as **Exhibit F**.

---

[15] Because Track Group had made its payment under the Original Settlement Agreement, but Mr. Windhorst had not, the prospects for both Mr. Sabag and Sapinda/Windhorst to return to the original arbitration without Track Group had also changed.

[16] See https://www.ft.com/content/fd534657-024f-46b2-bc85-c7d4915f14ce (last visited March 23, 2023).

The first partial award dated August 17, 2022 found that Sapinda/Windhorst breached the "time is of the essence" clause of the Amended Settlement Agreement, and it awarded the pre-agreed principle amount of $2.85 million to Mr. Sabag.  (Doc. 118-6).  The second award was a "Final Award" which, after a side dispute on pre-Settlement Agreement legal fees, awarded Mr. Sabag certain legal fees and costs (for enforcement) and 9% running interest until Sapinda/Windhorst paid the award.  (Doc. 118-12).  The Final Award concluded, without room for interpretation that, "**Any and all other claims and counterclaims arising out of this arbitration are dismissed**." (Doc. 118-12, ¶ 12(e)).  There was no dispute whether the arbitrator meant that all claims under the Settlement Agreements were being dismissed because the arbitrator's sole job at that time was to issue a Final Award relating to the Settlement Agreements. The arbitrator's authority over the proceeding was concluded, and the scope of his jurisdiction over the parties' matter was over.  The doctrine of *functus officio* precludes the arbitrator from re-examining his old decision which dismissed all claims and counterclaims.[17]

As discussed above, Mr. Windhorst is now seeking to have the ICDR re-litigate the issues that were dismissed by the ICDR in Case Number 01-23-0001-0936.  The Original Settlement Agreement required that Mr. Windhorst file any claim relating to that Original Settlement Agreement under Case Number 01-20-0003-6931, but Mr. Windhorst is now seeking emergency relief through a new arbitration with a new case number.  *See* Ex. B.  As the Seventh Circuit held in *Chauffeurs v. Jefferson Trucking Co., Inc.*, 628 F.2d 1023, 1027 (7th Cir. 1980), the entire purpose of finality in arbitration awards "would seem to condemn the conduct of [a] defendant who ignored an award disfavorable to it, failed to move to vacate the award, and then sought to be

---

[17] *See Chi. Reg'l Council of Carpenters v. Unique Casework Installations, Inc.*, 2015 WL 5873380 (N.D. Ill. Oct. 5, 2015) (arbitrator exceeded authority and violated *functus officio* doctrine when he entered supplemental award after entry of final award).

given its day in court when the plaintiff brought suit in frustration to have the arbitration award enforced."

Judge Hanlon previously ruled in this matter that "having authorized the legal process under § 1782 that required production of discovery to Mr. Sabag, the Court [not the ICDR arbitrator] retains authority over how and where that discovery may be used." (Doc. 97, p. 6) (parenthetical added). Mr. Sabag now asks this Court to prohibit any further activities from Mr. Windhorst in the ICDR that attempt to interfere with the orders and proceedings of this Court. (Doc. 122).

E.     The BVI Enforcement Proceedings and Mr. Windhorst's Admissions that the Settlement Agreement Had Been Terminated

On October 6, 2022, after Mr. Windhorst continued his empty promises to satisfy the ICDR Awards, Mr. Sabag initiated an involuntary liquidation proceeding against Sapinda Asia in the British Virgin Islands ("BVI Proceedings"). A true and accurate copy of that filing is attached hereto as **Exhibit F**. Two members of Ernst & Young ("E&Y") were judicially appointed as co-liquidators, and Mr. Sabag expended substantial resources at his own risk to seek the satisfaction of the Awards. A true and accurate copy of the order of the BVI court to approve the involuntary liquidation is attached hereto as **Exhibit G**.[18] Mr. Sabag did not seek to enforce the Settlement Agreements in the BVI Proceedings. Mr. Sabag sought to enforce the ICDR Awards. Sapinda Asia, which was represented by Mr. Windhorst as its director, never contested the jurisdiction of the BVI courts to enforce the Awards. During the liquidation proceedings, the co-liquidators from E&Y, who were not working for free, lost patience with Mr. Windhorst when they became aware

---

[18] Mr. Sabag noted in his original Section 1782 Application that he had to initiate an involuntary liquidation petition against Sapinda Asia in 2017 after it failed to pay Mr. Sabag under a Put Option Agreement for his Restricted Shares in Track Group. (Doc. 9, p. 20). Mr. Windhorst would ultimately make a payment to Mr. Sabag to prevent Sapinda Asia from going into full liquidation. Mr. Windhorst's breaches of agreements and failures to pay have been purposeful and calculated to cause the maximum damages to Mr. Sabag.

of more fake wire attempts from Euram Bank and his delays in providing required reports.  A true and accurate copy of the communication is attached hereto as **Exhibit H**.  Mr. Windhorst now avers that his multiple alleged wires from Euram Bank that never cleared were misunderstandings regarding cross-border currency issues.  (Doc. 118, ¶ 8).  The *Financial Times*, and Mr. Windhorst's extensive cross-border business dealings, belie his claims.[19]

On February 8, 2023, Mr. Windhorst finally made a full payment to the bank account of Mr. Sabag's BVI counsel (not to Reed Smith, as would have been required under the Original Settlement Agreement) to cease the BVI Proceedings and stop Sapinda Asia's liquidation.

During the discussions between Mr. Sabag's and Mr. Windhorst's BVI counsel regarding the BVI Proceedings, Mr. Windhorst's counsel made multiple direct admissions to Mr. Sabag's counsel to show that the Settlement Agreement no longer had any force and effect.  On January 24, 2023, Mr. Windhorst's BVI counsel sent multiple emails to Mr. Sabag's BVI counsel attempting to condition Sapinda Asia's future payment in the BVI Proceedings on Mr. Sabag's dismissal of the Section 1782 proceeding.  A true and accurate copy of that correspondence is attached hereto as **Exhibit I**.  In response, Mr. Sabag's BVI counsel admonished Mr. Windhorst's counsel for discussing the Section 1782 Proceeding in the BVI Proceedings.  *See* Ex. I, p. 3.  At no time did Mr. Sabag ever agree to engage in any discussions regarding this Section 1782 Proceeding.  Mr. Windhorst's BVI counsel even sent an apology note to Mr. Sabag's BVI counsel for falsely representing to the co-liquidators, that Mr. Windhorst and Mr. Sabag were engaged in such negotiations.  *See* Ex. I, p. 2.

Mr. Sabag was clear at all times with Mr. Windhorst's BVI counsel that Mr. Windhorst's deposition was to take place irrespective of Sapinda/Windhorst's agreement to make a payment to

---

[19] *See* footnote 16 *supra*.

terminate the BVI liquidation, including through his Notice of Status of Compliance filed with this

Court on January 20, 2023, which outlined Mr. Windhorst's failures to cooperate. (Doc. 106).  Mr.

Windhorst would later satisfy the ICDR Awards to protect Sapinda from liquidation despite his

knowledge that Mr. Sabag would not dismiss this Section 1782 Proceeding.

At one point towards the end of the discussions in the BVI, Mr. Windhorst's BVI counsel

made the following additional comments that confirmed that Mr. Windhorst did not actually

believe that he had legal rights to terminate the Section 1782 Proceedings if he made a payment to

terminate the involuntary liquidation proceedings:

> Further to my email below, I understand the Indiana proceedings do not involve a
> claim for the payment of money against our client but only a deposition.  As
> mentioned, our client asks whether your client is willing to withdraw the Indiana
> proceedings once the sums claimed in the BVI (as discussed below) have been paid.
> For the avoidance of doubt, our client is also prepared to satisfy your client's legal
> costs in the Indiana proceedings (even though he does not believe he has any legal
> obligation to do so).

*See* Ex. I, p. 1.

In other words, Mr. Windhorst's counsel offered additional consideration to Mr. Sabag to

compensate Mr. Sabag for his legal fees in the Section 1782 Proceeding if Mr. Sabag would agree

to dismiss the Section 1782 Proceeding.  Mr. Sabag once again refused to dismiss this Section

1782 Proceeding.  Notwithstanding, Mr. Windhorst ultimately made a wire payment to Mr.

Sabag's BVI lawyers (not to Reed Smith) to satisfy the amount of the ICDR Awards, with post-

Award interest, costs, and Mr. Sabag's BVI legal fees.

III.    Legal Arguments

    A.    Mr. Windhorst Failed to Provide the Agreed Consideration to Mr. Sabag to Retain Rights under the Settlement Agreements

Mr. Windhorst argues that Mr. Sabag is legally obligated to dismiss this Section 1782 Proceeding because he believes that the Settlement Agreements, which are governed by New York law, are still valid.  Mr. Windhorst's arguments ignore basic concepts of contract law which require an offer, acceptance, and consideration.  Mr. Sabag was willing to enter into the Settlement Agreements with Mr. Windhorst based on Mr. Windhorst's agreement to make prompt payment such that Mr. Sabag would not be required to initiate new "enforcement" litigation around the world to collect the amounts owed.  Mr. Sabag knew of Mr. Windhorst's history of evading debt, and he had already spent months in the BVI courts in 2017 to collect payments from Sapinda Asia and Mr. Windhorst.  The Settlement Agreements speak for themselves in requiring that Mr. Windhorst make prompt payment to end all litigations around the world as a material condition of the agreement.  (Doc. 118-1; Doc. 118-3).

Time was of the essence for payment under the Amended Settlement Agreement.  "New York law provides that where time is of the essence, performance on the specified date is a material element of the contract, and failure to perform on that date constitutes . . . a material breach of the contract." *Lockheed Martin Transp. Sec. Sols. v. MTA Capital Constr. Co.*, 2014 WL 12560686, *22 (S.D.N.Y. Sept. 16, 2014) (citation omitted).  The arbitrator ruled in his partial award of August 7, 2022 that (1) the Settlement Agreement had a "time is of the essence" clause for payment and (2) Mr. Windhorst breached his obligation to make the payment.  (Doc. 118-11, ¶ 14).

Mr. Sabag was willing to agree to dismiss this Section 1782 Proceeding only if Mr. Windhorst provided the promised consideration, prompt payment, to ensure the timely end of all litigation battles around the world.  Mr. Windhorst now takes the baseless position that the benefits

of the Settlement Agreements (i.e., the fixed settlement amount and the discharge of all litigation by the parties) still would be available to him at any time in the future if and when he finally decided to make his required payments.   The Amended Settlement Agreement specifically modified the Original Settlement Agreement such that Mr. Windhorst affirmatively would lose all of his rights under the Settlement Agreements if he did not make a prompt payment.

Mr. Windhorst's decision not to pay Mr. Sabag in a timely manner prompted Mr. Sabag to terminate the Settlement Agreements, obtain the ICDR Awards, and initiate the BVI Proceedings to enforce the ICDR Awards.   The very essence of the Settlement Agreements was to cause the discharge of all claims between the parties with a "time is of the essence" condition.   The Settlement Agreements nowhere presumed that Mr. Windhorst would be entitled to choose to settle his obligation whenever convenient and still reap all the benefits, while forcing Mr. Sabag to pay additional amounts of money to start up new litigations.

B.   The Amended Settlement Agreement Contains a Liquidated Damages Clause Which Explicitly Allowed Mr. Sabag to Terminate the Settlement Agreement and Seek Liquidated Damages

Section 3 of the Amended Settlement Agreement provides:

Sabag reserves all rights and remedies available to him in the event the required payment is not made by the extended due date including, but not limited to, the right to seek interest on the amount owed, reasonable attorneys' fees, and the right to seek an immediate summary international arbitration award fully enforceable pursuant to the Inter-American and New York Conventions.  **Windhorst shall not contest whether the payment called for by the Settlement Agreement is due and owing.**  Windhorst reserves the right to contest the reasonableness of any attorneys' fees sought.

(Doc. 118-3) (emphasis added).

Under this Section 3 to the Amended Settlement Agreement, if Windhorst did not make his payment, Mr. Sabag could elect to terminate the Settlement Agreement and seek an immediate summary award of a fixed amount ($2.85 million), plus interest, reasonable legal fees, and costs.

(Doc. 118-3).  Section 3 specifically provides that Mr. Windhorst could not contest whether the payment of that financial award was due and owing (creating the liquidated damages scenario). (Doc. 118-3).

Under New York law, once a party has materially breached a contract, the other party can elect to either "terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach."[20]  Liquidated damages are generally defined under New York law as "an amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches."[21]  If the nonbreaching party elects to terminate the contract, the non-breaching party is discharged from performing any further obligations under the contract.[22]  Mr. Sabag elected to terminate the Settlement Agreement to seek a liquidated damages award.  Mr. Sabag knew when amending the Settlement Agreement that Mr. Windhorst would attempt to evade payment, and Section 3 was specifically added to the Amended Settlement Agreement to provide Mr. Sabag with the option to quickly return to the same ICDR

---

[20] *ESPN Inc. v. Office of the Commissioner of Baseball*, 76 F.Supp.2d 383, 387 (S.D.N.Y. 1999) (quoting *Bigda v. Fischbach Corp*., 898 F.Supp. 1004, 1011-1012 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996)); *See also; Barbagallo v. Marcum LLP*, 925 F.Supp. 275 (E.D.N.Y. 2013) (same);  *Greater Eastern Transport v. Waste Management*, 211 F.Supp.2d 499 (S.D.N.Y. 2002) (same); VFS Fin., Inc. v. Falcon Fifty LLC, 17 F. Supp.3d 372 (S.D.N.Y. 2014) (same); *Martell Strategic Funding LLC v. Am. Hosp. Acad*., 2019 WL 632364 (S.D.N.Y. 2019) (same*); CH Acquisitions 2, LLC v. Aquila Aviation L.P.,* 2018 WL 2081860 (S.D.N.Y. 2018) (same).

[21] *Whitsons Food Serv. (Bronx) Corp. v. Unitherm Food Sys., Inc*., 2018 WL 6336042, *3 (E.D. N.Y. 2018) ((citing Damages, Black's Law Dictionary (10th Ed. 2014)).  In *Yonofsky v. Wernick*, 362 F.Supp. 1005, 1018 (S.D. N.Y. 1973), the Southern District of New York defined the term "liquidated damages" as meaning "damages, agreed upon as to amount by the parties, or fixed by operation of law, or under the correct applicable principles of law made certain in amount by the terms of the contract, or susceptible of being made certain in amount by mathematical calculations from factors which are or ought to be in the possession or knowledge of the party to be charged."

[22] *See e.g., Cary Oil Co., Inc. v. MG Refining Marketing, Inc*., 90 F. Supp.2d 401, 408-09 (S.D.N.Y. 2000); *AM Cosmetics Inc. v. Solomon*, 67 F. Supp.2d 312, 317 (S.D.N.Y. 1999).

tribunal under Case Number 01-20-0003-6931 to obtain a summary award that could be enforced under the New York Convention.

In response to Mr. Sabag's August 2022 filing with the ICDR to enforce the Settlement Agreements, Mr. Windhorst responded with a three-line email stating that he intended to make a payment in the future.  *See* Ex. D.  The time for Mr. Windhorst to raise any claims in the ICDR arbitration regarding any rights to which he believed he should remain entitled under the Settlement Agreement (e.g., rights to dismiss the Section 1782 Proceeding) was <u>before</u> the Final Award was rendered and <u>before</u> the ICDR arbitrator dismissed all claims and counter claims arising out of the Settlement Agreements.  The Seventh Circuit teaches us that Mr. Windhorst's failure to mention his "Section 1782 claim" in ICDR Case Number 01-20-0003-6931 in a timely manner unconditionally foreclosed his opportunity to raise those same claims before this Court.[23]

When Mr. Sabag filed his Supplemental Motion to depose Mr. Windhorst in this Section 1782 Proceeding (providing this Court with a copy of the Original Settlement Agreement), Mr. Windhorst had another opportunity to raise issues regarding the enforceability of the Settlement Agreements in response.  He chose not to do so.

Mr. Sabag is not seeking a double benefit.  Mr. Windhorst knowingly failed to provide the required consideration of <u>prompt</u> payment under the Settlement Agreement, and he forced Mr.

---

[23] *See Nat'l Wrecking Co. v. Teamsters Local 731*, 990 F.2d 957, 960 (7th Cir. 1993) (holding that a party "cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court. We will not tolerate such sandbagging."); *United Food v. John Hofmeister & Son, Inc.*, 950 F.2d 1340, 1344 (7th Cir. 1991) ("If parties were allowed to withhold information during arbitration, and then use it to sandbag their opponents during enforcement proceedings, much of the efficiency and usefulness of arbitration would be lost."). *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939 (7th Cir. 2013); *Ganton Techs., Inc. v. UAW*, 358 F.3d 459, 462 (7th Cir. 2004) ("Arbitration would not be an efficient and cost-effective method of resolving labor disputes if federal courts indulged late arguments that were not brought to the attention of the arbitrator below.").  The Seventh Circuit has also held, "we have repeatedly disapproved of the practice of remaining silent on an arbitrability issue during arbitration proceedings, only to play the arbitrability card in federal court after the party loses." *Lippert Tile  Co. v. Int'l Union of Bricklayers  & Allied Craftsmen*, 724 F.3d 939, 945 (7th Cir. 2013) ("This waiver rule [regarding the failure to timely raise issues with the arbitrator] applies equally to questions concerning arbitrability.").

Sabag to obtain the ICDR Awards and initiate new litigation to enforce his right to the liquidated damages provided in the Awards.  The Settlement Agreements demanded that all litigation immediately cease between the parties.  Mr. Windhorst failed to live up to his end of the bargain, and the consequences were established through the ICDR Awards which unequivocally dismissed Mr. Windhorst's original rights under the Settlement Agreements.

C.   New York Case Law Directly Refutes the Main Legal Arguments Asserted by Mr. Windhorst

New York case law provides that Mr. Windhorst lost all rights to enforce the Settlement Agreement after he breached the Settlement Agreement and Mr. Sabag legally terminated the Settlement Agreement while seeking liquidated damages.

In *NAS Electronics,* 262 F. Supp. 2d 134 (S.D.N.Y. 2003), the District Court for the Southern District of New York addressed a nearly identical set of circumstances involving a breaching party to a settlement agreement who later demanded his original benefits from the settlement agreement once he was finally forced to pay under a subsequent enforcement action. The Southern District of New York made it clear that the breaching party to a settlement agreement forfeits all rights under the settlement agreement if the nonbreaching party elects to terminate the agreement while seeking liquidated damages.

> Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages. *See Cary Oil Co., Inc. v. MG Refining Marketing*, Inc., 90 F. Supp.2d 401, 408-09 (S.D.N.Y. 2000); *AM Cosmetics Inc. v. Solomon*, 67 F. Supp.2d 312, 317 (S.D.N.Y. 1999). Alternatively, the non-breaching party may "choose to continue performance under the contract despite that breach." Id. However, if the non-breaching party chooses not to terminate the contract, it loses the right to terminate the contract on the basis of the earlier breach. Id.
>
> In this case, the plaintiffs acknowledge that they breached the Settlement Agreement by failing to make timely payment of funds due and by failing to transfer to the defendants the enumerated patent rights. The defendants argue that

24

after this breach, they promptly terminated the contract, and were relieved from any further obligations arising from the Settlement Agreement, by invoking the default provisions that provided for the case to be reopened and by suing to have Judgment entered in the amount of $3,200,000. The plaintiffs now argue that although they breached the Settlement Agreement, the defendants did not terminate the Settlement Agreement, because the defendants relied on § IV of the Settlement Agreement and its default provisions to obtain the Judgment of $3,200,000, and therefore the Settlement Agreement continues to remain a valid and binding contract. Consequently, the plaintiffs argue that the defendants are still liable for their obligations under § V of the Settlement Agreement dealing with the sale of the Leadsinger abroad.

The plaintiffs' argument is without merit. It is undisputed that the plaintiffs breached the Settlement Agreement. Section IV of the Settlement Agreement, upon which the defendants did rely in obtaining the Judgement of $3,200,000, served as the liquidated damages provision in the Settlement Agreement, because it outlined the remedies available to NAS-Transtech and Transtech in light of a breach by the plaintiffs. The fact that the defendants relied upon § IV of the Settlement Agreement to reopen the litigation and to have the Court enter Judgment does not mean that the defendants did not terminate the contract or that they continue to be obligated to perform their obligations, notwithstanding the plaintiffs' failure to perform their obligations. It is clear that by using § IV of the Settlement Agreement, the defendants were terminating the contract and suing for damages. Section IV is a provision that can only be invoked if there was a breach, because § IV provided that in an event of a default, the defendants "may . . . move to reopen the New York Federal Action and enter Judgment against . . . Jerry Choe, Pil Yong Choe, and NAS Electronics, Inc., jointly and severally, in the principal amount of US $3,200,000 . . ." (Settlement Agreement § IV) (emphasis added). In the absence of any breach, § IV did not impose any obligation on either the plaintiffs or the defendants, and as a matter of law, can only be interpreted as a liquidated damages provision. See, e.g., Kentelle v. Devori Int'l, No. 85 Civ. 5906, 1987 WL 19637, at *1-*2 (S.D.N.Y. Oct. 29, 1987) (interpreting provision allowing for non-breaching party to recover specified damages in light of breaching party's failure to pay amounts due under settlement agreement to be a liquidated damages provision).

The decision in *NAS Electronics* refutes Mr. Windhorst's primary position that the Settlement Agreements are still valid. Mr. Windhorst, of course, never discussed the actual terms and conditions found in the Amended Settlement Agreement and the ICDR Awards because he wanted this Court to believe that a different set of factual circumstances governed this case. *NAS Electronics* confirms that (1) Mr. Sabag properly terminated the Settlement Agreements back in

August 2022 and (2) Mr. Windhorst has no rights to raise new claims under those terminated agreements.

D.   Mr. Windhorst's Legal Authorities Suggesting that Mr. Windhorst Is Seeking a Double Benefit Do Not Apply to the Facts in this Matter

In his request for emergency relief to the arbitrator, Mr. Windhorst falsely asserts that Mr. Sabag was legally required, under the New York "election of remedies" doctrine, to either continue performance under the Settlement Agreement or re-initiate the original arbitration.  (Doc. 123-5, p. 21; Doc. 123-6, p. 14-15).  Mr. Windhorst did not produce any cases to support this misleading proposition.  He simply made up the law while ignoring that Mr. Sabag was entitled to terminate the Settlement Agreements and seek liquidated damages.[24]

Mr. Windhorst rests his entire argument to dismiss this Section 1782 Proceeding on the decision in the federal district court case of *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231 (S.D.N.Y. Aug. 7, 2006).  In *Sofi Classic*, the plaintiffs accepted promissory notes and guarantees from a joint venture defendant as a part of a settlement agreement.  *Id*. at 235-36.  After the defendant failed to make payments under the promissory notes, the plaintiffs tried to void the settlement agreement so they could initiate new "breach of contract" claims from the original litigation while also trying to enforce the promissory notes which they received for entering into the settlement agreement.[25]  *Id*.  The court held that the settlement agreement did not allow the plaintiffs to both pursue new claims (after declaring the settlement agreement void) while also

---

[24] Other than payment, Mr. Windhorst had no remaining "performance" to give under the Settlement Agreements, so Mr. Sabag would never have chosen the option to continue the Settlement Agreements.  Section 3 of the Amended Settlement Agreement provided Mr. Sabag with the specific option to terminate the Settlement Agreements and obtain an arbitration award of liquidated damages enforceable under the NY Convention.

[25] The plaintiffs in *Sofi Classic* argued that the waiver provisions of the settlement agreement authorized the plaintiffs "to both (1) seek remedies for breach of the Settlement Agreement against the [defendants] and (2) declare the Settlement Agreement void and seek remedies for breach of the underlying obligations [i.e., the promissory notes and guarantees]." *Id.* at 239.

seeking to enforce the promissory notes. *Id*. at 238-39. Mr. Sabag elected to terminate the Settlement Agreement and seek liquidated damages, which Section 3 of the Amended Settlement Agreement allowed him to do. Mr. Sabag is not trying to raise new "breach of contract" or "fraud" claims from the original arbitration. This Section 1782 Proceeding was initiated before the arbitration even began, and it still continues after the arbitration concluded.

Mr. Sabag did not "gain an advantage" (as discussed in *Sofi Classic*) when Mr. Windhorst decided to breach the Settlement Agreement by not complying with the "time is of the essence clause" for payment. Mr. Sabag lost the benefit of his bargain, and he gained a headache in having to chase after Sapinda/Windhorst to obtain the ICDR Awards and then enforce them. The Section 1782 Proceeding represents a (non-monetary) collateral proceeding involving U.S. discovery, and Mr. Sabag was willing to dismiss this Section 1782 Proceeding at one moment in time, to the detriment of U.K. SFO, if it truly meant the end to the exhaustive litigation between the parties. Mr. Windhorst had full control over his own fate when he negotiated the Settlement Agreements, but he later chose to evade his obligations and squander the benefits that he had negotiated. [26]

E.   The "Election of Remedies" Defense Argued by Mr. Windhorst Is an Affirmative Defense that Must be Timely Asserted

Mr. Windhorst argues that Mr. Sabag elected, when enforcing the Settlement Agreements, to retain the Settlement Agreements rather than to terminate them. Mr. Windhorst is simply wrong. Moreover, the "election of remedies" defense is an affirmative defense that must be raised at the pleading stage."[27] When Mr. Sabag sought to terminate the Settlement Agreement, Mr. Windhorst

---

[26] *Sofi Classic* recognized the holding in *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) which stands for the proposition that "the non-breaching party [to a settlement agreement] . . . can elect to terminate the contract and recover liquidated damages or [it] can continue the contract and recover damages solely for the breach."
[27] *See Travellers Int'l, A.G. v. Trans World Airlines, Inc*., 41 F.3d 1570, 1580 (2d Cir. 1994). *See also Midcoast Aviation, Inc. v. General Elec. Credit Corp*., 907 F.2d 732, [Footnote 4] (7th Cir. 1990) ("Election of remedies is an affirmative defense" that must be raised at first instance in reply).

had an opportunity at that time to raise his "election of remedies" arguments with the ICDR arbitrator (even though his arguments would have failed). Mr. Windhorst, however, remained silent, and the ICDR arbitrator dismissed any and all claims under the Settlement Agreement in the Final Award.

  F. The Parties Explicitly Agreed that the Final Award in the ICDR Arbitration Would be "Final"

  As Mr. Sabag explained in his request for an emergency stay against Mr. Windhorst's attempt to circumvent this Court's Orders through new ICDR arbitration, the parties determined that any action to enforce the Settlement Agreements should be brought under the same case number as the original ICDR arbitration. (Doc. 118-1, ¶ 13). The parties were all represented by very capable arbitration counsel, and they all understood that the ICDR Awards were final. No new arbitrations were allowed. The arbitrator ruled that all claims and counterclaims in the arbitration (which included the Settlement Agreement) have been dismissed. (Doc. 118-12, ¶ 12(e)). The ICDR rejected Mr. Windhorst attempt to relitigate his forfeited rights under the same ICDR case number. *See* Ex. A.

  If Mr. Sabag's lawyers (Reed Smith) had hypothetically received a timely payment from Sapinda/Windhorst, but Mr. Sabag did not dismiss the Section 1782 Proceeding within 5 days of receiving the payment, Reed Smith was required to return the payment. If Reed Smith did not return the payment, Sapinda/Windhorst would have rights under the Settlement Agreements to go back to the ICDR arbitrator to recover those funds. When all of the parties agreed that any disputes over the Settlement Agreements must be filed under the same ICDR case number, they all presumed that all performance and counter-performance needed to occur in advance of any awards from the ICDR arbitrator. Section 3 of the Amended Settlement Agreement clarified that, if Mr. Windhorst did not pay Mr. Sabag by August 1, 2022, Mr. Sabag could terminate the Settlement

Agreements while seeking a summary award from the ICDR arbitrator.  The Awards from the ICDR arbitrator speak for themselves in terminating Mr. Windhorst's rights to raise any further claims under the Settlement Agreements.

If Mr. Windhorst did not like the ICDR Awards, he could have sought to vacate or modify them.  Of course, even if Mr. Windhorst had hypothetically argued for the tribunal to leave open the issue of the Section 1782 Proceeding pending Mr. Windhorst's possible satisfaction of the Awards in the future, the tribunal would have rejected Mr. Windhorst's request because (1) he was in breach of the Settlement Agreement having missed two payment dates (with a "time is of the essence" condition) and (2) Mr. Sabag elected to terminate the Settlement Agreement while seeking the liquidated damages that Section 3 of the Amended Settlement Agreement authorized him to seek.

>   G.   Mr. Windhorst's Motions to Vacate Fail to Meet the Applicable Standards under Fed. R. Civ. Pro. 55(c) or Fed. R. Civ. Pro. 60(b).

Relying on Fed. R. Civ. Pro. 55(c) or Fed. R. Civ. Pro. 60(b), Mr. Windhorst's Motions to Vacate seek to relitigate the issues underlying this Court's Order granting Mr. Sabag's Supplementary Request for Discovery (Doc. 105) and its Order to Show Cause (Doc. 108).  First, as a threshold matter, Mr. Windhorst is not entitled to relief under Rule 55(c) or 60(b), because there has not been a default, a default judgment, or a final order issued in this matter.

Relief under Rule 55(c) may be granted for a default entered under Rule 55(a)[28] and/or a default judgment entered under Rule 55(b)[29] if the moving party can demonstrate good faith.

---

[28] Pursuant to Rule 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."

[29] Under Rule 55(B), default judgment may be entered either by the Court after receiving a petition from the Plaintiff or by the Clerk if the plaintiff's petition sets forth a sum certain or a computable sum for damages.

The docket of this matter reveals that Mr. Windhorst chose to intervene and appear in this matter. The Clerk never entered default and Mr. Sabag never sought a default judgment. Mr. Windhorst's Motions to Vacate presume that the Court's Orders were based solely on Mr. Windhorst's failure to respond. To the contrary, the Court's Orders under Section 1782 clearly provide an analysis and conclusion based on the merits of the issues before it. Mr. Windhorst is not entitled to relief under Rule 55(c), as no default or default judgment was entered.

Fed. R. Civ. P. 60(b) states, as argued by Mr. Windhorst, that a Court may relieve a party from a final judgment, order, or proceeding for: excusable neglect; newly discovered evidence; evidence that the judgment has been released or discharged; or any other reason that justifies relief.

Neither of the Motions to Vacate address whether the subject orders are, in fact, final, which is defined by Fed. R. Civ. Pro. 54(b), which states:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

The Court's Orders are not final, as they do not adjudicate all the rights raised by the parties. In fact, the Order on Supplementary Request specifically permitted to conduct Mr. Windhorst's deposition and the Order to Show Cause clearly contemplates a hearing and future orders of the Court. This matter has not been fully adjudicated, and Mr. Windhorst's Motions to Vacate should be denied for failing to meet the very threshold basis for Rule 60(b) relief.

Second, even if Rule 60(b) relief were available to Mr. Windhorst, he has failed to establish any excusable neglect, newly discovered evidence, any released rights, or any other good cause reason for such relief. "Relief from a judgment under Rule 60(b) is an extraordinary remedy and is granted only in exceptional circumstances." *United States v. One 1979 Rolls-Royce Corniche Convertible*, 770 F.2d 713, 716 (7th Cir. 1985).

### 1.   Mr. Windhorst Has Not Established Any Excusable Neglect.

"'[E]xcusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 394 (1993). The Seventh Circuit has held that, "outright and consistent disregard of a court's scheduling orders' 'can *only* be classified as inexcusable inattentiveness or neglect, rather than excusable carelessness.'" *Cato v. Thompson*, 118 Fed. Appx. 93, 97 (7th Cir. 2004) (citing *Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004)) (emphasis in original).

Here, Mr. Windhorst claims excusable neglect, because (1) he was unrepresented at the time (Doc. 115, p. 13-14; Doc. 116, p. 12-13); (2) he "believed the case to be closed in light of the Court's July 15, 2022 Order (Doc. 98) directing the clerk to close the case docket" (Doc. 115, p. 14; Doc. 116, p. 12-13); (3) he directed his efforts towards "making Mr. Sabag whole" i.e. complying with the arbitrator's Final Award (Doc. 115, p. 14; Doc. 116, p. 13); (4) there were alleged settlement negotiations ongoing. (Doc. 115, p. 14; Doc. 116, p. 13).

First, Mr. Windhorst's claims regarding his inability to obtain legal counsel strain credulity. Setting aside the fact that Mr. Windhorst was interviewed aboard his superyacht shortly before Mr. Sabag filed his Supplementary Request (see footnote 9 *supra*), Mr. Windhorst has always been well represented by counsel. Further, Mr. Windhorst was more than capable of appearing *pro se*

as is expected of many other petitioners appearing before this Court.   At the very least, Mr. Windhorst could have explained to the Court that he needed more time to secure legal counsel, but he failed to do so.

Second, Mr. Windhorst's argument that he "did not expect this Court to entertain the Supplementary Request because [he] understood the case had already been closed pursuant to the Court's July 15 Order" is equally without merit.  (Doc. 118, ¶ 13).  When Mr. Windhorst's previous counsel moved to withdraw, he was informed of his response deadline and that, "[f]ailure to immediately secure new counsel could result in an adverse ruling."  (Doc. 100-1).  When the Court granted Mr. Windhorst's Motion for Extension of Time, he was on notice that this Court was actively issuing orders in this matter.   (Doc. 104).   Once this Court granted Mr. Sabag's Supplementary Request and ordered Mr. Windhorst's deposition, Mr. Windhorst was on clear and unambiguous notice that his participation was required in this matter.  Mr. Windhorst cannot blame his failure to respond on ignorance of whether this Court was actively adjudicating this matter.

Third, Mr. Windhorst claims that his "focus was to resolve [his] liquidity issues so [he] could fund" the ICDR arbitrator's Awards.  (Doc. 118, ¶ 13).  Again, Mr. Windhorst admits that he purposefully chose to ignore this matter.   There is no reasonable basis to believe that Mr. Windhorst's obligations to comply with the ICDR Awards and engage in this matter (into which he chose to intervene) were mutually exclusive or that he could not otherwise do both.  Mr. Windhorst chose to set this matter aside, and he cannot claim excusable neglect as a result.

Fourth, Mr. Windhorst's briefs reference caselaw for the proposition that Courts have found excusable neglect where a party fails to act as a result of a good faith belief in ongoing settlement discussions.  (Doc. 115, p. 14; Doc. 116, p. 13).  However, neither Mr. Windhorst's affidavit, nor the facts available, demonstrate that Mr. Windhorst reasonably believed that there

were ongoing settlement discussions.  Mr. Windhorst claims that he believed that if he paid, "Mr. Sabag would abide by the Settlement Agreement and dismiss this case" but he provides no actual evidence to support his position. (Doc. 118, ¶ 16).  All communications between Mr. Windhorst's counsel with Mr. Sabag's Arbitration and/or BVI counsel regarding this Section 1782 Proceeding resulted in a direction from Mr. Sabag's counsel that Mr. Windhorst needed to speak with undersigned counsel.  Neither Mr. Windhorst nor his counsel ever reached out to undersigned counsel, intentionally ignoring him, until after the Final Award was satisfied.  Mr. Windhorst cannot establish that he reasonably relied on any settlement negotiations because none were ongoing.

2.      Mr. Windhorst Has Not Established The Discovery Of Any "New Evidence."

The "newly discovered evidence" that Mr. Windhorst points to is the evidence of the payment he made after Mr. Sabag filed his Supplementary Request, after this Court granted leave to take Mr. Windhorst's deposition, after Mr. Windhorst failed to appear for his deposition, and after Mr. Sabag filed his Motion for Order to Show Cause.  (Doc. 115, p. 15).  In order to grant relief under Rule 60(b)(2):

> a movant must meet a five-part test: (1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result.

*George v. Bezy*, 2006 WL 517683, at *2 (S.D. Ind. Mar. 2, 2006), aff'd, 204 Fed. Appx. 569, 2006 WL 3228625 (7th Cir. 2006).  If any one of these factors are not met, Mr. Windhorst's motion must fail.  *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 732 (7th Cir. 1999).

Mr. Windhorst cannot assert that his payment of the Final Award ordered in the Arbitration was "newly discovered," as it was newly created by Mr. Windhorst.  To be clear, Mr. Sabag filed his Supplementary Request for Discovery on October 11, 2022.  (Doc. 98).  This Court granted the Supplementary Request on December 15, 2022.  (Doc. 105).  Mr. Windhorst failed to cooperate in selecting a date and a Motion to Show Cause was filed on February 1, 2023.  (Doc. 107).  Mr. Windhorst satisfied the ICDR arbitrator's Awards on February 8, 2023.  There was no new evidence presented such that this Court should vacate its Orders.

3.      Mr. Windhorst Has Not Established That Mr. Sabag Released His Rights To Pursue This Matter.

Mr. Windhorst claims that this Court should vacate its orders because this Section 1782 Proceeding was released as part of the Settlement Agreements in the arbitration.  (Doc. 115, p. 15-

16; Doc. 116, p. 13-14).  As set forth in Section I(B) above, the Settlement Agreements were terminated and Mr. Sabag's rights to pursue this matter were not released.

### 4.    Mr. Windhorst Has Not Established Any Other Good Cause for Relief.

"Relief under Rule 60(b)(6) 'is available only in 'extraordinary circumstances.' A judge may consider many factors when making this determination, including 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'"[30]   Mr. Windhorst claims that he is entitled to relief under this section because: (1) he has made Mr. Sabag "whole" (Doc. 115, p. 16; Doc. 116, p. 15); (2) the Court generally has an interest in enforcing contractual agreements between parties (Doc. 115, p. 16-17; Doc. 116, p. 15); and (3) Mr. Sabag seeks to compel Mr. Windhorst to violate his privileges against self-incrimination through his requested deposition.  (Doc. 115, p. 17; Doc. 116, p. 15).

First, while Mr. Windhorst points to his payment under the Final Award as making Mr. Sabag "whole," he overlooks the fact that he only made his payment after (1) he breached the Original Settlement Agreement; (2) he breached the Amended Settlement Agreement; (3) Mr. Sabag had to seek to enforce the Settlement Agreements by terminating the agreements and seeking awards from the ICDR arbitrator; (4) the arbitrator issued the ICDR Awards; and (5) Mr. Sabag had to initiate the BVI Proceedings.  Mr. Windhorst has not made Mr. Sabag whole.  Instead, he paid an obligation only when his BVI entity was in danger of liquidation.

Second, Mr. Windhorst's arguments that the Court has an interest in ensuring that parties' contractual agreements are enforced is bold given the fact that he breached two Settlement Agreements and forced the BVI Proceedings.  Mr. Windhorst is not seeking for this Court to uphold

---

[30] *Braun v. Vill. of Palatine*, 56 F.4th 542, 554 (7th Cir. 2022), reh'g denied, 2023 WL 2188741 (7th Cir. Feb. 23, 2023) (citing *Buck v. Davis*, 580 U.S. 100, 137 S. Ct. 759, 777, 197 L.Ed.2d 1 (2017)).

some ideal of integrity between contracting parties – he is asking this Court to ignore his own breaches, while protecting him from the natural results of his actions.

Third, Mr. Windhorst has not, and cannot, demonstrate that the requested deposition would violate his rights. To the extent it is appropriate, Mr. Windhorst can claim his privilege against self-incrimination during his deposition. U.K. SFO can evaluate how Mr. Windhorst's refusal to answer questions will affect their decision to prosecute. Mr. Sabag has met the applicable standards required to take the deposition and Mr. Windhorst remains free to raise whatever procedural rights he may have, while answering questions under oath.

     5.     **Mr. Windhorst's Motions to Stay Are Improper, As the Settlement Agreements Were Terminated**

Mr. Windhorst argues in both his Motions to Vacate and his Motion to Stay that this Court should stay these proceedings. (Doc. 115, p. 23-28; Doc. 116, p. 20-27; Doc. 117). Mr. Windhorst's arguments can be summarized as (1) this Court must issue a stay this matter in order for the ICDR arbitrator to determine whether the settlement agreements are enforceable; and (2) even if this Court is not required to stay this matter pending the arbitrator's determination, it should stay this matter to wait to see what happens in the arbitration.

The original ICDR arbitrator explicitly found jurisdiction under Section 13 of the Original Settlement Agreement to issue the Awards (Doc. 118-12), and he exercised that jurisdiction by dismissing any further claims under the Settlement Agreements. This Court must respect the ICDR Awards, and may not allow Mr. Windhorst to re-litigate his original arbitration. As stated above, the Seventh Circuit has held that a party to arbitration "cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal

court. We will not tolerate such sandbagging."[31]   Here, Mr. Windhorst continues to press his

position that he made his payment in the regular course of the Settlement Agreements and that he

is entitled to enforcement thereunder in the arbitration.   However, the record is clear that Mr.

Windhorst's payment was made pursuant to the ICDR Awards, and not the Amended Settlement

Agreement.  (Doc. 118-12).  In fact, in order to get Mr. Windhorst to satisfy the ICDR Awards, Mr.

Sabag had to initiate liquidation proceedings in the BVI Proceedings.  Ex. E.[32]

It is also not appropriate for this Court to exercise its discretion to stay this matter.  "District

courts have inherent power to control their docket and enjoy broad discretion when determining

whether to stay proceedings."[33]  "A party has no inherent right to a stay; thus, the moving party

bears the burden of proving that the Court should exercise its discretion in staying the case."[34]  In

determining whether to order a stay, courts review the following factors: "(1) whether a stay will

unduly prejudice or tactically disadvantage the non-moving party; (2) whether the stay will

simplify the issues in question and streamline the trial; and (3) whether a stay will reduce the

burden of litigation on the parties and on the [C]ourt."[35]

---

[31] *See Lippert Tile Co. v. Int'l  Union*, 724 F.3d 939 (7th Cir. 2013) (quoting *Nat'l Wrecking Co. v. Teamsters Local 731*, 990 F.2d 957, 960 (7th Cir. 1993)).

[32] On March 6, 2023, when Mr. Windhorst tendered his Motion to Enforce to the arbitrator (Doc. 119-4), the ICDR informed Mr. Windhorst that, "[w]e have reviewed our records and note that this case was closed as per our closing letter of November 7, 2023.  When Mr. Windhorst tried to open a new emergency ICDR arbitration by purporting to make the request under the old ICDR case number, but by paying a new arbitration fee and seeking a new arbitration number for a new arbitrator, it became evident that Mr. Windhorst was playing the exact "arbitration card" that Seventh Circuit has stated that this Court should not tolerate.  *See Id.*

[33] *United Leasing, Inc. v. Xcelerate Auto, LLC*, 2022 WL 18540544, at *1 (S.D. Ind. Nov. 18, 2022) (citing *Clinton v. Jones*, 520 U.S. 681, 706-07 (1997)).

[34] *Id.* (citing *Ind. State Police Pension Trust v. Chrysler LLC*, 556 U.S. 960, 961 (2009)).

[35] *United Leasing, Inc. v. Xcelerate Auto, LLC*, 2022 WL 18540544, at *2 (S.D. Ind. Nov. 18, 2022) (citing *Madbak v. Anthem Ins. Co. Inc.*, No. 1:16-cv-03197-SEB-MPB, 2017 WL 5075262, at *1 (S.D. Ind. May 23, 2017)).

Here, the motivation for Mr. Windhorst's repetitive requests for a stay are clear – he believes that, "there is a significant risk that [he] will suffer the irreparable harm of being sanctions and/or held in contempt of Court based on Mr. Windhorst's failure to sit for a deposition in the 1782 Action…" (Doc. 123-6, ¶ 9).  Mr. Windhorst actively recognizes that he failed to comply with this Court's Orders and he is trying to or escape responsibility for his purposeful choice to ignore this Court.  Mr. Sabag will be unduly prejudiced and tactically disadvantaged by a stay or any further delay in this matter.  Mr. Sabag sought Mr. Windhorst's deposition over five months ago. (Doc. 98).[36]

Further, the issues before this Court will not be simplified or streamlined if a stay is granted, as the burden of litigation would only be postponed.  The merits of Mr. Sabag's motions, and this Court Order to Show Cause, do not change pending the outcome of the arbitration.

---

[36] Mr. Windhorst had proper notice and every opportunity to respond thereto.  He failed to respond.  This Court granted Mr. Sabag's request based on the merits of Mr. Sabag's arguments under Section 1782.  (Doc. 105).  Then, Mr. Sabag made every effort to obtain Mr. Windhorst's compliance with this Court's Order.  (Doc. 106).  However, Mr. Windhorst, again with proper notice and opportunity, failed to respond.  Instead, Mr. Windhorst's counsel spoke to Mr. Sabag's counsel in every other matter instead of dealing directly with Mr. Sabag's counsel in this case.  Mr. Windhorst should not now be rewarded with a stay in the face of his outright contempt for this Court.

6.     Mr. Windhorst Has Waived His Rights to Arbitrate New Claims in the ICDR that Directly Interfere with this Section 1782 Proceeding.

As Mr. Sabag noted in his Emergency Motion, Mr. Windhorst not only has waived his right to arbitrate his new claims with the ICDR after failing to raise his arbitration claims in a timely manner with this Court to respond to Mr. Sabag's Supplementary Request for Discovery (Doc. 98) and Motion for Order to Show Cause (Doc. 107)[37] but he also has waived his right to arbitrate by voluntarily asking this Court to grant him additional substantive relief under Section 1782 in accordance with federal law.[38]  In particular, the "totality of the circumstances" test established by the Seventh Circuit (discussed in footnote 37) requires that this Court treat Mr. Windhorst as having waived his rights to arbitrate through his own audacious actions.

7.     Mr. Windhorst is Not Entitled to File a Rule 72(A) Objection to this Court's Order Granting Supplementary Discovery

---

[37] The Seventh Circuit has ruled, in the context of determining whether a party has waived its rights to arbitration, that lower district courts should ask, under a "totality of the circumstances" test (which does not require a showing of prejudice to the non-waiving party), "**did the party seeking arbitration ... do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration**?"  *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018) (citing *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc*., 50 F.3d 388, 391 (7th Cir. 1995)); *See also*, *Cabinetree*, 50 F.3d at 391 (delay in filing for a stay to arbitrate to "weigh options" is the worst possible reason for delay. It amounts to the party playing "heads I win, tails you lose" in wanting to see how the case is going in federal court before deciding whether the case would be better off in arbitration. The selection of forum must be made at the earliest time possible to economize public and private resources consumed in dispute resolution); *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prod., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011) ("Other factors that we consider include whether the allegedly defaulting party participated in litigation [or] substantially delayed its request for arbitration. . ."); *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991) (holding that a party waives its right to arbitrate when it either (1) "loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration" or (2) "too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense.").  Mr. Windhorst substantially delayed his request for arbitration through his own contemptuous actions leading to a "show cause" hearing.  Rule 37 sanctions should punish Mr. Windhorst, not reward him.  "Only when [Appellant] had exhausted his pretrial maneuvers did he finally abandon the litigation playing field and retreat to his contractual [claim] to arbitration." *Id*. at 180.

[38] *See Magallanes Inv., Inc. v. Circuit Systems, Inc*., 994 F.2d 1214, 1218 (7th Cir. 1993) ("Here the parties have waived any right to arbitrate the existence of this contract in England by choosing to contest the issue under Illinois law in federal court. Since they now prefer Illinois litigation to English arbitration, so be it.").

The Court's Order Granting Supplementary Discovery was granted on December 15, 2022. (Doc. 105).  Any Rule 72(a) objections to that Order were due by December 29, 2022.  Fed. R. Civ. Pro. 72(a).  Instead of pursuing an objection, Mr. Windhorst sat idly by ignoring this matter. For that fact alone, Mr. Windhorst's attempt to make a Rule 72(a) objection should be denied.

Nonetheless, even on its merits, a Rule 72(a) objection fails.  Mr. Windhorst argues that this Court erred in its Order Granting Supplementary Discovery, because "the jurisdictional requirements of Section 1782 were not satisfied."  (Doc. 115, p. 22).  Mr. Windhorst makes no effort to explain why he thinks he is not found in this District, after he chose to intervene in this matter, or why he believes this Court's sound determination that, "[w]hen Windhorst moved to intervene in this § 1782 proceeding as a party to assert his claims and defenses, he waived his right to object to personal jurisdiction or whether he 'is found' in the Southern District of Indiana" is somehow incorrect.  (Doc. 105, p. 4).  This Court is correct and Mr. Windhorst is found in this Court's jurisdiction.

8.  Mr. Windhorst Did Not File a Rule 72(A) Objection to this Court's Order to Show Cause, and He is Not Entitled to Any Relief Thereunder.

The Court's Order to Show Cause was issued on March 1, 2023.  (Doc. 108).  Any Rule 72(a) objections to that Order were due on or before March 15, 2023.  Fed. R. Civ. Pro. 72(a). While Mr. Windhorst references making a Rule 72(a) Objection (Doc. 116, p. 1), he does not make any substantive argument thereto and his time to raise any such objection has passed.  As a result, Mr. Windhorst's deficient Rule 72(a) objection should be denied.

9.  Mr. Windhorst Should Not Be Entitled to Respond in Opposition to Mr. Sabag's Supplementary Request for Discovery.

Mr. Sabag's Supplementary Request for Discovery was filed on October 11, 2022.  (Doc. 98).  Mr. Windhorst, through his previous counsel, sought an extension of time for Mr. Windhorst

to obtain new counsel and to respond to the Supplementary Request for Discovery, through to November 22, 2022.  (Doc. 99).  This Court granted that request on October 26, 2022.  (Doc. 104). As set forth in Mr. Windhorst's affidavit, he purposefully chose not to respond to the Supplementary Request, or even seek counsel.   Mr. Windhorst is not entitled to Rule 60(b) relief and, accordingly, he is not entitled to file a belated response to the Supplementary Request for Discovery.

IV.     Conclusion

Mr. Sabag requests the dismissal of Mr. Windhorst's Motions to Vacate and Motion to Stay (Doc. 115; Doc. 116; Doc. 117) and an award of further sanctions and costs against Mr. Windhorst consistent with his contemptuous conduct in the face of having violated this Court's prior orders.  As stated in Mr. Sabag's emergency motion filed on March 20, 2023, Mr. Sabag requests that this Court order Mr. Windhorst to cease any further activities in the ICDR that attempt to impinge on this Court's authority to enforce its own orders in this Section 1782 Proceeding. Now that this Court has fully reviewed the facts and evidence, Mr. Sabag also requests that this Court permanently enjoin Mr. Windhorst from pursuing any further arbitration in the ICDR relating to this Section 1782 Proceeding.

Dated:  March 23, 2023

Respectfully submitted,

*Offer Korin*
Offer Korin, No.: 14014-49
Brooke Smith, No. 32427-03
STOLL KEENON OGDEN PLLC
334 N. Senate Avenue
Indianapolis, IN  46204
Office:  317-464-1100; Fax:  317-464-1111
offer.korin@skofirm.com
brooke.smith@skofirm.com

Courtney Caprio [Admitted *pro hac vice*]
AXS LAW GROUP, PLLC
2121 NW Second Avenue, Suite 201
Miami, FL  33127
Office:  305-297-1873; Fax:  305-397-2336
courtney@axslawgroup.com

*Counsel for Movant Eli Sabag*

## CERTIFICATE OF SERVICE

I hereby certify that on **March 23, 2023**, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's ECF.  Parties may access this filing through the Court's system.

| | |
|---|---|
| Sean Tyler Dewey<br>Michael A. Wukmer<br>Meredith Wood<br>ICE MILLER LLP<br>*Counsel for Track Group* | sean.dewey@icemiller.com<br>michael.wukmer@icemiller.com<br>meredith.wood@icemiller.com |
| Ann O'Connor McCready<br>TAFT STETTINIUS & HOLLISTER LLP<br>*Counsel for Lars Windhorst* | amccready@taftlaw.com |
| Gavin S. Frisch [PHV]<br>Lucas V.M. Bento [PHV]<br>QUINN  EMANUEL  URQUHART  &<br>SULLIVAN LLP<br>*Counsel for Lars Windhorst* | gavinfrsich@quinnemanuel.com<br>lucasbento@quinnemanuel.com |

*Offer Korin*
Offer Korin