Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

In Re:
The Application of:

ELI SABAG, for an Order Pursuant to 28
U.S.C. § 1782 to Conduct Discovery for Use in
Foreign Proceedings.

Case No.: 1:19-mc-00084-JPH-TAB

**REPLY MEMORANDUM OF LAW IN SUPPORT OF LARS WINDHORST'S**
**MOTIONS TO VACATE AND/OR STAY (DOC. 115 AND DOC. 116)**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  PRELIMINARY STATEMENT ................................................................. 1

II.  ARGUMENT ........................................................................................ 6

    **1.**  **As a preliminary matter, the validity of the arbitral clause in the Settlement Agreement is severable from the validity of the Settlement Agreement** ................................................................................ 6

    **2.**  **This Court Need Not Rule On the Validity of the Settlement Agreement or Arbitration Agreement to Vacate its Prior Orders** ...................... 7

    **3.**  **The Court Has Inherent Authority To Vacate The Orders, And Mr. Windhorst Has Shown He Is Entitled To Relief Under Federal Rules of Civil Procedure 55 & 60(b)** .................................................... 9

        a.  Mr. Windhorst Has Shown Good Cause For His Delay ........................ 10

            i.  Mr. Windhorst Has Shown Excusable Neglect .............................. 10

            ii.  Newly Discovered Evidence Warrants Vacating the Deposition Order ........................................................................ 12

            iii.  Mr. Sabag Released this 1782 Action ........................................... 13

            iv.  Mr. Windhorst Is Entitled To Relief Under Rule 60(b)(6) ............ 13

        b.  Windhorst Took Quick Action To Correct The Delay ............................. 14

        c.  Mr. Windhorst Has A Meritorious Defense .......................................... 15

    **4.**  **The ICDR's Closing of the Predecessor Arbitration and Does Not Impact the Arbitrator's Jurisdiction over Mr. Windhorst's Breach of the Settlement Agreement Claim** ................................................... 16

    **5.**  **The Final Award Does Not Bar Mr. Windhorst's New Breach of Contract Claim** .......................................................................... 19

    **6.**  **Despite Mr. Windhorst's prior breach, the Settlement Agreement remains valid because Mr. Sabag elected to affirm the validity of it** ............. 23

        a.  The Settlement Agreement and its Amendment does not contain a Liquidated Damages clause ............................................................ 25

            (i)  No requisite "express agreement" of a liquidated damage clause can be found in the Settlement Agreement or its Amendment ........................................... 25

            (ii)  The Arbitrator Did Not Interpret Mr. Sabag's Motion to Enforce as a Motion to Terminate for Liquidated Damages ........................................................................... 28

            (iii)  Mr. Sabag's Sole Authority is Distinguishable ................. 29

b.      Mr. Sabag has elected to affirm the validity rather than terminating the Settlement Agreement and suing for liquidated damages...................31

c.      Mr. Sabag's Efforts to Distinguish Mr. Windhorst's Cases are Unavailing...................................................................................34

**7.      Mr. Windhorst has not waived any arguments**................................35

**8.      Mr. Windhorst's Alternative Requests Should Be Granted**...........................38

a.      The Court Should Sustain Mr. Windhorst's Objections Under Rule 72(a) ........................................................................................38

b.      A Stay is Warranted Pending Arbitration ..................................39

III.   CONCLUSION..............................................................................................40

# **TABLE OF AUTHORITIES**

**Page**

### Cases

*Akzo Coatings, Inc. v. Aigner Corp.*,
909 F. Supp. 1154 (N.D. Ind. 1995) ................................................................. 8

*In re Alpene, Ltd.*,
2022 WL 15497008 (E.D.N.Y. Oct. 27, 2022) .................................................. 10

*Art Press Ltd. v. Western Printing Mach. Co.*,
852 F.2d 276 (7th Cir. 1988) ........................................................................... 31

*Bancol y. Cia. S. en C. v. Bancolombia*,
280 F. App'x 85 (2d Cir. 2008) ........................................................................ 21

*Carr v. Gateway, Inc.*,
944 N.E.2d 327 (Ill. 2011) ............................................................................... 16

*Cato v. Thompson*,
118 Fed. Appx. 93 (7th Cir. 2004) ................................................................... 11

*Chase Manhattan Bank v. American National Bank*,
889 F. Supp. 121 (S.D.N.Y. 1995) ................................................................... 26

*Chicago Typographical Union No. 16 v. Chicago Sun Times*,
860 F.2d 1420 (7th Cir. 1998) ......................................................................... 22

*City of New York v. New York Pizzeria Delicatessen*,
2006 WL 2850237 (S.D.N.Y. Sep. 29, 2006) ................................................... 24

*Collins v. Experian Credit Reporting Service*,
2004 WL 3078825 (D. Conn. Dec. 22, 2004) .................................................. 21

*Colvin v. Nannenga*,
2010 WL 3001947 (N.D. Ind. July 26, 2010) .................................................. 14

*Court v. MacWeeney*,
195 A.D. 2d 381 (N.Y. App. Div. 1993) .......................................................... 36

*Denihan v. Denihan*,
34 N.Y.2d 307 (N.Y. 1974) ............................................................................. 36

*Easley v. Kirmsee*,
382 F.3d 693 (7th Cir. 2004) ........................................................................... 11

*Eatoni Ergonomics, Inc. v. Research in Motion Corp.*,
633 F. Supp. 2d 109 (S.D.N.Y. 2009) .............................................................. 29

*Elder-Keep v. Aksamit*,
    460 F.3d 979 (8th Cir. 2006) ............................................................................. 9

*Elzinga & Volkers, Inc. v. LSSC Corp.*,
    47 F.3d 879 (7th Cir. 1995) ............................................................................. 13

*Emcee Personnel v. Morgan Lewis Bockius, LLP*,
    702 N.Y.S.2d 633 (N.Y. App. Div.  2000) ..................................................... 29

*ESPN, Inc. v. Office of Comm'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999) .................................................. 23, 24, 25

*In re Ex Parte Application of Eli Lilly & Co.*,
    580 F. Supp. 3d 334 (E.D. Va. Jan. 18, 2022), *aff'd*, 37 F.4th 160 (4th Cir. 2022) ................ 10

*Finn v. Anderson*,
    2013 WL 12085092 (S.D.N.Y. Sept. 6, 2013), *aff'd*, 592 F. App'x 16 (2d Cir. 2014) ........... 19

*Fox y Garcia Constr. & Dev. Corp. v. Brijall Realty Corp.*,
    57 Misc.3d 1225 (N.Y. Civ. Ct. 2017) ............................................................ 32

*Ganton Techn. v. Intern. Union, United Auto*,
    358 F.3d 459 (7th Cir. 2004) ........................................................................... 22

*Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC, Loc. 182B v. Excelsior Foundry Co.*,
    56 F.3d 844 (7th Cir. 1995) ............................................................................. 23

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287, 301 (2010)................................................................................... 6

*Gustavia Home LLC v. VVS1 Corp.*,
    2019 WL 2527291 (E.D.N.Y. June 19, 2019) ................................................ 20

*Harrington v. Hasan*,
    191 Misc.2d 617, 743 N.Y.S.2d 684 (N.Y. Civ. Ct. 2002) ................... 27, 28, 29, 30

*Hill Dermaceuticals, Inc. v. Anthem, Inc.*,
    2017 WL 26861 (M.D. Fla. Jan. 3, 2017)........................................................ 9

*Huckaba v. CSX Transp., Inc.*,
    2015 WL 11237032 (S.D. Ill. July 20, 2015) .................................................. 8

*Jean v. Auto & Tire Spot Corp.*,
    (E.D.N.Y. May 24, 2013) ................................................................................ 34

*Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*,
    660 F.3d 988 (7th Cir. 2011) ........................................................................... 36

*Khan v. Dell, Inc.*,
   669 F.3d 350 (3d Cir. 2012) ................................................................................. 16

*Kruger v. Apfel*,
   214 F.3d 784 (7th Cir. 2000) ................................................................................. 38

*La Comision Ejecutiva Hidroelecctrica Del Rio Lempa v. El Paso Corp.*,
   617 F. Supp. 2d 481 (S.D. Tex. 2008) ................................................................... 10

*Lemus v. Manhattan Car Wash, Inc.*,
   2010 WL 4968182 (S.D.N.Y. Dec. 9, 2010) .......................................................... 25

*Lonon v. J.G. Wentworth Co.*,
   No. CV 16-6456, 2018 WL 5316349 (E.D. Pa. Oct. 26, 2018).............................. 19

*Lumbermens Mut. Cas. v. Broadspire Mgt. Servs*,
   623 F.3d 476 (7th Cir. 2010) ................................................................................. 35

*Magallanes Inv., Inc. v. Circuit Systems, Inc.*,
   994 F.2d 1214 (7th Cir. 1993) ............................................................................... 38

*Marvel Characters v. Simon*,
   310 F.3d 280 (2d Cir. 2002) .................................................................................. 21

*Menorah Home v. Local 144*,
   573 F. Supp. 908 (E.D.N.Y. 1983), aff'd 751 F.2d 370 (2d Cir. 1984) .................. 17

*Molina v. Harvard Maint.*,
   2021 WL 5281098 (S.D.N.Y. Nov. 11, 2021)........................................................ 17

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)................................................................................................... 17

*NAS Electronics, Inc. v. Transtech Electronics Pte Ltd.*,
   262 F. Supp. 2d 134 (S.D.N.Y. 2003) .............................................................. 29, 30

*Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.*,
   328 F.3d 462 (8th Cir. 2003) ................................................................................. 35

*New York Hotel and Motel Trades v. Hotel St. George*,
   988 F. Supp. 770 (S.D.N.Y. 1997) ........................................................................ 23

*Ohanian v. Avis Rent A Car Sys.*,
   779 F.2d 101 (2d. Cir. 1985) ............................................................................ 26, 27

*Parlux Fragrances, LLC v. S. Carter Enters., LLC*,
   204 A.D.3d 72 (N.Y. App. Div. 2022) ................................................................... 23

*People for Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*,
2019 WL 3342087 (S.D. Ind. July 25, 2019) ............................................................. 8

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967) ................................................................................................. 39

*Primex Intl Corp. v. Wal-Mart*,
89 N.Y.2d 594 (N.Y. 1997) ...................................................................................... 39

*Ray v. Chafetz*,
236 F. Supp. 3d 66 (D.D.C. 2017) ........................................................................... 19

*Rent-A-Ctr. v. Jackson*,
561 U.S. 63 (2010) ..................................................................................................... 6

*Reynolds v. U.S. Dep't of Justice*,
10 F. Supp. 3d 134 (D.D.C. 2014) ........................................................................... 21

*Rock Hemp Corp. v. Dunn*,
51 F.4th 693 (7th Cir. 2022) ...................................................................................... 7

*Sims v. EGA Products, Inc.*,
475 F.3d 865 (7th Cir. 2007) ................................................................................... 14

*Smith v. GC Servs. Ltd. P'ship*,
907 F.3d 495 (7th Cir. 2018) ................................................................................... 38

*Smith v. Widman Trucking & Excavating, Inc.*,
627 F.2d 792, 795 (7th Cir.1980) .............................................................................. 9

*Sofi Classic S.A. de C.V. v. Hurowitz*,
444 F. Supp. 2d 231 (S.D.N.Y. 2006) .......................................................... 24, 34, 35

*Stevens Constr. Corp. v. Chicago Reg'l Council of Carpenters*,
464 F.3d 682 (7th Cir. 2006) ................................................................................... 23

*Sweet Dreams Unlimited v. Dial-A-Mattress Int'l*,
1 F.3d 639 (7th Cir. 1993) ....................................................................................... 39

*Transtech Electronics Pte Ltd. v. NAS Electronis, Inc.*,
2000 WL 381428 (S.D.N.Y. April 13, 2000) ..................................................... 31, 32

*Travelport Global Distrib. Sys. BV v. Bellview Airlines Ltd*,
2012 WL 3925856, (S.D.N.Y.) ................................................................................ 17

*United States v. Di Mucci*,
879 F.2d 1488 (7th Cir. 1989) ................................................................................... 9

*In re Webuild S.P.A.*,
 2022 WL 17807321 (S.D.N.Y. Dec. 19, 2022) ...................................................................... 10

*Weil v. Theron*,
 585 F. Supp. 2d 473 (S.D.N.Y. 2008) ................................................................................... 27

*Welborn Clinic v. Medquist, Inc.*,
 301 F.3d 634 (7th Cir. 2002) ................................................................................................ 37

*Wells Fargo Bank v. Sokaogon Chippewa Community*,
 787 F. Supp. 2d 867 (E.D. Wis. 2011) ................................................................................. 36

*Wilson v. PBM, LLC*,
 140 N.Y.S.3d 276 (N.Y. App. Div. 2021) ............................................................................ 19

*Yates v. Lifchitz*,
 No. 11-cv-0469-MJR-PMF (S.D. Ill. Aug. 28, 2012) .......................................................... 10

*Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*,
 2011 WL 307617 (N.D. Ill. Jan. 28, 2011) .......................................................................... 18

**Statutory Authorities**

28 U.S.C. § 1782 ................................................................ 8, 10, 12, 13, 14, 16, 17, 38, 39

**Rules and Regulations**

Fed. R. Civ. P. 55 ................................................................................................. 6, 9, 11, 40

Fed. R. Civ. P. 59(e) ........................................................................................................... 10

Fed. R. Civ. P. 60 ............................................................................................................... 10

Fed. R. Civ. P. 60(b) ................................................................................. 6, 9, 10, 11, 17, 40

Fed. R. Civ. P. 72(a) ........................................................................................................... 40

Fed. R. Civ. P. 72 ............................................................................................................... 40

Fed. R. Civ. P. 60(b)(1) ................................................................................................. 11, 13

Fed. R. Civ. P. 60(b)(2) ................................................................................................. 13, 14

Fed. R. Civ. P. 60(b)(5) ....................................................................................................... 14

Fed. R. Civ. P. 60(b)(6) ....................................................................................................... 14

**Additional Authorities**

*https://www.icdr.org/sites/default/files/document_repository/ICDR_Rules.pdf?utm_sour ce=icdr-website&utm_medium=rules-page&utm_campaign=rules-intl.*................................ 18

*https://www.icdr.org/sites/default/files/document_repository/ICDR_Rules_1.pdf?utm_so urce=icdr-website&utm_medium=rules-page&utm_campaign=rules-intl-update- 1mar.* ...................................................................................................................... 18

Lars Windhorst ("Mr. Windhorst"), through counsel, respectfully submits this Reply Memorandum of Law in support of his motions to vacate, modify, and/or stay this Court's orders filed under Docket Entries 115 and 116 (collectively "Motions to Vacate and/or Stay").

## I.     PRELIMINARY STATEMENT

Mr. Sabag's opposition brief ("Opposition", Doc. 126) provides no legitimate answer to the critical question of why it is that, after receiving a multi-million dollar payment awarded to him under the parties' settlement agreement and its amendment ("Settlement Agreement Amendment", Doc. 118-3; collectively with the "Original Settlement Agreement", Doc. 118-1, 'Settlement Agreement"), Mr. Sabag insists on pursuing discovery in a proceeding that he should have voluntarily dismissed over 6 weeks ago.  Mr. Sabag was quick to enforce the terms of the Settlement Agreement in the summer of 2022 and, through January 2023, had no hesitation to enforce the Settlement Enforcement Award (Doc. 118-11), which, in the arbitrator's own words, "incorporat[ed] the terms of the settlement" (Opp. Ex. G, Doc. 127-7).  But now that the shoe is on the other foot, Mr. Sabag offers a series of baseless reasons for why the agreement is "invalid," why the arbitration shouldn't proceed, and why this Court should continue to entertain his section 1782 application ("1782 Action"), despite having been made whole.[1]

Much of Mr. Sabag's Opposition (Doc. 126 at 19-29) is a strawman and an attempt to litigate issues that are currently subject to arbitration, including (1) the arbitrator's jurisdiction over Mr. Windhorst's breach of contract claim, and (2) the validity of the parties' Settlement Agreement.  Not only does he fail to meaningfully engage in the Rule 60 factors, he also does not

---

[1]  Moreover, Mr. Sabag's own filings in this action reveal that payment of the settlement amount would terminate his status as an alleged "victim" in the purported foreign proceedings.  Doc. 98 [Sabag's Supplementary Request] at 3, n.5 ("Mr. Sabag considered the settlement agreement with Windhorst as causing partial remediation/restitution for Windhorst's criminal acts against Mr. Sabag. Windhorst's failure to honor his settlement obligation, however, leaves Mr. Sabag as a continued victim without any remediation/restitution.")

deny that he has received the multi-million dollar settlement payment that Mr. Windhorst owed him.  (Doc. 126 at 18.)  And while it is undisputed that Mr. Sabag had to wait longer than he hoped to receive that money, his assertion (Doc. 126 at 20) that he did not get his "benefit of the bargain" rings hollow: Mr. Sabag has enjoyed the full benefits under the Settlement Agreement, having pocketed the full $2.85 million settlement payment plus interest and legal fees.

Many of Mr. Sabag's factual assertions are either misleading or inaccurate.  At the outset, Mr. Windhorst's good cause arguments are centered on his efforts to rectify his liquidity problems. Mr. Sabag's Opposition attempts to cast doubt on Mr. Windhorst's efforts, and assumes Mr. Windhorst could have hired counsel to represent him despite the fact that, as Mr. Sabag has acknowledged, (Doc. 126 at 14), Mr. Windhorst's prior counsel in this 1782 Action withdrew because Mr. Windhorst could not pay them.

Essentially, Mr. Sabag conflates Mr. Windhorst's reported wealth and Mr. Windhorst's liquidity.  Yet despite ignoring this distinction and repeatedly claiming Mr. Windhorst's liquidity problems are a pretextual excuse, Mr. Sabag's own sources confirm Mr. Windhorst was facing liquidity problems.  For example, Mr. Sabag cites a November 2022 article from the Financial Times as purported evidence  that somehow Mr. Windhorst's failed bank transfers from Euram to Mr. Sabag were "fake."  (Doc. 126 at 15.)  The Financial Times, blocked by a paywall and not provided by Mr. Sabag to the Court, actually confirms Mr. Windhorst's position here: The individual who reported Euram to financial authorities in connection with Mr. Windhorst's delayed wire transfers ultimately apologized to the bank, expressing he "regretted any 'potential irritation'" he caused.  (McCready Decl. Ex. 1 [Financial Times Article] at 2.)

Likewise, Mr. Sabag's reference to the BVI liquidation proceeding against Sapinda does nothing to challenge the validity of the parties' Settlement Agreement.  Contrary to what Mr.

Sabag claims, Mr. Windhorst's BVI counsel never "made multiple direct admissions to Mr. Sabag's counsel" that the Settlement Agreement no longer had any force and effect, or "offered additional consideration" if Mr. Sabag would agree to dismiss the Section 1782. (Doc. 126 at 18-19.)  As evidenced in Mr. Sabag's Opposition Exhibit I (Doc. 127-9 at 2), Mr. Windhorst's BVI counsel merely relayed Mr. Windhorst's desire to achieve "a global resolution of all issues"  (Opp. Ex. I at 2.)   Here, Mr. Windhorst's BVI counsel—who were not involved in the Settlement Agreement negotiations and likely never saw a copy of the agreement—were only seeking to have Mr. Sabag confirm that he would comply with the Settlement Agreement and "withdraw the Indiana proceedings," so that "the parties can avoid further satellite litigation"  to enforce the Settlement Agreement.[2] (*Id.*; see also *id.* ("We also do not agree that it is inappropriate for our client to seek a "global" or "partly global" resolution.").)  Indeed, in his very next email (Doc. 118-15 at 27), Mr. Windhorst's BVI counsel noted Mr. Windhorst was willing to compensate Mr. Sabag for his legal costs in this 1782 Action to amicably resolve this proceeding, while emphasizing that he had "no obligation to do so."  (Windhorst Decl. Ex. 15, at 27; Doc. 126 at 19.)  Mr. Sabag's BVI counsel likely had no authority to discuss these matters as they recommended that Mr. Windhorst "do so via Mr Sabag's Indiana counsel."

Having fully enjoyed the fruits of the Settlement Agreement, only now has Mr. Sabag come forward stating his belief that the agreement is invalid and that the arbitration clause within it does not cover Mr. Windhorst's breach of contract claim.  Mr. Windhorst's counsel spoke with Mr. Sabag's Indiana counsel over the phone on two occasions and sent Mr. Sabag's Indiana counsel a

---

[2]  Neither did Mr. Windhorst's BVI counsel admit the termination of the Settlement Agreement by saying that "our client does however accept liability in principle for these amounts," and "will not require the liquidation application to be amended if your client agrees to dismiss the action in Indiana including the deposition scheduled for Mr Windhorst therein in return for payment."  Opp. Ex. I at 4.  This is consistent with Mr. Windhorst's position that Mr. Sabag's obligation to dismiss the 1782 Action only arises after Mr. Windhorst makes the full payment.

letter about Mr. Sabag's obligation to dismiss this 1782 Action, yet not once did Mr. Sabag or his representatives inform Mr. Windhorst that the Settlement Agreement was invalid.  *See* Doc. 119.

At the time Mr. Windhorst filed his Motions to Vacate and/or Quash, there was no dispute over the validity of the Settlement Agreement, let alone the arbitrability of Mr. Windhorst's breach of contract claim.  The Settlement Agreement contained a broad arbitration clause covering "any issue or dispute relating to the creation, execution, interpretation, performance, or breach of" the Settlement Agreement.[1]   There is no question that language covers Mr. Windhorst's breach of contract claim against Mr. Sabag; indeed, Mr. Sabag relied on the same arbitration clause in his August 2, 2022 Motion to Enforce the Settlement Agreement.  (Doc. 118-6.)  Moreover, the reference to ICDR case number 01-20-0003-693, which doesn't appear to even exist,[3] poses no bar to arbitrability since there is no doubt the parties must arbitrate their disputes before the ICDR, which, if disputed, is a question for the arbitrator, not this Court.

After the ICDR declined to accept Mr. Windhorst's Motion to Enforce (Doc. 119-4) in the predecessor arbitration and instructed him to file a new claim, Mr. Windhorst did just that ("ICDR Arbitration").  (Supp. Bento Decl. Ex. I [Notice of Arbitration], Doc. 123-5.)  That arbitration is in progress and, while Mr. Sabag has objected to the ICDR's jurisdiction, the parties have already attended a preliminary conference and are proceeding with the selection and appointment of the arbitrator.  (McCready Decl. Ex.2 [Letter from Mr. Carmona on March 27, 2023; McCready Decl. Ex.3 [Email from Mr. Bento on March 27, 2023].)  Mr. Windhorst has also filed an Application for Emergency Relief, (Supp. Bento Decl. Ex. J [Emergency Arbitrator Application], Doc. 123-6),

---

[3]   The Settlement Agreement provides that the dispute shall be submitted under case number 01-20-0003-693, without the "1" at the end.  While the assumption is that the case number should have read "01-20-0003-693<u>1</u>", the typo, if there is one, does not undermine the validity of the agreement to resolved disputes before the ICDR, and here only further reflects that the parties included the case number only to address logistics, rather to delineate parties' substantive rights.

and the Emergency Arbitrator has elected to proceed with adjudicating Mr. Windhorst's Emergency Application despite Mr. Sabag's protestations regarding the Emergency Arbitrator's jurisdiction. (Doc. 127-3 [Emergency Arbitrator PO No.1].)

Relatedly, Mr. Sabag's argument that he terminated the Settlement Agreement following Mr. Windhorst's failure to pay the settlement funds by August 1, 2022 has no basis in fact or law. Mr. Sabag had a choice: (1) terminate the Settlement Agreement and revive his underlying SPA and Put Option Agreement claims against Mr. Windhorst, or (2) affirm the validity of the Settlement Agreement by seeking a "summary international arbitration award" to obtain the exact amount he was supposed to receive from Mr. Windhorst as consideration for the settlement as well as attorneys' fees. Mr. Sabag chose the latter, electing to affirm the continuation of the contract in his motion to <u>enforce</u> the Settlement Agreement. Nowhere does the Settlement Agreement refer to, nor do any of its provisions amount to a liquidated damages clause.

Separately, Mr. Windhorst's ICDR arbitration and request for emergency relief in that forum do not interfere with this Court's authority over this action. *Contra* Doc. 126 at 8. Mr. Windhorst is not asking that the arbitrator order *this Court* to do anything; rather, Mr. Windhorst's Notice of Arbitration requests the arbitrator to order *Mr. Sabag* to specifically perform his obligations under the Settlement Agreement by voluntarily dismissing this action. (Doc. 123-5 ¶ 92 ("Relief Sought").) Likewise, the relief Mr. Windhorst has requested from the Emergency Arbitrator is simply to request *Mr. Sabag* to maintain the status quo ante by requiring Mr. Sabag to stay discovery (or requesting such a stay) while the parties first arbitrate whether Mr. Sabag has breached the Settlement Agreement.[4] (Doc. 123-6 ¶ 68 ("Relief Sought").)

---

[4] Similarly, Mr. Windhorst's request for a stay in his Motions to Vacate and/or Stay is simply to maintain the status quo while the arbitration rules on Mr. Sabag's obligation to dismiss this action. There is no harm or prejudice to Mr. Sabag by holding the deposition in abeyance, especially where Mr. Sabag's

Ultimately, Mr. Sabag's opposition is ineffectual because he simply glosses over the Rule 55 and Rule 60(b) legal inquiry.  As explained in Mr. Windhorst's opening briefs, he has more than met the necessary showing to obtain relief.  To allow Mr. Sabag to take a deposition of Mr. Windhorst purportedly for use in criminal proceedings against Mr. Windhorst, without considering Mr. Windhorst's opposition arguments on the merits, would be a grave injustice, especially since Mr. Sabag has now been made whole.  Vacatur and/or a stay of the Deposition Order  (Doc. 105) and the OSC Order (Doc. 108) (collectively, the "Orders") is warranted.

## II.   ARGUMENT

**1.     As a preliminary matter, the validity of the arbitral clause in the Settlement Agreement is severable from the validity of the Settlement Agreement**

In his Emergency Motion to Stay Arbitration ("Emergency Motion", Doc. 122)) and his Opposition (Doc. 126),  Mr. Sabag contests the arbitrability of Mr. Windhorst's breach of contract claim and the validity of the Settlement Agreement.  Even if Mr. Sabag is correct that the Settlement Agreement is no longer valid (he is not), these questions should be addressed by the arbitrator.

As a matter of substantive federal arbitration law, the validity of the arbitration clause is "severable" from the remainder of the relevant agreement, and the arbitrable issues should still be referred to the arbitrator if the challenge is not "to the arbitration clause itself."  *Rent-A-Ctr, W., Inc., v. Jackson*, 561 U.S. 63, 84 (2010); *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) ("[C]ourts treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself.").

---

allegedly "contemplated foreign proceeding" has not been initiated since filing this 1782 Action more than 3 years ago and despite having already received discovery from the original Respondents.

Here, the validity of the Settlement Agreement's arbitration agreement cannot reasonably be questioned.  Indeed, Mr. Sabag has himself previously invoked this arbitration clause.  Thus, Mr. Sabag's argument that the Settlement Agreement is no longer valid should be determined by the arbitrator.  *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (finding that because the party's argument does not affect the validity of the arbitration clause specifically, "the issue of the contract's validity must be considered by the arbitrator in the first instance.").

## 2.    This Court Need Not Rule On the Validity of the Settlement Agreement or Arbitration Agreement to Vacate its Prior Orders

Although Mr. Sabag would have this Court decide whether he has breached the Settlement Agreement, that question is already pending in the ICDR arbitration.[5]  The Court need not decide that question to vacate the Orders.  For example, Mr. Windhorst's excusable neglect argument provides grounds for this Court to vacate its Orders without resorting to any contractual interpretation or any finding that Mr. Sabag is in breach of the Settlement Agreement because it is premised on Mr. Windhorst's good faith efforts to tender payment to Mr. Sabag and good faith belief that doing so would result in this 1782 Action being dismissed.  The Court need not actually determine whether Mr. Windhorst's good faith belief is the correct interpretation of the Settlement Agreement.  Similarly, the Court may sustain the objections, stay this 1782 Action pending resolution of the ICDR Arbitration, and/or grant leave to file the 1782 Opposition without resort to any contractual interpretation of the Settlement Agreement.

Nonetheless, this Court can consider the Settlement Agreement and its terms in order to revisit its discretion when granting the 1782 application and application for an order to show cause.

---

[5]  Mr. Windhorst never waived his right to arbitrate.  He filed his motion in the ICDR (raising the same arguments he raised in the new arbitration, per the ICDR's instructions) before moving before this Court.  Doc. 119 [Bento Decl.] ¶ 12.

*See* Doc. 105 at 5-6 (weighing discretionary factors in favor of discovery); *Huckaba v. CSX Transp., Inc.*, 2015 WL 11237032, at *1 (S.D. Ill. July 20, 2015) ("The court has sound discretion to determine whether the facts require vacating its earlier order.") (citing *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 795 (7th Cir.1980)); *Estate of Brown v. Arc Music Group*, 523 F.App'x. 407, 410 (7th Cir. 2013) (taking judicial notice of a settlement agreement in public records)[6]; *Rolon v. Henneman*, 389 F.Supp.2d 517, 519 (S. D. N. Y 2005) (court taking notice of the settlement to determine if claims are barred by the previous settlement);*Akzo Coatings, Inc. v. Aigner Corp.*, 909 F. Supp. 1154, 1159 (N.D. Ind. 1995) (whether to reconsider an order before the final judgment is "within the sound discretion of the district court."); *People for Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*, 2019 WL 3342087, at *4-5 (S.D. Ind. July 25, 2019) (exercising discretion to deny an order to show cause for sanctions where the defendants, represented by counsel, transferred the property in violation of the court's preservation order but stated they would abide by the court's order in the future; the court noted that "contempt is a serious remedy, often not imposed until a court has no other options."); *United States v. Int'l Bus. Machines Corp.*, 1975 WL 960, at *1 (S.D.N.Y. Oct. 3, 1975) ("the granting of an order to show cause is in the nature of an extraordinary remedy").).

Relatedly, the Court can also stay this action pending the outcome of the ICDR Arbitration, which will provide a definitive interpretation of the parties' Settlement Agreement.  (Doc. 115 [Windhorst's Opening Brief on Vacating/Stay Depo Order] at 11-12 (legal standard of motion to stay pending arbitration).)   That would provide the most efficient path to resolve this dispute,

---

[6]   The Settlement Agreement is a public record, as part of Track Group, Inc.'s SEC Form 8-k filing.  https://trackgrp.com/wpcontent/uploads/2022/06/TRCK-8K.pdf.

since an arbitral award ordering Mr. Sabag to dismiss this proceeding would resolve this action in toto, and an award to the contrary would narrow the issues before this Court.

> **3.** **The Court Has Inherent Authority To Vacate The Orders, And Mr. Windhorst Has Shown He Is Entitled To Relief Under Federal Rules of Civil Procedure 55 & 60(b)**

Mr. Windhorst is entitled to relief under Rules 55, 60(b), and/or the court's inherent authority to vacate its own orders.

At the outset, whether the Court proceeds under Rule 55 or Rule 60(b), the legal test is the same. *United States v. Di Mucci*, 879 F.2d 1488, 1495 (7th Cir. 1989) ("The test is the same for relief under either Rule 55(c) or Rule 60(b)"). And while there has technically been no entry of default or default judgment, the orders here effectively function as such. Indeed, Mr. Sabag's argument (Doc. 126 at 29-30) that Rule 60 is inapplicable because the Orders are not "final order[s]" is without merit. Courts still apply Rule 60 to non-final orders. *See, e.g.*, *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006) (analyzing the motion to reconsider a non-final order under Rule 60(b); *Yates v. Lifchitz*, 2012 U.S. Dist. LEXIS 121623, at *4 (S.D. Ill. Aug. 28, 2012) ("Motions in civil actions asking the district court to reconsider an order or set aside a judgment typically are analyzed under either Federal Rule of Civil Procedure 59(e) or Rule 60(b).").

In any event, Mr. Sabag cannot dispute that the court has inherent authority to reconsider its Orders. *See, e.g.*, *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 2017 WL 26861, at *1 (M.D. Fla. Jan. 3, 2017) ("As long as a district (or an appellate) court has jurisdiction over the case, then (in absence of prohibition by statute or rule), it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient."). This makes sense, particularly in the § 1782 context where the standard procedure for challenging a § 1782 application that has been granted by a court is to move to vacate the court's order granting the application, which is precisely what Mr. Windhorst has done here. Courts (including this Court in

this case) regularly vacate orders granting § 1782 discovery in such circumstances.  *See* Doc. 69 (vacating the order granting Mr. Sabag's initial § 1782 application); *La Comision Ejecutiva Hidroelecctrica Del Rio Lempa v. El Paso Corp.*, 617 F. Supp. 2d 481, 487 (S.D. Tex. 2008) (ordering that a motion to reconsider the court's decision to grant a § 1782 Application is "more properly termed a Fed.R.Civ. P. 60(b) motion for relief from a judgment or order); *In re Ex Parte Application of Eli Lilly & Co.*, 580 F. Supp. 3d 334, 342 (E.D. Va. Jan. 18, 2022), *aff'd*, 37 F.4th 160 (4th Cir. 2022) (vacating the order granting § 1782 application); *In re Alpene, Ltd.*, 2022 WL 15497008, at *4 (E.D.N.Y. Oct. 27, 2022) (same);  *In re Webuild S.P.A.*, 2022 WL 17807321, at *3 (S.D.N.Y. Dec. 19, 2022) (same).

Here, as described below, Mr. Windhorst has met the three-part test for relief under Rules 55 and 60(b).  Accordingly, the Court should vacate the Orders.

a.      Mr. Windhorst Has Shown Good Cause For His Delay

Mr. Windhorst has shown good cause for his delay in the form of excusable neglect, newly discovered evidence, release from the prior order, and other justifiable circumstances.

i.      Mr. Windhorst Has Shown Excusable Neglect

Mr. Windhorst has shown excusable neglect under FRCP 60(b)(1) based on his focus on addressing his liquidity problems in order to pay the settlement funds to Mr. Sabag rather than continuing to litigate a dispute the parties had agreed to resolve upon payment of the settlement funds.  Mr. Windhorst's liquidity problems are not fictional, as Mr. Sabag would have this Court believe – indeed, Mr. Sabag acknowledges Mr. Windhorst's prior counsel in this matter, Sidley Austin, withdrew because Mr. Windhorst could not pay them.  (Doc. 126 at 14.)

In over two pages of briefing on whether Mr. Windhorst has shown excusable neglect, it is telling Mr. Sabag not only makes no effort to distinguish Mr. Windhorst's cited cases, (Doc. 115

at 13-14; Doc. 116 at 12-13), but he only cites a single case, *Cato v. Thompson*, 118 F. Appx. 93 (7th Cir. 2004), to support his argument.  That case is readily distinguishable.  (Doc. 126 at 31.) In *Cato*, the party asserting excusable neglect, unlike Mr. Windhorst, was represented by counsel in the court's proceeding.  *Cato*, 118 F. Appx. at 94.  Moreover, the Seventh Circuit's reprimand of "outright and consistent disregard of the court's scheduling orders," was only directed to the attorneys, and not a pro se party.  *Id.* at 96-97 (holding the attorney's conduct failed to meet the standard for excusable neglect for his disregard of the court's scheduling order); *Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004) (noting that the conduct by the attorney is the "type of" disregard of a court's scheduling orders that failed to justify relief).

Moreover, contrary to Mr. Sabag's baseless assertion (Doc. 126 at 33), Mr. Windhorst has provided sworn evidence showing he believed Mr. Sabag intended to comply with the settlement agreement.  For one thing, from July 2022 to the date that Mr. Sabag submitted his opposition to Mr. Sabag's motion to Vacate and/or Stay, the word "termination" never appeared in the parties' correspondence, submissions to the arbitrators, or awards/correspondence from the arbitrator. Neither did Mr. Sabag otherwise inform Mr. Windhorst that he would not perform his obligation under the Settlement Agreement.  *See* Windhorst Decl. ¶¶ 7-11, 14-17 and the exhibits attached therein; *infra*, § II.6.[7]

If anything, Mr. Sabag's Opposition supports Mr. Windhorst's arguments that he has established excusable neglect.  Mr. Sabag readily admits Mr. Windhorst was *pro se* in this 1782

---

[7] Mr. Sabag's reliance on Mr. Windhorst 's BVI counsel's correspondence with Mr. Sabag's BVI counsel is not to the contrary.  Doc. 126 at 33 (citing Doc. 127-9).  At the outset, Mr. Sabag's BVI counsel neither told Mr. Windhorst' BVI counsel that Mr. Sabag will not dismiss this 1782 Action nor that Mr. Sabag had believed the Settlement Agreement was void.  Moreover, Mr. Sabag's BVI counsel, like Mr. Sabag, has been focused on obtaining payment, so Mr. Windhorst thought Mr. Sabag was only willing to comply with his obligation upon receiving the payment.  Doc. 118 ¶¶13, 15-16.  Therefore, after resolving the liquidity and administrative issues and making the payment, Mr. Sabag promptly hired Quinn Emanuel to ask Mr. Sabag perform his obligation.  Doc. 119 [Bento Decl.] ¶¶ 3-7.

Action since mid-October 2022, and that Mr. Windhorst's prior counsel withdrew due to Mr. Windhorst's liquidity problems.  (Doc. 126 at 14.)  Moreover, Mr. Sabag's reliance on the Financial Times article undermines his assertion that Mr. Windhorst's Euram bank transfers were fraudulent, as the article states the resolution of Mr. Windhorst's delayed Euram banks transfers involved the complainant issuing an apology to the bank.  (McCready Decl. Ex.1 at 2 )

> ii.  Newly Discovered Evidence Warrants Vacating the Deposition Order

Mr. Windhorst has shown new evidence under Rule 60(b)(2) warrants vacating the Deposition Order.  Prior to Mr. Sabag filing his Supplementary Request, he and Mr. Windhorst executed the Settlement Agreement, which as discussed in Mr. Windhorst's opening briefs (Doc. 115 at 5; Doc. 116 at 5-6) and below (*infra*, § II.6), required (1) Mr. Windhorst to pay Mr. Sabag, and (2) Mr. Sabag to release and dismiss, *inter alia*, this 1782 Action within 5 business days of receiving the payment.  It is undisputed that at the time the Court granted Mr. Sabag's Supplementary Request Mr. Windhorst had not paid the settlement funds.  (Doc. 126 at 34 (acknowledging that "this Court granted the Supplementary Request on December 15, 2022," and that Mr. Windhorst made the payment "on February 8, 2023").)  Because Mr. Sabag elected to affirm the Settlement Agreement rather than revive his claims in the underlying arbitration against Mr. Windhorst, Mr. Windhorst's payment of the settlement funds after the date of the Deposition Order resulted in Mr. Sabag being obligated to dismiss this 1782 Action, which is directly relevant to the Court's assessment of whether Mr. Sabag can show his requested discovery satisfies § 1782's statutory and discretionary requirements.

Mr. Sabag cites a five-part test for relief under Rule 60(b)(2), (Doc. 126 at 34), but only argues Mr. Windhorst has failed to meet a single factor: the evidence must be newly discovered since the trial.  That, of course, is incorrect.  As stated above, Mr. Windhorst paid Mr. Sabag after

the date the Court entered Deposition Order.  Tellingly, Mr. Sabag does not cite any authority to support his contention that "Mr. Windhorst cannot assert that his payment of the Final Award ordered in the Arbitration was 'newly discovered,' as it was newly created by Mr. Windhorst." (Doc. 126 at 34.)  That payment was for Mr. Sabag's own benefit – indeed, he agreed to receive the funds.  (Doc. 126 at 18-19.)  Moreover, the Seventh Circuit has recognized that newly discovered evidence can be considered in a motion to vacate or modify, even if that evidence was created by the parties' own conduct.  *See Elzinga & Volkers, Inc. v. LSSC Corp.*, 47 F.3d 879, 822-23 (7th Cir. 1995) (holding district court should have considered, on Rule 60 motion, newly created contract between parties). Accordingly, relief under Rule 60(b)(2) is appropriate.

iii.        Mr. Sabag Released this 1782 Action

Mr. Windhorst has also shown he is entitled to relief under Rule 60(b)(5) because Mr. Sabag released this 1782 Action.  Mr. Sabag's argument to the contrary (Doc. 126 at 34-35) cites no legal authority.  Mr. Sabag's argument that he terminated the Settlement Agreement fails for the reasons set forth below.  *Infra*, § II.6.  Therefore, Mr. Sabag has released Mr. Windhorst of any liability in this 1782 Action pursuant to the Settlement Agreement.

iv.        Mr. Windhorst Is Entitled To Relief Under Rule 60(b)(6)

As explained in Mr. Windhorst's Motions to Vacate and/or Stay (Doc. 115 at 16-17; Doc. 116 at 14-16) and as noted above, (*supra*, §§ II.1.a.i&ii), the totality of the circumstances here warrants vacatur under Rule 60(b)(6) and/or based on the court's inherent authority.  Those circumstances include: the presence of the Settlement Agreement, Mr. Sabag's affirmation of it, Mr. Windhorst's liquidity problems, Mr. Sabag filing a new discovery request (which seeks to compel Mr. Windhorst to violate his privileges, no less) in a closed case and changing the target from a third party to Mr. Windhorst himself (and therefore transmute Mr. Windhorst, as a mere

13

intervenor, into a respondent), and the resulting harm on Mr. Windhorst.  Unlike Mr. Sabag, Mr. Windhorst has provided several authorities in his Motions to Vacate and/or Stay supporting his argument that these circumstances are sufficient to warrant find Rule 60(b) relief.  *Compare* Doc. 115 at 16-17 and Doc. 116 at 14-16, *with* Doc. 126 at 35-36.  Mr. Sabag's refusal to dismiss this 1782 Action, in connection with the rest of his conduct in affirming the Settlement Agreement, renders the circumstances here particularly suitable for Rule 60(b) relief.

Accordingly, Mr. Windhorst has shown good cause for his delay.

b.     Windhorst Took Quick Action To Correct The Delay

Next, Mr. Windhorst has taken quick action to correct his delays in responding to Mr. Sabag's Supplementary Request (Doc. 98) and his Motion for Order to Show Cause (Doc. 107). Mr. Windhorst explains the quick action he took in his respective Motions to Vacate and/or Stay (Doc. 115 at 17; Doc. 116 at 16).  Indeed, Mr. Windhorst promptly filed his Motions to Stay and/or Vacate merely three weeks after the date on which Mr. Sabag should have dismissed this 1782 Action.  Courts have found quick action in response to longer delays than those at issue here.  *See* Doc. 115 at 17-19 (citing cases); Doc. 116 at 16-18 (citing cases); *see also Sims v. EGA Prods., Inc.*, 475 F.3d 865 (7th Cir. 2007) (five months after the deadline constitutes "quick action"); *Colvin v. Nannenga*, 2010 WL 3001947, at *1 (N.D. Ind. July 26, 2010) (two-month delay qualifies as "quick action," especially when the defendant at first thought the issue had been solved, and when he realized that the issues hadn't been resolved, he retained an attorney quickly, and the attorney filed the motion as soon as he could gather the necessary facts).

Tellingly, Mr. Sabag has made no arguments to the effect that Mr. Windhorst's actions were not "quick" or that Mr. Sabag has been prejudiced by Mr. Windhorst's delay.  *See* Doc. 126 at 31-36.  That is because Mr. Sabag has not been prejudiced at all.  Indeed, he has been paid in

full, including interest and other fees. *Infra*, § II.6. As such, Mr. Sabag is effectively in the same position as if he had received the full settlement payment on August 1, 2022. Having reaped the full benefits under the Settlement Agreement, Mr. Sabag has suffered no prejudice, especially in light of his obligation under the Settlement Agreement to dismiss the proceeding.

c.   <u>Mr. Windhorst Has A Meritorious Defense</u>

Finally, Mr. Windhorst has a meritorious defense with respect to both Mr. Sabag's Supplementary Request and Mr. Sabag's Motion for Order to Show Cause. In light of Mr. Windhorst's arguments set forth in his opening briefs (Doc. 115 at 20-21; Doc. 116 at 18-20) and his Proposed Opposition to Mr. Sabag's Supplementary Request (Doc. 115-2), it is no surprise that Mr. Sabag's opposition completely ignores this portion of the Rule 55 / 60(b) test. *See* Doc. 126 at 31-36.

With respect to the Deposition Order, Mr. Windhorst has explained why Mr. Sabag's Supplementary Request has not satisfied the statutory requirements under § 1782 and why the discretionary factors weigh against Mr. Sabag's Supplementary Request. *See* Doc. 115 at 20-21 (citing Doc. 115-2 at § IV.). Mr. Windhorst has more than met his burden to show a meritorious defense to Mr. Sabag's Supplementary Request.

With respect to the OSC Order, Mr. Windhorst has also provided ample legal and factual support as to why the OSC Order should not have been issued. (Doc. 116 at 18-20.) Specifically, Mr. Sabag has suffered no prejudice as a result of Mr. Windhorst's delay beyond briefing the OSC Motion and paying for a court reporter,[8] and there is zero likelihood of disrupting a trial because there is no trial in a § 1782 proceeding. *Id.* Finally, Mr. Windhorst has acted in good faith and

---

[8]   In any event, Mr. Windhorst has offered to reimburse Mr. Sabag for those expenses. Doc. 119 ¶ 8.

has aimed to avoid expending further judicial resources in connection with this 1782 Action that should by now have been dismissed.  As such, Mr. Windhorst has also met his burden to show a meritorious defense to Mr. Sabag's Motion for Order to Show Cause.

### 4.     The ICDR's Closing of the Predecessor Arbitration and Does Not Impact the Arbitrator's Jurisdiction over Mr. Windhorst's Breach of the Settlement Agreement Claim

Mr. Sabag argues that by agreeing to submit the arbitration to ICDR under the same case number as the original ICDR arbitration, Mr. Windhorst forfeited all rights after the final award is issued under this case number. (Doc. 126 at 28.)   That is simply not true.

Courts are clear: where an arbitration agreement demonstrates the parties' clear intent to arbitration, its validity will not be affected by the unavailability of the parties' logistic choices. *Carr v. Gateway, Inc.*, 944 N.E.2d 327, 333 (Ill. 2011) (upholding the arbitration agreement even if the designated arbitral forum fails, where "the designation of an arbitral forum is only an ancillary, logistical concern and the primary consideration is the intent to arbitrate disputes"); *Khan v. Dell, Inc.*, 669 F.3d 350, 354 (3d Cir. 2012) (upholding the arbitration agreement despite unavailability of parties' chosen arbitral institution, unless parties "have unambiguously expressed their intent not to arbitrate their disputes in the event that the designated arbitral forum is unavailable"); *see also Travelport Global Distrib. Sys. BV v. Bellview Airlines Ltd*, 2012 WL 3925856, at *5 (S.D.N.Y.) (upholding the agreement with a non-existent forum).  Here, the language of the arbitration agreement makes it clear the parties have intended to arbitrate any disputes regarding the breach of the Settlement Agreement before the ICDR, particularly when the reference to ICDR itself is sufficient to confer ICDR full administrative authority, according to the ICDR Rules.  ICDR Procedures (2021) at § 1.2 ("when [the parties] provide for arbitration of an international dispute by the ICDR or the AAA without designating particular rules, they thereby

16

authorize the ICDR to administer the arbitration.");[9] *see also* ICDR Procedures (2014) (same).[10] As noted above, (*supra*, § I at 4), the reference to the case number of the parties' existing arbitration is clearly for logistical concerns such as efficiency and cost.[11]  To the extent Mr. Sabag dispute the intent of the arbitration clause, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), and that dispute should be submitted to the arbitrator.  *See* Doc. 115 at 25-26 (collecting cases); *Yellow Cab Affiliation, Inc. v. New Hampshire Ins.* Co., 2011 WL 307617, at *7, n.11 (N.D. Ill. Jan. 28, 2011) ("Even in cases where the parties have not specifically empowered the arbitrator to determine his own jurisdiction, courts have left questions of whether an agreement to arbitrate has expired or terminated for the arbitrator to determine.").

Moreover, Mr. Sabag's interpretation, which assumes the parties contemplated at the time of contracting that the Settlement Agreement's arbitration clause would become obsolete upon a final award, (Doc. 126 at 28), crumbles when the Settlement Agreement's arbitration clause is read in light of the entire Settlement Agreement.  *Molina v. Harvard Maint.*, 2021 WL 5281098, at *2 (S.D.N.Y. Nov. 11, 2021) (when determining parties' intent to arbitrate and interpreting the

---

[9]

https://www.icdr.org/sites/default/files/document_repository/ICDR_Rules_1.pdf?utm_source=icdr-website&utm_medium=rules-page&utm_campaign=rules-intl-update-1mar.

[10]

https://www.icdr.org/sites/default/files/document_repository/ICDR_Rules.pdf?utm_source=icdr-website&utm_medium=rules-page&utm_campaign=rules-intl.

[11]  Mr. Sabag incorrectly interprets *Menorah Home v. Local 144*, to argue the court "rejected the AAA arbitration when a party ignored an agreement to make any new filings under the same AAA case number."  Doc. 126 at 8 (citing 573 F. Supp. 908 (E.D.N.Y. 1983), *aff'd sub. nom.* 751 F.2d 370 (2d Cir. 1984)).  In *Menorah Home*, the court rejected the AAA arbitration only because the court found that the parties had not entered into a valid arbitration agreement regarding the disputes at issue, where the parties merely agreed they *may* submit disputes to arbitration.  *Menorah Home,* 573 F. Supp. at 912.  Here, in contrast, the broad arbitration clauses is not optional – it applies to, *inter alia*, disputes related to breaches of the Settlement Agreement.  Doc. 118-1 at ¶ 13.

arbitration agreement in a contract under New York law, "a reading of the contract should not render any portion meaningless," and "the contract should be read as a whole, with every part interpreted with reference to the whole.") (citing *Wilson v. PBM, LLC*, 140 N.Y.S.3d 276, 283 (N.Y. App. Div. 2021)).  At the outset, if the parties intended to limit arbitrability to only disputes or issues arising before entry of a final award, they could have said just that.[12]  Moreover, as discussed below, (*infra*, § II.5), the Settlement Agreement imposes ongoing obligations on both parties that persist beyond the entry of a final award.  It would make little sense for the parties to a global settlement agreement imposing ongoing mutual obligations to draft an arbitration clause broadly covering disputes and issues related to the Agreement yet to limit that clause to an undetermined period.

Mr. Sabag's position as to the effect of the prior ICDR arbitration being "closed" is quite similar to an argument rejected by the District Court of the District of Columbia addressing a substantially similar issue regarding the AAA's authority to reopen a closed case:

> Petitioners assert that the AAA manifestly disregarded the law by reopening the arbitration after it had been terminated. The Crux of this claim is that after the AAA terminated the arbitration, there was no AAA Rule permitting the AAA to reopen the arbitration. . . .

> Petitioners' claim fails, as Respondent correctly asserts, because while there may be no AAA Rule that permits the reopening of a terminated arbitration, the record contains no indication that there is an AAA Rule that forbids the AAA from taking that action. Given that there is no AAA Rule forbidding the reopening of a terminated proceeding, and no other viable legal doctrine has been presented that precludes the AAA from taking that action—let alone one that was acknowledged by the AAA or the arbitrators—the Court cannot conclude that "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether" by reopening the arbitration, or that the law ignored by the arbitrators was well

---

[12]   In contrast, the arbitration agreement only provides that the parties shall submit the dispute under case number 01-20-0003-693, and did not impose any limitations on ICDR's administrative authority or jurisdiction. Doc. 118-1 ¶ 13. Indeed, as set forth in Article 1.2 of the ICDR Rules, "when [the parties] provide for arbitration of an international dispute by the ICDR or the AAA without designating particular rules, they thereby authorize the ICDR to administer the arbitration."

defined, explicit, and clearly applicable to the case. <u>That the AAA initially thought they should not reopen the arbitration but ultimately decided to do so does not change this analysis.</u>

*Ray v. Chafetz*, 236 F. Supp. 3d 66, 79-80 (D.D.C. 2017) (emphasis added) (internal citations and quotations omitted); *see also Finn v. Anderson*, 2013 WL 12085092, at *4 (S.D.N.Y. Sept. 6, 2013), *aff'd*, 592 F. App'x 16 (2d Cir. 2014) (observing that closed arbitration was reinstated at one party's urging); *Lonon v. J.G. Wentworth Co.*, 2018 WL 5316349, at *3 (E.D. Pa. Oct. 26, 2018) (noting AAA administratively closed the matter without prejudice due to party's failure to pay arbitration fees).

Here, as no ICDR rule forbids reopening closed cases, it remains entirely possible that the arbitrator and/or the ICDR will reopen the prior case or assign the same case number once jurisdictional objections are resolved. And even if the ICDR elects not to reopen the prior arbitration or assign the same case number,[13] that does not stand in the way of the ICDR's jurisdiction because, as explained above, the reference to the case number of the parties' existing arbitration is clearly for logistics concerns such as efficiency and cost. The fact that Mr. Sabag is seeking discovery here via a closed case but yet seeks to invoke the closure of the arbitration to avoid arbitration is not lost on Mr. Windhorst.

**5.     The Final Award Does Not Bar Mr. Windhorst's New Breach of Contract Claim**

Throughout his Opposition, Mr. Sabag asserts the Final Award in the predecessor arbitration (Windhorst Decl. Ex. 12, Doc. 118-12) precludes Mr. Windhorst's current breach of contract claim. Neither the Final Award nor the law supports this view.

---

[13]     Mr. Sabag has stated in the ICDR Arbitration that he opposes the reappointment of the prior arbitrator based on, *inter alia*, conflict of interest grounds.

At the outset, Mr. Sabag misrepresents the plain language of the Final Award.  The final

paragraph of the Final Award says "[a]ny and all other claims and counterclaims arising out of this

arbitration are dismissed."  (Doc. 118-12 at ¶12(e) (emphasis added).)  This does not mean, as Mr.

Sabag claims, (Doc. 126 at 23), the ICDR arbitrator "dismissed all claims and counter claims

arising out of the Settlement Agreements."  Nowhere is that language found in the award.  In any

event, a dismissal of a claim, without an adjudication on the merits, is not the same as the

evisceration or invalidation of a right, let alone of an entire agreement.  *See Gustavia Home LLC*

*v. VVS1 Corp.*, 2019 WL 2527291, at *4 (E.D.N.Y. June 19, 2019), *aff'd*,  805 F.App'x. 82 (2d.

Cir. 2020) (dismissal does not equate to a "valid and conclusive adjudication of the parties'

substantive rights").  Thus, the prior arbitrator did not eviscerate Mr. Windhorst's rights under the

Settlement Agreement by including a boilerplate dismissal of claims and counterclaims at the end

of the Final Award

At a fundamental level, Mr. Sabag's argument fails because he ignores a simple yet crucial

fact:  Mr. Windhorst did not have a cause of action for breach of the Settlement Agreement at the

time the Final Award was made because Mr. Windhorst had not triggered Mr. Sabag's obligation

to dismiss this proceeding.  At that time, Mr. Windhorst had not paid the settlement funds.  There

is no dispute the Final Award was issued before Mr. Windhorst paid Mr. Sabag, (Doc. 126 at 16-

18), and there is no dispute Mr. Sabag's obligation to dismiss this 1782 Action only arose after

Mr. Windhorst effectuated payment.  (Doc. 118-1 at ¶ 5).  Thus, Mr. Windhorst's claim was not

before the prior arbitrator and not dismissed.

Tellingly, Mr. Sabag doesn't cite any authority for the proposition that an arbitrator

dismissing all claims and counterclaims before him at the time of the award precludes a party from

initiating a new arbitration under the same agreement that includes an arbitration clause.  Indeed,

Mr. Sabag's position contravenes the well-established *res judicata* doctrine which provides the preclusive effect of an arbitral award can only bar subsequent claims that "were, or could have been raised" in the prior proceeding, *Bancol y. Cia. S. en C. v. Bancolombia*, 280 F. App'x 85, 86 (2d Cir. 2008) (an international arbitration award bars claims in subsequent actions only when those claims "were, or could have been, raised in the prior action."), and does not bar later "claims which did not even then exist." *Marvel Characters v. Simon*, *Inc.* 310 F.3d 280, 286-87 (2d Cir. 2002) (no preclusive effect when the contractual rights at issue did not exist at the first action); *see also Collins v. Experian Credit Reporting Serv.*, 2004 WL 3078825, at *2 (D. Conn. Dec. 22, 2004) (the dismissal in the prior action does not preclude claims related to "any new breach" of the settlement agreement); *Reynolds v. U.S. Dep't of Just.*, 10 F. Supp. 3d 134, 144, n.4 (D.D.C. 2014) (refusing to dismiss Count Eight because "Count Eight alleges that [the party] breached the settlement agreement…. Because the alleged breach occurred after the prior suit, … was dismissed, it could not have been litigated in that case and is not barred by res judicata.").

To try to circumvent the *res judicata* doctrine, Mr. Sabag offers bald statements that "the parties explicitly agreed that the final award in the ICDR Arbitration would be 'Final,'" and that "when all of the parties agreed that any disputes over the Settlement Agreements must be filed under the same ICDR case number, they all presumed that all performance and counter-performance needed to occur in advance of any awards from the ICDR arbitrator." (Doc. 126. at 28.) Mr. Sabag did not provide (because he cannot) any evidence of how Mr. Windhorst has "explicitly" agreed, let alone "presumed," that "all performance and counter-performance needed to occur in advance of any awards from the ICDR arbitrator." The Settlement Agreement on its face refutes Mr. Sabag's position, as it contains numerous provisions beyond Mr. Windhorst's obligation to make a payment. Indeed, many of these provisions, for example, the non-

disparagement clause and the covenant not to pursue legal or equitable claims, (Doc. 118-1 at ¶ 8), impose ongoing obligations on both parties that are readily encompassed by the broad arbitration clause applying to "<u>any issue or dispute relating to</u> the creation, execution, interpretation, performance, or breach of [the Settlement] Agreement." (*Id.* at ¶ 13.) Under Mr. Sabag's interpretation, if, hypothetically Mr. Windhorst disparages Mr. Sabag tomorrow, Mr. Sabag could not arbitrate that breach of the non-disparagement clause against Mr. Windhorst even though he had no reason to know Mr. Windhorst would disparage him after the prior arbitrator issued the Final Award.  There is simply no reason why the ordinary scope of *res judicata* should be superseded by Mr. Sabag's say-so.[14]

By the same token, Mr. Windhorst is not trying to have the ICDR relitigate the issue previously before the ICDR, or otherwise affecting the finality of the Final Award, no matter how many times Mr. Sabag repeated that in his Opposition.  *See, e.g.*, Doc. 126 at 16; *id.* at 23, footnote 23 (string citing cases where the claims existed before the issuance of a final award).[15]  Mr. Windhorst did not attempt to vacate the Final Award, because Mr. Windhorst does not deny that he was under an obligation to pay Mr. Sabag by August 1, 2022 (and, by paying the interest, to make sure Mr. Sabag was enjoying the benefits of the payment as if he had received it on August 1, 2022), and that Mr. Sabag's obligation to dismiss the 1782 Action came after Mr. Windhorst made the payment, according to the terms of the agreement.  Mr. Windhorst merely seeks to have the arbitrator resolve these <u>subsequent</u> developments related to the Settlement Agreement.

---

[14]   It is well established that "[p]rocedural issues, including . . . the res judicata effect of a prior arbitration award . . . are for the arbitrator, so long as the subject matter of the dispute is within the arbitration clause." *Chicago Typographical Union No. 16 v. Chicago Sun Times*, 860 F.2d 1420, 1424 (7th Cir. 1988).

[15]   Mr. Sabag's cited cases actually support Mr. Windhorst's position: *Ganton Techs. v. Int'l Union, United Auto, Aerospace & Agric. Implement Workers of Am., U.A.W., Loc.*, 358 F.3d 459, 462 (7th Cir. 2004), which is cited in Doc. 126 at 23, provides that the "failure to pose an *available* argument to the arbitrator waives that argument." (emphasis added).

Similarly, Mr. Sabag's reliance on the doctrine of *functus officio* is misplaced. "The doctrine of *functus officio* does not bar submission of any claim or issue to a second arbitration if that claim or issue has not been decided previously by the arbitrators." *New York Hotel and Motel Trades Councilv. Hotel St. George*, 988 F. Supp. 770, 781-82 (S.D.N.Y. 1997) (holding that "[t]he doctrine of *functus officio* does not apply here because the [] Award is neither a reconsideration of, nor an amendment to, the first award," and that the second complaint is "separate and distinct from the one that resulted in" the first award). Thus, and for the same reason that the Final Award does not extinguish Mr. Windhorst's rights under the Settlement Agreement (i.e., Mr. Windhorst' breach of contract claim was not decided by the predecessor arbitrator), *functus officio* does not apply here. *See Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC, Loc. 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 846 (7th Cir. 1995) (Posner, J.) (The *functus officio* doctrine "originated in the bad old days when judges were hostile to arbitration and ingenious in hamstringing it....Today, riddled with exceptions, it is hanging on by its fingernails.").

In sum, the Final Award does not preclude the ICDR from adjudicating Mr. Windhorst's claim that Mr. Sabag has breached the Settlement Agreement.

**6.      Despite Mr. Windhorst's prior breach, the Settlement Agreement remains valid because Mr. Sabag elected to affirm the validity of it**

As Mr. Sabag acknowledges (Doc. 126 at 22), under New York law, a party's breach does not automatically discharge the non-breaching party the obligation under the contract. *See Parlux Fragrances, LLC v. S. Carter Enters.*, LLC, 204 A.D.3d 72, 86 (N.Y. App. Div. 2022) ("a party, upon learning of a material breach of a contract, must choose between terminating the contract and continuing performance.") Rather, the non-breaching party has to elect his remedy: either to continue or terminate the contract. *Id.*; Doc. 126 at 21-22 (citing *ESPN, Inc. v. Office of Comm'r*

*of Baseball*, 76 F. Supp. 2d 383, 387 (S.D.N.Y. 1999)).)   Under this doctrine, the party must "make an election and cannot at the same time treat the contract as broken and subsisting." *ESPN*, 76 F. Supp. 2d at 388.  In other words, "one may not both affirm and disaffirm a contract . . . or take a benefit under an instrument and repudiate it." *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 238 (S.D.N.Y. 2006).

*Sofi Classic S.A.* is particular instructive, as the court held that a party needs to honor its obligation under the settlement agreement when that party "elected to affirm the continued validity of the Settlement Agreement" by bringing an action for breach of the Settlement Agreement against the [the opposing party], obtaining a judgment, and seeking to enforce that judgment against the [opposing party].  *Id.* at 238 ("because by doing so, that party "have 'gained an advantage' through this course of action, in that they hold judgments against the [opposing party].").

Here, as described in further detail below (*infra*, § II.6.b) and in Mr. Windhorst's arbitration filings (Doc. 123-5; Doc. 123-6), Mr. Sabag chose to affirm the Settlement Agreement so he could receive the full benefit thereof.  Indeed, he does not dispute that he has received the full $ 2,8500,000 owed under the Settlement Agreement <u>plus</u> interest to compensate for the delay <u>plus</u> legal fees to compensate for the "headache"[16] in having to seek a summary award.  (Doc. 126 at 18-19.)  But the consequence of doing so – as opposed to terminating the Settlement Agreement to pursue his underlying Put Option Agreement and SPA claims – is that Mr. Sabag must also perform his obligations under the Settlement Agreement.  *City of New York v. New York Pizzeria Delicatessen*, 2006 WL 2850237, at * 7 (S.D.N.Y. Sep. 29, 2006) ("When the non-breaching party elects to continue the contract, 'it is not freed from its obligations under the contract, despite the

---

[16]   Doc. 126 at 27.

[other] party's breach.'") (citing *ESPN*, 76 F. Supp. 2d at 397-98); *Lemus v. Manhattan Car Wash, Inc.*, 2010 WL 4968182, at *10, (S.D.N.Y. Nov. 24, 2010) ("[P]laintiff's motion to enforce the settlement agreement presumes that the agreement will remain in effect; it will therefore bind him according to its terms, requiring him to release defendants from his prior claims upon payment of the settlement sum.")

In his Opposition, Mr. Sabag, for the first time since the Final Award, claims that he had "chose[n] to terminate the Settlement Agreements by filing a motion for immediate entry of summary award with the arbitrator to enforce the liquidated damages provision of the Settlement Agreement." (Doc. 126 at 9.) Mr. Sabag's claims that (1) the Settlement Agreement contains a liquidated damages provision, and (2) the Settlement Agreement has been terminated are without merit.

> a.   The Settlement Agreement and its Amendment does not contain a Liquidated Damages clause

A core premise of Mr. Sabag's argument is that the Settlement Agreement and its Amendment allowed him to seek liquidated damages. This assertion is contradicted by the plain language of the agreement and by black-letter law.

> (i)   No requisite "express agreement" of a liquidated damage clause can be found in the Settlement Agreement or its Amendment

The parties' Settlement Agreement does not contain a liquidated damages clause. Under New York law, "a liquidated damage clause must be the result of an express agreement between the parties; courts will not read such a clause into a contract by implication." *Raymond Weil., S.A. v. Theron*, 585 F. Supp. 2d 473, 489 (S.D.N.Y. 2008) (quoting *Ohanian v. Avis Rent A Car Sys.*, 779 F.2d 101, 109 (2d Cir. 1985)). Where a clause calls the payment of a "fixed sum," it is not a liquidated damage clause if courts find "it is anything but clear from the record" that the parties

"intended the [payment] to constitute as damages." *Ohanian*, 779 F.2d at 119-110.  Also, if "there is no express language in the contract that designates the [provision in dispute] as a liquidated damages clause," and the [provision in dispute] "appears to constitute [the party]'s contemplated consideration under the contract," then such a provision is not a liquidated damages clause.  *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co. of Chicago*, 889 F. Supp. 121, 123 (S.D.N.Y. 1995).  Moreover, "[w]hen the [non-breaching party's] actual loss is easily ascertainable, then [a] liquidated damages clause will be treated as a penalty and thereby unenforceable." *Harrington v. Hasan*, 743 N.Y.S.2d 684, 688 (N.Y. Civ. Ct. 2002) (awarding actual damages instead of applying liquidated damages clause because the plaintiff's damages were ascertainable).

Mr. Sabag now asserts that Section 3 of the Amendment to the Settlement Agreement is a liquidated damages clause.  (Doc. 126 at 21.)  Section 3, which Mr. Sabag neglects to mention is titled "Reservation of Rights," reads as:

> Sabag reserves all rights and remedies available to him in the event the required payment is not made by the extended due date including, but not limited to, the right to seek interest on the amount owed, reasonable attorneys' fees, and the right to seek an immediate summary international arbitration award fully enforceable pursuant to the Inter-American and New York Conventions.  Windhorst shall not contest whether the payment called for by the Settlement Agreement is due and owing.  Windhorst reserves the right to contest the reasonableness of any attorneys' fees or interest sought.

Doc. 118-3 at § 3 (emphasis added).

This provision of the Settlement Agreement Amendment is not a liquidated damages clause because there is no indication in Section 3 of the Settlement Agreement Amendment, the remainder of the Amended Settlement Agreement, and the parties' correspondence evidence the parties' intent for the "Reservations of Rights" section to function as a "liquidated damages clause."  The terms "liquidated damages" and "termination" appear ***nowhere*** in any of the parties' agreements,

26

correspondence, or submissions to the arbitrator.  Rather, the $2.85 million settlement amount stated in Section 2 of the Settlement Agreement Amendment reflects the parties' agreed upon consideration to resolve Mr. Sabag's various claims against Mr. Windhorst.  Doc. 118-3 at § 2. Moreover, the "Reservation of Rights" section is just that: it reserves and emphasizes the rights that the Settlement Agreement has already conferred to Mr. Sabag, which is to enforce Mr. Windhorst's substantive obligations under the Settlement Agreement.  *Id.* at § 3.  This "reservation of rights" does not confer Mr. Sabag any new rights (such as rights to liquidated damages) beyond allowing him to resort to a summary award process.  *See id.*

Section 4 of the Settlement Agreement Amendment highlights the flaw in Mr. Sabag's position.  That section provides that "except as specifically set forth above, all terms and conditions of the Settlement Agreement remain in full force and effect, and the Amendment is intended solely to provide Windhorst additional time in which to pay Sabag."  (Doc. 118-3) at § 4 (emphasis added).)[17]  Since the Original Settlement Agreement itself does not have a liquidated damage clause, any effort to interpret the Settlement Agreement Amendment as subjecting Mr. Windhorst to the additional liability of liquidated damages would contravene the explicit language of Section 4 of the Settlement Agreement Amendment.  *See Emcee Personnel v. Morgan Lewis Bockius, LLP*, 702 N.Y.S. 2d 633, 634 (N.Y. App. Div.  2000) (holding a court should interpret a contract to give effect to the parties' intentions, as expressed in the language of the contract, and, in interpreting a contract, a court may not add or delete terms).

---

[17]   This clause also explicitly refutes Mr. Sabag's repeated misrepresentation that "The Amended Settlement Agreement specifically modified the Original Settlement Agreement such that Mr. Windhorst affirmatively would lose all of his rights under the Settlement Agreements if he did not make a prompt payment."  Doc. 126 at 21.

Moreover, the fact that Mr. Sabag could seek a summary award for the exact amount the parties' determined to be Mr. Sabag's actual damages is further evidence that the Settlement Agreement does not contain a liquidated damages clause. "The case law is clear that a liquidated damages clause will be upheld when the amount liquidated bears a reasonable proportion to the probable loss *and the amount of actual loss is incapable or difficult of precise estimation*." *Harrington*, 743 N.Y.S.2d at 687 (N.Y. Civ. Ct. 2002) (emphasis in original) (citation omitted). As Mr. Sabag's actual loss was the settlement amount, which was obvious from the face of the agreement,, there is simply no basis for a liquidated damages clause. *See id.*

Accordingly, Settlement Agreement does not have a liquidated damage clause.

(ii)    <u>The Arbitrator Did Not Interpret Mr. Sabag's Motion to Enforce as a Motion to Terminate for Liquidated Damages</u>

The prior arbitrator's awards clearly show the arbitrator did not consider Mr. Sabag's Motion to Enforce as a termination of the Settlement Agreement. Rather, the Settlement Enforcement Award was clearly issued based on the continued validity of the Settlement Agreement. In the Settlement Enforcement Award, (Doc. 118-11) ¶¶ 5-6), the arbitrator, in reaching his decision, did not even mention Section 3 of the Amendment to Settlement Agreement (i.e., the section with the clause Mr. Sabag claims to be a "liquidated damages clause"). Likewise, in the arbitrator's "Analysis" section, the arbitrator merely finds Mr. Windhorst to have breached the Settlement Agreement without any inquiry into Mr. Sabag's injury or any other legal requirements related to assessing damages after finding of a breach. *Id.* at ¶¶ 11-14. There is simply no indication whatsoever the prior arbitrator intended to award liquidated damages.

Moreover, Mr. Sabag's own evidence confirms that the prior arbitrator's understanding was that the Settlement Agreement would survive the arbitration. Mr. Sabag cites a preliminary ruling from the prior arbitrator showing the arbitrator "grant[ed] Claimant [Mr. Sabag]'s motion

28

to issue an Award *incorporating the terms of the settlement* between Claimant and the Respondents Sapinda Asia Limited ("Sapinda") and Lars Windhorst that had previously been agreed, but not completed."  Doc. 127-7.  This makes clear the prior arbitrator did not view Mr. Sabag's motion to enforce as terminating the Settlement Agreement, but rather to incorporate and preserve the terms of the settlement within the award.  *See Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 633 F. Supp. 2d 109, 115 (S.D.N.Y. 2009) (finding that the arbitral award does not extinguish the arbitral clause because the award incorporates the Settlement Agreement and "specifically references the arbitration clause.")

(iii)   <u>Mr. Sabag's Sole Authority is Distinguishable</u>

Mr. Sabag's argument rest entirely on *NAS Electronics.*[18] (Doc. 126 at 24.)  However, that case is readily distinguishable.  For starters, *NAS Electronics* did not deal with a "summary international arbitration award", which in addition to being an undefined term in both the agreement and under the ICDR Rules, does not readily appear elsewhere in the arbitration literature.  The language of the contended clause in *NAS Electronics* was clear and unambiguous in setting forth a payment of "fixed amount" that was independent from the parties' substantive obligations in the Settlement Agreement, including the settlement consideration. It provided that in the event of default, "plaintiff may … enter Judgment against defendants … in the principal amount of US $3,200,000.00. … The only issues the Court may consider in connection with Plaintiffs' motion to reopen the case and for entry of Judgment is whether (i) the required payment has been made …."*NAS Electronics*, 262 F. Supp. 2d at 146; *Transtech Electronics Pte Ltd. v. NAS Electronis, Inc.*, 2000 WL 381428, at *1 (S.D.N.Y. April 13, 2000) (the opinion of the judgment entered against the defendants in the amount of $ 3,200,000).  The amount in this clause

---

[18]  *NAS Electronics, Inc. v. Transtech Electronics Pte Ltd.*, 262 F. Supp. 2d 134 (S.D.N.Y. 2003).

was unrelated to the amount of the primary settlement payment obligation. *Id.* (observing settlement called for $800,000 payment over 5 years, with first payment of $50,000). Additionally, the court in *NAS Electronics* entered the judgment of US $3.2 million based on finding the clause was unambiguous such that the plaintiffs were entitled to the judgment "in accordance with the plain language of the agreement," *Transtech Electronics Pte Ltd.*, 2000 WL 381428, at *2. Furthermore, the court also noted that "in the absence of any breach, [the contract] did not impose any obligation on either the plaintiffs or the defendants." *NAS Electronics,*, 262 F. Supp. 2d at 146.

Section 3 of the Amendment to the Settlement Agreement is distinct from the clause at issue in *NAS Electronics.* First, the plain language of Section 3 of the Amendment to the Settlement Agreement says that Mr. Sabag reserves the right "to seek an immediate summary international arbitration award." It does not provide Mr. Sabag is specifically entitled to entry of a judgment in a specified amount, let alone a distinct amount reflecting liquidated damages instead of the parties' bargained-for consideration. Furthermore, in *NAS Electronics*, there was no survival clause akin to Section 4 of the Amendment to the Settlement Agreement, which provides "except as *specifically* set forth above, all terms and conditions of the Settlement Agreement remain in full force and effect."

Finally, the Settlement Agreement Amendment's language that Mr. Windhorst "shall not contest whether the payment called for by the Settlement Agreement is due and owing" does not, as Mr. Sabag argues, "create the liquidated damages scenario." Doc. 126 at 22. This clause does not limit what an adjudicator may or may not do. By contrast, in *NAS Electronics*, the settlement agreement provided that "[t]he *only* issues the Court may consider in connection with Plaintiffs' motion to reopen the case and for entry of Judgment is whether (i) the required payment has been made." *Transtech Electronics Pte Ltd.*, 2000 WL 381428, at *1. In fact, court in *NAS Electronics*

relied upon this restrictive language to find the parties' "unambiguous intent" to enter into a judgment solely based on the clause at issue. *Id.* at *3. Here, in contrast, the arbitral tribunal is not restricted to consider issues Mr. Windhorst agreed not to contest.

      b.   <u>Mr. Sabag has elected to affirm the validity rather than terminating the Settlement Agreement and suing for liquidated damages</u>

Mr. Sabag claimed that he elected to terminate the Settlement Agreement by "filing a motion for immediate entry of summary award with the arbitrator to enforce the liquidated damages provision of the Settlement agreement." (Doc. 126 at 9.) Not so. He has reaped the full benefits of the Settlement Agreement, which was resulted from his affirmation of the Settlement Agreement. While an attempt to retrospectively terminate the agreement may appear convenient to Mr. Sabag, it is belied by the law and facts. At the outset, he did not, as he claimed, "los[e] the benefit of his bargain", or otherwise suffered loss in the process of obtaining the payment. (Doc. 126 at 27.)[19] Any such claimed loss in relation to the delay in payment have been fully compensated, on the assumption of the continued validity of the Settlement Agreement.

While it is undisputed that Mr. Sabag did not actually receive the $ 2,85 million on August 1, 2022, he had been compensated with interest starting to accrue on August 2, 2022 and ended until the day of the payment, which had essentially made him be in the same position as if he had received the $ 2,85 million on August 1, 2022. *See Art Press Ltd. v. Western Printing Mach. Co.*, 852 F.2d 276 (7th Cir. 1988) ("interest compensates people for the time value of money."); Doc. 118-15 at 1 (showing that Mr. Windhorst has paid all interests from August 2, 2022 to February 8,

---

[19]   Mr. Sabag also claims that by having to initiate the BVI proceeding, Mr. Sabag has lost the consideration of "discharging all claims." (Doc. 126 at 10). Mr. Sabag elected to voluntarily pursue additional claims against Sapinda in the BVI, so any purported "lost [ ] consideration" is entirely of his own doing. Indeed, Mr. Windhorst's obligation to discharge Mr. Sabag of claims under the Settlement Agreement does not include "those obligations that are created by and set forth in this Agreement." . Doc. 118-1 at ¶ 6.b.

2022); Doc. 126 at 19 (acknowledging that Mr. Sabag had received the amount of the settlement payment, with interest[20]). Additionally, Mr. Windhorst has also paid all the costs that Mr. Sabag incurred to obtained the payment, including the attorneys' fees and the fees in the BVI proceeding. (Doc. 126 at 19 (acknowledging that Mr. Sabag had also received "costs, and "BVI legal fees").)

Mr. Sabag's conduct shows he intended to affirm the validity of the contract and to enforce all the terms of the contract, rather than terminating the contract to only enforce a purported "liquidated damages" clause. Never in parties' correspondence did Mr. Sabag state that he had terminated the Settlement Agreement. Rather, as noted in Mr. Windhorst's opening brief, Mr. Sabag has only demanded payment from Mr. Windhorst. (Doc. 115 at 5-7; Windhorst Decl. ¶¶ 5-11, 14). Demand of payment is not recognized as a sign of terminating the agreement. *See Fox y Garcia Constr. & Dev. Corp. v. Brijall Realty Corp.*, 57 Misc. 3d 1225 (N.Y. Civ. Ct. 2017) (demand of payment is a request for performance, not a termination of the agreement).

Moreover, Mr. Sabag's claim that he terminated the Settlement Agreement upon filing his Motion to Enforce the Settlement Agreement has no basis in the record. Doc. 126 at 9. Nothing in Mr. Sabag's Motion to Enforce the Settlement Agreement states, let alone suggests, Mr. Sabag was terminating the Settlement Agreement. Indeed, Mr. Sabag moved to "enforce" the Settlement Agreement where he specifically requested the arbitrator "enforce the terms of the parties' signed Settlement Agreement against Mr. Windhorst, as amended." Windhorst Decl. Ex. 6 (Doc. 118-6) at 6. Furthermore, Mr. Sabag's Motion to Enforce the Settlement Agreement did not even mention

---

[20] Here, Mr. Sabag misrepresented that Mr. Windhorst has only paid "post-Award interest". Doc. 126 at 19. To the contrary, Mr. Windhorst has paid "interest on 2,850,000 at 9% per annum from 2 August 2022", the day immediately following Mr. Windhorst's payment deadline, meaning Mr. Sabag has reaped the full benefit as if he received the full payment on August 1, 2022. Doc. 118-15 at 1.

"damages," let alone claiming he was seeking "liquidated damages" or that Section 3 of the Amendment to the Settlement Agreement was a liquidated damages clause. *See id.*

Furthermore, after Mr. Sabag filed his Motion to Enforce, on August 4, 2022, Edward Mullins, Mr. Sabag's counsel in the ICDR proceeding to Mr. Calamari, saying "we can only accept per bank regulations the 'settlement monies.'"[21] (Doc. 118-7.)  If Mr. Sabag really elected to terminate the contract and sue for liquidated damages, he would not have sought "settlement monies" but rather "damages," as the former is based on the continued validity of the Settlement terms.  Neither can Mr. Sabag reconcile his argument that he terminated the Settlement Agreement when he filed his Motion to Enforce and the fact that: 1) he relied on the original terms of the Settlement Agreement (¶ 10, a standalone clause) in claiming "'costs, expense, and reasonable attorneys' fees' incurred as a result of a dispute relating to the Settlement Agreement", in both his Motion to Enforce and post-summary-award Petition for Fees and Costs (Doc. 118-6 at 4-5; McCready Decl. Ex. 4 [Sabag Fee Petition] at 2) in his Petition for Fees and Costs, Mr. Sabag claimed that "[w]hile the Settlement Agreement does have a release, the Agreement is clear—the Release is not effective until *after* payment is made" and "any release by Mr. Sabag is only effective upon receipt of the settlement funds" (*Id.* at 8) (emphasis added).

In fact, if, during the briefing of his Motion to Enforce, Mr. Sabag had ever mentioned that he had elected to terminate the Settlement Agreement and was claiming liquidated damages, Mr. Windhorst would have objected that Section 3 of the Settlement Agreement was not a liquidated damages clause, and that he could not terminate the contract and enforce all terms of the contract at the same time.[22]  By couching his purported motion to terminate the Settlement Agreement as

---

[21]    McCready Decl. Ex. 5 (on August 2, 2022, after filing Mr. Sabag's Motion to Enforce, Mr. Mullins stated to Mr. Calamari that "if, in fact, your client paid we will withdraw [the Motion to Enforce].").

[22]    *Supra*, § II.6.i.

Motion to Enforce, seeking in that motion for Mr. Windhorst to pay up under the parties' contract, and by remaining silent about his thirteenth-hour view that he had terminated the Settlement Agreement in subsequent correspondence, Mr. Sabag has affirmed the validity of the Settlement Agreement. Having done so, Mr. Sabag cannot "assume[] a contrary position now, simply because his interests have changed," as it has come time for him to perform. *See Wells Fargo Bank v. Sokaogon Chippewa Comm.*, 787 F. Supp. 2d 867, 877 (E.D. Wis. 2011) ("where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him"); *See also Jean v. Auto & Tire Spot Corp.*, at *4, n.4 (E.D.N.Y. May 24, 2013), *report and recommendation adopted*, (E.D.N.Y. May 28, 2013) (denying the motion to reopen, noting "[m]oreover, by seeking both to enforce the Settlement Agreement and to reopen the case, plaintiff is requesting mutually exclusive types of relief. However, plaintiff cannot have his proverbial cake and eat it too.") (internal citation omitted); *see also Sofi Classic S.A. de C.V.*, 444 F. Supp. 2d at 238 (holding plaintiff's affirmed the parties' settlement agreement by bringing an action for breach of the settlement agreement, obtaining a judgment, and seeking to enforce the judgment).

c.   Mr. Sabag's Efforts to Distinguish Mr. Windhorst's Cases are Unavailing

Despite Mr. Windhorst having cited numerous cases across this 1782 Action and the parties' new arbitration proceeding, (Doc. 119-4 [Windhorst's Motion to Enforce] at ¶¶ 29-33 (citing cases); Doc. 123-5 [Windhorst's Notice of Arbitration] at ¶¶ 71-72 (citing cases)), Mr. Sabag ignores the vast majority of Mr. Windhorst's supporting authorities to take aim at *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231 (S.D.N.Y. 2006). *See* Doc. 126 at 26-27. The distinction Mr. Sabag draws between *Sofi Classic* and the instant case does not stand. Mr.

Sabag misinterprets *Sofi Classic* to mean that the "election of remedies" doctrine only comes into play when a party tries to bring new claims.  (Doc. 126 at 26-27. )  Not only is this not the holding of *Sofi Classic*, but Mr. Sabag's position makes little sense in that his Motion to Enforce was for breach of the Amended Settlement Agreement while his underlying claims in the arbitration were for, *inter alia*, breaches of other contracts.  *Compare* Doc. 118-6 [Mr. Sabag's Motion to Enforce] at 6 (seeking to enforce the Settlement Agreement) *with* Doc. 33-3 [Mr. Sabag's Notice of Arbitration Statement of Claim] at 56, 62 (alleging breach of the Share Purchase Agreement and the Put Option Agreement).  In any event, *Sofi Classic*'s teaching is that "one may not both affirm and disaffirm a contract . . . or take a benefit under an instrument and repudiate it." *Sofi Classic*, 444 F. Supp. 2d at 238.  Therefore, a party needs to observe the terms of the contract if it gets a benefit on the premise that the contract is still valid.  That rule squarely applies here.

### 7.    Mr. Windhorst has not waived any arguments

Despite Mr. Sabag's protestations, Mr. Windhorst has not waived any rights or arguments.

As an initial matter, Mr. Windhorst has not waived his right to arbitrate his breach of contract claim against Mr. Sabag.   Mr. Sabag, incorporating his arguments from his Emergency Motion (Doc. 122), argues Mr. Windhorst has waived his right to arbitrate his breach of contract claim by "failing to raise his arbitration claims in a timely manner with this Court to respond to Mr. Sabag's Supplementary Request for Discovery (Doc. 98) and Motion for Order to Show Cause (Doc. 107)" and by "voluntarily asking this Court to grant him additional substantive relief under Section 1782 in accordance with federal law."  (Doc. 126 at 39.)  At the outset, the issues of delay and waiver is for the arbitrator.  *Lumbermens Mut. Cas. v. Broadspire Mgmt. Servs*, 623 F.3d 476, 480 (7th Cir. 2010) ("presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability"); *Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.*,

328 F.3d 462, 466 (8th Cir. 2003) (refusing to address waiver of already-pending arbitration which "may be presented for the [arbitral] panel's consideration").  However, even if this Court decides to address Mr. Sabag's waiver arguments, Mr. Windhorst did not waive his right to arbitrate. Waiver of a right to arbitrate, as Mr. Sabag acknowledges (Doc. 126 at 39 & n. 37), can only be inferred when, "considering the totality of the circumstances, a party acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods.*, Inc., 660 F.3d 988, 994 (7th Cir. 2011).  The key determination is "whether a party manifested an intent to proceed with litigation." *Id.* at 995.

Here, the totality of circumstances show that Mr. Windhorst has not waived his right to arbitrate.  Indeed, Mr. Windhorst has always intended to arbitrate the dispute of whether Mr. Sabag is obligated to voluntarily dismiss the 1782 Action.  This issue is distinct from the issues Mr. Windhorst submitted to this Court in his Motions to Vacate and/or Stay, which pertain to whether the Court should have granted Mr. Sabag's Supplementary Request for Discovery and the OSC Motion in the first place now that it has the benefit of a fuller record. *See* Doc. 115 and 116 (explaining why the Court should reconsider its order granting the Supplementary Request for Discovery and OSC); *see also* Doc. 115-3 (explaining why the Supplementary Request for Discovery should not be granted in the first place for failing to meet the requirements of § 1782).[23] Mr. Windhorst, contrary to Mr. Sabag's assertion, does not "ask[] this Court to grant <u>him</u> additional substantive relief under Section 1782;" rather, he asks the Court to vacate its Order granting substantive relief under Section 1782 to <u>Mr. Sabag</u>.

---

[23]   That the factual background of the breach of Settlement Agreement might be similar to this 1782 Action does not constitute grounds for a waiver of the right to arbitrate.  *Denihan v. Denihan*, 34 N.Y.2d 307, 310-11 (N.Y. 1974), 310-311 ("litigation of separate and distinct claims even if involving overlapping factual issues will not constitute a waiver of the right to arbitrate"); *see also Court v. MacWeeney*, 195 A.D. 2d 381, 382 (N.Y. App. Div. 1993) (same).

Likewise, Mr. Windhorst's delay in responding to Mr. Sabag's Supplementary Request does not constitute a waiver.  First, at the time when Mr. Sabag filed his Supplementary 1782 Request and the OSC motion, Mr. Sabag had not breached the Settlement Agreement, and therefore there was nothing Mr. Windhorst could refer to arbitration.  Mr. Windhorst actually filed his motion to stay pending arbitration only three weeks after Mr. Sabag breached the Settlement Agreement by not voluntarily dismissing the 1782 Action by February 15, 2023, which is far from "delay."  *Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002) (finding no delay when the party moved to compel less than eight months after the initial right giving rise to a cause of action).

Relatedly, as Mr. Sabag has acknowledged, Mr. Windhorst moved to enforce the Settlement Agreement in the ICDR arbitration <u>before</u> Mr. Windhorst submitted his Motions to Vacate and/or Stay – the same arbitration that Mr. Sabag himself has used to enforce the Settlement Agreement.[24]  Thus, Mr. Windhorst's first move was to arbitrate, then to vacate.  And once Mr. Windhorst was instructed by the ICDR to file a new arbitration proceeding (and pay the significant filing fee), Mr. Windhorst promptly filed with the ICDR a notice of arbitration and an application for emergency relief.  *Supra*, § I.

Since Mr. Windhorst filed his claims in the ICDR arbitration before making any move in this Court, and that Mr. Windhorst's activities in the Court are to oppose Mr. Sabag's substantive requests for § 1782 discovery and sanctions and to seek a stay of this proceeding pending

---

[24]   Mr. Windhorst has not moved to compel arbitration as he assumed Mr. Sabag will honor the arbitration agreement that he himself has affirmed.  Mr. Windhorst reserves the right to move this Court to compel arbitration should Mr. Sabag submit to this Court his firm refusal to proceed the arbitration and instead seek to litigate the breach of the Settlement Agreement question.

Arbitration, the totality of the circumstances unambiguously shows Mr. Windhorst never waived his right to arbitrate.[25]

Separately, Mr. Windhorst did not waive the "elections of remedies" argument (Doc. 126 at 27-28) by not bringing it before the Final Award was issued.  The Settlement Agreement clearly established that Mr. Sabag's obligation to dismiss the 1782 Action only arises after Mr. Windhorst made the full payment.  (Doc. 118-1 at ¶ 5.)  Therefore, this defense could not have been made before the Final Award was issued.  *Supra*, § II.5.

### 8.    Mr. Windhorst's Alternative Requests Should Be Granted

a.    The Court Should Sustain Mr. Windhorst's Objections Under Rule 72(a)

As an alternative to vacating the Orders under Rules 55 and 60(b), the Court may exercise discretion to sustain Mr. Windhorst's Rule 72 objections to the Orders.  Mr. Sabag does not challenge Mr. Windhorst's arguments that the Court may entertain untimely Rule 72 objections, and his arguments on the merits cannot withstand scrutiny.  In his opening brief, Mr. Windhorst cited authorities for the proposition that district courts have the inherent power to consider late objections where they are not egregiously late and do not prejudice the opposing party. Doc. 115 at 22 (citing *Kruger v. Apfel*, 214 F.3d 784, 786–87 (7th Cir. 2000)).   Additionally, Mr. Windhorst's opening brief clearly references his Proposed Opposition which explains in detail that Mr. Windhorst's limited intervention in this 1782 Action does not render him "found" in this

---

[25]    The cases cited by Mr. Sabag on the waiver point are readily distinguishable. (Doc. 122 at 6). *Magallanes Inv., Inc. v. Cir. Sys., Inc.*, 994 F.2d 1214 (7th Cir. 1993) is not instructive because in that case, no party initiated an arbitration.  In *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 500 (7th Cir. 2018), while the arbitrable claims were there from the very beginning, the party did not "privately demand" the arbitration until "eight months after she filed suit," and waved another five months before moving to compel.  The court also found that the party could not provide any justification for this delay. *Id.* at 500.

District for purposes of § 1782.  (Doc. 115 at 22-23.)  As such, the Court should sustain Mr. Windhorst's Objections under Rule 72.[26]

        b.      A Stay is Warranted Pending Arbitration

Without providing any reasoning, Mr. Sabag argues that "Mr. Windhorst's Motions to Stay are Improper, as the Settlement Agreement was terminated. (Doc. 126 at 36-37.)  However, Mr. Sabag's position clearly conflicts with the "severability" principle of the arbitration agreement.  It is well-established that "[g]enerally, a broad arbitration clause in an agreement survives and remains enforceable for the resolution of disputes arising out of that agreement *subsequent to the termination thereof and the discharge of obligations thereunder*, irrespective of whether the termination and discharge resulted from … the breach of the agreement by one of the parties."[27] *Primex Intl Corp. v. Wal-Mart*, 89 N.Y.2d 594, 598-99 (N.Y. 1997); *see also Sweet Dreams Unlimited v. Dial-A-Mattress Int'l*, 1 F.3d 639, 643 (7th Cir. 1993) ("the failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship."); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) (affirming Second Circuit's view that "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud.").

---

[26]    Mr. Windhorst's Rule 72 Objection to the OSC Order is timely as the OSC Order is directly related to the Deposition Order.  In any event, Mr. Sabag's complaints are entirely academic as Mr. Windhorst has met the Rule 55 / 60(b) standard for vacatur of both Orders.

Even if the Settlement Agreement were to hypothetically be deemed invalid, its arbitration agreement survives.  A stay here would provide the most efficient path to resolve this action, since an arbitral award ordering Mr. Sabag to dismiss this proceeding would resolve this action in toto (assuming Mr. Sabag complies with the award), and an award to the contrary would narrow the issues before this Court.

## III.   CONCLUSION

For the foregoing reasons, Mr. Windhorst respectfully requests that this Court enter an order granting Mr. Windhorst's Motions to Vacate and/or Stay in substantially the form set forth in Mr. Windhorst's proposed orders (Docs. 115-1, 116-1).

DATED:  March 30, 2023

*/s/ Ann O'Connor McCready*
Ann O'Connor McCready, Atty. No. 32836-53
Taft Stettinius & Hollister LLP
One Indiana Square, Ste. 3500
Indianapolis, IN 46204
(317) 713-3500
amccready@taftlaw.com

*/s/ Lucas V.M. Bento*
Lucas V.M. Bento (New York Bar No. 4907986)
lucasbento@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave. 22d Floor
New York, NY 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100

Gavin S. Frisch (Mass. Bar No. 704216)
gavinfrsich@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Ste. 520
Boston, MA 02199
Telephone: (617) 712-7100
Fax: (617) 712-7200

*Attorneys for Lars Windhorst*

76963262v1