UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In Re:                          )
                                )
APPLICATION OF ELI SABAG,       )
FOR AN ORDER PURSUANT TO        ) CAUSE NO. 1:19-mc-00084-JPH-TAB
28 U.S.C. & #167; 1782          ) Indianapolis, Indiana
TO CONDUCT DISCOVERY FOR        ) Tuesday, April 11, 2023
USE IN FOREIGN PROCEEDINGS      )


Before the
HONORABLE MAGISTRATE JUDGE TIM A. BAKER


TRANSCRIPT OF SHOW CAUSE HEARING


APPEARANCES:

FOR THE INTERVENOR          Quinn Emanuel Urquhart & Sullivan LLP
LARS WINDHORST:             By:  Lucas V.M. Bento and
                            Gavin S. Frisch
                            51 Madison Avenue, Floor 22
                            New York, New York 10010

                            Taft Stettinius & Hollister LLP
                            By:  Ann O. McCready
                            One Indiana Square, Suite 3500
                            Indianapolis, Indiana 46204

FOR ELI SABAG:              Stoll Keenon Ogden PLLC
                            By:  Offer Korin and
                            Brooke Smith
                            334 North Senate Avenue
                            Indianapolis, Indiana 46204

FOR THE INTERVENOR          Ice Miller LLP
TRACK GROUP, INC.:          By:  Michael A. Wukmer
                            One American Square, Suite 2900
                            Indianapolis, Indiana 46282

COURT TRANSCRIBER:          Jean A. Knepley, RDR, CRR, CRC, FCRR
                            46 East Ohio Street, Room 301
                            Indianapolis, Indiana 46204


PROCEEDINGS TAKEN BY ELECTRONIC SOUND RECORDING

2

*(In open court.)*

(REPORTER'S NOTE:  This hearing was held and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURT:  All right.  It is April 11, 2023.  We are here in the case of In re:  Sabag, 1:19-mc-84, and we are here for a number of proceedings in connection with largely an order to show cause based upon Mr. Windhorst's failure to appear for a deposition and to address the other matters that need to be addressed.

For the record, I see Mr. Offer Korin there on behalf of Mr. Sabag, and is that Miss Smith with you as well?

MR. KORIN:  It is, Your Honor.

MS. SMITH:  Yes.

THE COURT:  Brooke Smith and Offer Korin.  All right.

And on behalf of the Track Group we have Mr. Michael Wukmer here.  Good morning, Mr. Wukmer.

On behalf of Mr. Windhorst, I see Ms. McCready here. Good morning.  And who do you have with you?

MS. McCREADY:  Good afternoon.  We have Lucas Bento and Gavin Frisch.

1          THE COURT:  Which is which?

2          MS. McCREADY:  I am sorry.  This is Mr. Bento.

3          THE COURT:  Mr. Bento of the third declaration,

4    excellent.  Good morning.  All right.  And I have reviewed the

5    third declaration that was filed, as well as the response and

6    the arbitrator's decision.  I just — a couple of preliminary

7    things.

8          I just was curious, in light of the arbitrator's

9    decision and anything else that has occurred on this case, Mr.

10   Korin, is there any discussion about being able to resolve this

11   rather than continuing to litigate this?

12         MR. KORIN:  There was.  Your Honor —

13         THE COURT:  You don't have to stand up if you don't

14   want to.

15         MR. KORIN:  Thank you, Judge.  There was a, a reach

16   out of whether or not there was something that we could do to

17   resolve it.  I felt that we needed to get through this hearing

18   and see where, where this takes us, and my client at this

19   moment just wants to take the deposition.  And obviously —

20         THE COURT:  All right.

21         MR. KORIN:  — receive compensation for the failure to

22   appear and go forward.  That would be the — that would — from

23   our perspective, end the matter.  There may be now that there

24   is, you know, there may be potential for resolution.  There is

25   now going to be a third arbitrator looking at it, but that is

1  beyond my pay grade —

2           THE COURT:  Okay.

3           MR. KORIN:  — at the moment to discuss.

4           THE COURT:  All right, Ms. McCready, anything to add

5  to that?

6           MS. McCREADY:  I am going to refer to Mr. Bento.

7           THE COURT:  I am sorry.  All right.  Mr. Bento?

8           MR. BENTO:  I am sorry.  Your Honor, there haven't

9  been discussions since the emergency arbitrator issued his

10 decision, but we agree that in light of that decision, it is

11 very clear that, you know, the arbitration is probably going to

12 go one way if the arbitrator in the main arbitration agrees

13 with the interpretation of the agreement.

14           We haven't reached out and spoken since.  I know we

15 reached out back in maybe February to see if we could resolve

16 this matter.  Our interpretation of the agreement is that

17 Mr. Sabag should have dismissed this proceeding over two months

18 ago now, and that is where we stand at the moment.

19           We did offer to compensate Mr. Sabag for his fees in

20 preparation for the deposition, in preparation for the order to

21 show cause, but that was rejected, and so here we are today.

22           THE COURT:  Okay.  Well, I just thought perhaps peace

23 might break out.  So here is what I want to do.

24 Mr. (inaudible) you didn't have anything to add to that, did

25 you?  All right.

1    I just have some questions for both sides.  It looks

2  like we have a little show and tell here.  Perhaps we will give

3  you an opportunity to do that.  I think I will ask Mr.

4  Windhorst's counsel some questions first, and so let me do

5  that.  And then, if there is anything else you want to add

6  then, of course, you get the opportunity to do that.

7    So Mr. Bento, you want to take the lead on this?

8    MR. BENTO:  Yes, Your Honor.

9    THE COURT:  All right.

10    MR. BENTO:  Should I approach the lectern?

11    THE COURT:  Sure.  You might as well.

12    How are things in New York, New York?

13    MR. BENTO:  Actually, Mr. Korin and I were just having

14  this discussion.  Indianapolis is much cleaner than New York so

15  it is refreshing to be here.

16    THE COURT:  Good.  Well, you picked a nice time to be

17  here.  It is beautiful.

18    So just a couple of things.  Clarify, to get a better

19  understanding of who the players are in this case.  So Mr.

20  Windhorst, in, in something that Mr. Sabag has filed, Docket

21  No. 106 in a footnote they say, "Mr. Windhorst is represented

22  to be chief executive officer of Tennor Holding, B.V."

23    MR. BENTO:  Correct.

24    THE COURT:  Is that still what he is?

25    MR. BENTO:  Yes.  Correct, Your Honor.

1          THE COURT:  And Mr. Calamari is represented to be
2     general counsel and chief administrative officer of Tennor
3     Holding, B.V.?
4          MR. BENTO:  Correct, Your Honor.
5          THE COURT:  So has that been true throughout the
6     proceedings, throughout the pendency of this miscellaneous
7     case?
8          MR. BENTO:  I believe so.  Yes, Your Honor.
9          THE COURT:  So Mr. Calamari kind of works as the
10    counsel for Tennor Holdings.  He has never entered an
11    appearance in this case, but I presume him and Mr. Windhorst
12    work closely together?
13         MR. BENTO:  I assume so based on his relationship to
14    the company, yes.
15         THE COURT:  Okay.  All right.
16         I am going to put you on the spot here for a minute.
17    This is Mr. Sabag's response to your two filings or multiple
18    filings.  This is Docket No. 126, and in here Mr. Sabag says,
19    "As this Court is now amply aware, Mr. Windhorst is well-known
20    around the world for evading debts and breaching payment terms
21    of settlement agreements."
22         MR. BENTO:  Your Honor, we completely object to that.
23    There is no basis in fact that was submitted in support of
24    that proposition.  In fact, Mr. Windhorst, as the facts are
25    clear in this case, has made good on the settlement agreement

1    and on his obligation to pay.  So if anything, Mr. Sabag should
2    be the first witness, the first individual to say that, you
3    know, Mr. Windhorst is, is — this is not to say, by the way,
4    that Mr. Windhorst didn't pay on time.  We are not trying to
5    evade that point.  We recognize —
6              THE COURT:  He did.  He was late.
7              MR. BENTO:  He was late, absolutely, and he did face
8    liquidity issues around the time that he was supposed to make
9    the payment under the settlement agreement and we explained
10   that in our briefs.  In fact, one of the articles that
11   Mr. Sabag has introduced in the record, the *Financial Times*
12   article dated November 2022, confirms precisely that
13   Mr. Windhorst was going through very difficult liquidity issues
14   in that time.  And so I think that it is not just with
15   Mr. Sabag that Mr. Windhorst was facing difficulties but also
16   with other stakeholders.
17             THE COURT:  So when he agreed to make the payments,
18   wouldn't he have known he was having liquidity issues?
19             MR. BENTO:  Not at that time, no.  In the summer of
20   2022, and this is, you know, this is something that is also
21   part of the public record.  Mr. Windhorst is facing a series of
22   legal issues, including in Germany, and once that started to
23   happen, it became clear that his bank account was going to have
24   difficulties.  In fact, it was frozen as a result of that, and
25   so that is why he asked for an amendment to the agreement.

1    He was hoping to resolve it.  He was hoping to work

2   through the issues with his bank; but again, this is a large

3   sum of money, $3 million.  By any account, I know Mr. Sabag is

4   making the point that Mr. Windhorst is extremely wealthy, etc.,

5   etc.  But this is still a lot of money to move, and so that is

6   why he asked for the additional time to pay up.  And it became

7   clearer and clearer that he wasn't going to be able to do that.

8   He never reneged on his obligation, however.  He confirmed

9   throughout the entire period, I am going to make good on the

10  payment.  He never said —

11       THE COURT:  He paid interest and —

12       MR. BENTO:  He paid interest, and he paid fees and he

13  paid legal fees and enforcement fees.  So Mr. Sabag has been

14  placed in the position that he would have been had the payment

15  been done on time.

16       THE COURT:  Okay.  Now, this is a kind of more nuanced

17  or complicated question — not complicated but just requires a

18  little background.  I was just looking at the, at the procedure

19  of this case.  So bear with me for a second, but as I am

20  sitting here trying to figure out what the proper thing to do

21  is with your client, there was a motion for — supplemental

22  motion for discovery back in October of 2022 that was basically

23  the request for the deposition.  And then, shortly thereafter,

24  on October 20th, prior counsel withdrew or filed a motion to

25  withdraw and filed an unopposed motion for extension of time to

1    November 22nd to respond to that discovery.  And then, I

2    granted the motion to withdraw.

3              So that was on October 26, 2022.  As of October 26,

4    2022, Mr. Windhorst no longer has counsel.  I granted the

5    extension of time to November 22nd, and then, nothing.  I mean,

6    that is what is part of what is concerning to me.  Nothing

7    happened.

8              November 22 passed, and then, December 15th comes the

9    order on the supplemental request.  I grant Mr. Sabag's request

10   to depose Mr. Windhorst, and then, there is quite a bit in the

11   briefing of -- I won't go into it all, but efforts to schedule

12   that deposition, e-mails that were sent, no response.

13   Mr. Calamari was copied on those as a courtesy.  They just got

14   regular silence, at least as the response; and then, they filed

15   a motion to order show cause on February 1st.  I grant it on

16   March 1st; and then, lo and behold, immediately thereafter

17   within a week, Ms. McCready appears.  What was going on that

18   whole time?

19             MR. BENTO:  That is an excellent question, and we

20   actually have some slides here but maybe I can just walk

21   through.

22             THE COURT:  I will defer to you.  If you want to do

23   the slides as part of your response, if you think it is

24   appropriate, however you want to respond.

25             MR. BENTO:  Well, the thing -- the first point that we

1   would like to make, and I should have made this earlier, is

2   that Mr. Windhorst sincerely apologizes to this Court.  It was

3   never the intention of Mr. Windhorst to ignore or disrespect

4   this court.  Mr. Windhorst was focused on resolving his

5   liquidity issues to pay off the settlement so that we didn't

6   have to be here today.  The parties had a settlement agreement

7   in which they clearly intended that upon payment, this

8   proceeding would be dismissed.

9            THE COURT:  Well, let me stop you there because I am

10  not sure I agree with that or at least I wouldn't get your

11  input on this.  So now I am going to actually quote from

12  Mr. Sabag's response to your Docket Nos. 115, 116, 117.

13  Specifically, this is Docket No. 126, and I am going to read

14  from page 19.

15           So just give me a second.  "At one point towards the

16  end" — towards isn't a word, by the way.  It is toward, but

17  hey, that is just me.  "At one point toward the end of the

18  discussion in the BVI, Mr. Windhorst's BVI counsel made the

19  following additional comments that confirmed that Mr. Windhorst

20  did not actually believe he had the legal rights to terminate

21  the Section 1782 proceedings if he made a payment to terminate

22  the involuntary liquidation proceedings."  Then, this is a

23  quote from the exhibit.

24           "Further, to my e-mail below, I understand the Indiana

25  proceedings do not involve a claim for the payment of money

1  against our client but only a deposition.  As mentioned, our
2  client asks whether your client is willing to withdraw the
3  Indiana proceedings once the sums claimed in the BVI (as
4  discussed below) have been paid.  For the avoidance of doubt,
5  our client is also prepared to satisfy your client's legal
6  costs in the Indiana proceedings (even though he does not
7  believe he has any legal obligation to do so).

8          Then the brief continues.  "In other words,
9  Mr. Windhorst's counsel offered additional consideration to
10  Mr. Sabag to compensate Mr. Sabag for his legal fees in the
11  Section 1782 proceeding if Mr. Sabag would agree to dismiss the
12  1782 proceeding.  Mr. Sabag once again refused to dismiss the
13  Section 1782 proceeding.  Notwithstanding, Mr. Windhorst
14  ultimately made a wire payment to Mr. Sabag's BVI lawyers to
15  satisfy the amount of the ICDR award" with interest, etc.

16          So that suggests that -- there was no thought or
17  agreement that this matter would be dismissed.

18          MR. BENTO:  With respect, there was, Your Honor.  So
19  two points:  Number 1, the BVI lawyers weren't involved in the
20  settlement at all.  They weren't involved in the negotiations
21  and the agreements.  I really don't think they have even seen
22  the agreement.

23          The point that they were making was that they were
24  trying to have -- to achieve a global resolution of all of the
25  disputes.  It is important to, to look back through the

1    procedural background of the case.  In October, when, when ——
2    October 2022, when Mr. Sabag filed the 1782 request here,
3    seeking a deposition of Mr. Windhorst, around that same time,
4    he filed the BVI claims.
5          Those claims were seeking to enforce the settlement
6    monies.  Those are the amounts of monies that are referenced in
7    the e-mail.  The reference to monies that are trying to be
8    collected, that are sought to be collected are in reference to
9    the BVI claims that Mr. Sabag filed in the BVI.  The fact that
10   the BVI lawyer is saying that look, if we can resolve this, if,
11   if upon payment we can have a guarantee that we are not going
12   to have to go back to Indiana, which we are now, we are having
13   to relitigate these issues, expend money, expend the Court's
14   resources to resolve this.  If we can avoid that, can we have
15   that confirmed now?
16         Of course, Mr. Windhorst wasn't in the position at
17   that point in time prepayment, right, to request Mr. Sabag to
18   dismiss these proceedings.  He hadn't made the payment yet.  So
19   he was just seeking confirmation that that was going to happen.
20   And so by reading the contract, it is clear that —— and I think
21   the thinking was —— that, look, upon making the, the payment,
22   there is no, there is no other way around for them to get out
23   of this because the contract is clear.  Upon payment, the 1782
24   action must be dismissed.
25         So that, that, that description, I think, if any —— if

1    any further strengthens our position because it really shows

2    that Mr. Windhorst, you know, planned to dismiss this, this

3    1782 proceedings once the payment was done and not beforehand.

4    The discussion of a global resolution was only in an effort to

5    avoid further legal expenses, further litigation, further

6    arbitration, which clearly, we have been forced to do here.

7            THE COURT:  Okay.  Those are my main questions.  Was

8    there something you wanted to present?

9            MR. BENTO:  So yes, Your Honor.

10           THE COURT:  We've gone to all the trouble of getting

11   all this nice equipment here for you.  It is really around

12   anyway, but you wake up the IT people to come up and get it

13   going for us.

14           MR. BENTO:  So Your Honor — Your Honor, may I

15   approach?

16           THE COURT:  Sure.  Thanks.  Oh, my God, we are not

17   going to go through this whole thing, are we?

18           MR. BENTO:  So I, I think we have, we have covered the

19   reasons why we are here, and we fully recognized, fully

20   recognized that Mr. Windhorst failed to coordinate that

21   position.  This, this is beyond dispute, but Your Honor asked a

22   very important question.  And that was, what was going on

23   throughout this entire time?

24           And so my plan is to explain exactly what was going

25   on, and I hesitate to make an analogy to an iceberg, but I

1   think the analogy stands here because from your perspective,

2   Your Honor, you are seeing the tip of the iceberg, and what you

3   were — (audio cut out) — seeing was in action.  But below

4   the, the, the water surface, a lot of things were going on.  So

5   we are here because Mr. Sabag refused to dismiss this

6   proceeding, and I am just going to skip a few, a few slides

7   here to show what was going on around the time the settlement

8   agreement was, was entered.

9          A few days after the amendment was entered, this Court

10  directed the clerk to close the case, and the agreement, as, as

11  we all know, this is well into the record and I am not going to

12  belabor the Court with, with these, with these slides.  But the

13  agreement is very, very clear that this proceeding should have

14  been dismissed upon payment, very clear, and I think the

15  emergency arbitrator agreed with that.

16         Mr. Sabag, in the emergency arbitration, argued that

17  the agreement was completely terminated.  It was down the

18  drain.  It was gone, but I think the facts show quite the

19  opposite.  Mr. Sabag moved to enforce the agreement.  He moved

20  to enforce the terms of the agreement in the arbitration.  He

21  didn't terminate the agreement and then sort damages.  He

22  sought to collect the settlement monies.

23         He didn't seek to collect liquidated damages as he now

24  claims, but throughout this entire time, the parties were

25  discussing Mr. Sabag's counsel in the arbitration, in the

1   arbitration was, was chasing Mr. Windhorst and Mr. Calamari for

2   payment of the settlement monies.  That is very clear from the

3   correspondence, and through the critical moments, the critical

4   time period of January 2022, a few days after the deposition

5   notice was served — it was served December 29th.  This is the

6   first time that Mr. Windhorst got hold of the deposition

7   notice.

8           The parties started to talk about payment logistics

9   and figure out when payment was going to be done.  This was all

10  on the record, BVI counsel and Mr. Windhorst's counsel

11  discussing when the payment is going to be done, for how much,

12  whether it is going to include costs, legal costs, fees, BVI

13  enforcement fees.  All of that discussion is going on, and it

14  is interesting that right around the end of January, when the

15  deposition was supposed to take place, within that 45-day

16  period that Your Honor has set in the order, Mr. Windhorst and

17  Mr. Sabag had a phone call.

18          They talked, and in that conversation there was a

19  discussion to make the settlement payment in two traunches.

20  And Mr. Windhorst actually made those payments in two

21  traunches.  Unfortunately, that payment didn't go through not

22  because Mr. Windhorst, as Mr. Sabag alleges, didn't make those

23  payments but because the —

24          THE COURT:  He alleges fake wire transfers.

25          MR. BENTO:  Right.  He alleges that, but he signs the

1  FT, the *Financial Times*' article in support of that.  The

2  *Financial Times*' article supports the opposite.  In fact, the

3  recipient in the *Financial Times*'s article apologized to the

4  bank for the irritation that had caused; in effect, apologizing

5  for creating a huge hassle over nothing, and they got paid.

6  The payment was delayed, fair enough, but it was paid.

7       But around the end of January 2023 of this year,

8  Mr. Sabag and Mr. Windhorst discuss payment terms, payment

9  logistics.  And the payment didn't go through not because

10  Mr. Sabag didn't make the payment but because the receiving

11  account wouldn't accept euros, and so the payment bounced.  And

12  a week later Mr. Windhorst made the same payment in U.S.

13  dollars, and it went through and everything was fine.

14       So it is not like Mr. Windhorst was silent, missing in

15  action, doing absolutely nothing; no, quite the contrary.  He

16  was trying to make good on the payment.  He was trying to

17  resolve the issues that he had with his bank, trying to get the

18  situation resolved so that he could make good on the settlement

19  agreement.  The parties -- again, I have to go back to this.

20  The parties had a written settlement agreement.  This was in

21  writing.  It was no provision that said if payment is not made,

22  the, the --

23       THE COURT:  The supplement had time of the essence,

24  right?

25       MR. BENTO:  It has time of the essence, but Mr. Sabag

1    elected to affirm the contract.  He could have terminated.  We
2    don't disagree with that, but under the election of remedies
3    doctrine which applies under New York law, he could have done
4    two things:  Either terminated the contract or affirmed the
5    contract.  He did the opposite, and the emergency arbitrator
6    agreed with our interpretation.

7          He agreed with the fact that Mr. Sabag moved to affirm
8    the contract by seeking to enforce its terms, and the
9    arbitrator in the original arbitration also agreed with that.
10   He issued a preliminary award enforcing, incorporating the
11   terms of the settlement.  There was no discussion of a
12   termination of the agreement.  That was never mentioned up
13   until the time that we decided to file our own motion to
14   enforce the settlement agreement a few weeks ago.  First time
15   that was ever mentioned.

16         THE COURT:  So are you suggesting that if your client
17   was in breach of the timeliness of the payment, that Mr. Sabag
18   could have taken the option of returning the payment and then
19   proceeding with this action as opposed to keeping the payment
20   and still trying to proceed with this action?

21         MR. BENTO:  Correct.  He could have terminated the
22   agreement, right?  He could have proceeded on the underlying
23   arbitration for the $17.6 billion that he was seeking, right?
24   But that was — he didn't do that.  He decided to enforce the
25   settlement agreement.  He affirmed it.  He affirmed the

1   parties' intentions.  So Mr. Windhorst looks at this and
2   thinks, oh, clearly, he wants to get this thing, this thing
3   resolved.  He wants his money under the settlement agreement.
4   That is what I am going to do.  I am going to work really hard
5   to get that done, and that is what he did.
6          So if we look at January 2023, January of this year,
7   he did exactly that.  He worked extremely hard to get it
8   resolved, and Mr. Sabag got paid.  That is beyond dispute.  No
9   one is disputing the fact that he got paid with interest and
10  with costs.
11         And so, I think that alone is reason enough for this
12  Court to look at these, these proceedings here and, and
13  exercise its discretion to vacate the deposition order.  And
14  the only thing that we are seeking here, Your Honor, is a right
15  to be heard.  The only thing that we are seeking is a right to
16  be heard.  The, the very — the vacating of the deposition
17  order doesn't make this case go away.
18         In our interpretation of Rule 60, we think that
19  vacating the order would put us back to the position of, of
20  November 2022 when we should have filed — when Mr. Windhorst
21  should have filed an opposition to the 1782.
22         THE COURT:  Right, but haven't you waived all that?  I
23  mean, you, you are served with — withdrawing.  I know you tell
24  me now he was trying to secure payment, but this motion just
25  sits out there.  There is no response.  How can you make all

1   these arguments now?

2          MR. BENTO:  Because under Rule 60, there are certain

3   grounds that we can rely upon.

4          THE COURT:  Right, but there is no excusable -- I, I

5   mean, I shouldn't say -- the issue, is there excusable neglect,

6   is there good faith?  I mean, is there some basis, new evidence

7   which you claim, and I am not sure that qualifies.

8          Bottom line is, Mr. Windhorst knew that he, that these

9   motions were filed. He didn't do anything.  He knew his lawyers

10  had backed out on him or whatever happened, they withdrew, and

11  he did nothing.  How can you come in now and say, oh, no, Rule

12  60 is my savior?

13         MR. BENTO:  So they withdrew, Your Honor, because he

14  couldn't pay them.

15         THE COURT:  That is usually the reason.

16         MR. BENTO:  Correct, and so it would be highly unfair

17  for this Court to order, effectively compel a deposition, a

18  deposition of a private individual for use in a foreign

19  criminal proceeding against that very individual.  That is the

20  first time this has ever happened in this country where a 1782,

21  which is a civil discovery tool using the, the discovery

22  procedures under the federal rules of practice, civil

23  procedure, to be -- to extract and compel testimony from a

24  private citizen for use in a criminal proceeding abroad.  That

25  is unheard of.

1        Not only does that raise serious questions about the
2   user 1782 in the first place, but also it raises very serious
3   issues as to Mr. Winhorst's rights against self-incrimination.
4   And those are very, very explicit privileges that we have laid
5   out in our briefs, both under U.S. law and English law.
6        And so to allow Mr. Sabag to, to move this Court and
7   use a federal tool that is really only designed for, for use
8   against the parties, I mean, what Mr. Sabag has done here was
9   use weaponized 1782 against an intervenor who merely sought to
10  being in this proceeding to object to the Court's jurisdiction
11  in the proceeding under 1782 in the first place.  And now, he
12  is trying to shift, to shift the, the scenario and weaponize
13  1782 against that intervenor.
14        That is unheard of, absolutely unheard of, and we
15  explain in our briefs, you know, why, why that shouldn't allow
16  to stand.  And so the only thing that we, we are seeking here
17  is an opportunity to be heard so that we can file an open
18  decision.  The, the most sensible thing perhaps for this Court
19  to do, and I think this Court did something very similar in
20  2008 or 2009 in the — believe it was the *Irvin* (phonetic)
21  case, was to stay this proceeding pending the arbitration, and
22  I will explain why.
23        The arbitration will resolve, whether Mr. Sabag ought
24  to dismiss the proceedings under the settlement agreement.
25  That is going to be resolved in the arbitration.  So that will

1   simplify the legal issues and the factual issues before this

2   Court.

3          So the most sensible approach, perhaps, is for this

4   Court to stay this proceeding pending the arbitration, the

5   conclusion of the arbitration and, you know, the ICDR has

6   already sent us a list of arbitrators who — to select.  So

7   that that proceeding is well underway, and you know, we have,

8   you know, very good reasons to believe that the arbitration

9   will go away.  But if it doesn't, I mean, that is going to

10  resolve a lot of the issues before this Court as well, right?

11         And so in our view, that might be the most practical

12  solution, but I am happy to go into the 1782 merits, merits of

13  the 1782 application.  If, if, if this, if this Court grants a

14  leave for us to oppose it, I mean, the other issue for the 1782

15  application is that under *Intel*, Factor 1, Mr. Sabag is seeking

16  evidence from someone who is very well within the jurisdiction

17  of the U.K. courts and U.K. regulatory agencies.

18         That, alone, weighs the entire application against

19  discovery.  In fact, this Court, in your opinion, your initial

20  opinion on, on the application, I believe you, you, you

21  actually referenced the fact that, the fact that the original

22  respondents weren't going to be parties and are not within the

23  jurisdiction of the foreign courts.  That would weigh in favor

24  of discovery.

25         Using that same logic here, Mr. Windhorst would be a

1   participant in the foreign proceedings.  He is the Defendant.
2   He is the target of the investigation.

3   THE COURT:  What about that?  It has been years.
4   Still, still nothing to report on any, any investigation —

5   MR. BENTO:  That, that is, that is a great point, Your
6   Honor.  It has been over three years since Mr. Sabag has been
7   saying I, I am going to initiate these proceedings.  I, I am
8   going to do it.  It, it is being contemplated.

9   Reasonable contemplation doesn't mean forever,
10  contemplation forever, but the law is clear that while, while
11  the proceedings don't have to be initiated imminently, that is
12  very clear from *Intel*.  It does have to be initiated within
13  reasonable time, and that makes sense because otherwise, these
14  proceedings could go on forever.  It could be abused.  It could
15  be used as a fishing expedition, especially in a criminal
16  context, right?

17  And Mr. Sabag says that he is in communications, his
18  word, communications with the SFO, the Serious Fraud Office in
19  England.  We haven't seen these communications.  We don't know
20  who is doing the communicating.  We don't know if the ESFO is
21  even remotely interested in these supposed proceedings and
22  investigations.  Nothing has happened.  So what this Court is
23  allowing Mr. Sabag to do here, again, is to weaponize 1782.

24  THE COURT:  Let me just —

25  MR. BENTO:  Ulterior motive.

1        THE COURT:  Let me just come back.  I don't know how

2   much more of that you want to go through.  Let me just come

3   back to your client, his apparent sophistication as a business

4   person, his, you know, financial problems he is having.  But

5   nevertheless, you are telling me that Mr. Sabag couldn't find a

6   way to get a lawyer to come over here and ask for an extension

7   of time or file a response to the request to take his

8   deposition?  I mean, he couldn't do that?

9        MR. BENTO:  His, his focus once was from the

10  settlement.  Again, any, any amounts would have mattered,

11  right?  To get — and again, it wasn't just Mr. Sabag that

12  Mr. Windhorst had to, to deal with, many other stakeholders.

13  As the *Financial Times* article points out, that alone will, I

14  think, a $500 million payment, it — he, he is widely exposed.

15       And so every little, every little bit of money

16  matters, and so what he was trying to do was make good on the

17  settlement.  Why bother through this Court, why bother the

18  arbitrator?

19       THE COURT:  Because this, this is, is his right and

20  his, you know, there are consequences by ignoring things, which

21  he knew about.  All right.  I understand your position.

22  Anything else you want to add?

23       You went through all this time to put this PowerPoint

24  presentation together.  Don't go through the whole thing.  If

25  there are certain parts you really think are important you can

1    highlight them.

2         MR. BENTO:  I, I, I think, I think I, I made the, I

3    made the main points.  The, the only thing I would add is that

4    Mr. Sabag, you know, when he made good on the payment, he took

5    quick action.  So it is not like he wasn't doing anything, you

6    know, for a long time.  It is not like after making the payment

7    he didn't move and entered an appearance and reached out to Mr.

8    Korin.

9         We did that very quickly.  So once the payment was

10   done, once the funds were cleared and he was able to make that

11   payment, he took quick action.  So I think that alone shows

12   that while he couldn't have done that before because he just

13   didn't have the liquidity to do that.  Once he got the

14   liquidity, he did that very quickly.  And so I think that alone

15   is evidence that it was never his intent to disrespect this,

16   this Court's order.  It was never his intent to ignore the

17   deposition.  It was never his intent to — not to engage with

18   opposing counsel.

19        THE COURT:  But when they send e-mails, which you

20   didn't deny.  If they sent him e-mails and Mr. Calamari e-mails

21   saying, hey, we are trying to schedule this for whatever it

22   was, January 27th or something, and they didn't respond.

23        MR. BENTO:  He was coordinating.  So he was

24   coordinating with Mr. Sabag, Sabag's counsel to get the

25   settlement paid because his understanding was — and he didn't

1   have U.S. counsel, right, to respond on his behalf.  His

2   understanding was, clearly Mr. Sabag is trying to get paid.  He

3   didn't, he didn't refuse payment.  He accepted payment, right?

4   And it, it, it, it is not like, you know, he wasn't cooperating

5   with Mr. Sabag.  He was.

6          He wasn't missing in action, he was coordinating the

7   payment of the settlement, which further led to the dismissal

8   of this action.  And it is not Mr. Windhorst making that up.

9   The parties' settlement agreement is very clear on that, and

10  so, for, for those reasons, you know, we, we would respectfully

11  request the Court to deny sanctions today and, and to vacate

12  the prior order; or in the alternative, to stay this action so

13  that we can resolve these matters in the arbitration.

14         And then, if we have to come back to this court and

15  figure out whether, you know, deposition is, is, is

16  appropriate, then, we can do that on a more simplified

17  approach.  But for us to go through that position now or be

18  sanctioned now while the arbitration is trying to resolve

19  whether Mr. Sabag ought to dismiss; and by the way, Mr. Sabag

20  set in motion this entire proceeding, right?

21         It is his application.  He is the one requesting

22  discovery.  He has the power to move, to dismiss this action.

23  And so for Mr. — there is no prejudice as well from Mr. Sabag.

24  His foreign proceedings haven't, haven't commenced yet.  It is,

25  you know, he is going to commence these proceedings.  It has

1    been three years already.  Nothing has been done, and so there

2    is no prejudice to the other side.

3              Mr. Windhorst, on the other hand, not only is he going

4    to be prejudiced to sit for a deposition or suffer sanctions

5    before this Court, but there is the risk of inconsistent

6    decisions in the arbitration and in this court.  And so the

7    most reasonable, maybe pragmatic approach to take here is to

8    stay these proceedings, figure out what the arbitration is

9    going to do, see whether Mr. Sabag is going to comply.  We have

10   no reason to believe he is not going to comply with an order

11   requesting him to dismiss these proceedings, and then, figure

12   out; and then, come back to this court if we need to.

13             THE COURT:  All right.  Okay.

14             Your iceberg analogy is apropos, I believe, if my

15   memory is correct.  Today is the anniversary of the day that

16   the Titanic set sail for, for North America.  So I am sure that

17   was a coincidence.  I believe that is correct.

18             MR. BENTO:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             MR. BENTO:  Thank you.

21             THE COURT:  Mr. Korin?  I have few questions for you

22   as well, Mr. Korin.  Then, you can say whatever else you want.

23             MR. KORIN:  Thank you, although I am not thrilled that

24   the iceberg and the reference today to the Titanic just taking

25   off.

1        THE COURT:  So you, you say in your — I mention it to

2   Mr. Bento, the — I don't want to misquote anything, but the,

3   the Court is now amply aware of Mr. Windhorst is well-known

4   around the world for evading debts and breaching payment terms

5   of settlement agreements.  You have a quote to the *Heritage*

6   *Travel* case, but what is the basis of that?

7        MR. KORIN:  Well, there are articles in the paper.

8   There is the fact that we have had to chase him for payments to

9   the BVI now a second time.  There is the fact that he has had

10  his, his plane taken back or, or frozen, accounts frozen.

11  These are all evidence of continuous financial gamesmanship

12  that he plays, and I do believe that there are some cases out

13  there.

14        I, I can't — where he has, he has done this with the,

15  the put options before.  So it was based on — it was based

16  primarily in the article but all those other historical events

17  that we are aware of.

18        THE COURT:  Okay.  So cutting to the core here, I

19  heard Mr. Bento say that the contract at issue is very clear

20  upon payment of the term, payment of the money, the 1782

21  proceeding must be dismissed.  You want to respond to that?

22        MR. KORIN:  Well, first, there was an election of

23  remedies, and it was to — it wasn't a settlement agreement

24  that was being — was being enforced in the liquidation.  It

25  was the arbitrator's award, received an award.  It is an

1   arbitrator's award that is being chased.  We chose to liquidate
2   it for that amount, plus there were the fees and, and some
3   interest that were paid as part of it.  In fact, there were
4   two -- there were two awards, right?  There was, on the
5   principal amount, and then, there was the second final award
6   that, that covered the rest.

7        What is interesting is in the interim between those
8   two, this, this Court.  You know, there was -- the petition
9   for, for the deposition occurred during, during that time.  Had
10  Mr. Windhorst thought that it should have been dismissed that
11  there is nothing should have happened in Indiana while they
12  were working things out in the arbitration, should have brought
13  that to the arbitrator's attention at that time.  He didn't do
14  any of that.

15       He just said, I intend to pay.  So okay, you intend to
16  pay, but the agreement provided that time was of the essence.
17  Had he paid in time of the essence, we would have never had to
18  get a final award in the arbitration.  We would have had a
19  settlement and would have been done.  We wouldn't have had to
20  chase him in collection efforts to the BVI.  So there --

21       THE COURT:  Paid on time, would you still be seeking
22  his deposition?

23       MR. KORIN:  Had we been paid on time way back then?
24  No.  We had an agreement that said we needed to, to petition at
25  that time to dismiss it.

1      THE COURT:  So following up on that.

2      MR. KORIN:  Yeah.

3      THE COURT:  I mean, are you picking and choosing what

4  you want to be bound by?  Because I mean, what about the notion

5  that if you want to proceed with this matter, the 1782, pay the

6  money back, and you can do whatever you want.  But you are

7  keeping the money and still wanting the 1782 relief?

8      MR. KORIN:  Right, because we elected, we elected to

9  terminate the agreement and get it to be a liquidated damage

10  amount.  I mean, that, that is what we — that is what

11  Mr. Sabag did in the arbitration.  He received an award for the

12  amount.  There — he didn't, he didn't say let, let's — he —

13  it was a liquidated damage provision in the settlement

14  agreement.

15      THE COURT:  That is not what it says.  The words

16  "liquidated damages" don't appear in there, do they?

17      MR. KORIN:  No, it has the, the sum certain, right?

18  And, and we got an award for that sum certain; and then, we had

19  an additional award.  But the, the point of the, the — you

20  can't — I got to back off because the 1782 action was

21  occurring in parallel, right?  So we had this, this action.

22  There should have been a resolution.  He breached, materially

23  breached, and once you materially breach, you don't get the

24  benefit of that.

25      And, and your — and we have cited New York cases that

1   say that, and, and what is really troubling is that this,

2   this — Mr. Windhorst just ignored these proceedings.  He just

3   ignored this Court's order.  Had he lived up to his

4   obligations, had he done what this Court had ordered him to do,

5   this deposition would have been, would have been done with, and

6   here is a protective order in this case.

7        He chose to intervene, not just file an objection,

8   which he could have done.  He actually chose to intervene to

9   this action, become a party to this action, and bring himself

10   to this Court.  But he had an opportunity throughout all this

11   to stop.  He — all he had to do was pay timely.

12        Instead, he went silent, and, and Judge, I, I don't

13   think it is going out on a limb to say, had counsel reached out

14   to me and said hey, we just got in this case, we need another

15   30 days or, or whatever.  I — we would have agreed to that.

16   We have — because you would have granted it either way.  So,

17   so we were going — we would have agreed to it, but none of

18   that happened.

19        THE COURT:  You would have actually agreed — you

20   agreed originally to an extension of time, right?  Wasn't there

21   —

22        MR. KORIN:  Right.  It was unopposed.

23        THE COURT:  Yeah, right.

24        MR. KORIN:  I mean, we are not, we are not — we are

25   not trying to play gotcha here.  He — there, there is just not

1   much more that could be done.  We met the requirements.  There

2   is a protective order.  The, the only, the only, the only thing

3   that can be done with this information is be handed over to the

4   foreign tribunal.  That is all that we can do.

5         THE COURT:  So what, what is going on there?  Is, is

6   it reasonably contemplated?  I mean, it has been going on for

7   three years.

8         MR. KORIN:  There are conversations, but we also

9   obviously pointed out that this is pending, and so I am sure

10   they are waiting to, to, to see what happens here, but...

11         THE COURT:  They didn't have a deposition where he is

12   going to raise the Fifth Amendment every time you ask him a

13   question?

14         MR. KORIN:  You know, Judge, and that is okay, right?

15   He has that right.  We, we — if that, if that is what he wants

16   to do, he has the right to do that.  We get to ask the

17   question, and then, he gets to, to raise that.  And if it has

18   not been raised in some fashion, that, that is fine.  We can do

19   the deposition right in this courtroom.  So he can have you

20   here to, to, to make those calls as need be if they arise.

21         He has those protections.  No one is taking away any

22   of his protections, and he has a protective order that he got

23   from this Court to make sure that when you use this in any of

24   this, in, in another proceeding.

25         THE COURT:  If the deposition were to proceed, do you

1    think he has to be -- I know I said it occurred in Indiana, but

2    I am wondering if it were to proceed, any reason you couldn't

3    do it remotely?

4            MR. KORIN:  I would very much prefer to be in --

5            THE COURT:  I know.  Lawyers always prefer that.

6            MR. KORIN:  So the answer is that is absolutely my

7    preference for depositions, especially one that, that is likely

8    to have the issues that this one will have.  Much prefer to do

9    it face to face, Your Honor.

10           THE COURT:  So he offered to pay your reasonable fees

11   incurred in connection with this proceeding; is that right?

12           MR. KORIN:  Well, from talking settlement, Mr. Bento

13   did reach out and say we would -- he would be willing to pay,

14   but our experience with, with Mr. Windhorst that a promise to

15   pay anything certainly doesn't work out the way we imagine.  We

16   always have to go chase him all over the world.

17           THE COURT:  Well, but, and I know that.  That is

18   obvious, but he -- he did, under arbitration, not pay it, paid,

19   paid the, on the settlement amount, paid the attorney's fees

20   and interest on that.  Just in terms of --

21           MR. KORIN:  Well, he -- just need to liquidate the --

22   for the liquidation fees.  It wasn't for the arbitration.  It

23   wasn't -- I mean, it wasn't the large sum --

24           THE COURT:  It was a settlement amount.  It was a

25   settlement amount.

1          MR. KORIN:  Has paid — so, so the answer —

2          THE COURT:  Settlement.  He didn't pay.

3          MR. KORIN:  Right.

4          THE COURT:  Extended the time, and then, he finally

5     paid.  And then, he paid you fees and interest for being late

6     —

7          MR. KORIN:  He, he paid.

8          THE COURT:  — is that fair?

9          MR. KORIN:  He satisfied the arbitrator's awards,

10    that's correct.

11         THE COURT:  Okay.

12         MR. KORIN:  And then, that was in order to not have —

13    liquidate.

14         THE COURT:  All right.  Okay.

15         MR. KORIN:  Yes.  You know, chasing it — we had to

16    chase his assets, but the reality is, all these objections that

17    he has raised, and as you noted, were all waived.  He should

18    have sat for the deposition.  We would have been done with this

19    action by then, but he cannot be rewarded for his, for ignoring

20    this Court, ignoring — thankfully, the obligation to respond

21    to us when he would talk about anything about global — they

22    were pointed to reach out to me and try to talk about Indiana,

23    never did, not until well after.

24         THE COURT:  So you sent those e-mails, or somebody in

25    your firm sent those e-mails?

1       MR. KORIN:  I did, Your Honor.

2       THE COURT:  And you had no response?

3       MR. KORIN:  No response at all.

4       THE COURT:  And you copied Mr. Calamari as well?

5       MR. KORIN:  Absolutely.

6       THE COURT:  Other than delay and extra costs, is there

7  any prejudice that your client has incurred as a result of what

8  happened?

9       MR. KORIN:  Oh, there —— I mean, there, there was lots

10  of personal harm for him for not being paid in a timely basis.

11  I mean, you talk about liquidity issues, Mr. Sabag has spent

12  more than half a decade trying to get paid for his business.

13  He has had to chase all over the world, fight every fight and

14  only, only faced with liquidation of Sapinda twice now has, has

15  the payments that should have been made originally finally

16  made.

17       So yeah, there was a lot of —— I mean, there was a lot

18  of personal issues.  There were a lot of financial issues that

19  arose in the last six months as a result the failure to

20  timely pay.  Frankly, you know, when —— should Mr. Sabag's

21  willingness to try to work with him, right, we extended the

22  deadline.  There was a benefit.  There was a $50,000 increase

23  in the settlement amount in order to get paid, but we agreed to

24  do that, just pay within 30 days so I can move on with my life.

25  They didn't do that, and there was great ramifications on a

1    personal level to Mr. Sabag.

2         THE COURT:  So Mr. Bento says you are weaponizing

3    1782, that it is unheard of to use this to proceed against his

4    client with this deposition in a criminal proceeding.  Can you

5    respond to that?

6         MR. KORIN:  We met the requirements of 1782.  There is

7    no weaponizing of, of anything.  He intervened in this case.

8    There was, there, there is — this is a discovery process, and

9    in civil cases, the, you know, there may be criminal outcomes

10   to every civil business dispute.  And people have the right to

11   exercise their Fifth Amendment right in, in those proceedings

12   no different than you would have in this proceeding, Your

13   Honor.

14        So we, we really do believe that sitting for this

15   deposition, and, and as — that should even be a sanction,

16   right?  That just should be this Court enforcing its, its own

17   orders.  The sanction should be the cost of all this — all

18   that has occurred to get us to this day, and those two things

19   occurring in this, getting this deposition done in the next 30

20   days, moves it along.

21        You know, otherwise, we are just going to be — there

22   is just going to be additional delay and additional fight.

23   Frankly, court orders the deposition, take the deposition,

24   there is nothing more to do in this, and, and as the emergency

25   arbitrator found, there is nothing — there was no emergency to

1  stop —

2          THE COURT:  Right.

3          MR. KORIN:  — the deposition.  So the arbitrator

4  doesn't think that there is a need to do it but then raise it

5  with —

6          THE COURT:  The arbitrator did a pretty good job, I

7  thought.  He was pretty quick, and that — I know you didn't

8  like part of the decision about the jurisdiction but —

9          MR. KORIN:  Mr. Bento didn't talk about this, but I

10 suspect we both went yeah and then no.

11         THE COURT:  Right, right.  There is something for

12 everyone.  It, it, it is interesting, stay in his lane and all

13 that.  I thought that was interesting.  He had a tough

14 situation that he dealt with I thought pretty effectively,

15 so — not effectively but efficiently, so.  All right.

16 Anything else?

17         Oh, a question.  Have you provided them with the

18 estimate or statement of what your fees you believe were

19 incurred as a result of this, what is — the order not being

20 followed and having to be here today?

21         MR. KORIN:  No.  We have not had that discussion.  No,

22 Your Honor.

23         THE COURT:  Anything else?

24         MR. KORIN:  I am afraid to add that up, actually.

25 You're on the receiving end of a lot of briefs.

1          THE COURT:  Well, we shall see.  Anything else?

2          MR. KORIN:  Your Honor, we believe that, that

3    Mr. Windhorst acted in, in, in, in a strategic way in ignoring

4    this Court's orders and not, and not responding.  He cannot be

5    rewarded for that.  He needs to be sanctioned for it.  He needs

6    to sit for his deposition and this — and allow this matter to,

7    to see its way through to the end, which I thought we were very

8    close to at one point.

9          THE COURT:  All right.

10         MR. KORIN:  Thank you, Your Honor.

11         THE COURT:  Mr. Wukmer, did you want to add anything?

12         MR. WUKMER:  I do.

13         THE COURT:  Go ahead.

14         MR. WUKMER:  If I may.

15         THE COURT:  Sure.  You got all dressed up to come over

16   here today, I might as well have you talk.

17         MR. WUKMER:  I know.  I have almost forgot how to do

18   this.

19         THE COURT:  I doubt it.

20         MR. WUKMER:  This case has a long storied history,

21   none of which you want to hear about.  I do have to respond,

22   though, to the statement that Mr. Sabag spent a half a decade

23   chasing payments that he was entitled to get for the payment of

24   his company.  We, on the record, want to say we adamantly

25   disagree with that.  We reached a settlement, but we don't

1  think Mr. Sabag was entitled to anything.  So I just want that

2  to be clear in the record.

3          THE COURT:  Almost $3 million, and you didn't think he

4  was entitled to anything?

5          MR. WUKMER:  Well, we didn't pay him $3 million.

6          THE COURT:  Well, he was paid.

7          MR. WUKMER:  But, yeah, there were a lot of

8  considerations that went into that, including an enormous cost

9  in discovery.

10         A VOICE:  Judge, Judge — I don't mean to interrupt,

11  but I wasn't — anything with regard to Track Group in my

12  presentation, we were talking just about Mr. Windhorst just to,

13  to —

14         MR. WUKMER:  It wasn't that clear, but during the

15  course of that, this 1782 action was filed.  And we intervened

16  for the sole reason that we wanted to protect our client from

17  discovery, our client being Marion County Corrections, and, and

18  so that is why we intervened.

19         A VOICE:  I am going to object to that.  He didn't —

20  didn't represent them.  He represented Track Group.  He didn't

21  represent Marion County.

22         MR. WUKMER:  Well, I said our client.

23         A VOICE:  Our client, Marion County.

24         MR. WUKMER:  Track Group's client —

25         THE COURT:  Actually, I had the same question, when

1   you said, just the way you phrased it but —

2                   (Attorneys are cross talking.)

3                   MR. WUKMER:  Marion County —

4                   A VOICE:  Sorry for the —

5                   THE COURT:  The objection (inaudible).  Go ahead.

6                   MR. WUKMER:  We entered into a settlement agreement,

7   as you pointed out.  Part of the consideration was that this

8   case would be dismissed when the payments were made.  Now, the

9   point we had was we just wanted our client — Marion County

10  clients, our clients' client to be out of this, and that is why

11  we expected to be dismissed.  We were getting ready to withdraw

12  when the case was closed.  So we thought the case was over.

13                  THE COURT:  I did too.

14                  MR. WUKMER:  And, and so we, we didn't take any

15  further action.  It was only during the subsequent filings that

16  we learned that Mr. Sabag was taking the position that the

17  agreement was not — it, you know, the agreement was

18  terminated.  And so, one of the positions I just want to make

19  clear here on the record, and I think Sabag's counsel agrees,

20  is that with regard to Track Group, this agreement remains in

21  full force and effect, and it is not terminated.  And, and I

22  think Mr. Sabag will agree with that.  And we take, you know —

23  so we are going to object, and part of that is the dismissal.

24  And we expect the case to be dismissed and not further

25  discovery against Marion County.

1          Now, I heard a lot of discussion.  I heard Mr. Sabag's
2    counsel say at least three times that once this deposition is
3    taken, the case is over.  If that is the case, you know, our
4    client would be fine with that.  We don't have any position on
5    the deposition, no position on the sanctions.  We just want to
6    make sure our agreement is in place and this case is dismissed
7    without any further action against Track Group's client.
8          THE COURT:  Okay.  All right.  Mr. Bento, anything
9    else you wanted to say to wrap up?
10         MR. BENTO:  Yes, just very briefly, Your Honor.
11         THE COURT:  Okay.  Come on up here.
12         MR. BENTO:  I think Your Honor hit the nail on the
13   head when you asked Mr. Sabag's counsel whether he was picking
14   and choosing, and I, I think the way we put in our briefs is,
15   you know, he is trying to eat his cake and have it too.  And I
16   think on the election of, of, of remedies point, I think
17   Mr. Sabag misses the point.
18         It is not that he elected to enforce the award in the
19   BVI, it is that he elected to enforce the settlement agreement
20   in the arbitration.  That was the point in time when he had to
21   elect his remedies.  He could have terminated the agreement.
22   He didn't.  He sought to enforce it.  So I just wanted to, to,
23   to clarify that, and now that we had a little bit about the
24   Marion County points, this reminds me of another issue
25   underlying the original 1782.

1   And I completely admit that we are way past, and it is
2   way too late to raise that.  But there is very good law, and it
3   is unfortunate that we weren't retained back then.  But there
4   is very good law that would have precluded this Court to
5   authorize discovery from a Government agency and Government
6   agents.
7   The word "person" under 1782 excludes the Government.
8   The Supreme Court is very clear on that.  There is very clear
9   authority on 1782.
10  THE COURT:   (Inaudible) *v. Michigan*?  You know that
11  case?
12  MR. BENTO:   Correct, and indeed the case in, in D.C.,
13  Dodi — *Al Fayed v. The CIA*.  Mr. Al Fayed tried to weaponize,
14  again, the 1782 statute to obtain information from the CIA.
15  And the D.C. Circuit very clearly said, the word "person," the
16  target of the 1782, cannot include the Government and its
17  agents.  This is exactly what Mr. Sabag did here, and so I know
18  we are late, but I know that the Court has authority and
19  discretion still in this case.
20  And I would respectfully request the Court to consider
21  that point, to consider the fact that not only is Mr. Sabag
22  seeking to weaponize 1782 against the target of the criminal
23  investigation, but it also used it to obtain discovery that it
24  shouldn't have been able to obtain from Government agencies.
25  So that is another form of weaponization that shouldn't have

1  been authorized in the first place.

2       I haven't had anything specifically as to Mr. Sabag's

3  prejudice, and I have heard vague references to personal harm.

4  But I don't know what that means, Your Honor.  He has been paid

5  over $3 million.  In fact, Mr. Windhorst overpaid him because

6  of currency conversion issues, but he has been paid.  And he

7  needs to keep up with his side of the bargain.

8       This Court shouldn't, you know, allow him to proceed

9  with discovery that seeks to circumvent the policy in this

10 country that seeks to uphold the enforcement of contracts.  If

11 folks are allowed to enter into settlement agreements that

12 specifically resolve the proceeding at issue here, take the

13 money but then seek to do something else and seek to go back on

14 their word, I don't think that is fair.  And I think this, this

15 Court should exercise its discretion to deny not just the 1782

16 but the sanctions altogether.

17      The sanctions are only focused on Mr. Windhorst's

18 delay and failure to engage in a discussion about the

19 depositions.  We are not disputing that.  We accept that, and

20 we apologize for that, but the reverse, the other side of the

21 coin is that Mr. Windhorst wasn't just sitting around doing

22 nothing.  He was communicating with Mr. Sabag's counsel about

23 payment of the very settlement monies that Mr. Sabag sought to

24 enforce that would have resolved this proceeding.

25      It stands to reason that if someone seeks to settle a

1   proceeding upon receiving payment and payment is forthcoming,
2   that, that proceeding would be dismissed.  It makes no sense
3   for Mr. Sabag to seek to push, and so we were completely
4   surprised when we received the e-mail from Mr. Sabag's
5   representative.  And this is in no way a criticism of Mr.
6   Korin.  This is Mr. Sabag's position, the one-liner e-mail
7   saying it is our intent -- it is Mr. Sabag's intent to continue
8   with the deposition.  It just didn't, didn't make sense.

9           The monies were paid.  The settlement stood.
10  Mr. Sabag sought to enforce it time and time again, not only
11  through the arbitration but through the BVI proceeding as well.
12  The BVI proceeding was all about the settlement monies.  That
13  is what it was about.  It wasn't anything else, and Mr. Sabag
14  didn't just get paid for the settlement monies, he got paid for
15  his BVI costs as well.

16          And so, you know, I think we heard that the criticism
17  that Mr. Windhorst isn't, you know, isn't going to pay fees on
18  time, but he has.  He, he, he has paid.  He has been late
19  before, but he has paid, and he has paid the BVI costs on time.
20  Why?  Because his liquidity issues resolved.  I mean, it, it is
21  not rocket science.  It is not like he was trying to evade the
22  payment.  He signed his name on the agreement.  He intended to
23  be bound by it.  He just encountered liquidity problems.

24          Now, would it have been a more ideal situation had he
25  not encountered those, those, those, those liquidity problems?

1    Of course.  We wouldn't be here today.

2         THE COURT:  Is it your position he signed on the

3    dotted line, he had no idea he was going to be facing any

4    liquidity issues?

5         MR. BENTO:  He didn't.  He wouldn't have otherwise,

6    right?

7         THE COURT:  I don't know.

8         MR. BENTO:  He wouldn't.  His intention was to get

9    this resolved.  That is the whole point, and not just this

10   resolved, by the way, but the arbitration as well.  There is a

11   variety of proceedings in the settlement agreement, the

12   arbitration, purported employment claims, this proceeding, and

13   as well as the global release of any and all claims, right?

14        And so I think I touched on the, on the prejudice

15   point.  I think I heard an argument as to waiver, that we

16   waived the arguments that we are making as to the election of

17   remedies and so on and so forth in the arbitration.  We kind of

18   made those arguments in the arbitration because they don't

19   exist.  Mr. Windhorst hadn't paid Mr. Sabag so there was no

20   breach of contract argument to make.  Mr. Sabag only received

21   the monies after February 8th.

22        That is when — and he didn't dismiss these

23   proceedings on February 15 by February 15.  That is when the

24   breach occurred.  That is when — that is the first time that

25   the breach of Mr. Windhorst's breach of contract argument

1  arose.  So the fact that Mr. Windhorst — Mr. Windhorst didn't

2  know that he was going to be able to pay Mr. Sabag at a certain

3  point in time during the arbitration.  He was trying, but he

4  didn't know exactly when.  So he didn't have a breach of

5  contract claim back then so there is no waiver.

6      THE COURT:  Okay.  Anything else?

7      MR. BENTO:  Unless I can assist the Court any

8  further —

9      THE COURT:  Look, you-all did a good job, and it is an

10  interesting issue, a series of issues.  It is unfortunate, as

11  you had pointed out — you can have a seat.  Thank you.

12      It is unfortunate, as you pointed out, this is kind of

13  all here because in large part, your client didn't pay on time,

14  and all of this could have been avoided and didn't come to the

15  Court and keep us appraised of what was going on.

16      An order I have issued, it was completely ignored, and

17  so I have got to figure out the best way to resolve that, in

18  light of the concerns you have raised about the 1782 proceeding

19  and the concerns that Mr. Korin has raised as well.  So I, I

20  would like to tell you right now exactly what I am going to do.

21  Although I think I know what I am going to do, I am not going

22  to say too much more about that other than I do have — I am

23  not sure anything I heard today changed my concerns about

24  Mr. Windhorst's conduct, you know.

25      We have lots of folks who appear in front of the Court

1  who have financial or other issues why they end up not obeying
2  my court orders, and we, we just can't say oh, that is fine.
3  But there is other issues here too that need to be figured out.
4       I will try to get a ruling out relatively soon,
5  whatever that means, but it means relatively soon.  And so I
6  would encourage you — I mean, I have got two lawyers here I
7  know pretty well, maybe three, who in my experience, get things
8  resolved without the Court having to, you know, issue rulings
9  that maybe one or both sides would rather the Court not issue,
10 and so I would encourage you to continue to talk.
11      Maybe, maybe there is a resolution.  Maybe you're
12 here, you can use the courtroom if you want to talk for a few
13 minutes.  If there is anything we can do to help resolve the
14 case, let us know, but you probably have about, I would say,
15 two-weeks' max before this order will go out.  So it could be
16 less, but it is probably in that range.
17      So all right.  Thank you for your time.
18      (Concluded, 10:59 a.m.)
19                     – – –
20
21
22
23
24
25

47

47

CERTIFICATE OF COURT TRANSCRIBER

        I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


s/s Jean A. Knepley                     April  23, 2023
Signature of Approved Transcriber       Date