**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In Re: | ) |
| | ) |
| The Application of: | ) |
| | ) Case 1:19-mc-00084-JPH-TAB |
| ELI SABAG, for an Order Pursuant to 28 | ) |
| U.S.C. § 1782 to Conduct Discovery for Use | ) |
| in Foreign Proceedings. | ) |

**ELI SABAG'S RESPONSE IN OPPOSITION TO LARS WINDHORST'S OBJECTIONS
TO MAGISTRATE JUDGE'S ORDER ON SHOW CAUSE HEARING AND
PENDING MOTIONS (DOC. 141), ORDER ON SUPPLEMENTARY REQUEST
FOR DISCOVERY IN ACCORDANCE WITH 28 U.S.C. § 1782 (DOC. 105), AND
ORDER TO SHOW CAUSE WHY SANCTIONS ARE NOT APPROPRIATE (DOC. 108)**

I.      **Introduction**

The dispute between Eli Sabag ("Mr. Sabag") and Lars Windhorst ("Mr. Windhorst") began in 2014 when Mr. Sabag's company was acquired by Track Group, Inc. ("Track Group"). Track Group was controlled at the time by Mr. Windhorst's British Virgin Islands ("BVI") entity called Sapinda Asia Limited ("Sapinda"). The ultimate acquisition was executed through various agreements between Track Group, Sapinda, Mr. Windhorst, and Mr. Sabag, but the two most relevant agreements for purposes of this discussion included: (1) an Acquisition Agreement between Track Group and Mr. Sabag that provided Mr. Sabag with shares in Track Group and (2) a Put Option Agreement that allowed Mr. Sabag to sell/put/transfer his Track Group shares that he received in the acquisition to Sapinda on certain pre-agreed terms. Mr. Windhorst was a co-obligor to Sapinda under the Put Option Agreement, so he was obligated to perform for Sapinda if Sapinda failed to perform itself.

In 2017, Sapinda/Windhorst breached the first part of their Put Option Agreement with Mr. Sabag after Sapinda refused to tender approximately $3 million for a specific number of Mr.

Sabag's Track Group shares.   Mr. Sabag was thereafter required to initiate an involuntary liquidation proceeding in the BVI against Sapinda to enforce Mr. Sabag's rights under the Put Option Agreement.   Sapinda and Mr. Windhorst would later agree to pay Mr. Sabag what he was owed to resolve the BVI dispute.

Also in 2017, when the time came for Track Group to award Mr. Sabag certain contingent shares under the earn-out clause of their Acquisition Agreement (based on Track Group's future sales), Track Group suddenly claimed that it did not owe Mr. Sabag his earn-out shares due to, *inter alia*, certain unexplained last-minute changes that were made to an agreement with Marion County Community Corrections ("MCCC") which changed the duration of the agreement.   (Doc. 9, pp. 23-24; 27-31).   Had those earn-out shares been awarded to Mr. Sabag, Sapinda (as guaranteed by Mr. Windhorst) would have been required to purchase those shares under the Put Option Agreement for no less than approximately $17.6 million.

After Track Group, Sapinda, and Mr. Windhorst refused to honor their agreements regarding the earn-out shares, the parties' dispute was ultimately compelled to arbitration in the International Centre for Dispute Resolution ("ICDR").   Before the arbitration trial, the parties agreed to settle the matter through an agreement ("Settlement Agreement") under which Track Group agreed to pay $1.6 million to Mr. Sabag, and Sapinda/Windhorst agreed to pay $2.8 million to Mr. Sabag.   The Settlement Agreement provided that after Mr. Sabag's arbitration counsel received payments (totaling $4.4 million) from both Track Group and Sapinda/Windhorst, Mr. Sabag would dismiss this Section 1782 Proceeding.   Track Group honored its promise to pay. Sapinda/Windhorst breached their obligation to pay.

In an effort to salvage the Settlement Agreement with Sapinda/Windhorst, Mr. Sabag agreed to an amended settlement agreement ("Amended Settlement Agreement") under which (1)

the settlement amount for Sapinda/Windhorst was increased to $2.85 million, (2) the time for payment was extended by several weeks, and (3) a "time is of the essence" clause was added to ensure Mr. Windhorst's prompt performance.  The Settlement Agreement and Amended Settlement Agreement are collectively referred to herein as the "Settlement Agreements."

The settlement parties had agreed that any disputes that arose under the Settlement Agreements should be immediately resolved by the same arbitrator who was hearing the original ICDR arbitration.  The Amended Settlement Agreement also added a unique provision (Section 3) whereby Sapinda/Windhorst's breach of the new "time is of the essence clause" would trigger a special remedy allowing Mr. Sabag to go back to the same ICDR arbitrator (in the still-ongoing arbitration) to immediately seek a final damages award of $2.85 million (plus interest and costs).  The damages award could thereafter be enforced under the NY Convention.  Section 3 of the Amended Settlement Agreement did not reserve any rights to Mr. Windhorst to seek the dismissal of this Section 1782 Proceeding if Mr. Windhorst materially breached his obligations to make a timely payment.  Section 3 intended that any final ICDR award would replace the Settlement Agreements, and the ICDR arbitrator would later rule as such.

After Sapinda/Windhorst once again failed to honor their payment obligations to Mr. Sabag under the Settlement Agreements, Mr. Sabag terminated the Settlement Agreements by invoking Section 3, and he obtained a damages award from the ICDR arbitrator of $2.85 million (plus interest and costs).  Mr. Sabag once again initiated an involuntary liquidation proceeding against Sapinda in the BVI.

Back in December 2019, before Mr. Sabag had filed his ICDR arbitration claim, Mr. Sabag had initiated this Section 1782 Proceeding to seek discovery from MCCC regarding its dealings with Mr. Windhorst and Track Group.  Mr. Sabag intended (and still intends) to pursue criminal

remedies against Mr. Windhorst in the United Kingdom. After this Court initially granted Mr. Sabag's Section 1782 Application, Mr. Windhorst would intervene in May 2020 in an attempt to vacate the order. As noted in Mr. Sabag's Rule 72 Objections, Mr. Windhorst's attempt to vacate this Court's orders later proved unsuccessful, but Mr. Windhorst thereafter sought and received both (1) the rights to participate in the MCCC discovery and (2) a protective order limiting the use of the discovery to only U.K. criminal proceedings. By that time, Mr. Sabag's Section 1782 discovery had led to a finding, *inter alia*, that the son of the executive director of MCCC (who was also the son of the deputy director) was provided with a job with Track Group after the period in which Mr. Sabag had originally alleged that Mr. Windhorst had bribed the executive director. In other words, the findings of the original Section 1782 discovery provided documentation substantially bolstering Mr. Sabag's allegations of bribery (as defined under the U.K. Anti-bribery Act). Guided by Mr. Sabag's Section 1782 findings, Mr. Sabag filed a Supplementary Request to Depose Mr. Windhorst ("Supplementary Request") in further pursuit of discovery to be used in a criminal prosecution against Mr. Windhorst in the U.K. (Doc. 106).

After Mr. Sabag filed his Supplementary Request, Mr. Windhorst's counsel in this matter withdrew, but put him on notice that he could face consequences if he did not respond to the Supplementary Request in a timely manner. (Doc. 100-1). Mr. Windhorst then had four (4) months and no fewer than thirteen prompts[1] to reach out to undersigned counsel or this Court regarding any issues, claims, or assertions he had regarding claims to arbitration. Instead of making a phone call or writing an email, Mr. Windhorst (and his personal legal counsel) did nothing.

---

[1] Mr. Windhorst could have responded to : (1) Mr. Sabag's Supplementary Request for Discovery in Accordance with 1782 ("Supplementary Request"); (2) his own attorneys' motions to withdraw, motion for extension of time, and the corresponding orders; (3) this Court's Order on Supplementary Request for Discovery ("Deposition Order"); (4) written and electronic communications from undersigned counsel; (5) Mr. Sabag's Notice of Compliance; and (6) Mr. Sabag's Motion for Order to Show Cause.

As Mr. Windhorst faced the reality of Sapinda's eventual liquidation in the BVI, he finally made payment to Mr. Sabag (approximately four months after Mr. Sabag filed his Supplementary Request). At that point, Mr. Windhorst apparently expected that all the ongoing activity that he caused in this Court after ignoring this matter and violating this Court's orders be halted. Mr. Windhorst now claims to this Court that the Settlement Agreements (which were terminated and replaced with an ICDR Award) are still valid, and that a new ICDR arbitrator should make a new determination of the validity of the Settlement Agreements. The Settlement Agreements themselves required that any disputes be resolved only by the original ICDR arbitrator (under the original arbitration case number), and Mr. Windhorst's new arguments, which try to overrule the Final Award of the original ICDR arbitrator, defy all logic.

Notwithstanding Mr. Windhorst's attempts to fight concurrent battles in both this Court and the ICDR, Mr. Windhorst is too late to raise his arbitration arguments with this Court. "When a party chooses to proceed in a judicial forum, there is a rebuttable presumption that the party has waived its right to arbitrate."[2] Mr. Windhorst waived his claims to arbitration when he ignored Mr. Sabag's Supplementary Request and he thereafter violated this Court's order which required him to sit for a deposition within 45 days. Even today, Mr. Windhorst is still presenting new arguments to this Court in an attempt to dismiss this Section 1782 Proceeding, thereby further demonstrating, through his litigation conduct, that Mr. Windhorst wants to continue his litigation in this forum.

## II.   Relevant History

Mr. Sabag provides the following relevant and combined timeline:

(1)   On June 10, 2022, Mr. Sabag, Mr. Windhorst, Sapinda, and Track Group entered into the Original Settlement Agreement in the arbitration matter pending before the

---

[2] *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prod., Inc.*, 660 F.3d 988, 995 (7th Cir. 2011)

ICDR ("Arbitration Matter"), which required Mr. Windhorst/Sapinda to pay $2.8 million to Mr. Sabag via his arbitration counsel. (Doc. 118-1). The Settlement Agreement had a provision that required Mr. Sabag to dismiss this Section 1782 Proceeding if Sapinda/Windhorst made his payment in a timely manner to Mr. Sabag's arbitration counsel (Reed Smith).

(2)   Sapinda/Mr. Windhorst breached the Settlement Agreement in the Arbitration Matter by failing to pay the $2.8 million as required.

(3)   On July 11, 2022, Mr. Sabag, Mr. Windhorst, and Sapinda entered into the Amended Settlement Agreement, which increased the settlement amount owed by Mr. Windhorst to $2.85 million and required Mr. Windhorst to pay that amount on or before August 1, 2022. (Doc. 118-3, p. 2). Mr. Sabag also protected his interests in the Amended Settlement Agreement by including (1) a "time is of the essence" clause to require prompt payment as a material condition of the Amended Settlement Agreement and (2) a damages clause (resembling a liquidated damages clause) that permitted Mr. Sabag to "seek an immediate summary international arbitration award" under the NY Convention in the event that Mr. Windhorst did not pay. (Doc. 118-3, p. 2). Mr. Windhorst did not preserve any rights in the Amended Settlement Agreement to cause Mr. Sabag to dismiss this Section 1782 Proceeding if (1) Mr. Windhorst did not pay in a timely manner and (2) Mr. Sabag was required to initiate new litigation to enforce an arbitration award. The Settlement Agreement, if honored, was supposed to foreclose and discharge any future litigation.

(4)   Mr. Windhorst failed to make the required payment under the Amended Settlement Agreement by August 1, 2022.

(5)   On August 2, 2022, Mr. Sabag chose to terminate the Settlement Agreements[3] and file his ICDR "Motion to Enforce Settlement Agreement as Amended Against

---

[3] *See Nas Electronics v. Transtech Electronics Pte*, 262 F.Supp.2d 134, 145 (S.D.N.Y. 2003) which provides:

Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages. . . It is undisputed that the plaintiffs breached the Settlement Agreement. Section IV of the Settlement Agreement, upon which the defendants did rely in obtaining the Judgement of $3,200,000, served as the liquidated damages provision in the Settlement Agreement, because it outlined the remedies available to [defendants] in light of a breach by the plaintiffs. The fact that the defendants relied upon § IV of the Settlement Agreement to reopen the litigation and to have the Court enter Judgment does not mean that the defendants did not terminate the contract or that they continue to be obligated to perform their obligations, notwithstanding the' plaintiffs' failure to perform their obligations. It is clear that by using § IV of the Settlement Agreement, the defendants were terminating the contract and suing for damages. Section IV is a provision that can only be invoked if there was a breach, because § IV provided that in an event of a

Respondents Sapinda Asia Limited and Lars Windhorst and for Immediate Entry of Summary Award" ("Motion for Award"), which sought to enforce the damages provision of the Settlement Agreements and thereby terminate the Settlement Agreements. (Doc. 118-6).

(6)    On August 9, 2022, Mr. Windhorst purportedly sent documents evidencing a wire transfer from the Euram Bank in Austria to Mr. Sabag with payment. (Doc. 118-10). However, no payment ever arrived and the wire documents from Euram Bank appeared to be illegitimate.

(7)    On August 15, 2022, the arbitrator responded to Mr. Sabag's Motion for Award, having read the submissions, indicating that he had jurisdiction to issue a partial award of the $2.85 million principal amount, leaving issues of fees, costs, and interest to a subsequent final award after briefing. (Doc. 118-11).

(8)    On August 17, 2022, the arbitrator issued a partial award, explicitly ruling that Mr. Windhorst and Sapinda breached a "time is of the essence" clause of the Amended Settlement Agreement to pay $2.85 million on or before August 1, 2022. (Doc. 118-12). The arbitrator awarded Mr. Sabag damages in the amount of $2.85 million. In a subsequent final award issued on November 7, 2022 (discussed below), the arbitrator awarded Mr. Sabag with expected attorneys' fees and costs, arbitrator's fees, and 9% interest. (Doc. 118-12, p. 3).

(9)    On October 6, 2022, Mr. Sabag initiated an involuntary liquidation proceeding against Sapinda in the British Virgin Islands ("BVI Proceedings"). (Doc. 127-5). Two members of Ernst & Young were judicially appointed as co-liquidators. (Doc. 127-8). Mr. Sabag did not seek to enforce the Settlement Agreements, but rather sought to enforce the arbitrator's award(s).

(10)   On October 11, 2022, Mr. Sabag filed his Supplementary Request for Discovery, in this Court, seeking Mr. Windhorst's deposition. (Doc. 98). Mr. Sabag made this Court aware in his affidavit[4] that Mr. Windhorst breached the Settlement Agreements in the Arbitration Matter, the arbitrator found a breach, and the arbitrator issued an award against Mr. Windhorst. (Doc. 98-2, ¶7).

---

default, the defendants "may . . . move to reopen the New York Federal Action and enter Judgment against [plaintiffs]. In the absence of any breach, § IV did not impose any obligation on either the plaintiffs or the defendants, and as a matter of law, can only be interpreted as a liquidated damages provision.

[4] Due to a confidentiality order from the arbitrator, Mr. Sabag acted cautiously at the time. However, because Track Group has published the original Settlement Agreement in an SEC filing, it was no longer confidential.

(11) On October 20, 2022, Mr. Windhorst's counsel in this matter from Sidley Austin, LLP and Hoover Hull Turner, LLP sought leave for their appearances to be withdrawn and a motion for extension for Mr. Windhorst to respond to the Supplementary Request for Discovery "to allow sufficient time for [Mr. Windhorst] to retain and consult with new counsel." (Doc. 99, p. 10, Doc. 100, Doc. 101). In Hoover Hull Turner, LLP's 7-day letter, Mr. Windhorst specifically notified Mr. Windhorst that, "[f]ailure to immediately secure new counsel could result in an adverse ruling." [5] (Doc. 100-1).

(12) On October 26, 2022, this Court issued its Order granting Mr. Windhorst until November 22, 2022, to "respond to the Supplementary Request." (Doc. 104).

(13) On November 7, 2022, the arbitrator issued its Final Award in the Arbitration Matter, including an award of interest, legal fees, and costs to Mr. Sabag and concluded that, **"[a]ny and all other claims and counterclaims arising out of this arbitration are dismissed."** (Doc. 118-12, p. 3) (emphasis added). The Arbitration Matter was then closed, and all claims under the Settlement Agreements (which arose "out of this arbitration") were in fact dismissed.

(14) Neither Sapinda nor Mr. Windhorst sought to vacate, modify, or appeal either arbitration award. Although Mr. Windhorst was (by that time) aware that Mr. Sabag was seeking his deposition in this Section 1782 Proceeding, Mr. Windhorst never notified the arbitrator, to whom all future arbitrations under the Settlement Agreement were required to be sent (i.e., under the same ICDR case number), that the arbitrator should carve out future rights for Mr. Windhorst's to claim that he was entitled to the dismissal of this Section 1782 Proceeding (if he later paid). [6]

(15) Mr. Windhorst never responded to Mr. Sabag's Supplementary Request for Discovery. On December 15, 2022, this Court granted Mr. Sabag's Supplementary Request and ordered that Mr. Windhorst's deposition was to occur "at a mutually acceptable time within 45 days, in Indiana, and may be videotaped." ("Deposition Order"). (Doc. 105, p. 6).

(16) On December 29, 2022, undersigned counsel tendered a Notice of Video Deposition and Subpoena to Testify at Deposition on January 27, 2023, to Mr. Windhorst and his personal attorney, Peter Calamari. (Doc. 106, ¶2). Undersigned

---

[5] Sidley Austin LLP's 7-day letter informed Mr. Windhorst of his deadline to respond to the Supplementary Request for Discovery and also outlined the fact that they had not been paid since September 2021. (Doc. 101-1).

[6] If Mr. Windhorst had raised the Section 1782 issue in the arbitration in a timely manner, such claims could have been fought before the arbitrator at that time, not through a new arbitration that Mr. Windhorst is now seeking (on questionable jurisdictional grounds).

counsel also sent a follow-up email to Mr. Windhorst and Mr. Calamari seeking their cooperation to select a mutually acceptable deposition date, if January 27, 2023 did not work for Mr. Windhorst.  (Doc. 106-2).

(17)   On January 13, 2023, undersigned counsel attempted to get in contact with Mr. Windhorst and Mr. Calamari concerning Mr. Windhorst's deposition via email. (Doc. 106-4).  Neither ever responded to undersigned counsel.

(18)   On January 17, 2023, undersigned counsel once again attempted to get in contact with Mr. Windhorst and Mr. Calamari concerning Mr. Windhorst's deposition. (Doc. 106-5).  Neither responded to undersigned counsel.

(19)   On January 20, 2023, Mr. Sabag filed his Notice of Status of Compliance with Doc. 105, in this matter outlining his efforts to engage Mr. Windhorst and/or Mr. Calamari in the process of scheduling the deposition and Mr. Windhorst's lack of response.  (Doc. 106).

(20)   On January 24, 2023, Mr. Windhorst's BVI counsel emailed Mr. Sabag's BVI counsel, "If this matter proceeds, the [liquidation] application will need to be amended, and our client will not bear the costs your client incurs in doing so.  Our client does however accept liability in principle for these amounts, and will not require the liquidation application to be amended if your client agrees to dismiss the action in Indiana including the deposition scheduled for Mr Windhorst therein in return for payment." (Doc. 127-9, p. 4).

(21)   Mr. Sabag's BVI counsel responded that same day, "[w]e remind you of your representation to Sapinda's liquidators that Sapinda is in a position to pay its outstanding debt owed to our client. If that is truly the case, please arrange for payment to be made forthwith. It is entirely improper to now condition that payment on the discontinuance of entirely separate proceedings in another jurisdiction (in respect of which our firm is not involved and is not in a position to make any representations related to such proceedings)." (Doc. 127-9, p. 3) (parenthetical in original).

(22)   Mr. Windhorst's BVI counsel replied, "We also do not agree that it is inappropriate for our client to seek a "global" (or partly global) resolution; on the contrary it is commercially sensible.  You say your firm is not involved and is not in a position to make any representations related to the proceedings in Indiana, but the question is directed at your client, who is in a position to answer.  Please could you therefore confirm whether or not your client is willing to withdraw the Indiana proceedings so that the parties can avoid further satellite litigation?" (Doc. 127-9, p. 2) (parenthetical in original).  These exchanges with BVI counsel show that Mr.

Windhorst was fully aware of his obligations to this Court, but he was choosing to ignore this Court and undersigned counsel.

(23)   On January 27, 2023, Mr. Windhorst failed to appear at his subpoenaed deposition without any cause or justification.  (Doc. 107-1).

(24)   On February 1, 2023, Mr. Sabag filed his Motion for Order to Show Cause related to Mr. Windhorst's failure to appear at his deposition.  (Doc. 107).  Mr. Windhorst made no response thereto.

(25)   On February 8, 2023, Mr. Windhorst finally agreed to make a full payment to Mr. Sabag's BVI counsel to cease the BVI Proceedings so that Sapinda would not be liquidated.  (Doc. 118-15, p. 3-5).

(26)   On February 14, 2023, Lucas Bento, with Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), reached out to undersigned counsel to discuss this matter.  (Doc. 119-1, p. 5).

(27)   Mr. Bento and undersigned counsel spoke on February 15, 2023, and on February 22, 2023.   Undersigned counsel confirmed that it is still Mr. Sabag's intent to conduct the deposition of Mr. Windhorst for use solely with the United Kingdom ("U.K.") criminal authorities.  (Doc. 119-1, p. 2).

(28)   On February 23, 2023, Mr. Bento and undersigned counsel spoke again, and on February 27, 2023, undersigned counsel confirmed Mr. Sabag's intent to depose Mr. Windhorst. (Doc. 119, ¶ 9).

(29)   On March 2, 2023, this Court entered[7] its Order to Show Cause Why Sanctions Are Not Appropriate ("Order to Show Cause"), ordering Mr. Windhorst to personally appear on April 11, 2023, to "show cause as to why sanctions are not appropriate for violating this court's order in Filing No. 105, issued on December 15, 2022, by and through failing to cooperate in scheduling his deposition and through failing to appear at the subpoenaed deposition."  (Doc. 108).

(30)   On March 2, 2023 and within hours of the Court's circulation of the Order to Show Cause, Mr. Bento tendered a letter demanding that Mr. Sabag draft a joint stipulation to dismiss this matter on or before March 3, 2023.  (Doc. 119-3).

---

[7] The Order to Show Cause was signed on March 1, 2023, but not entered and issued to the parties until March 2, 2023 (Doc. 108).

Numerous subsequent filings were made.  Most recently, after conducting a hearing, the Magistrate Judge issued an Order on Show Cause Hearing and Pending Motions ("Sanctions Order").  (Doc. 141).  On May 8, 2023, Mr. Windhorst filed his "Objections to Magistrate Judge's Order On Show Cause Hearing And Pending Motions" (Doc. 141), "Order On Supplementary Request For Discovery In Accordance With 28 U.S.C. § 1782" (Doc. 105), and "Order To Show Cause Why Sanctions Are Not Appropriate" (Doc. 108) ("Windhorst's Objections") (Doc. 143), which is the subject of this Response.  Mr. Sabag filed his own Objection to the Sanctions Order to address the issue of whether the Magistrate Judge erred in failing to analyze whether Mr. Windhorst waived his claims to arbitration through his contemptuous litigation conduct, which still continues today.

### III.    Standard of Review

Under Rule 72(a), "the clear error standard is highly differential, permitting reversal of the magistrate judge's ruling only when "the district court is left with the definite and firm conviction that a mistake has been made." *Outzen v. Kapsch Trafficcom USA, Inc.*, 2022 WL 2703847, at *2 (S.D. Ind. July 11, 2022).

In order to be clearly erroneous, "'a decision must strike [the court] as more than just maybe or probably wrong,' and the court will not modify a magistrate judge's non-dispositive, pretrial decision 'simply because [it has] doubts about its wisdom or think[s] [it] would have reached a different result.'"  *Id.* (citing *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).

## IV.     Argument

### a. The Magistrate Judge Correctly Found That Mr. Windhorst Waived His Arguments Related to Mr. Sabag's Supplementary Request, Including His Section 1782 Arguments.

Contrary to Mr. Windhorst's Objections, the Magistrate Judge did not commit clear error when he correctly found that "in failing to timely respond to the Court's orders, Windhorst waived any arguments he had related to the underlying motion seeking to take his deposition and whether Sabag met the jurisdictional requirements of § 1782 at that time." (Doc. 141, p. 8).

First and foremost, the Magistrate Judge holds the specific power to deem a waiver of an argument as an appropriate sanction under Rule 37(b)(2)(A), and Mr. Windhorst's ability to challenge such an imposition of a sanction would be subject to an especially high burden.[8]  As discussed further below, the Magistrate Judge exercised its "authority" (not his "jurisdiction") under Section 1782 to rule that Mr. Sabag had satisfied all of the Section 1782 requirements to depose Mr. Windhorst.  Mr. Windhorst waived his right, through his contemptuous conduct, to justify a second bite of the apple under Rule 60 to vacate the order.

Just prior to the Magistrate Judge's finding that Mr. Windhorst waived his arguments by "failing to timely respond to the Court's orders," the Magistrate Judge expressly found that, Mr. Windhorst "simply ignored the Court.  He had no good cause for his shortcomings and lack of communication with the Court before March 9." (Doc. 141, p. 8).  The Magistrate Judge also found that "Windhorst never responded to Sabag's" Supplementary Request; that "Windhorst failed to cooperate in scheduling or appearing for the deposition"; and that Mr. Windhorst did not

---

[8] See *Marrocco v. General Motors Corp.*, 966 F.2d 220, 223-24 (7th Cir. 1992) ("We cannot understate the difficulty of the task litigants face when challenging a district court's choice of sanctions. They must convince us that the district court abused its discretion in sanctioning them--a burden which is met only when it is clear that no reasonable person would agree the trial court's assessment of what sanctions are appropriate. . . . Most are unable to meet so demanding a standard.").

respond "once again" to Mr. Sabag's Motion for Order to Show Cause.  (Doc. 141, p. 3).  The

Sanctions Order sufficiently explained how Mr. Windhorst waived any arguments in response to

the Supplementary Request.

Second, Mr. Windhorst speculates, without citing any authority, that this Court's authority

under Section 1782 is solely "jurisdictional" such that this Court could never find that Mr.

Windhorst waived his right to challenge the Section 1782 Statutory Factors.  Mr. Windhorst's

statement is, at best, highly controversial, but most likely, just wrong.  As the Fifth Circuit

explained in *Republic of Ecuador v. Connor*, 708 F.3d 651, 655 (5th Cir. 2013):

> Describing a federal court's authority under § 1782 as "jurisdictional" fits
> awkwardly with conventional Article III terminology. Normally, federal
> court jurisdiction reflects the courts' power to decide cases or controversies
> between contending parties. Significantly, a § 1782 application may or may
> not be adversarial. The federal court addresses an interlocutory discovery
> application that is ancillary to a non-domestic proceeding. Its § 1782 order
> "adjudicates" nothing else. Perhaps in recognition that Congress delegated
> a quasi-administrative role to the courts in § 1782, the Supreme Court
> discussed the scope of a court's "authority"—not its "jurisdiction"—under
> the statute. *Intel Corp. v. Advanced Micro Devices*, Inc., 542 U.S. 241, 246,
> 124 S.Ct. 2466 2472, 159 L.Ed.2d 355 (2004).

Third, in Mr. Sabag's Supplementary Request, he clearly addressed the four Section 1782

Statutory Factors (Doc. 98, p. 5-8) to cause Mr. Windhorst's deposition.  Mr. Windhorst had every

opportunity to raise his (meritless) opposition to Mr. Sabag's filing.  Mr. Windhorst chose not to

respond to Mr. Sabag's Supplementary Request.  This Court then issued an order containing a

substantive analysis that showed how Mr. Sabag satisfied the four Section 1782 Statutory Factors.

(Doc. 105, p. 3-5).  This is not a situation where a dispute over the Section 1782 Statutory Factors

has just been uncovered.  Rather, the Section 1782 Statutory Factors were thoroughly reviewed by

this Court in Mr. Sabag's original Section 1782 Application, and again in Mr. Sabag's

Supplementary Request.  In the first instance, Mr. Windhorst responded in opposition to Mr.

Sabag's original Section 1782 Application, but the Court found Mr. Sabag met the prima facie elements under Section 1782.  (Doc. 89, p. 3-5).  In the second instance, Mr. Windhorst had an opportunity to respond, but simply chose not to do so.  Nothing has changed since that time, except for Mr. Windhorst's interest in escaping responsibility for his contempt.

Fourth, even if, *arguendo*, the Sanctions Order issued by the Magistrate Judge incorrectly concluded that Mr. Windhorst waived the ability to dispute the Section 1782 Statutory Factors, Mr. Sabag (as explained more fully in Section IV(b) below) met the prima facie Section 1782 Statutory Factors.  This Court has the authority and facts to modify the Sanctions Order from the Magistrate Judge to make a clear reaffirmation that Mr. Sabag has met the prima facie requirements of Section 1782.  *See* Rule 72(a).

Finally, Mr. Windhorst's attempt to compare himself to a defendant in a civil action that had made arguments (in opposition to Mr. Sabag's Supplementary Request) clear from other portions of the record, despite not formally responding, is without merit.  Such a position does, however, further confirm that Mr. Windhorst waived his claims to arbitration (based on his litigation conduct) by selecting litigation (by inference) to respond to Mr. Sabag's Supplementary Request rather than invoking arbitration.

This Court already found that Mr. Sabag met the prima facie factors under Section 1782.  (Doc. 98).  Mr. Windhorst did not dispute that finding, file a motion to reconsider, appeal, or take any other steps to indicate that he objected to the Court's findings.  He still fails to offer anything new to change those findings.

### b. The Magistrate Judge Did Not Err In Granting Mr. Sabag's Supplementary Request

#### i. The Fact That Mr. Sabag's Original Application Sought Discovery From Marion County Community Corrections ("MCCC") Does Not Remove This Court's Subject Matter Jurisdiction.

Mr. Windhorst argues that this Court lacked "subject matter jurisdiction" over this entire matter, because the party from which discovery was sought in the Original Application, MCCC, is a government entity. (Doc. 143, p. 20). That argument is meritless and unsupported by the authorities. Mr. Windhorst does not even himself believe his own argument as he states only that "§ 1782 shall be **presumed** not to include governmental agencies." (Doc. 143, p. 20) (emphasis altered from original). The cases cited by Mr. Windhorst do not support his presumption. *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853 (2019) describes how the term "person" should be defined under a separate statutory scheme. In *In re Al Fayed*, 91 F. supp. 2d 137, 141 (D.D.C. Apr. 10, 2000), the Court found, "there is 'no hard and fast rule of exclusion,' ... and much depends on the context, the subject matter, legislative history, and executive interpretation,'" before finding that, in that specific situation, that the CIA should be excluded from the term "person." (internal citations removed). Importantly, at the time Mr. Sabag filed his Original Application, none of the parties, including MCCC and Mr. Windhorst with his counsel from Sidley Austin, LLP, disputed that MCCC is a person for the purposes of Section 1782. Mr. Windhorst, who is an intervening party in this Section 1782 Proceeding, is clearly a person in this matter.

#### ii. The Supplementary Request Is Meant to Obtain Discovery "For Use" in a Foreign Tribunal

Judge Hanlon has already dispositively found that a criminal case against Mr. Windhorst was reasonably contemplated by Mr. Sabag:

> Mr. Sabag's application and supporting exhibits are robust: Mr. Bibby's affidavit provides a detailed analysis of the contractual

agreements between Mr. Sabag, Track Group, and Mr. Windhorst. Dkt. 6-1 at 4–14. It then explains Mr. Sabag's allegations and identifies five specific criminal offenses that he believes Mr. Windhorst committed. *Id.* at 14–23. That affidavit's detailed legal analysis and Mr. Sabag's sworn statement that he intends to pursue criminal charges are "objective indicium that the action is being contemplated" and that criminal proceedings in the United Kingdom are not "merely speculative" or "just a twinkle in counsel's eye." *Certain Funds*, 798 F.3d at 123–24.2 And while Mr. Sabag had not yet brought a criminal complaint in the UK when he filed the application, he was allowed to wait until he had gathered evidence through § 1782 to bring the contemplated foreign proceedings. *See Consorcio*, 747 F.3d at 1271.

([Doc. 80](#), p. 8).

Mr. Windhorst has not pointed to any substantive reason why that analysis has changed or why Mr. Sabag's diligence in obtaining discovery should be punished by this Court, especially where any applicable U.K. statute of limitations has yet to run.  More importantly, Mr. Sabag explained to the Magistrate Judge, through an affidavit that accompanied his Supplementary Request, that Mr. Sabag had now been in communications with the U.K. Serious Fraud Office regarding Mr. Windhorst's conduct since October 2021.  ([Doc. 98-2](#), ¶¶ 4-6).

### iii.   Windhorst Is "Found" In This District[9].

Mr. Windhorst argues that he is not found in this District and relies on arguments set forth in his proposed opposition.[10]  ([Doc. 143](#), p. 23).  Mr. Windhorst's arguments in his proposed opposition fail to adequately rebut the arguments raised in Mr. Sabag's Supplemental Request. As

---

[9] Mr. Windhorst includes an ancillary argument concerning privileged information in the same section in which he discusses whether he is found in this district.  ([Doc. 143](#), p. 23-24).  While Section 1782 provides that Mr. Windhorst cannot be compelled to provide testimony that violates any legally applicable privilege (*i.e.*, assuming that he has not already waived that privilege), he remains free to assert any legally appliable privilege during his deposition.  This Court has already ordered, in accordance with a protective order previously sought by Mr. Windhorst, that Mr. Sabag may use Mr. Windhorst's deposition testimony only with respect to the U.K. criminal foreign proceedings.

[10] By incorporating an additional eleven pages of briefing, Mr. Windhorst has violated this Court's Local Rule 7-1(e), by filing an oversize brief without leave of this Court.  In the interest in resolving this matter efficiently, Mr. Sabag does not intend to file a motion to strike Mr. Windhorst's surplus pages.

set out in Mr. Sabag's Supplemental Request, when Windhorst moved to intervene in this Section 1782 proceeding as a party, he waived his right to object to personal jurisdiction or whether he is found in the Southern District of Indiana.  *See, e.g., County Sec. Agency v. Ohio Dept. of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002) ("[a] motion to intervene is fundamentally incompatible with an objection to personal jurisdiction."); *John v. Sotheby's, Inc.*, 141 F.R.D. 29, 37 (S.D.N.Y. Feb. 10, 1992) ("Finally, by moving to intervene in this action, Dr. Nava has consented to personal jurisdiction."); *see also* Wright, Miller & Kane, 7C Fed. Prac. & Proc. Civ. § 1920 (3d ed.) ("[T]he intervenor has submitted to the personal jurisdiction of the court by seeking to intervene in the action and cannot move to dismiss on that ground.").

In *In re Edelman*, 295 F.3d 171, 178 (2d Cir. 2002), the Second Circuit recognized that Congress requires district courts to read Section 1782 consistent with the Federal Rules of Civil Procedure, and Rule 45 ties the reach of a district court's jurisdiction over an individual to concepts of "personal jurisdiction."  The Second Circuit specifically held:

> We think another part of § 1782(a) supports a flexible reading of the phrase "resides or is found."  Section 1782(a) expressly provides that "[t]o the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure." . . . One of these procedural rules, Rule 45, states: "a subpoena may be served at any place within the district of the court by which it is issued." Fed. R. Civ. P. 45(b)(2).  The same rule further states that *unless a person is a party to the litigation* or an officer of a party, he cannot be compelled to travel more than 100 miles from where he resides or works to be deposed. Fed. R. Civ. P. 45(c)(3)(A)(ii).

*Id.* at 178.

Mr. Windhorst intervened as a "party" in this matter under Rule 24(b), and he himself has been provided with the right to participate in the discovery from MCCC under Rule 45.  He

nowhere argues now that his earlier motions to intervene and participate in the discovery were improper.[11]

### iv.   The Intel Factors Weigh In Favor Of The Supplementary Request

Mr. Windhorst's Objection asserts that the Magistrate Judge's discretionary findings under the four *Intel* factors were in error and then summarily addresses those factors in a little over a paragraph, while relying instead on his proposed opposition.  (Doc. 143, p. 25).  The Magistrate Judge made the correct findings related to this Court's discretion to order Section 1782 discovery, and Mr. Windhorst has not met his high burden to overturn those findings.  Mr. Sabag relies on his arguments made in his Supplemental Response and incorporates pages 9-12 of that document hereto by reference.  (Doc. 98, p. 9-12).

Additionally, Mr. Windhorst relies on his physical presence in the U.K. in an attempt to establish that he is within the U.K. authorities' ability to physically compel for a deposition.  (Doc. 143, p. 18).  Mr. Windhorst's argument carries no weight as Mr. Sabag is not required under Section 1782 jurisprudence to satisfy an "exhaustion" requirement (i.e., asking the U.K. criminal authorities to seek Mr. Windhorst's deposition) as a condition to his right to obtain that same deposition.[12]

---

[11] Additionally, an Indiana state court also found "personal jurisdiction" over Windhorst in a civil case brought by Mr. Sabag in Indiana that arose out of similar facts as this Section 1782 proceeding.  (Doc. 48-1, p. 7-9). The state court ruled that Windhorst was engaged in a joint venture in Indiana with Intervenor Track Group, so Windhorst could be found where the joint venture was found in Indiana.  (Doc. 48-1, p. 9).  Windhorst cannot argue that he cannot be found in Indiana when an Indiana state court has ruled that he was a partner of an Indiana joint venture with co-Intervenor Track Group.

[12] *See e.g., The Fed. Republic of Nigeria v. VR Advisory Servs.*, 27 F4th 136, 155 (2nd Cir. 2022) ("Thus, in *Malev Hungarian Airlines*, we held that a district court abused its discretion by denying an application on the basis that the applicant had not exhausted its opportunities for discovery before the foreign tribunal – a requirement that, while perhaps supported by sound policy considerations, has no basis in the text or purpose of § 1782."); *In re O'Keeffe*, 646 F. App'x 263 [at 9-10] (3d. Cir.) ("We have never held that an applicant must seek discovery relief in the foreign forum first. For example, in *In re Bayer AG*, we rejected the argument that an application should be denied when the applicant could have gone to the foreign court to seek production of the materials before coming to the United States and invoking section 1782").

Moreover, Mr. Windhorst's claims of strong ties to the United Kingdom belie his representations made over the past years.  In Mr. Windhorst's most recent Declaration, he asserts, "I am a citizen of Germany and I currently work in the United Kingdom."  (Doc. 118, ¶ 2).  Mr. Windhorst's assertion comes with a footnote that, "Given the nature of my work, I also work in other jurisdictions."  (Doc. 118, fn. 1).  In a previous declaration, Mr. Windhorst averred that, "I currently reside in Switzerland."  (Doc. 27, ¶ 2).  In his Notice of Removal in the matter before this Court under cause number 1:18-cv-2208, Mr. Windhorst claimed that he was then "living and intends to remain in Monaco." (ECF 1).  It is also known that Mr. Sabag owns multiple yachts[13] and recently purchased an expansive $47.5 million mansion in Beverly Hills, California.[14]  Mr. Windhorst's physical presence in any location is or could be temporary and does not ensure that he would be within the reach of a jurisdiction's authority.

Separately, Mr. Windhorst's hypothetical theory about the possibility of the U.K. criminal authorities having a right to depose him is nothing more than a red herring, as the rights of crime victims are different between the two countries.  (Doc. 143, p. 26).  As this Court acknowledged, Mr. Sabag, as the victim of Mr. Windhorst's crimes in the U.K., is empowered to privately prosecute his own criminal case against Mr. Windhorst in the U.K., in the event that U.K. authorities do not charge Mr. Windhorst.  (Doc, 6-1, p. 32, ¶ 85).

---

[13]  https://www.boatinternational.com/luxury-yacht-life/owners-experiences/on-board-global-with-nobisrkug-owner-lars-windhorst (last visited May 22, 2023).

[14]  https://therealdeal.com/la/2023/04/21/financier-pays-48m-for-beverly-crest-spec-home-or-1m-over-ask/ (last visited May 22, 2023).

**c.   The Court Correctly Rejected Mr. Windhorst's Arguments For Vacatur Under Rules 55, 60(B), And/Or The Court's Inherent Authority**

**i.   The Sanctions Order Did Not Err In Applying Rule 60(b)(5)**

Mr. Windhorst's arguments under Rule 60(b)(5) presume, incorrectly, that Mr. Windhorst's eventual payment to Mr. Sabag retroactively required Mr. Sabag to dismiss this Section 1782 Proceeding.  Mr. Windhorst also states, without any evidence, that the payments made to Mr. Sabag have made him "whole."   However, the record is clear that Mr. Windhorst's payment was an attempt to keep Sapinda from liquidation and made to satisfy the ICDR Award, not the Settlement Agreements.  The record is also clear that Rule 60(b)(5) was not available to Mr. Windhorst at the time of the Supplementary Request, because Mr. Windhorst was in breach of the purported Settlement Agreements.  Stated simply, Mr. Windhorst unilaterally decided to ignore this Court's Deposition Order because he thought that it was ok to "march to the beat of his own drum."  *See Cent. Illinois Carpenters Health & Welfare Tr. Fund v. Con-Tech Carpentry, LLC*, 806 F.3d 935, 937 (7th Cir. 2015).

Further, Mr. Windhorst appears to claim that he should receive relief under Rule 60(b)(5), because he believed when he violated this Court's orders that he would later pay the ICDR Award amount and that everything would resolve itself.  However, a party cannot simply decide whether or not to comply with a court order due to a unilateral belief that the party's future remedial action will resolve the violation.  That kind of self-help is not the purpose of Rule 60(b)(5).[15]

---

[15] *See United States v. Brace*, 2021 WL 4391289, at *16 (W.D. Pa. Sept. 24, 2021), aff'd, 2023 WL 118466 (3d Cir. Jan. 6, 2023) (finding that, "Consequently, Rule 60(b)(5) may not be invoked as a retroactive defense for a party's self-help measures, when those measures violate the terms of a valid court order or decree") (Citing *O'Sullivan v. City of Chicago*, 396 F.3d 843, 868 (7th Cir. 2005) for the proposition that, "A party may not simply ignore [a consent] decree because it believes that factual or legal changes since the decree's entry renders continued enforcement illegal or inequitable. Rather, Rule 60(b) provides an avenue to seek relief from some or all of the requirements of the original decree.").

Mr. Windhorst's arguments also conflate what can and cannot be resolved through his reliance on Rule 60(b)(5).  Mr. Windhorst did not show up for his deposition after this Court found that Mr. Sabag had a right to Mr. Windhorst's deposition and ordered the same.  (Doc. 105).  That order was not discharged or satisfied.  It was violated.  Rule 60(b)(5) does not absolve Mr. Windhorst's contempt.  At the time that Mr. Sabag filed his Supplemental Request, Mr. Windhorst was in breach of the Settlement Agreements.  He failed to engage in any process before this Court, and failed to comply with this Court's Deposition Order.  Mr. Windhorst's deposition should have taken place before Mr. Windhorst satisfied the ICDR Award.  As the Seventh Circuit held in *Cent. Illinois Carpenters Health & Welfare Trust Fund*, 806 F.3d at 937 (7th Cir. 2015), after a party tried to invoke Rule 60(b) after ignoring motions and scheduling hearings due to the unilateral belief that he would later settle the matter, "no district judge has to put up with that, or excuse it in retrospect. . . . A defendant can both file an answer and try to negotiate a settlement; doing the latter does not eliminate the need to do the former."

There is no ambiguity or reasonable question that Mr. Windhorst engaged in civil contempt at the time he chose to ignore his deposition.  In order to establish civil contempt, the Court must find:

> by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply.

*U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).  Mr. Windhorst had an obligation to follow this Court's Deposition Order, and he cannot now escape sanctions for his conduct.

### ii.  The Court Correctly Rejected Mr. Windhorst's Other Arguments for Vacatur.

#### 1.  Mr. Windhorst Was Not Entitled To Relief Under Rule 60(b)(6).

Mr. Windhorst's reliance on Rule 60(b)(6) is also misplaced.  "Relief under Rule 60(b)(6) 'is available only in 'extraordinary circumstances.' A judge may consider many factors when making this determination, including 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Braun v. Vill. of Palatine*, 56 F.4th 542, 554 (7th Cir. 2022), reh'g denied, 2023 WL 2188741 (7th Cir. Feb. 23, 2023) (citing *Buck v. Davis*, 580 U.S. 100, 137 S. Ct. 759, 777, 197 L.Ed.2d 1 (2017)).  Mr. Windhorst claims that he was entitled to relief under this section because: (1) he believes, without evidence, that he has made Mr. Sabag "whole" (Doc. 115, p. 16; Doc. 116, p. 15); and (2) that Mr. Sabag seeks to compel Mr. Windhorst to violate his privileges against self-incrimination through his requested deposition. (Doc. 143, p. 30).  Neither of those baseless allegations rise to the level needed to obtain extraordinary relief under Rule 60(b)(6).

First, Mr. Windhorst's claim that he made Mr. Sabag whole by satisfying Mr. Sabag's ICDR Award in a BVI liquidation proceeding is not supported by any factual finding.  Mr. Sabag can never recover the extra months of anxiety chasing Mr. Windhorst around the world to seek payment that originated from Mr. Windhorst's actions when Mr. Sabag sold his company to Track Group in 2014.  Many of Mr. Sabag's actual legal costs from the BVI liquidation proceeding were not recovered.  The Settlement Agreements were supposed to end all litigation, but Mr. Windhorst decided to breach those agreements.  Yes, on February 8, 2023, Mr. Windhorst finally paid Mr. Sabag nearly six months after he had agreed to do so.  The amount paid represented, in settlement, only a fraction of a total amount that Mr. Windhorst should have paid to Mr. Sabag in 2017 (after

Mr. Windhorst engaged in allegedly criminal acts), and, even then, the payment was made only to avoid the liquidation of Sapinda.  That payment did not make Mr. Sabag whole.[16]

Second, Mr. Windhorst has not, and cannot, demonstrate that the requested deposition would violate his rights in any way.  Mr. Sabag has met the applicable standards required to take the deposition, and Mr. Windhorst must sit for the previously ordered deposition.  To the extent that it is appropriate, Mr. Windhorst is free to invoke his privilege against self-incrimination during his deposition under oath.

### 2. Mr. Windhorst Did Not Take Quick Action To Remedy His Delay.

Mr. Windhorst's Objection recasts his choice to ignore this Court's Deposition Order as an altruistic attempt to make Mr. Sabag whole.  (Doc. 143, p. 31).  Mr. Windhorst admits in his own Declaration that he purposefully chose not to take action in this matter.  Mr. Windhorst was aware of Mr. Sabag's Supplementary Request but, instead of responding, reaching out to undersigned counsel, reaching out to the Court, or even attempting to obtain new counsel, Mr. Windhorst chose not to participate.  (Doc. 118, ¶ 12).  "[D]istrict judges are entitled to protect the judicial system from litigants . . . who choose to play by their own rules."  *See Cent. Illinois Carpenters Health & Welfare Tr. Fund*, 806 F.3d at 937.  As stated above, Mr. Windhorst "made a deliberate decision to disregard the pending suit. No district judge has to put up with that, or excuse it in retrospect."  *Id*.

---

[16] Mr. Windhorst overlooks the fact that he only made his payment after (1) he breached the Original Settlement Agreement by failing to pay the required $2.8 million; (2) he breached the Amended Settlement Agreement by failing to pay the required $2.85 million; (3) Mr. Sabag had to seek the ICDR Award; (4) Mr. Windhorst failed to argue to the ICDR arbitrator for any retained rights to require Mr. Sabag to dismiss this Section 1782 Proceeding (which would have allowed Mr. Sabag to present arguments at that time), (5) the arbitrator issued an initial Award and accepted additional argument from the parties on interest, cost, and fees (where Mr. Windhorst once again failed to mention this Section 1782 Proceeding); (6) the arbitrator issued a Final Award dismissing all claims and counterclaims under the Settlement Agreements; (7) Mr. Sabag had to seek the liquidation of Mr. Windhorst's BVI entity (and Mr. Windhorst did not invoke any arbitration rights in the BVI proceeding).

While Mr. Windhorst claims he was prioritizing making payment to Mr. Sabag, Mr. Windhorst has never described why he could not have informed this Court or Mr. Sabag about his priorities.  Litigants before this Court always have to balance the need to participate in litigation with their other financial obligations.  Had Mr. Windhorst truly taken quick action, he should have taken any number of the opportunities provided to him to speak with undersigned counsel or respond to the Court before Mr. Sabag incurred the costs of preparing for Mr. Windhorst's deposition and continuing to litigate this matter.

### 3.  Mr. Windhorst Does Not Have A Meritorious Defense.

Like Mr. Windhorst, Mr. Sabag relies on his prior briefing in this Response to demonstrate that Mr. Windhorst does not have a meritorious defense to Mr. Sabag's Supplementary Request, to Mr. Sabag's Order to Show Cause, or this Court's Sanctions Order.

### 4.  Mr. Windhorst Is Not Entitled To Relief Under Rule 55(C) And/Or This Court's Inherent Authority To Reconsider Its Own Orders.

Mr. Windhorst fails to state why the Sanctions Order was required to expressly address each and every meritless argument he proffered in his Motions to Vacate.  The Court is not required to do so and the Magistrate Judge's decision not to expressly address those arguments was not a clear error.  Moreover, Mr. Windhorst was clearly not entitled to the more lenient Rule 55(c) standard, because there was no default judgment entered in this matter.

### d.  The Court Did Not Err In Sanctioning Mr. Windhorst

First, as set forth above, the Court did not err in issuing the Deposition Order and therefore, Mr. Windhorst's failure to comply with that order properly led to contempt sanctions.

Second, the Magistrate Judge had full authority as a magistrate judge to issue the Sanctions Order. In *Annie Oakley Enters. v. Amazon.com, Inc.*, 2021 WL 2373779, *8 (S.D. Ind. June 10, 2021), this Court held that:

> The Court acknowledges that there is a split of authority among district courts in this Circuit concerning whether awarding fees and costs under Rule 37 is a dispositive or a non-dispositive matter, and the Seventh Circuit Court of Appeals has never squarely addressed the issue. *See Cage v. Harper*, 2020 WL 1248685, at *5 (N.D. Ill. Mar. 16, 2020) (collecting cases). However, "[e]very United States Court of Appeals that has examined the issue directly has held that a Rule 37 award of attorneys' fees and costs is a nondispositive order," *id.* at *1, and this Court is among those that have applied the clearly erroneous or contrary to law standard of review when reviewing a magistrate judge's order relating to fees under Rule 37, *see Alerding Castor Hewitt LLP v. Fletcher*, 2019 WL 1746284, at *1-2 (S.D. Ind. Apr. 18, 2019).

Additionally, in *Davis v. Ind. Packers Corp.*, 2022 WL 15739240, *1 (N.D. Ind. Oct. 28, 2022), the United States District Court for the Northern District of Indiana recently reversed its once-held position on Rule 37 awards when holding that, "[t]he balance of authority in this circuit holds that because monetary sanctions imposed by a magistrate judge are 'not case dispositive;' Rule 72(a) supplies the appropriate standard of review."

Third, even if, *arguendo*, Mr. Windhorst's argument is correct that the Magistrate Judge did not have authority to issue an outright order on sanctions and instead should have issued a report and recommendation, it is an error without impact. This Court is reviewing the Sanctions Order and has the authority to modify the Sanctions Order. *See* Rule 72(a). The facts here are clear: Mr. Windhorst was subject to the Deposition Order. He failed to comply. The Magistrate Judge reached the factual conclusion from the briefing and a hearing that, "there is reason to believe Windhorst has engaged in gamesmanship with the way he has handled and caused delayed in these proceedings." (Doc. 141, p. 10). Mr. Windhorst should be, and was, properly sanctioned for his contempt.

## V.      Conclusion

This Court should overrule Mr. Windhorst's Objections to Magistrate Judge's Order on Show Cause Hearing and Pending Motions (Doc. 141), Order on Supplementary Request for Discovery in Accordance with 28 U.S.C. § 1782 (Doc. 105), and Order to Show Cause Why Sanctions are Not Appropriate (Doc. 108), and grant Mr. Sabag all other proper relief.

Dated:  May 22, 2023                                      Respectfully submitted,

_Offer Korin_
Offer Korin, No.: 14014-49
Brooke Smith, No. 32427-03
STOLL KEENON OGDEN PLLC
334 N. Senate Avenue
Indianapolis, IN  46204
Office:  317-464-1100; Fax:  317-464-1111
offer.korin@skofirm.com
brooke.smith@skofirm.com

Courtney Caprio [Admitted pro hac vice]
AXS LAW GROUP, PLLC
2121 NW Second Avenue, Suite 201
Miami, FL  33127
Office:  305-297-1873; Fax:  305-397-2336
courtney@axslawgroup.com

Counsel for Movant Eli Sabag

## CERTIFICATE OF SERVICE

I hereby certify that on **May 22, 2023**, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's ECF. Parties may access this filing through the Court's system.

| | |
|---|---|
| Sean Tyler Dewey<br>Michael A. Wukmer<br>ICE MILLER LLP<br>*Counsel for Track Group* | sean.dewey@icemiller.com<br>michael.wukmer@icemiller.com |
| Ann O'Connor McCready<br>TAFT STETTINIUS & HOLLISTER LLP<br>*Counsel for Lars Windhorst* | amccready@taftlaw.com |
| Gavin S. Frisch [PHV]<br>Lucas V.M. Bento [PHV]<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>*Counsel for Lars Windhorst* | gavinfrsich@quinnemanuel.com<br>lucasbento@quinnemanuel.com |

*Offer Korin*
Offer Korin